UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DARLINGTON AMADASU

       Plaintiff

-v-

JAMES R. DONOVAN, MD
JAMES E. LOCKEY, MD
ANDREW G. FREEMAN, MD
DEBRA ANN MIDDAUGH, MD
MURIEL POHL, RN
DORA JEFFERSON-GAYNOR
RALPH CHARLES BUNCHER
JUDY L. JARRELL
TRACY HERRMANN
ANDREW T. FILAK, MD

      And
UNIVERSITY OF CINCINNATI
P. O. BOX 210063,
CINCINNATI, OH 45221-0063
           Defendants
      And

CLAUDIA S. MILLER, MD
      And
ROGER B. PERALES
      And
UNIVERSITY OF TEXAS
HEALTH SCIENCE CENTER AT SAN ANTONIO
7703 FLOYD CURL DRIVE
SAN ANTONIO, TEXAS 78284-7794

       Defendants

Case No: C-1-01-210

Judge Spiegel
Magistrate Judge Sherman

<u>COMPLAINT</u>
<u>WITH JOINDER OF CLAIMS & PERSONS</u>

<u>WITH JURY DEMAND ENDORSED HEREIN</u>

Comes now Plaintiff, Darlington Amadasu, Pro Se, and for his joinder of claims and persons in the complaint against the defendants individually and jointly, as well as personally and or officially, states as follows:

<u>PARTIES</u>

1. Plaintiff, Darlington Amadasu, ("Amadasu") is black, belongs to the protected class, of African ancestry, a

1

citizen of the United States, of Nigeria origin. Plaintiff Amadasu is resident of Cincinnati, Hamilton County, and State of Ohio.

2.  Defendant, James R. Donovan, MD, ("Donovan") is white male, an employee of, Assistant Professor and Director of Occupational and Environmental Medicine Residency Training Program at the Department of Environmental Health, ("DEH"), University of Cincinnati, ("UC"), Cincinnati, Ohio.

3.  Defendant James E. Lockey, MD, ("Lockey") is white male, an employee of, Professor and Head of the Division of Occupational and Environmental Medicine, ("DEM"), DEH, UC.

4.  Defendant Andrew G. Freemen, MD, ("Freeman") is white male, an employee of, Assist. Professor and Assist. Director of Occupational and Environmental Medicine Residency Training Program, and Director of The Center for Occupational Health, ("COH"), UC

5.  Defendant Debra Ann Middaugh, MD, ("Middaugh"), is white female, an employee of, Adjunct Assoc. Professor of Occupational & Environmental Medicine, UC

6.  Defendant Muriel Pohl, RN, ("Pohl"), is white female, an employee Registered Nurse, Center for Occupational Health, UC

7.  Defendant Dora Jefferson-Gaynor, ("Gaynor"), a black female, at the relevant period, an employee Secretary/Clerk at the Graduate Studies Office, DEH, UC

8.  Defendant Ralph Charles Buncher, Sc.D., ("Buncher"), is white male, Professor and Director of Graduate & Continuing Education, DEH, UC.

9.  Defendant Judy L. Jarrell, Ed.D., ("Jarrell"), is white female, an employee Assist. Professor and at the Relevant period, Director of Graduate & Continuing Education, DEH, UC.

10.  Defendant Tracy Herrmann, ("Herrmann"), is white female, employee and Chairperson of Allied Health Department, Raymond Walters College, UC.

11.  Defendant Andrew T. Filak, MD, is white male, employee, Professor and Dean of Graduate Medical Education, University Hospital, UC.

12.  Defendant University of Cincinnati, ("UC") Cincinnati, Ohio is a publicly owned, financed and predominantly white institution organized under the law of Ohio to carry out education, training and research, as well as other services.

13.  Defendant Claudia S. Miller, MD, ("Miller") is white female, employee of, Director of South Texas Environmental Education and Research (STEER) program-Laredo under the department of Family Practice, University of Texas Health Science Center ("UTHSC") at San Antonio, San Antonio, Texas. She was based at San Antonio.

14.  Defendant Roger B. Perales, ("Perales"), is a white-hispanic male, an employee of UTHSC at the STEER center at Laredo, Texas. At relevant period, he was a part-time student at UTHSCSA.

15.  Defendant University of Texas Health Science Center at San Antonio, ("UTHSC"), San Antonio, Texas is publicly owned, financed (federal and state), predominantly white institution, organized to provide education, training and research, and other services, such as STEER, and Area Health Education Center (AHEC).

2

## JURISDICTION AND VENUE:

16.    This action arises under the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., providing relief from discrimination in federally assisted programs on the basis of race, color and national origin; Title VII, 42 U.S.C. 2000e et seq; that forbids employment discrimination; 42 U.S.C. sections 1981, 1983, 1985,and 1986, which respectively protects individuals against intentional discrimination, conspiracy to interfere with civil rights, deprivations of civil rights by persons acting under the color of state law, and neglect to prevent discrimination. This action also arises under 42 U.S.C. 3601 et seq.-Federal Fair Housing; Violation of rights protected under U.S. Constitution: First Amendment-Free Speech; Fourth Amendment-Non Violation of people to be secured in their persons, houses, papers, and effects; Fifth Amendment- deprivation of liberty without due process; Sixth Amendment- right to be informed of the nature and cause of accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor; and the Fourteenth Amendment-deprivation of liberty, privileges, and immunities without due process; The court has jurisdiction over supplemental state claims pursuant to 28 U.S.C. 1367 because these claims arose from the same facts and circumstances as follows: Ohio and Texas anti discrimination acts,  Ohio and Texas Bill of Rights; and common law of defamation, personal injury, negligence and misrepresentations. This court also has jurisdiction over diversity actions. This court has in personam jurisdiction over Ohio defendants and over all Texas defendants pursuant to Ohio State Long-Arm Statutes, ORC 2307.381 - 2307.385.

17.    The venue is properly laid in Southern District of Ohio, Western Division because defendants Donovan, et al  and UC are natural persons and institution respectively in this district and the claims substantially arise in this district.

## FACTUAL ALLEGATIONS

18.    Plaintiff Amadasu at all material times relevant to this action was undergoing education and training in the medical specialty of Occupational and Environmental Medicine in the Occupational and Environmental Medicine Residency Training program ("The Residency Transaction") at the Defendant University of Cincinnati, ("UC"), Cincinnati, Ohio from July 1999 through June 2000.

19.    In or about September 1999, Defendant Donovan, Director of the Residency, and Plaintiff Amadasu's residency training advisor introduced and recommended to Amadasu a four (4) week-rotation through Environmental Medicine/Border Health program being conducted at the STEER-Center, Laredo, Texas by the Defendant UTHSC under the directorship and supervision of Defendant Miller who continually sent catalog, brochures, flyers to UC.

20.    Upon Amadasu's inquiry, UTHSC at San Antonio sent application materials and information brochure to Amadasu. Upon review of the said application materials, Amadasu made more phone calls for more information from a few officials, and particularly to Defendant Miller.

21.    During one of such inquiries, Defendant Miller represented to Amadasu among others that: the program provide free, safe, healthful and fully furnished housing with kitchen fully equipped with new and modern appliances to participants; free transportation from and to Amadasu's residence in Laredo, to and from any and all activities relating,

3

pertinent to and connected with the rotation, customization and or individualization of the contents of the rotation to fit Amadasu's background and interests, and provision of materials for travel within the Laredo areas.

22.    In or about December 2000,upon approval of the rotation by Defendant Donovan, Donovan and Amadasu completed, signed and sent all the necessary application materials to Defendant Miller.

23.    In or about January 2000, Defendant UTHSC by Defendant Miller sent acceptance letter to Amadasu, but omitting the promised travel materials.

24.    About the end of March 2000, Amadasu drove for days from Cincinnati, Ohio to Laredo, Texas to participate in the four-week rotation beginning from April 3 and ending on April 28, 2000.

25.    Upon arrival, Amadasu had much difficulty locating the STEER Center at Laredo, went to Laredo Community College campus where he was helped to contact the STEER officials, particularly Mr. Perales who refused and failed to come and get him to their office. However, Amadasu managed to get to the STEER Center where Perales coldly received him.

26.    Perales and Amadasu drove to the UTHSC-AHEC office for housing allocation and from there Perales and Amadasu drove to Laredo Community College Campus where Amadasu was assigned an archaic substandard home with leaking roof, leaking walls, leaking windows and doors, rusted piping, rusted pipes. rusted faucets, rusted cooking utensils, rusted cutleries, rusted spoon and forks, running dirty water with rusted grit, etc.

27.    On occasions when it rained, the rainwater was leaking from the roof, the walls, the doors and windows, flooding the floor, the beddings; the wind was blowing through the doors and windows, and setting the building into vibration. All these unhealthful and unsafe conditions constituted nuisances that affected health and safety, directly and proximately caused physical and emotional injuries, disrupted Amadasu's comfort, peace and quiet enjoyment of the premises.

28.    As a result of the nuisances, unsafe and the unhealthful conditions in the premises, Amadasu suffered severed abdominal cramps, nausea, vomiting, diarrhea, fever which prompted Amadasu to seek medical attention.

29.    Similarly situated white participants in the program were given safer, healthful modern homes, with modern new utensils, new appliances, modern new cutleries, with no leaking roof, doors, walls and windows.

30.    Upon information Amadasu was the first and the only black, only of Nigeria origin, only of African ancestry to have participated in the program history, and was treated differently than similarly situated whites who were treated better, some of whom were mere students and non-physicians.

31.    On or about April 1, 2000, Amadasu volunteered his free professional services to Health Fair organized by Laredo Department of Health, during which he intermingled with people of both sexes and made new friends, but Perales was always disruptive, and interrupting, unnecessarily controlling Amadasu. Perales became jealous and unhappy because white Hispanic females were friendly with Amadasu, who is black. Perales on many occasions expressed his disfavor for White Hispanic females being friendly with Amadasu, which were totally private matters. Perales also made many racial slurs, epithet, and innuendoes.

32.    On or about April 3, 2000, the first official beginning of the rotation, there was no schedule of activities for Amadasu, but after about a few days a schedule with blanks, and contents, which Amadasu already knew,

4

was hastily made. Low-level personnel without formal and due trans-cultural education and training and ethnic sensitivities were put in charge over activities and to supervise Amadasu. Miller, who was based in San Antonio about 200 miles away, was not available to instruct and supervise Amadasu. One other white female personnel at the STEER Center at Laredo was so preoccupied with her private domestic and family problems that she almost completely abandoned Amadasu.

33.    From April 3 through April 19, 2000 Amadasu used his car for most of the activities the program was to provide their free transportation for.

34.    The schedule of activities was not customized or individualized as promised by Miller and UTHSC.

35.    On or about April 13, 2000, Miller arrived from her base at San Antonio, to Laredo that is about 200 miles away from San Antonio to lecture on the controversial "Multiple Chemical Sensitivity" She was several minutes late and when she arrived she was so cold and indifferent. She told Amadasu that She had told Donovan that the rotation had been cancelled and thought that Donovan should have told Amadasu before Amadasu drove from Ohio to Texas. Miller was also very uncomfortable with and intimidated by Amadasu's extensive intellectual background and experience.

36.    Amadasu complained to Miller among others, about the lack of preparation for his coming to participate in the program; lack of Miller's directly supervising his rotation; about the attitudes and behaviors of her low level personnel she put to supervise Amadasu; about the different treatment of Amadasu than those similarly situated white participants; failure to fulfill promises; the housing discrimination, Perales and other white lectures making racial slurs, epithets, innuendoes, etc.

37.    During Miller's lecture on the controversial "Multiple Chemical Sensitivities" and other lectures given by other white presenters before her, Amadasu expressed his opinions and opposing views in some areas of the topics but Miller and others took it personal. Amadasu was simply exercising his academic freedom and freedom of speech.

38.    Miller proposed to invite herself to Amadasu resident but Amadasu declined.

39.    Perales without notice to and permission of Amadasu on separate occasions entered Amadasu's residence and conducted searches. When Amadasu asked him why he would do searches in his absence without notice and permission, Perales without apology simply stated that he had the right to do whatever he wanted. Amadasu disagreed with him.

40.    On about April 18, 2000 about three white males arrived from San Antonio to participate in the STEER program. Upon their arrival, Perales completely abandoned Amadasu, treated the whites better than Amadasu. Perales told Amadasu that he would need to give Amadasu's assigned apartment to the whites, not only because they are white but also because the STEER program gave preferences to participant from within Texas, but Amadasu objected to the idea and Perales said that he would have to recommend to Miller to terminate Amadasu's participation in the program. Further, on many occasions Perales had asked Amadasu to privately tutor him free some courses he was taking as part of his MPH degree program, but Amadasu declined and Perales developed antagonism and hostility towards Amadasu.

41.    On or about April 19, 2000 Perales cumulatively and ultimately made good with his words when he

5

communicated orally and in writing to Miller at San Antonio, TX that among others, Amadasu was engaging in sexual harassment of white women in Laredo. While Amadasu was conversing and familiarizing with some personnel at the Laredo Health Department, Perales came and told Amadasu that Miller was on the phone to talk to him. On the phone without prior warnings, and notice Miller told Amadasu that his participation in the program was terminated immediately and that Amadasu should pack and go immediately. Amadasu asked Miller why such a sudden termination without knowing what he had done wrong, Miller refused to tell Amadasu the reason for her action but said that she had had discussions on many occasions with Donovan about him and that after conferring and agreeing with Donovan today both agreed to terminate his participation. She said that she would be putting everything in writing to Donovan who would tell Amadasu why the sudden termination. Miller also told Amadasu that on the phone Donovan had told her that Amadasu had record of sexual harassment at UC. Upon this moment Donovan refused and failed to tell Amadasu why Miller took that action. As a result of this incident, Amadasu had sudden and continuous extreme nervous shocks, mental anguish, emotional distress, humiliation, chagrin, anxiety, depression, etc., which prompted medical attention at Laredo, TX and at Cincinnati, OH. Miller action was arbitrary and capricious, in bad faith, and was a "SETUP".

42.    Later in the evening, Donovan phoned Amadasu without probable cause or justification, threatened him with immediate termination of his entire residency training program saying that Miller had told him that Amadasu was conducting criminal activities at Laredo. Donovan would not disclose the nature and cause of the alleged criminal activities. Amadasu absolutely denied conducting any criminal activity. Amadasu told Donovan that Miller said she would be sending you written report about the incident and he (Donovan) would tell Amadasu in writing the reason for Miller's action. Donovan, furthermore, caused and or aggravated Amadasu's extreme nervous shocks, mental anguish, emotional distress, anxiety, depression, etc.

43.    Same day, Amadasu emailed his partial report/complaint to Donovan and Dr Andrew Freeman, Assistant Director of Occupational Medicine Residency at UC. But they failed to follow up on this.

44.    Amadasu was unable to drive back to Ohio immediately because of his mental, psychological, emotional and physical trauma directly and proximately caused by the actions of Miller and Donovan. Perales and UTHSC-AHEC threatened to forcibly evict Amadasu either by self-help or by police if he did not leave immediately. However, luckily, Amadasu was assisted by a tourist driving back to Ohio on or about April 23. 2000.

45.    Upon information, soon after Amadasu vacated the assigned apartment, Perales and UTHSC-AHEC assigned the apartment to the white participant from San Antonio.

46.    On or about April 24, 2000 during Amadasu meeting with Donovan at Cincinnati, Donovan told Amadasu orally that he was putting Amadasu on probation for the remaining entire portion of his residency training pending when he received written report from Miller at UTHSC, San Antonio, TX. Amadasu protested Donovan action but Donovan heightened his threat of summarily terminating Amadasu's residency without credit. On or about April 4, 2001 Donovan told Dr Marshall Anderson of UC that he made a bad or negative residency terminating evaluation for Amadasu because of the alleged Amadasu's sexual harassment of white women in Laredo, Texas. The conspired, bad faith, arbitrary and capricious actions of Donovan and Miller pushed Amadasu to the brink of suicide, caused and or aggravated his extreme depression, mental anguish, emotional distress, nervousness, insomnia, lack of appetite, extreme

6

pain and suffering, flashbacks, nightmares, post traumatic stress disorder, headaches, constitutional and physical maladies.

47.    A trilogy of Perales, Miller and Donovan concertedly accusing Amadasu of sexual harassment is false and defamatory per se and it was a mastermind pretext for discrimination and terminating Amadasu's training and putting Amadasu in false light.

48.    Beginning in July 1999, up to March 2001, and continuing to the moment,  UC, its employees, servants, and agents have engaged in regular, repeated and continuing series of discriminatory acts and systematic patterns of discriminations against plaintiff arising from its employment and educational policy, or pattern and practice in continue violation of Title VII of the Civil Rights law. The discrimination pervades a series of events culminating in discriminating act occurring in or about March 2001 and thereafter continuing to the present.

49.  Plaintiff timely filed a charge of discrimination within the limitation time period with U.S. Equal Employment Opportunity Commission on  April 26, 200. On September 5, 2001 plaintiff received a Notice of Right to Sue within 90 days from the Civil Rights Division of the U.S. Department of Justice, which is hereto annexed as Exhibit A


# COUNT 1:

(Civil Rights Violation, Discrimination, 42 USC 2000d et seq.)

50.    Plaintiff incorporates herein paragraphs 1 through 38.

51.    Plaintiff is black, of African ancestry, of Nigeria origin was exercising his protected rights.

52.    Defendants without probable cause and justification excluded plaintiff from participation in, denied him benefits of, and subjected him to discrimination under the program because of his race, color and national origin in violation of Civil Rights Act of 1964 as amended, and 42 U.S.C.2000d et seq.

53.    As a result, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.


# COUNT 2:

42 U.S.C. 1981 EQUAL RIGHTS UNDER THE LAW

54.    Plaintiff incorporates all of the paragraphs set forth above as if fully ser forth herein

55.    Defendants' actions have denied plaintiff equal rights under the law

56.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer.


# COUNT 3:

42 U.S.C. 1983 EQUAL PROTECTION/DEPRIVATION OF CIVIL RIGHTS

57.    Plaintiff incorporates all of the paragraphs above as if fully set forth herein

58.    Defendants' actions have denied plaintiff's right to equal protection of the law as secured to him by

7

the Fourteenth Amendment to the U.S. Constitution enforced through 42 U.S.C. 1983.

59.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions.

## COUNT 4:
### 42 U.S.C. 1983 SUBSTANTIVE DUE PROCESS

60.    Plaintiff incorporates all of the paragraphs above as if fully set forth herein

61.    Defendants' actions have violated plaintiff's rights to substantive due process as secured to him by the Fourteenth Amendment to the U.S. Constitution enforced through 42 U.S.C. 1983.

62.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions.

## COUNT 5:
### CIVIL RIGHTS VIOLATION, 42 U.S.C. 1983, PROCEDURAL DUE PROCESS

63.    Plaintiff incorporates all of the above paragraphs as if fully set forth herein

64.    Defendants' conducts violate 42 USC 1983 in that defendants under color of law and while clothed with the authority of their offices violated plaintiff's federally protected rights. Specifically, without limitation, defendants violated: a) plaintiff's First Amendment right to free speech by retaliating against him for complaining about matter of public concern and truthfully expressing his opposing opinions in academic and intellectual matters to Miller and others; b) Plaintiff's Sixth Amendment Right to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him by summarily terminating his rotation and putting him on probation without probable or just cause; c) Plaintiff's Fifth and Fourteenth Amendments' Liberty Rights in his education and training, in his good name, honor, profession, integrity and reputation by falsely and publicly accusing him of sexual harassment of white women; d) Plaintiff's right to privacy by publicizing and criminalizing a purely private matter and by publicly portraying plaintiff in a false light. Defendants are not entitled to immunity or privilege because their conducts were not a normal professorial function, a reasonable professor and or official under the same circumstances would have known (s)he was violating plaintiff's rights, and pursuant to 42 USC 2000d-7. Defendants acted maliciously, recklessly, wantonly, and with conscious disregard of plaintiff's rights.

65.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' conducts.

## COUNT 6:
### 42 U.S.C. 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

66.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

67.    Defendants motivated by a class-based invidiously discriminatory animus, conspired to deprive plaintiff of equal protection rights of the laws and or equal privileges and immunities under the laws and plaintiff was

8

thereby injured.

68.     Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions.

## COUNT 7:

### 42 U.S.C. 1986 NEGLECT TO PREVENT CIVIL RIGHTS VIOLATION & CONSPIRACY

69.     Plaintiff incorporates all of the paragraphs above as if set forth fully herein

70.     Defendants refused and failed to prevent violations of civil rights secured to plaintiff and or to prevent the conspiracy and plaintiff was thereby injured.

71.     Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions.

## COUNT 8:

### 42 U.S.C. 3601 et seq. VIOLATION OF FEDERAL FAIR HOUSING

72.     Plaintiff incorporates all of the paragraphs above as if set forth fully herein

73.     Defendants treated Amadasu differently than similarly situated whites in the assignment of housing.

74.     Plaintiff is entitled to recover damages from the defendants for injuries suffered and continue to suffer as a result of defendants' conducts.

## COUNT 9:

### NEGLIGENCE, NUISANCE, PREMISES LIABILITY

75.     Plaintiff incorporates all of the paragraphs above as if set forth fully herein

76.     Defendants, particularly, Miller and UTHSC have duty to provide a safe and healthful housing for plaintiff. Defendants breached the duty of reasonable care owed to plaintiff by acting unreasonably and discriminatorily. It was foreseeable that by acting unreasonably, they would injury plaintiff, and their actions naturally, directly and proximately caused plaintiff's injuries. Plaintiff suffered and continues to suffer physical, mental, psychological and emotional injuries.

77.     Plaintiff is entitled to recover damages from defendants for injuries suffered and continues to suffer as a result of defendants' actions.

## COUNT 10:

### NEGLIGENT HIRING/NEGLIGENT SUPERVISING/NEGLIGENT RETENTION

78.     Plaintiff incorporates all of the paragraphs above as if set forth fully herein.

79.     Defendants, particularly Miller and UTHSC have duty to provide a safe and hostility-free environment for plaintiff; Defendants have duty to educate its employees at the STEER Center, Laredo, TX about cross-cultural and ethnic differences and practices; Defendants have duty to supervise its employees; But defendants breached

9

their duty by negligently hiring and retaining; negligently failing to supervise, negligently failing to educate their employees; Failed to conduct workshop, which familiarized their employees with cultural differences.

80.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continues to suffer as a result of defendants' actions.

## COUNT 11:
### MISREPRESENTATION AND EDUCATIONAL MALPRACTICE

81.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein.

82.    Defendants, particularly Miller and UTHSC promised to make individualized or customized schedule, provide safe and healthful housing, provide free transportation for plaintiff during his rotation; At the time the promises were made defendants did not intend to perform; Plaintiff relied on the promises; Plaintiff acted upon the promises to his detriment, thereby causing plaintiff damages. Furthermore, defendant Miller had legal and professional duty of reasonable care to instruct and supervise plaintiff; She breached that duty by unreasonably failing to instruct and supervise plaintiff; It was foreseeable that by acting unreasonably, she would injure plaintiff and her actions caused maliciously, intentionally, naturally, directly and proximately plaintiff's injury.

83.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions. Further, Plaintiff is entitled to recover all his travel expenses.

## COUNT 12:
### DEFAMATION- LIBEL AND SLANDER

84.    Defendants, trilogy of Perales, Miller and Donovan repeated unprivileged oral and written publications concerning Plaintiff's alleged sexual harassment of white women in Laredo, Texas and at UC were false, unprivileged and defamatory statement of facts.  The false statements of facts by the defendants in concert that Amadasu; **"continuously conducted sexual harassment of  women here"** at Laredo, TX and at UC were defamatory per se,  slanderous per se, and libelous per se, and were made maliciously or with actual malice, and knowledge of falsity.

85.    At the times defendants repeatedly published the defamatory statements without plaintiff's consent, they knew they were false, fabricated and concocted. They acted grossly in irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible and reasonable persons or organizations. Furthermore defendants grossly mischaracterized the facts of purely private and personal matter and portrayed it in a scandalous and salacious false light. The statements are not constitutionally and statutorily protected

86.    These false statements of facts were willfully, intentionally and consciously concocted with actual malice, with reckless disregard for the truth,  to stigmatize, degrade and injury plaintiff in his reputation, good name, honor, and profession and have subjected plaintiff to ridicule, chagrin, humiliation, aggravation, mental, emotional, physical and psychological pain and suffering prompting his medical attention. Plaintiff is entitled to recover damages

from defendants.

## COUNT 13:
### INVASION OF PRIVACY AND TRESPASS

87.    Defendants intentionally, maliciously, illegally and without plaintiff's consent intruded and or invaded plaintiff's privacy by publicly disclosing matters concerning plaintiff's life in a highly offensive and objectionable manner. Defendants further maliciously misrepresented the facts concerning the private affair and misrepresented plaintiff's motivations and intentions concerning the private affair, thus placing plaintiff in a false light. Defendants particularly Perales trespassed into Amadasu's premises without his consent and notice for no emergency on many occasions. Plaintiff is entitled to judgment.

## COUNT 14:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

88.    The actions of defendants constitute intentional infliction of emotional distress.

89.    Defendants' actions were actually malicious, willful, severe, extreme, egregious, and outrageous that a normal reasonable person of ordinary sensibilities under the circumstances would feel extreme distress. They had intention to cause or reckless disregard of the probability of causing emotional distress.

90.    As a direct, natural, and proximate cause by defendants' wrongful conducts, Plaintiff suffered and continues to suffer extreme emotional distress, which included but not limited to fright, fear, horror, grief, shame, humiliation, embarrassment, chagrin, disappointment, worry, nausea, flashbacks, nightmares, brink of suicide, and insomnia, prompting plaintiff's hospitalization in medical facilities.

## COUNT 15:
### VIOLATION OF TEXAS BILL OF RIGHTS AND OHIO REVERSED CODE 4112 et seq.

91.    Defendants violated plaintiff's rights secured to him under the Texas Bill of Rights, particularly sections 3, Equal rights; 3a, Equality under the law; 8, Freedom of Speech and Libel; 9, Searches; 10, Rights of Accused; and 19, Deprivation of liberty, due course of law, privileges and Immunities.; And O.R.C. 4122 et seq.

### ADDITIONAL FACTUAL ALLEGATIONS OF CONTINUING DISCRIMINATION &VIOLATIONS

92.    Beginning in July 1999 plaintiff was employed by UC as Occupational Medicine Resident in the Occupational and Environmental Medicine Residency Training program, ("Residency transaction"), supposedly ending in June 2000.

93.    The division of Occupational and Environmental Medicine ("DOEM") is predominantly "white washed" with all white faculty made up of Lockey, Donovan, Freeman, Middaugh and Roy MacKay, with all white support staff made up of Connie Thrasher, ("Thrasher"), the Administrative Assistant,  Pohl, Connie Brockman

("Brockman"), Receptionist/Clerk, and with no single black and minority in any decision making and/or teaching position. Motivated by racial animus and national origins, they connived and conspired and did continually treat plaintiff different than similarly situated white Occupational Medicine Residents.

94.    For the first four months of the residency transaction, Brockman who was/is in charge of distributing tools of the trade, such as Dictation/Audio recording electronic devices, to the residents gave all the white residents but refused to give plaintiff. Plaintiff complained to Freeman, the COH Director, who asked Brockman to give plaintiff the devise. After protracted order by Freeman, Brockman hesitantly gave a defective one to plaintiff and continually use racial slur and epithet on plaintiff. Brockman was not disciplined.

95.    From July through September 1999 UC employees, servants and agents continually intruded, invaded, unduly monitored and left offensive statements in plaintiff's e-mail address provided by UC.

96.    In or About October 1999 Freeman in series of messages left on plaintiff's answering devise continually threatened to terminate plaintiff employment/.training because of what he called: "Heavy African Accent"

97.    On or about October 29, 1999, Donovan falsely accused plaintiff of sexually harassing two female employees when he stated that two females in the human resources department complained sexual harassment. When plaintiff demanded the names and written complaints of the complainants, nature, location, circumstances, date and time, and witnesses to the alleged sexual harassment in order to have opportunity for plaintiff to respond, Donovan stated he had no rational and factual foundation of the accusation but that they were conducting investigation. However, in November 1999 Donovan verbally told plaintiff that he and UC had no written complaints and that he considered the alleged complaint a hoax and it was closed. Plaintiff was very distressed and shocked but demanded a signed written letter from Donovan, which he provided plaintiff at a later date.

98.    In or about February 2000, Donovan and Pohl connived, conspired, intentionally, deliberately, malicious, recklessly, wantonly and knowingly "set up" plaintiff so as to mastermind a pretext for humiliating plaintiff and terminating his employment/training. Donovan precepted that day. Pohl arranged in one of the examination rooms at COH a then 20 year old African American female who came in for pre-placement/employment assessment. Donovan directed plaintiff to conduct the assessment, which plaintiff did within the prevailing standards, policy and procedures of COH.

99.    At the time of the assessment Pohl had the duty of chaperoning plaintiff but neglected and or failed to do so. During the examination the female tried to engage in conversation about Africa with plaintiff but plaintiff politely advised the female that the time was not convenient for such discussion. At the request of the female, plaintiff verbally gave the female the COH telephone number to call him at a later date to talk about Africa. The female came to the COH without her immunization records to complete the assessment. At the end of the examination, plaintiff presented the findings to Donovan who after reviewing the case with plaintiff and personally seeing the female advised her to send her immunization records to COH and also directed plaintiff to call the female to remind her to send the said record if she failed to send them.

100.    When the female failed to send the record, at the direction of Donovan, plaintiff made two separate reminder phone calls to her to send the records needed to complete her assessment.

101.     During and after the examination the female never made any complaint to any one but a few days later upon information and belief, at the direction of Donovan, Pohl in her malicious intent to make the female implicate plaintiff phoned and asked the female many questions suggestive of implicating plaintiff but the female made no statement of any impropriety by plaintiff.

102.     Donovan did the same act like Pohl. Donovan willfully, maliciously, intentionally, recklessly and Wantonly concocted, fabricated and published to a third party that plaintiff called the female to have a date with her. This is grossly false statement of facts made for the wrong reason to injure plaintiff.

103.     Donovan also instigated and persuaded the patient to make formal complaint to Ohio Medical Board so as to make it difficult and or impossible for plaintiff to obtain Ohio physician license.

104.     Without oral or written notice sent to and opportunity for plaintiff to response and defend himself about the purported female complaint, Donovan in a grossly humiliating and embarrassing manner before Middaugh penalized plaintiff, ordered that plaintiff be chaperoned while examining female patient and threatened to terminate plaintiff's employment/training.

105.     In or around December 1999 bypassing plaintiff who was the next most qualified, most experienced and next most senior resident after the graduating white female Resident  to be appointed to the position of the Occupational Medicine Chief Resident, Donovan and Freeman appointed a less qualified, less experienced, and more junior white male resident, Robert Gabel, MD, thereby denying plaintiff equal opportunity for job and professional advancement.

106.     Donovan and Freeman advised plaintiff that the Chief Resident in question was "typically a white position" Donovan and Freeman, on information and belief, are opposed to appointment of black and a Nigerian originals as a Chief Resident Plaintiff was not given the equal opportunity and the right of appointment as similarly situated white residents.

107.     In or around February 2000, Plaintiff applied for a second year position in Family Practice residency training program beginning from July 2000,  which  UC organizes, manages and controls with Mercy Franciscan Hospital, Mt. Airy, Cincinnati, OH. Plaintiff was the best qualified and most experience but upon information and belief, a less qualified and less experienced, younger, white was appointed. Upon information and belief, plaintiff was not appointed because of the negative references from Occupational Medicine faculty, to wit, inter alios, Donovan, Lockey, Freeman and Middaugh and because of plaintiff color, age, national origin, disability, race and foreign medical education.

108.     In or around May 2000, plaintiff applied for part-time adjunct faculty position in Health Promotions in Allied Health Department at UC Raymond Walters College but was not hired. Plaintiff was the best qualified but less qualified younger white was hired. Herrmann, the Chairwoman of the Allied Health Department, upon information and belief, who handpicked the less qualified younger white without giving plaintiff the equal employment opportunity.

109. Sometime between year 2000 and 2001 upon information and belief, Donovan and Gaynor willfully, intentionally, recklessly, wantonly, connived, conspired, intruded, invaded and put into plaintiff's file documents that were not relevant to the purpose and intent of the Personal Information Systems being kept by UC about plaintiff .

13

Donovan relied on the said irrelevant private documents in his decision not to graduate and or to negative evaluation of plaintiff in violation of the privacy, confidentiality and personal information system law.

110.    From the beginning of plaintiff's employment and residency transaction up to and including March 2001, Donovan continually maintained, controlled and managed illegal personal information systems file on plaintiff without plaintiff's notice, knowledge and consent. Donovan shared the said systems with Filak and Marshall Anderson, PhD, Chair of DEH. Donovan did not disclose to and did not allow plaintiff to inspect and copy the content of the said file when plaintiff formally requested to do so. Donovan relied on the said illegal system in his bad faith negative evaluation of and decision to prevent plaintiff from graduation.

111.    From the beginning of plaintiff's residency transaction up to and including March 2001 and continuing to date, the DOEM all white faculty, to wit, inter alios, Donovan, Freeman, Lockey and Middaugh , through their networking intentionally, willfully, recklessly, wantonly, knowingly connived and conspired and without consideration for the rights of plaintiff neglected, failed and refused to properly instruct, evaluate and supervise plaintiff; Without any justification, they withheld grades, transcripts and other records pertaining to plaintiff so as to delay and prevent plaintiff graduation and from gainful employment.

112.    Plaintiff successfully completed his one year practicum residency transaction in June 2000 without any negative evaluation but the all white faculty without justification, except for their animus delayed and prevented plaintiff graduation.

113.    **Plaintiff shall rely of the doctrines of repeat, subsequent, and continuing violations and discrimination, as well as the Double Recovery Doctrine citing the following counts for Ohio Defendants only: All paragraphs before the subsequent ones are deem repeated and incorporated in subsequent ones**

## COUNT 16:

### Race, Sex, Color and National Origin Discrimination. 42 U.S.C. Section 2000e et seq.

114.    Plaintiff belongs to the protected group, is black, of African Ancestry, Nigeria origin and well qualified

115.    Plaintiff is black, of African ancestry, of Nigeria origin and performed excellently his duties and fully comply with all rules, regulations, policies, procedures and guidelines at all relevant times

116.    Defendants created a hostile environment and set different terms and conditions for plaintiff than similarly situated Caucasian employee-resident because of his race, ancestry and national origin.

117.    Plaintiff was treated differently than similarly situated Caucasian employee-residents. Plaintiff was denied seniority rights and benefits and job and professional advancement

118.    Defendants disciplined, retaliated against, harassed, and delayed plaintiff's graduation because of his race, ancestry and national origin and for complaining about discrimination in violation of Title VII of the Civil Rights Act 1964, as amended.

119.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

14

## COUNT 17:

### Hostile Environment, Racial Harassment 42 U.S.C. Section 2000e et seq.

120.    Plaintiff incorporates all of the paragraphs above as if fully set forth herein

121.    Plaintiff is black, of African ancestry, of Nigeria origin, and performed his duties excellently and fully complied with all rules and regulations for his position at all relevant times

122.    Plaintiff was subjected to unwelcome conduct constituting harassing racial slurs, epithets, stereotypes, disrespect, verbal abuse and innuendoes.

123.    Plaintiff was treated differently or with iniquities than similarly situated Caucasian employees. Plaintiff was the only black resident of Nigeria origin who was denied tools of the trade.

124.    Plaintiff felt threatened, offended, harassed, horrified and humiliated when these severe and pervasive incidents occurred and by the totality of the circumstances. Plaintiff's race, national origin and ancestry were the motivating impulse for Donovan and his cohorts' discriminatory animus. Plaintiff gave Defendants actual notice but they failed to investigate or take remedial action and harassment constituted discrimination on the basis of plaintiff's race, age, national origin and ancestry. Donovan the main perpetrator, had the power to alter or effect the terms and conditions of plaintiff's employment and training by evaluating performance.

125.    Plaintiff perceived the workplace to be abusive and hostile that it was more difficult for him to do the job.

126.    Defendants disciplined and harassed plaintiff without rational justifications and factual basis but because of his race in violation of Title VII of the Civil Rights Act of 1964 as amended. They acted with malice and reckless indifference to plaintiff's civil rights and emotional and physical well being.

127.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 18:

### Civil Rights Violation, 42 U.S.C. Section 2000d et seq.

128.    Plaintiff incorporates all the paragraphs above as if fully set forth herein

129.    Plaintiff is black, of African ancestry, of Nigeria origin and performed excellenetly and complied with all rules and regulations for his position at all relevant times

130.    Defendants without probable cause and justification prevented and or excluded plaintiff from participation in, denied him benefits of, and subjected him to disparate treatment than similarly situated Caucasians, to discrimination in their Family practice educational and training programs because of his race, color and national origin in violation of civil rights act of 1964 as amended, and 42 U.S.C. section 2000d et seq.

131.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

15

### COUNT 19:

**Violation of Equal Rights under the Law, Intentional Discrimination 42 U.S.C. section 1981et seq.**

132.    Plaintiff incorporates all the paragraphs above as if set forth fully herein

133.    Defendants' action denied plaintiff equal rights under the law and intentionally discriminated against him because of his race, sex, ancestry, and national origin.

134.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

### COUNT 20:

**Equal protection/Deprivation of Civil rights, Privileges and Immunities; Article IV section 2 Clause 1, & 14th Amendment to U.S. Constitution.**

135.    Plaintiff incorporates all the paragraphs above as if set forth fully herein

136.    Defendants' actions denied plaintiff's right to equal protection and non-deprivation of civil rights, privileges and immunities as secured to him by the Article IV Section 2 Clause 1 and the Fourteenth Amendment to the U.S. Constitution.

137.    Plaintiff is entitled to recover damages from the defendants for injuries suffered and continue to be suffered as a result of defendants' unlawful conduct.

### COUNT 21:

**Civil conspiracy and Conspiracy to Interfere with/Violation of Civil rights 42 U.S.C. section 1985.**

138.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

139.    Defendants, particularly Donovan, Lockey, Freeman and Middaugh acting in concert and motivated by a class-based invidiously discriminatory animus, conspired to deprive the plaintiff of equal protection rights of the laws, equal privileges and immunities under the laws. They concertedly and purposely masterminded the delay and prevention of plaintiff graduation from his residency training program by concocting sham evaluation of plaintiff and by recklessly, knowingly, maliciously, wantonly and willfully failing to follow the established rules, regulations and procedures for awarding grades for courses, and evaluation of plaintiff thereby injuring plaintiff.

140.    Plaintiff is entitled to recover damages from defendants for the injuries directly, proximately and naturally caused by their unlawful conduct.

### COUNT 22

**Neglect to Prevent Civil Rights Violation, 42 U.S.C. section 1986**

141.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

142.    The defendants particularly, UC, Lockey and Filak, have the actual knowledge of the wrong to be done and have the power to prevent the wrong but neglected and or refused to prevent the violation of the plaintiff's civil rights.

16

143.    As a direct, proximate and natural cause by defendants' unlawful conduct plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 23:

**Violation of U.S. Constitutional Rights,  5TH Amendment Procedural and Substantive Due Processes,**

144.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

145.    Defendants with apparent authority of their offices violated plaintiff's federal statutorily and U.S. Constitutionally protected rights. Specifically, without limitation, defendants violated: a) Plaintiff's First Amendment right to free speech by retaliating against him for voicing on matters of public concern and truthfully complaining of discrimination; b) Plaintiff's Fifth and Fourteenth Amendments Liberty and Property Rights and Interests in his job, education and training, in means of livelihood, enjoyment of good things of life, in his good name, honor, profession, integrity and reputation by denying him liberty and property interests in education and training, delaying his graduation, preventing his graduation, preventing him from gainful employment, falsely and publicly calling him sexual harasser; c) Plaintiff's Fourth Amendment right to be secure in his person, papers and effects violated by defendants without plaintiff's consent.

146.    Defendants acted maliciously, willfully, wantonly and with reckless and conscious disregard of plaintiff's protected rights.

147.    Defendants violated plaintiff's right to procedural and substantive due process guaranteed to him by the Fifth Amendment to U.S, Constitution. Plaintiff is entitled to recover damages for each of the Articles or Amendments violated, from defendants for injuries directly, proximately and naturally caused by their unlawful conduct.

## COUNT 24:

### Age Discrimination, ADEA 1967 as amended

148.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

149     Defendants' conduct denied plaintiff's right protected under ADEA of 1967, as amended.

150.    Plaintiff is entitled to recover damages from defendants for the injuries suffered and continues to suffer as a result of defendants' unlawful conduct.

## COUNT 25:

### American with Disability Act 1990, as amended, 42 U.S.C. section 12101 et seq.

151.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

152.    Plaintiff is a qualified individual with a disability because there is record of it and defendants regarded plaintiff as having such impairment. Plaintiff was capable of doing the job.

153.    Defendants were motivated by plaintiff's disability when they denied him appointment as second year resident in Family Practice residency training program, and as Adjunct faculty in Health Promotions.

154.    As a result of direct, proximate, and natural cause by defendants' unlawful conduct plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 26:

### Retaliation, 42 U.S.C. section 2000e et seq.

155.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

156.    Plaintiff opposed the defendants' unlawful discriminatory employment practices, as well as voiced concern about the inappropriate and disparate treatment of plaintiff who was the only black in the residency program, and for truthfully evaluating defendant faculty.

157.    Defendants refused and failed to award grades, conduct evaluation of and graduate plaintiff from his residency training/employment in retaliation for the exercise of his protected rights.

158.    There is causal connection between plaintiff involvement in protected activity and his non evaluation, non award of grades, punishment and his prevention from and delay in graduation by the defendants.

159.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 27:

### Negligent Hiring/Negligent Supervising/Negligent educating & training/Negligent enforcing/Preventing

160.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

161.    Defendant UC has a duty of reasonable due care of providing workplace free from racism, discrimination, abuse and hostility; of educating the all Caucasian employees at the Division of Occupational & Environmental Medicine (DOEM) about non-discriminatory practices, cross-cultural and ethnic differences and practices; of preventing potential sources of conflicts, problems or controversies between employees; of conducting workshops for all the Caucasian employees at the DOEM, which familiarized them with need of, prepare them for and to accept ethnic diversity at the DOEM that had no track record of any minority, any black, any person of African ancestry and Nigeria origin ever been employed therein as faculty or in a decision making position; of supervising and monitoring Lockey, Donovan, Freeman, Middaugh, Pohl, Brockman, etc for compliance with the policies and procedures; of enforcing the policies and procedures; of providing support, education and training for all its employees.

162.    Defendants Donovan, Freeman, Lockey and Middaugh as per their assigned job-duties and obligations owe plaintiff mandatory and affirmative duty of reasonable due care of awarding grades for courses, teaching, educating and training, evaluating and counseling plaintiff

163.    Defendants UC, Donovan have mandatory and affirmative duty of reasonable due care of investigating, conducting hearing on information passed onto them before taking decision. Defendants Lockey and Filak have mandatory and affirmative of reasonable due care of supervising and overseeing Donovan, Freeman and Middaugh conducts

164.    Defendants breached those duties of due care by acting unreasonably; It is foreseeable that by acting

18

unreasonably, they would injure the plaintiff; and their unreasonable actions directly, proximately and naturally caused plaintiff's injuries.

165.    Plaintiff is entitled to judgment.


## COUNT 28:
### Intentional Misrepresentation

166.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

167.    Defendants , particularly UC, Donovan and Freeman made representations to plaintiff

168.    Before and after hiring plaintiff, Defendants made to plaintiff impressions (false impressions), statements (false statements), promises (false promises) or representations (misrepresentations), which included but not limited to: a) Timely and objective evaluation; b) Timely and objective award and posting of grades; c) fully executed documented objective job performance reviews/criticisms/corrective measures; d) fully executed documented due process disciplinary and grievance procedures; e) adherence to due process; f) equal opportunity in job and professional advancement; g) equal opportunity of seniority rights and benefits in appointment of Chief Resident; etc.

169    The defendants had knowledge that the promises/representations were false, and intended to induce plaintiff to rely thereon,

170.    Plaintiff actually and justifiably relied upon the false promises/misrepresentations, and acted upon the misrepresentations/false promises to his detriment, thereby causing plaintiff damages

171.    Plaintiff is entitled to judgment.

## COUNT 29:
### Negligent Misrepresentation

172.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

173.    Defendants made promises to plaintiff with intent to induce plaintiff to rely thereon; Plaintiff actually and justifiably relied and acted on the misrepresentations to his detriment, thereby causing plaintiff's damages.

174.    Plaintiff is entitled to judgment.


## COUNT 30:
### Defamation

175.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

176.    Defendant Donovan's communication/publication over the telephone and/or in writing to Filak, Marshall Anderson, Pohl and many other unknown that plaintiff was **"a Sexual harasser" and "calling a female patient for dating ....."** constituted defamation per se or slander per se. The publication about plaintiff was false statement of facts, defamatory and unprivileged, was made by defendants maliciously or with actual malice, with knowledge of the falsity of the statement, or with reckless disregard of the truth or falsity. The publication contained a false statement of fact, rather than a constitutionally and or statutorily protected opinion.

177.    That Filak, Jarell and Anderson perceived that the false statement related to plaintiff and the statement

was concocted and fabricated by Donovan to induce or influence these third parties to discharge plaintiff from the program with ignominy and without credit.

178.    The statement was intended by defendants to prejudice plaintiff's reputation, office, trade, business, profession, integrity, good name, means of livelihood and prevent plaintiff from obtaining Ohio State Physician License.

179.    As a result of the defendants' willful and intentional defamatory per se false statement of facts, plaintiff suffered and continues to suffer ridicule, chagrin, humiliation, insomnia, depression, aggravation, post-traumatic anxiety, mental, emotional, psychological and physical pain and suffering, nightmares, etc.

180.    Plaintiff is entitled to judgment.


### COUNT 31:
#### Injurious Falsehood/Disparagement

181.    Plaintiff incorporates all of the paragraphs above as if set froth fully herein

182.    Defendant Donovan's published to third parties false statement of facts that plaintiff **"called the female job applicant for dating"** The statement was derogatory to plaintiff's title to his business or his intellectual property or its quality, and intended to cause harm to plaintiff's pecuniary interest, trade and profession or either recognized or should have recognized that it was likely to do so. It was published with malice or with actual malice, thereby causing plaintiff damages.

183.    Plaintiff is entitled to judgment.


### COUNT 32:
#### Invasion and Intrusion of Rights to Privacy and Confidentiality

184.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

185.    Defendants, particularly Gaynor in conspiracy with Donovan intentionally, maliciously, unlawfully and without plaintiff's consent intruded and or invaded into plaintiff's private and confidential personnel information and into plaintiff's file.

186.    Further, defendants, UC, Donovan, Jarrell and Buncher authorized, condoned and or ratified Gaynor's conduct. Jarrell and Buncher as the directors of the Graduate and Continuing Education, custodians of the private and confidential files therein, and as immediate bosses of Gaynor have mandatory and affirmative duty of reasonable care to prevent Gaynor from her unlawful conduct and or to discipline her for her unlawful conduct but failed and neglected to exercise due care owed to plaintiff.

187.    Plaintiff has reasonable expectation of privacy and confidentiality in his private correspondences and in his file in the custody and management of UC.

188.    Plaintiff is entitled to judgment for damages against the defendants for injury proximately caused by the defendants.

20

## COUNT 33:

### Race Discrimination - O.R.C. 4112.02

189.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

190.    Plaintiff belongs to a protected group, is black, of African ancestry, of Nigeria origin and qualified for positions applied for at all relevant times

191.    Defendants created hostile environment for plaintiff because of his race, and opposition to discrimination

192.    Plaintiff was treated differently than similarly situated Caucasian employee residents.

193.    Defendants disciplined, harassed and oppressed plaintiff because of his race, and protected activity in violation of O.R.C. 4112.02 et seq.

194.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 34:

### Disability Discrimination - O.R.C. 4112.05

195.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

196.    Defendants violated plaintiffs' rights under ORC 4112.05 because of his recorded/perceived disability

197.    Causal relationship between disability and the employment discrimination exists. Plaintiff is entitled to judgment.

## COUNT 35:

### Breach of Contract-Express/Implied.

198.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

199.    Plaintiff was/is a member of a protected class, he was qualified for his position. Excellently fulfilled the employer and the training program legitimate performance expectations; he was harassed, disciplined and delayed and prevented from graduation because of his race, color and national origin.

200.    Defendants treated plaintiff differently than similarly situated Caucasian employee residents or treated similarly situated persons outside the protected class more favorably.

201.    That before or about the time plaintiff began his employment/training with defendants, defendants promised or expressed among others:

   a) A fixed term of a 12- month practicum

   b) That plaintiff would be graded and evaluated as per the established procedures

   c) That plaintiff would be disciplined and any complaints will be handled in accordance with the established due process and   only in accordance with specified procedures

   d) That plaintiff would be given full support, e.g. educational, financial & training supports,

21

        etc.

202.     That plaintiff on successful completion of his training at end of 12 months would graduate

202.     That the defendants' promises were communicated to the plaintiff

203.     That the plaintiff accepted the offer and the defendants accepted plaintiff's counteroffer/acceptance

204.     That the defendants' promise was supported by consideration

205.     But that the plaintiff was unduly delayed or prevented from graduation; and

206.     That the plaintiff's delayed graduation for more than 10 months was contrary to the terms of the contract; further

207.     That at the time the plaintiff began his employment with the defendants received a copy of some pertinent portions of the defendants' Policies and Procedures Manual (hereinafter "Manual"), as well as American Board of Preventive Medicine requirements (" the Board Requirement") as a condition of his employment and training program

208.     That the plaintiff's continue employment and training  were conditioned upon accepting the terms as set forth in  Manual and the Board requirement.

209.     That the aforesaid Board requirement, as well as the defendants' letter of offer received by the plaintiff specifically stipulated the duration of the practicum phase of the residency transaction.

210.     That the manual and the letter of offer did not contain any disclaimer or language indicating that the manual and the letter of offer were not to be deemed a contract of employment.

211.     That the letter of offer set forth the tenure of employee relationship; and the manual and the Board requirement set forth a specific progressive process of dealing with standards of performance and conduct.

212.     That the manual set forth a specific procedure to be followed regarding discipline of a resident

213.     That there was a contract [express, implied] between defendants and plaintiff of a tenure employment (See: Exhibit B)

214.     That defendants manifested their intent to enter into employment agreements with their employees by making representations and promises that the employees were entitled to support, fair and equitable treatment. These statements were made to induce plaintiff into employment and training with defendants.

215.     That defendants promised to abide by the progressive process of dealing with performance standards, evaluation and grading, as well as abide by the procedure for dealing with complaints in writing.

216.     That defendants breached this contract by failing to fulfill their promises, representations and to abide by the progressive process of dealing with performance standards, evaluation, grading and graduation procedures

217.     That defendants breached this contract, inter alia, by disciplining without rational and factual bases; by failing to award and post grades; by failing to release plaintiff academic transcripts; failing to give vacation benefits; by failing to provide evaluations, by delaying and preventing graduation of  plaintiff by more than 10 months without justification.

218.     That as a result of defendants' breach the plaintiff has been damaged. Plaintiff is entitled to judgment

## COUNT 36:

### Breach of Covenant of Good Faith and Fair Dealing

219.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

220.    Plaintiff has reasonable and legitimate expectation of compliance with the terms and conditions of the contract by defendants and of plaintiff graduation timely and good faith and fair dealings.

221.    Defendants deprived plaintiff of the benefits of the bargain and continued by acting in bad faith and unfair dealings.

222.    As a result of defendants' bad faith and unfair dealings plaintiff suffered and continues to suffer damages and plaintiff is entitled to judgment.


## COUNT 37:

### Non Hiring, Retaliation A Violation of Public Policy of Ohio & U.S., 29 U.S.C. section 701

223.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

224.    That defendants have obligation not to violate the Ohio and the United States Constitution in their relationships with employees;

225.    Defendants have obligation not to violate any law of the United States or the State of Ohio in their relationships with employees.

226.    Defendants have obligation not to violate any principles of common law in their relationships with employees.

227.    That employees have a right to oppose conducts of public concern

228.    That plaintiff, while working for defendants, made his opposition to racism, discrimination, hostility and harassment, and voices his opinion about defendants' violation of their own rules, policies and procedures.

229.    That plaintiff has disability recorded and or perceived by defendants

230.    That Defendants failed to hire and graduate plaintiff because he was disabled, and in an attempt to stop plaintiff from opposing defendants' unlawful conducts.

231.    That defendants' decision to not to hire and or graduate the plaintiff due to his disability and opposition violates the public policy of the State of Ohio and the United States.

232.    That plaintiff is entitled to judgement for damages.


## COUNT 38:

### Interference with Contratual Relations and Economic Advantage

234.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

235.    Defendants, particularly Donovan, intentionally, maliciously, without justification, but with improper objective or through improper means, purposefully interfered with plaintiff's contractual relationship with the defendant employers and prevented plaintiff from gainful employment.  Plaintiff is entitled to judgment.

## COUNT 39:

### Violation of the Byelaws, Rules, Regulations, Policies and Procedures

236.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

237.    Defendants have obligation to comply with the byelaws, rules, regulations, policies and procedures of the UC, but the defendants intentionally, willfully, recklessly and wantonly violated their own rules, byelaws, regulations, procedures and guidelines thereby directly, naturally and proximately causing plaintiff damages. Plaintiff is entitled to judgment.

## COUNT 40:

### Intentional Infliction of Emotional Distress

238.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

239.    Defendants continuing conducts constitute on going intentional infliction of emotional distress

240.    Defendants' conducts were actually malicious, willful, severe, extreme, egregious, and outrageous that a normal reasonable person of ordinary sensibility under the circumstances would feel extreme distress.

241.    Defendants had intent to cause or reckless disregard of the probability of causing emotional distress

242.    As a direct, natural and proximate cause by defendants' wrongful conducts, plaintiff suffered and continue to suffer extreme and severe emotional distress, physical, mental and psychological pain and sufferings, including but not limited to fright, horror, grief, shame, humiliation, embarrassment, chagrin, disappointment, worries, nausea, flashbacks, nightmares, brink of suicide, insomnia, depression, post traumatic anxiety, aggravation, etc.

243.    Plaintiff is entitled to judgment.

## COUNT 41:

### Violation of Personal Information System, ORC 1347 et seq.

244.    Defendants have a duty to comply with Ohio law governing Personal Information System

245.    Defendants breach this law and thereby injured plaintiff

246.    Plaintiff is entitled to judgment.

## COUNT 42:

### Violation of American Board of Preventive Medicine Requirements:

247.    American Board of Preventive medicine requirements are incorporated by reference into the residency transaction.

248.    Defendants failed to comply with the requirements, to wit, inter alia, evaluation, instruction, supervising, due process in disciplinary matters thereby injuring plaintiff.

249.    Plaintiff is entitled to judgment.

## COUNT 43:

### Dereliction of duty, malicious abuse and misuse of authority and fraud

24

250.    Defendants particularly Donovan, Freeman, Lockey and Middaugh through conspiracy, connivance and networking derelicted their lawful professorial duties and instead were engaged in clandestine and nefarious nemesis against plaintiff, engaged in intellectual bias and jealousy against plaintiff.

251.    Defendants particularly Donovan intentionally, willfully, reckless, wantonly, knowingly and deliberately expunge from plaintiff's file evaluations from other preceptors without justification but to injure plaintiff, putting into plaintiff's file irrelevant personal and private correspondences, thereby injuring plaintiff.

252.    Plaintiff is entitled to judgement.


**WHEREFORE,** Plaintiff demands judgment against defendants as follows:

A       Finding in favor of plaintiff on all counts set forth in this complaint

B       Awarding plaintiff compensatory damages on each of all the counts in an amount to be determined at trial

C       Awarding plaintiff exemplary damages on each counts in an amount to be determined at trial.

D       Awarding plaintiff pre & post judgment interest, costs, travels, room and board, attorney/s fees and costs

E       Awarding plaintiff such other relief as this court deems just and proper.


Respectfully submitted,


DARLINGTON AMADASU, PRO SE
2680 WENDEE DRIVE; # 2303
CINCINNATI, OH 45238

**WHEREFORE,** Plaintiff demands judgment against defendants as follows:

(a)    Finding in favor of plaintiff on all counts set forth in this complaint.

(b)    Awarding plaintiff compensatory damages on each of all counts in an amount to be determined at trial

(c)    Awarding plaintiff punitive damages on each of all counts in an amount to be determined at trial

(d)    Awarding plaintiff costs, interests, travels, room, board, interest, attorney's fees and costs

(e)    Awarding plaintiff such other relief as this court deems just and proper.

Respectfully submitted,

DARLINGTON AMADASU.

**JURY DEMAND:**

Plaintiff hereby demands a trial by jury on all issues raised in plaintiffs' complaint.

Darlington Amadasu, Plaintiff, Pro se.

26

U.S. Department of Justice

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
3510 8608

*Employment Litigation Section*
*P.O. Box 65968*
*Washington, DC 20035-5968*

Mr. Darlington Amadasu                    August 22, 2001
2680 Wendee Dr.
Ste. 2303
Cincinnati, OH  45238

Re:  EEOC Charge Against University of Cincinnati, et al.
     No. 221A10405

Dear Mr. Amadasu:

    Because you filed the above charge with the Equal Employment
Opportunity Commission, and the Commission has determined that it
will not be able to investigate and conciliate that charge within
180 days of the date the Commission assumed jurisdiction over the
charge and the Department has determined that it will not file any
lawsuit(s) based thereon within that time, and because you have
specifically requested this Notice, you are hereby notified that you
have the right to institute a civil action against the above-named
respondent under:

        Title I of the Americans with Disabilities Act of 1990,
        42 U.S.C. 12111, et seq., and,
        Title V, Section 503 of the Act, 42 U.S.C. 12203.

    If you choose to commence a civil action, such suit must be
filed in the appropriate Court within 90 days of your receipt of
this Notice.  If you cannot afford or are unable to retain an
attorney to represent you, the Court may, at its discretion, assist
you in obtaining an attorney.  If you plan to ask the Court to help
you find an attorney, you must make this request of the Court in the
form and manner it requires.  Your request to the Court should be
made well before the end of the time period mentioned above.  A
request for representation does not relieve you of the obligation to
file suit within this 90-day period.

    This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is
meritorious.

                        Sincerely,

                        Ralph F. Boyd, Jr.
                    Assistant Attorney General
                       Civil Rights Division

            by        *Karen L. Ferguson*

                       Karen L. Ferguson
                      Civil Rights Analyst
                  Employment Litigation Section

cc:  Cincinnati Area Office, EEOC
     University of Cincinnati, et al.

                                        EXH A

University of Cincinnati
Medical Center

Department of Environmental Health
Occupational and Environmental Medicine Divison
University of Cincinnati
PO Box 670056
Cincinnati OH 45267-0056

Delivery Address.
3223 Eden Avenue
Cincinnati OH 45267

January 25, 1999

Dr. Darlington O. Amadasu
University of Utah School of Medicine
1775 Austin Road Front # 11207
Salt Lake City, Utah  84112

Dear Dr. Amadasu:

    The Residency Selection Committee has met and reviewed
your application.  We are pleased to offer you a year plus resi-
dency position in Occupational Medicine at the University of
Cincinnati beginning in July 1999.  Occasionally, residents pre-
fer to begin with the start of classes in the fall, generally the
third week in September.

    The stipend for this position is $29,000 per year.  In
addition, this position has tuition remission for academic
classes and a health benefits package.  The faculty feels that
you will make an excellent addition to our training program.

    We would appreciate hearing from you by February 15,
1999, as to your decision to accept this offered position.
Please follow up any verbal communication with a written
response.

    Additionally, we request a letter of recommendation from
the University of Utah College of Medicine MPH Program and in-
clude confirmation of the expectation to complete and receive
your MPH degree in the spring of 1999.  This letter should be
sent direct to me from the Program Director.  In the interim, if
you have any questions, please feel free to contact me by mail or
phone at (513) 558-0030.

Sincerely,

James R. Donovan, Jr., MD, MS
Director, Occupational Medicine
    Residency Training Program

/dm

Patient Care • Education • Research • Community Service
An affirmative action/equal opportunity institution

EXHB