UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DARLINGTON AMADASU, MD**

    Plaintiff

 Against

**Case No: C-1-01-210**

Judge: Dlott/Black

**JAMES R. DONOVAN, MD**
**JAMES E. LOCKEY, MD**
**ANDREW G. FREEMAN, MD**
**DEBRA ANN MIDDAUGH, MD**
**MURIEL POHL, RN**
**DORA JEFFERSON-GAYNOR**
**RALPH CHARLES BUNCHER**
**JUDY L. JARRELL**
**TRACY L. HERRMANN**
**ANDREW T. FILAK, MD**
**KATHLEEN M. ROBBINS**
**LINDA HARPSTER**
Office of General Counsel
University of Cincinnati, Cincinnati, OH
**UNIVERSITY OF CINCINNATI**

**JACQUELINE COLLINS, MD**
**DIANA MCINTOSH, RN**
**CARLOS DAVIS**
311 Albert Sabin Way, Cincinnati, OH 45229-2801
**UNIVERSITY HOSPITAL, INC.**
234 Goodman Street
Cincinnati, OH 45267
    Defendants
  And
**CLAUDIA S. MILLER, MD**
**ROGER B. PERALES**
**UNIVERSITY OF TEXAS**
**HEALTH SCIENCE CENTER AT SAN ANTONIO**
   And
**GENERAL REVENUE CORPORATION**
11501 Northlake Drive
Cincinnati, OH 452 49
**NATIONAL ENTERPRISE SYSTEMS**
29125 Solon Road, Solon, OH 44139
    Defendants

**AMENDED/SUPPLEMENTED COMPLAINT**
**WITH JOINDER OF CLAIMS & PERSONS**

**WITH JURY DEMAND ENDORSED HEREIN**

Comes now Plaintiff, Darlington Amadasu, Lay Pro Se, and for his joinder of claims and persons and amended

1

and supplemented complaint against the defendants individually and jointly, as well as personally and or officially, alleges as follows:

**PARTIES IN GENERAL**

1. Plaintiff, Darlington Amadasu, ("Amadasu") is black male, African ancestry, belongs to the protected class, a citizen of the United States, of Nigeria origin. Citizen and resident of Cincinnati, Hamilton County, and State of Ohio. He was an employee, undergoing the third year of residency training ("Practicum Phase") in Occupational and Environmental Medicine ("OEM") in the Occupational and Environmental Medicine Residency Program ("OEMR") that was/is co-sponsored, organized and operated by University of Cincinnati ("UC") and the University Hospital, Inc. ("UH"). Plaintiff had satisfactorily and successfully completed the initial first year of the residency ("Clinical Phase") and the second year of residency ("Academic Phase") of the OEMR outside UH. He was the only black in the program

2. Defendant, James R. Donovan, MD, ("Donovan") is white male, Assistant Professor and Director of OEMR) at the Division of Occupational Medicine (DOM) of the Department of Environmental Health, ("DEH") College of Medicine, University of Cincinnati, ("UC"), Cincinnati, Ohio. Upon information and belief he was/is an employee, and precepted at University Hospital (UH). He was also supervisor and advisor of the plaintiff as well as similarly situated OEM residents of non-protected class.

3. Defendant James E. Lockey, MD, ("Lockey") is white male, Professor and Clinical Chief ("CC") of the DOM, DEH, UH. He was/is employee, the immediate supervisor of defendants, Donovan, Freeman and Middaugh, and also supervised plaintiff and similarly situated OEM residents of non-protected class during the relevant time period. He acted in concert with other defendants to violate plaintiff's civil rights

4. Defendant Andrew G. Freemen, MD, ("Freeman") is white male, Assist. Professor and Assistant Director of OEMR, and Director of The Center for Occupational Health, ("COH") of UH. He was/is employee and directly supervised plaintiff and similarly situated OEM residents of non-protected class

5. Defendant Debra Ann Middaugh, MD, ("Middaugh"), is white female, Adjunct Professor of Occupational and Environmental Medicine (OEM). She was/is employee of UC, and directly supervised plaintiff and similarly situated OEM residents of non-protected class. She was a preceptor at UH

6. Defendant Muriel Pohl, RN, ("Pohl"), is white female, an employee at COH. Defendants, Donovan and Freeman, supervised her. She colluded with Donovan to sexually harassed and set up plaintiff.

7. Defendant Dora Jefferson-Gaynor, ("Gaynor"), a black female, at the relevant time period, an employee Secretary/Clerk at the Graduate Studies Office, DEH, UC. She and Donovan were sexual harassers of plaintiff, mastermind and collusive hoaxers of sexual harassment hoax against plaintiff.

8. Defendant Ralph Charles Buncher, ("Buncher"), is white male, Professor and Director of Graduate &

Continuing Education, DEH. He was/is employee of UC and had supervisory duties over defendant Gaynor and responsibility of ensuring registration of courses, posting of grades and to protect files.

9. Defendant Judy L. Jarrell, ("Jarrell"), is white female, an employee, Assist. Professor and at the relevant period, Director of Graduate & Continuing Education, DEH, UC and had supervisory duties over defendant Gaynor and responsibility of ensuring registration of courses, posting of grades and security of graduates and residents files.

10. Defendant Tracy L. Herrmann, ("Herrmann"), is white female, employee and Chairperson of Allied Health Department, Raymond Walters College, UC. She deprived plaintiff of employment opportunity

11. Defendant Andrew T. Filak, MD ("Filak") is white male, employee, Professor and Dean of Graduate Medical Education, UCH. Had supervisory duties over DOM and the faculty of the DOM

12. Defendant Kathleen M. Robbins, ("Robbins") a white female, employee and legal counselor of UC, has duty and responsibilities of properly advising her employer and its employees about the statutes, bylaws, rules, regulations, policies and procedures and to prevent violation of plaintiff's civil rights

13. Defendant Linda Harpster, a female, employee-legal counsel of UC, has duty and responsibilities of properly advising her employer and its employees about the statutes, bylaws, rules, regulations, policies and procedures. She colluded with Donovan to sidestep the bylaws and to violate plaintiff's rights

14. Defendant University of Cincinnati, ("UC") Cincinnati, Ohio, Ohio State owned, a predominantly white institution organized under the law of Ohio as a distinct corporate entity. It is an employer, seller, supplier, creditor, debt collector as defined under applicable federal and state laws and in carrying out the business of education, training and research, and other services. It is a recipient of federal funds or assistances. Its services and products affect intra and interstate commerce.

15. Defendant Jacqueline Collins ("Collins"), is a female psychiatrist doctor, medical director of Mental Health Access Point ("MHAP") and employee of UH. She caused deprivation of federal and state mental patients' rights of and abandoned the plaintiff and violated his civil rights and confidentiality.

16. Defendant Diana Mcintosh, is a female nurse, employee and director of MHAP of UH who failed to investigate and prevent violation of plaintiff's federal and state mental health's rights.

17. Defendant Carlos Davis ("Davis"), a male, employee social worker of MHAP of UH who breached plaintiff's physician-patient privacy and confidentiality and lied about housing assistance to plaintiff

18. Defendant University Hospital ("UH") is state owned as distinct corporate entity. It is an employer, seller, creditor, debt collector as defined under applicable federal and state laws and in carrying out the business of education, training and research, healthcare and other services. It is a recipient of federal funds or assistances. Its services and products affect intra and interstate commerce.

19. Defendant Claudia S. Miller, MD, ("Miller") is white female, employee of, Director of South Texas

3

Environmental Education and Research (STEER) program-Laredo under the department of Family and Community Medicine, University of Texas Health Science Center ("UTHSC") at San Antonio, San Antonio, Texas. She was based at San Antonio. Has a duty to directly supervise plaintiff and her staff.

20. Defendant Roger B. Perales, ("Perales"), is a white-Hispanic male, an employee clerk of UTHSC at the STEER center at Laredo, Texas at relevant period, he was a part-time student at UTHSCSA.

21. Defendant University of Texas Health Science Center at San Antonio, ("UTHSC"), San Antonio, Texas is publicly owned distinct corporate entity, recipient of federal funds and assistance, predominantly white institution, organized to provide employment, education, training and research, and other services, such as STEER, and is in partnership with Area Health Education Center (AHEC).

22. Defendant General Revenue Corporation ("GRC") is an Ohio corporation doing business in Cincinnati, Hamilton County Ohio, which specializes in the debt collection and regularly collects or attempts to collect debts owed or due or asserted to be owed or due another and is a **"debt collector agent"** as defined in the Act at 15 U.S.C. 1692a(6). It was/is a debtor-collector agent and or contractor of UC.

23. Defendant National Enterprise Systems ("NES") is an Ohio corporation doing business in Cincinnati, Hamilton County Ohio, which specializes in the debt collection and regularly collects or attempts to collect debts owed or due or asserted to be owed or due another and is a **"debt collector agent"** as defined in the in the Act at 15 U.S.C. 1692a(6). It was/is a debtor-collector agent of UC.

## JURISDICTION AND VENUE:

24. This court has jurisdiction over this action pursuant to 28 U.S.C 1331, federal questions; 28 U.S.C. 1332 diversity of citizens, 28 U.S.C. 1343 Civil Rights Act of 1964 as amended, Title VI, Title VII, 42 U.S.C. 2000d et seq., Title VII, 42 U.S.C. 2000e et seq; 42 U.S.C. sections 1981, 1983, 1985,and 1986. This action also arises under 42 U.S.C. 3601 et seq.-Federal Fair Housing Act; The court has jurisdiction over supplemental state claims pursuant to 28 U.S.C. 1367 because these claims arose from the same facts and circumstances. This court has personal jurisdiction over Ohio defendants and over all Texas defendants pursuant to Ohio State Long-Arm Statutes, ORC 2307.381 - 2307.385.

25. The venue is properly laid in Southern District of Ohio, Western Division because Ohio defendants Donovan, et al  and UC and UH are natural persons and institution respectively in this district, plaintiff was employed and the substantial part of transactions or omissions arise in this district.

**FACTUAL ALLEGATIONS CONTINUING AND SYSTEMATIC**
**CIVIL RIGHTS VIOLATIONS COMMON TO "OHIO DEFENDANTS" to wit:**
(James R, Donovan, James E. Lockey, Andrew G. Freeman, Debra Ann Middaugh, Muriel Pohl,
  Dora Jefferson-Gaynor, Ralph Charles Buncher, Judy L. Jarrell, Tracy L. Harrimann, Andrew T. Filak

4

Kathleen M. Robbins, Linda Harpster, Jacqueline Collins, Diana Mcintosh, Carlos Davis, UC, UH,)

26. By employment letter dated January 25, 1999, defendants UC and UH employed plaintiff as Occupational and Environmental Medicine Resident ("OEMR") into the third year ("Practicum Phase") of their Occupational and Environmental Medicine Residency Program ("OEMRG") in the Division of Occupational and Environmental Medicine (DOM) at Department of Environmental Health (DEH) for one year plus beginning from July 1, 1999. Plaintiff was not a graduate student under UC definition

27. By the employment, plaintiff became a bona fide member of the medical staff of UH entitled to all protections, rights, privileges, immunities, and due process, procedural and fair hearing provisions, etc, of the Medical Staff Bylaws, etc, afforded to members of the medical staff. At UH

28. During the interview and at employment plaintiff expressed interest in a faculty position in the DOM And other positions at UC and UH upon completion and graduation from the OEMRG.

29. At the relevant time period, the faculty of DOM was made up entirely of Caucasians and upon information and belief no black had been a faculty member of DOM.

30. Defendants, UC and UH, made express, implied and oral promises to the plaintiff constituting employment contract encompassing express, oral and implied agreements. ("UC" or "UH"-Agreement")

31. UC, UH, their employees and servants named as defendants breached their promises, some of which are set forth in their bylaws, rules, regulations, policies and procedures, accreditation standards, federal and state statutes as stated below as follows:

32. The UC-agreement incorporated by reference and implication the byelaws, rules, regulations, policies and procedures of UC (UC-byelaws), which set forth, inter alia, rights, duties, responsibilities, etc, of UC, faculty and plaintiff, But defendants ignored them.

33. The UH-agreement incorporated by reference and implication the byelaws, rules, regulations, policies and procedures of UH Medical Staff, Section I ("MS-Bylaws"), which set forth, inter alia, composition, purpose, functions, duties, responsibilities of the Board of Trustees ("Board"), Medical Staff ("MS"), Executive Committee of the Medical Staff ("ECMS"), Committees of the Medical Staff ("CMS"), Chief of Staff ("CS"), Clinical Departments ("CD") and Clinical Chiefs ("CC"). Defendants ignored them.

34. The UH-agreement incorporated by reference and implication the MS-Bylaws, Section II, which set forth Fair Hearing Plan of the MS ("FHP") encompassing Professional Review Committee ("PRC") or Peer Review Committee ("PRC"), Professional Review Action ("PRA"), Hearing Committee ("HC"), mandatory Notice, Hearing, Adverse Recommendation or Action, Appellate Review, etc.

35. The UH-agreement incorporated by reference and implication the MS-Bylaws, Section II, Article I, which set forth procedure for appointment of medical staff member to positions within the UH.

5

36. The UH-agreement incorporated by reference and implication the MS-Bylaws, Section II, Article II, which set forth procedure for imposing corrective or disciplinary action or PRA on medical staff member of the UH but defendants, particularly, Donovan sidestepped this procedure.

37. The UH-agreement incorporated by reference and implication the MS-Bylaws, Section II, Article III, which set forth procedure for PRA hearing and appellate review of medical staff member of UH.

38. The UH-agreement incorporated by reference and implication the MS-Bylaws, Section III, which set forth MS-Rules and Regulations of UH, inter alia, discharges of patient but UH ignored them.

39. The UH-agreement incorporated by reference and implication the MS-Bylaws, Section IV, which set forth MS-Policies and Procedures for sexual harassment complaint against medical staff member. But defendants ignored them, failed to investigated and take remedial action.

40. The UH-agreement incorporated by reference and implication house staff handbook "University of Cincinnati Hospital Graduate Medical Education Selected Information, Policies and Procedures, 1994-95", page 78 and 68 which set forth assurance of due process for house officer and the procedures for handling sexual harassment complaint respectively. But defendants ignored the provisions.

41. The UH-agreement incorporated by reference and implication the Health Care Quality Improvement Act of 1986, P.L. 99-660, 42 U.S.C.11101 et seq. ("HCQIA"); Ohio Quality Assessment Utilization Review, and Professional Review Codes, ORC 2305 et seq. which set forth procedural due process safeguards for physicians. But defendants ignored and denied plaintiff the provisions of the statutes.

42. The UH-agreement incorporated by reference and implication the Accreditation Standards of Accreditation Council on Graduate Medical Education ("ACGME"), American Board of Preventive Medicine ("ABPM") and Joint Commission on Accreditation of Healthcare Organization ("JCAHO").

43. Plaintiff was a qualified, experienced, outstanding, loyal and dedicated employee, public servant, and medical doctor with excellent reputation.

44. Plaintiff performed his duties and responsibilities of his position with outstanding competencies, complied with all bylaws, rules, regulations, policies and procedures of both UC and UH and his job performance was rated excellent by defendants and all the preceptors who had supervised plaintiff's work. He successfully completed all the requirements for graduation from the OEMRP but not graduated by UC and UH from the program.

45. Half way in the OEMRP, in December 1999 defendant Donovan rated plaintiff's overall performance "fine" meaning superior quality.

46. In course of the residency, plaintiff was denied the tools of his trade, such as Dictation/Audio recording electronic devices, computer password and access codes, which plaintiff needed to perform his duty but other similarly situated Caucasian OEM residents were given those tools. Plaintiff complained to Freeman, the COH

6

Director but plaintiff was repeatedly refused those tools. COH officials responsible for giving out those tools continually use racial slurs, innuendoes, and epithet on plaintiff for complaining. Those Caucasian COH officials were not disciplined.

47. Defendants UC and UH denied plaintiff benefit funds to attend clinical conferences, which were afforded similarly situated OEM and other UH residents because of his race, national origin and invidious discriminatory animus in violation of Title VI, and Title VII of civil rights laws.

48. From July through September 1999 UC employees, servants and agents continually intruded, invaded, unduly monitored and left offensive, threatening and harassing statements in plaintiff's e-mail address provided by UC and UC failing to stop it plaintiff virtually stopped using the UC given email address.

49. In or About October 1999 Freeman in series of messages left on plaintiff's answering devise continually threatened to terminate plaintiff employment/training because of what he called: "Heavy African Accent"

50. On or about October 29, 1999, Donovan sexually harassed plaintiff by fabricating and falsely accusing plaintiff of sexually harassing two female employees when he stated that two fictitious females in the human resources department complained of sexual harassment.

51. Plaintiff demanded from defendant Donovan the names and written complaints of the feigned complainants, nature, location, circumstances, date and time, and witnesses to the alleged sexual harassment to enable plaintiff the opportunity to respond, be heard and confront the complainants but denied plaintiff. Plaintiff complained to UC and UH and their managers but to take action to stop it.

52. Donovan subsequently admitted that he had no shred of evidence or rational and factual foundations of the accusation of sexual harassment against plaintiff but continue to sexually harass plaintiff.

53. However, in year 2000, Donovan verbally told plaintiff that he, UC and UH had no written sexual harassment complaints from any person against plaintiff and that he considered the alleged complaint a hoax and it was closed. Donovan affirmed these conclusions in his written memo, which was jointly signed by Donovan and plaintiff. UC and UH policies and procedures mandate first-hand written and signed sexual harassment complaint by the complainant.

54. But during plaintiff's meeting with Donovan on or about February 26, 2001 in order to terminate the employment and residency agreement, Donovan reinvented the false sexual harassment complaints, which he had concluded to be hoax and used it to prevent plaintiff's grafuation from the OEMR.

55. Plaintiff was very embarrassed, humiliated, distressed, anxious and shocked by the harassment.

56. On or about February 16, 2000, Donovan and Pohl connived, conspired, intentionally, deliberately, malicious, recklessly, wantonly and knowingly "set up" plaintiff so as to mastermind a pretext for humiliating plaintiff and terminating his employment and training.

57. Donovan supervised plaintiff that day. Pohl arranged in one of the examination rooms at COH a then 20 year old African American female patient ("Patient") who came in for pre-placement/employment assessment.

58. Donovan directed plaintiff to conduct the patient's pre-placement assessment, which plaintiff professionally did within the prevailing standards, policy and procedures of COH.

59. At the time of the assessment Pohl had the duty of chaperoning plaintiff but neglected and or failed to do so.

60. During the examination the patient initiated a conversation with plaintiff about Africa where she intended to visit in future but plaintiff politely advised the patient that the time was not convenient for such discussion.

61. At the request of the patient, plaintiff verbally gave the patient the COH telephone number to call him at a later date to talk about Africa.

62. At the time of the exam, the patient came to the COH without her immunization records that were necessary to complete her assessment and issue medical reports to her prospective employer that sent her for the exam.

63. At the end of the examination, plaintiff presented the findings to Donovan who after reviewing the case with plaintiff and personally seeing the patient advised her to send her immunization records to COH and also directed plaintiff to call the patient to remind her to send the said record if she failed to send them.

64. It is the custom, usage, habit and practice at COH to phone and obtain from patients information, materials and things missing and needed to complete their assessment and make report.

65. When the patient failed to send the record, at the direction and order of Donovan, plaintiff made two separate reminder phone calls to the patient to send the immunization records needed to complete her assessment and make final report to her prospective employer.

66. At first reminder phone call, plaintiff left a message in her answering device to send her immunization records, which the patient admitted she ignored and at the second phone call, patient admitted impersonating her sister named "Bridget" while answering, and any way plaintiff left her a massage to tell the patient to send immunization record to COH so as to complete her assessment and report.

67. During and after the examination the patient never made any complaint to any one

68. But five days later on or about 2/21/00 defendants, Donovan and Pohl, confederated, conspired and colluded to use sexism and sexual harassment to injure plaintiff's reputation by suborning and tampering with and soliciting the patient to make false defamatory complaint of sexual impropriety against plaintiff when Pohl, in her malicious intent to make the patient charge plaintiff of impropriety, phoned and unusually asked the patient many suggestive sexist questions about the exam with intent and purpose of implicating plaintiff but the patient made no statement of any impropriety by plaintiff.

8

69. In 2/21/00 defendant Pohl's hand-written-signed statement purportedly made by the patient, the patient did not specifically stated that plaintiff "harassed" or "attempted at dating" her but defendant Donovan manipulated, spun and hyped the statement that plaintiff harassed and attempted at dating the patient, which are grossly false per se.

70. On 3/22/00, Defendant Donovan unsatisfied with 2/21/00 Pohl's statement not fitting into his sinister motives and intent to injure plaintiff, personally, knowingly, willfully, maliciously, intentionally, recklessly and wantonly by phone suborned, solicited, instigated and persuaded the patient to make false defamatory statement of facts concocted and fabricated by Donovan to the State Medical Board of Ohio with intent and purpose of injuring plaintiff's person, name, reputation, trade and career; making it impossible to obtain physician license any where in the nation; and to restrain and did restrained his trade. This is grossly false statement of facts made for the wrong reason to injure plaintiff.

71. In his continuous malicious campaigns to injure plaintiff, his trade and reputation, defendant Donovan fraudulently, maliciously, purposefully, knowing and willfully manufactured series of defamatory documents, which he published and intended to publish to several third persons without knowledge, consent of and without any copies to plaintiff. The documents included but not limited to the following:

72. A medical record one-page document with the incident patient's name dated 3/22/00, and recites that {Donovan] left apology with Ms ("R"); I indicated that our resident had been disciplined. I also noted that she was free to file a complaint with the State Medical Board.

73. The 2/21/00 medical record one-paged document made by defendant Pohl, copy of which was not afforded the plaintiff.

74. A published document dated April 19, 2000, and recites in pertinent part that plaintiff was informed …would have to be chaperoned; plaintiff harassing…and unwanted attempts at dating activity; I also informed the patient that she was free to file a complaint with the State Medical Board with regards to his behavior. Donovan acted unilaterally without authority and the letter was libelous per se.

75. The letter of probation, restriction upon activities, and threat of expulsion from the residency dated April 28, 2000, and recites that you are being placed on probation. It is necessary to impose this restriction upon your activities. Donovan had no authority and basis for this sanctions.

76. The document undated from Donovan to defendant Jarrell, and recites that Dr Jarrell, this is in follow up to our phone conversation of June 23, 2000. Donovan had no authority to act unilaterally.

77. Some or all of the preceding documents of 2/1/00, 3/22/00, 4/28/00 were published to several persons, inter alia, defendant Filak on 5/4/00, Jarrell, but none was afforded plaintiff thereby constituting a denial of due process secured to him.

78. Without oral or written notice sent to and opportunity for plaintiff to response and defend himself

9

against the purported patient"s complaint, Donovan in a grossly humiliating and embarrassing manner before defendant Middaugh penalized plaintiff, ordered that plaintiff be chaperoned while examining female patients and threatened to terminate plaintiff's employment/training.

79. From 7/1/99 to 12/31/99 Plaintiff and one female Caucasian, Loren J. Tapp, ("Tapp") were the most senior residents in the third year practicum phase of the OEMRP and Tapp was then Chief Resident ("CR"). She was give preferential treatment by all white faculty than plaintiff at DOEM.

80. In or about December 1999 Tapp graduated from the OEMRP leaving plaintiff as the only most senior resident in the OEMRP who was qualified and entitled to be promoted as the Chief Resident.

81. In or around December 1999 bypassing plaintiff who was the only most qualified, most entitled and most senior resident to be appointed to the position of the Occupational Medicine Chief Resident, defendants promoted a less qualified, less experienced, and more junior white male resident, Robert M. Gabel, over and above plaintiff, thereby, denying plaintiff equal opportunity for promotion as Chief Resident because of his race, ancestry and national origin, and humiliating, degrading and demoting

82. In or around February 2000, Plaintiff applied for a second year position in Family Practice Residency Training Program ("FPR") beginning from July 2000, which UC organizes, manages and controls with Mercy Franciscan Hospital, Mt. Airy, Cincinnati, OH. Plaintiff was qualified for the position but UC kept the position unfilled while continuing to advertise it for several months until a less qualified and less experienced, younger Caucasian applied and appointed.

83. Plaintiff was not appointed to the FPR because of the negative references from Occupational Medicine faculty, to wit, inter alios, Donovan, Lockey, Freeman and Middaugh and because of plaintiff age, national origin, race and foreign medical education.

84. In or around May 2000, plaintiff was qualified and applied for part-time adjunct faculty position in Health Promotions in Allied Health Department at UC Raymond Walters College but was not hired because of his age, race and national origin. Plaintiff was qualified but less qualified younger white female was hired. Defendant Herrmann, the Chairwoman of the Allied Health Department, upon information and belief, who handpicked the less qualified younger white without giving plaintiff the equal employment opportunity that UC preached.

85. In the summer of 2000, defendant Gaynor voluntarily and on her own free will offered plaintiff a dating relationship, which plaintiff accepted and both parties became dates engaging in consensual dating. Gaynor and plaintiff communicated by personal contact, phone and emails. Gaynor sent plaintiff romantic e-cards expressing love and affections for plaintiff.

86. Plaintiff immediately realized it was not wise to engage in this type of relationship with defendant Gaynor. Plaintiff expressed to Gaynor that he did not wish to pursue a relationship with her any more but

Gaynor continued to pursue plaintiff making repeated harassing and threatening phone calls and emails.

87. When plaintiff finally got the courage to tell Gaynor that he was meeting a another woman, Gaynor became angry with plaintiff, threatening him that she would used her power and connections to scandalize plaintiff and have him expelled from the OEMRP.

88. Approximately, two weeks after her threat, Gaynor saw plaintiff with the other woman that plaintiff was then later dating. Gaynor subsequently located and met with the woman who later told plaintiff that Gaynor had told her that she (Gaynor) was already dating plaintiff and the woman should stop dating plaintiff. Consequently, the woman broke off her dating relationship with plaintiff who accepted the brake-up amicably.

89. Subsequently, Gaynor solicited from the woman copies of plaintiff's emails to the woman, and Gaynor armed with the emails called and feigned to defendant Donovan that plaintiff was sexually harassing her and her girlfriend (i.e., the woman who broke relationship with plaintiff at the threat of Gaynor).

90. Then, at request of Donovan, Gaynor inappropriately put copies of the said emails in plaintiff's file kept at Office of Graduate and Continuing Education of the Environmental Health Department of UC, and she gave copies of the said emails to Donovan who put them in his secret files designed for plaintiff.

91. Not only did Gaynor continue to sexually harass plaintiff by phone and emails with sexual contents, but she continued to withhold back plaintiff's courses and rotations registration forms from the registration office; continued to threaten plaintiff with termination of employment and expulsion from the OEMRP as evidenced by her 12/15/99 email to plaintiff. Plaintiff never sent harassing email to any person.

92. Gaynor's supervisors, defendants Jarrell and Buncker neglected and failed to stop her behavior.

93. Plaintiff never knew that he was complaining of sexual harassment by Gaynor to Donovan who with Gaynor willfully, intentionally, recklessly, wantonly, connived, conspired, intruded, invaded and put into plaintiff's file documents that were not relevant to the purpose and intent of the Personal Information Systems being kept by UC on plaintiff.

94. Donovan relied on the said irrelevant private email documents and falsely accused plaintiff of sexually harassing two females (Gaynor and the other woman) of the UC human resources department. And in his decision not to graduate and or to make negative evaluation of plaintiff in violation of the Ohio State privacy, confidentiality and personal information system law and the UC and UH bylaws, policies and procedures.

95. From the beginning of 7/1/99 plaintiff's employment and residency transaction up to and including March 2001, Donovan continually maintained, controlled and managed illegal personal information systems file on plaintiff without plaintiff's notice, knowledge and consent. Donovan published the said file with defamatory false statements of facts to several persons, inter alios, defendants, Filak and lockey, and Marshall Anderson, the Chair of DEH, who failed to investigate, prevent and correct promptly the sexually harassing and hostile environment caused by Donovan against plaintiff in spite of plaintiff's complaint to them or discipline

11

Gaynor and Donovan, the perpetrators

96. Donovan relied on his own fabricated sexual harassment against plaintiff in his bad faith negative evaluation of and decision to singularly restricted or altered the terms, conditions of employment and training, to not promote and prevent plaintiff graduating from the program up to this moment.

97. As a result of the continuing harassment and hostile work environment, plaintiff suffered and is suffering from depression, suicidal ideation, attempted suicide, anxiety, embarrassment, humiliation, sleeplessness, forgetfulness for which he receives psychiatric care.

98. From the beginning of plaintiff's residency transaction on 7/1/99 up to and including March 2001 and continuing to date, the DOEM's all Caucasian faculty, to wit, inter alios, Donovan, Freeman, Lockey and Middaugh, through their networking intentionally, willfully, recklessly, wantonly, knowingly and concertedly connived and conspired and without consideration for the rights of plaintiff neglected, failed and refused to timely evaluate plaintiff than similarly situated Caucasian OEMRs.

99. From July 1999 to March 2001, defendants, Donovan, Freeman, Lockey and Middaugh without any justification withheld grades, mandatory evaluations and other records pertaining to plaintiff's courses and rotations with intent and purpose to delay and prevent plaintiff graduation from the OEMRP, from competing with them in the relevant Occupational medicine practice market and from gainful employment; to restrain his trade than similarly situated Caucasian OEMRs.

100.     Plaintiff successfully completed his one year practicum residency transaction so as to graduate in June 2000 without any negative evaluations but particularly defendant Middaugh assigned "F" (failing grade) to an audit course that required "T" (Audit) grade with intent and purpose to delay and prevent and did prevent plaintiff from graduating from the program for more than ten (10) months.

101.     From July 1999 to June 2000, defendants, Donovan, Lockey, Freeman and Middaugh without justification except for invidious discriminatory animus and malice constructively demoted plaintiff such that they prevented plaintiff from supervising junior residents, fellows and medical residents rotating through DOEM but actually made plaintiff to be subservient to Caucasian medical students.

102.     Under color of law, UC and UH discriminated against plaintiff when they paid him salary and benefits unequally below the minimum paid to third year residents nationally, locally and or even within the UH in violation of Title VII, Equal Pay Act and Fair Labor Standard Act as amended.

103.     The UC-UH Department of Environmental Health (DEH) is one of the 14 National Institutes of Occupational Safety and Health (NIOSH) sponsored and funded Educational Research Centers (ERC) in the country. Upon information and belief the minimum salary of practicum year residents in other ERCs than UC-UH ERC was $45,000 exclusive of benefits and the minimum average salary paid third year (PGY-3) residents of all medical specialties was $45,000 exclusive of benefits and the minimum average salary paid PGY-3

12

residents at UH in specialties other than OEM was $45,000 exclusive of benefits during the relevant period, thus, plaintiff was arbitrarily and discriminatorily underpaid by about $16,000 exclusive of benefits, and thus, constituting liquidated damages plus benefits that UH denied plaintiff.

### ALLEGATION OF CONTINUING UNFAIR DEBT COLLECTION, 15 U.S.C. 1692 et seq.

104.    The UC and UH and plaintiff agreement (Agreement) provided plaintiff with full and complete tuition remissions of all courses and clinical rotations taken and full health insurance coverage.

105.    In the course of plaintiff's OEM residency, plaintiff registered for courses and clinical rotations, which were/are deemed remitted pursuant to the agreement.

106.    Beginning from Autumn 1999 continuously through years, 2000, 2001, 2003 and ongoing in 2004, UC and UH regularly, repeatedly and continuously sent plaintiff bills for the courses and clinical rotations, which were deem fully and completely remitted and, of course, had been fully funded by applicable federal govt. agency funding the OEMRP.

107.    Defendants UC and UH (Creditor) converted the said bills into "Debt" in the amount of about $4,513.00. due and payable by plaintiff (Consumer) who absolutely did not owe and is not owing any portion of, or, the whole of the debt.

108.    The creditor (UC & UH) became "creditor-debt collector" and repeatedly and continuously engaged in debt collection by serial harassing, threatening and intimidating collection letters and telephone calls to plaintiff (Consumer).

109.    Plaintiff-Consumer on many occasions notified the creditor-debt collector in writing, by phone and in person that plaintiff did not owe any portion of or the whole debt and requested verification of the debt that was not verified; and on many occasions in writing and in person plaintiff-consumer requested the creditor-debt collector to cease further debt collection communication with the plaintiff since it could not verify the debt in writing but the creditor-debt collector continued repeatedly to harass, abuse, annoy, oppress, threaten and intimidate plaintiff-consumer by phone and mail causing plaintiff psychic injuries.

110.    At least, on two occasions, upon plaintiff-consumer challenging the assertion of the debt, the creditor-debt collector's servants in writing cleared plaintiff-consumer of the debt.

111.    Creditor-debt collector, therefore, falsely and deceptively represented the character, amount and legal status of the debt that plaintiff never owed whatsoever and failed to verify the debt upon requests.

112.    The creditor-debt collector followed through with their threats of obstructing, hampering, hindering and restraining plaintiff-consumer's requests for official transcripts of his courses and clinical rotations, and Verification of Attendance of OEMRP, all of which plaintiff needed for employment and other prospective contracts and economic advantages but denied plaintiff for the debt he did not owe.

13

113.     In or about November 2002, creditor-debt collector without plaintiff's consent published defamatory false and misleading statements of fact to the employees, servants and agents of defendant General Revenue Corporation (GRC) that plaintiff was a debtor and subsequently hired GRC as their debt collection agent (GRC-debt collector) to collect or attempt to collect debt owed, or due, or asserted by creditor to be owed by plaintiff. Plaintiff owed no debt whatsoever to creditor-debt collector.

114.     In or about December 2003, creditor-debt collector without plaintiff's consent published defamatory false and misleading statements of fact to the employees, servants and agents of defendant National Enterprise Systems (NES) that plaintiff was a debtor and subsequently hired NES as their debt collection agent (NES-debt collector) to collect or attempt to collect debt owed, or due, or asserted by creditor to be owed by plaintiff.

115.     From November 2002 through December 2003, GRC-debt collector, and from January 2004 through May 2004 NES-debt collector respectively, without verification of the debt, engaged in debt collection conduct the natural consequence of which was to and did harass, oppress, annoy, abuse, threaten and intimidate and did damaged plaintiff-consumer by repeatedly or continuously causing telephone to ring and by mailing vexatious letters repeatedly.

116.     Plaintiff-Consumer on many occasions notified GRC-debt collector and NES-debt collector respectively in writing and by phone that plaintiff disputed the debt and that he did not owe any portion of and the whole debt and on many occasions requested debt verification, which they failed to give to plaintiff.

117.     On many occasions in writing and by phone plaintiff-consumer requested both GRC-debt collector and NES-debt collector to cease further communication with the plaintiff since they failed to produce verification of the debt but both GRC-debt collector and NES-debt collector subsequently, continued repeatedly to harass, abuse, annoy, oppress, threaten and intimidate plaintiff-consumer by innumerable repeated phone calls and mails causing plaintiff psychic injuries, loss of privacy, reputation and prospective employment and economic advantages.

118.     Both GRC-debt collector and NES-debt collector falsely and deceptively represented the character and amount of the debt in violation of Fair Debt Collection Practices Act, 15 USC 1692 (FDCPA) and Ohio Consumer Sales Practices Act, ORC 1345.01 et seq. (OCSPA).

119.     UC and UH use false representation of debt to block the issuance of official transcripts of courses and clinical rotations, and Verification of Attendance needed for plaintiff to be employed, obtain economic advantages.

**ALLEGATION OF MENTAL HEALTH RIGHTS VIOLATION & ABANDONMENT
AGAINST OHIO DEFENDANTS, to wit, UH, COLLINS, DAVIS, MCINTOSH**

14

120.    In May 2002, UH and its Mental Health Access Point (MHAP) and Central Clinic (CC) represented and agreed that it would provide plaintiff with mental health care services and assistance to obtain housing.

121.    Defendant Collins, a psychiatrist, appointed by UH at the Central Clinic (CC) of the Mental Health Access Point (MHAP) to provide medical treatment for plaintiff neglected and or failed to complied with the known, prescribed and accepted Standards of Care pursuant to ORC 5122 et seq. and OAC 5122 et seq.

122.    Defendants' negligence, conducts and failure include but not limited to: refusing, neglecting and failing to perform physical examination on the plaintiff; neglecting and failing to include plaintiff in the making of treatment plan; intentionally refusing, failing to inform and explain to plaintiff the treatment plan they had made for the plaintiff; arbitrarily discharging plaintiff against his will and wishes and without notice; neglecting and failing to give complete and full information to plaintiff about the so called "CORE Behavioral" in order for the plaintiff to make informed decision and or informed consent before transferring services without notice to and consent of plaintiff; neglecting and failing to know and or should have known that the so called "CORE Bahavioral" was not the appropriate place for the plaintiff to be housed and treated but without plaintiff's consent and notice transferred plaintiff's medical record there; negligently making physician-to-social worker instead of the accepted physician-to-physician patient transfer; for failing to supervise or oversee and coordinate activities of the defendant Davis, a social worker; for abandoning plaintiff; making improper transfer of plaintiff; neglecting to keep plaintiff confidentiality and privacy; Defendant Collins neglected and failed to comply with federal and state mandated plaintiff's mental health patients' "Bill of Rights" Acts; denying plaintiff mental health care services at their facilities without justification;

123.    From May 1, 2003 to the present UH and its MHAP and CC refused and denied plaintiff his medical records to which he has the right to obtain. Plaintiff made request and reminders to UH-MAHP-CC to release to him copy of and access to his medical records but they refused, neglected and failed to do so to the present without justification in violation of plaintiff's federal, state and the UH-MAHP-CC mental health rights

124. Plaintiff filed couple of grievances with the mental health advocate and Clients Rights Office (CRO) of the UH-MHAP-CC but the advocate and the CRO neglected, refused and failed to investigate conduct hearing and remedy the situation.

    **Plaintiff shall rely of the doctrines of repeat, subsequent, and serial continuing violations and discrimination, as well as the Double Recovery Doctrine citing the following counts for Ohio Defendants only: All paragraphs before the subsequent ones are deem repeated and incorporated in subsequent ones**

### ALLEGATIONS COMMON TO OHIO DEFENDANTS to wit, UC, UH, DONOVAN AND TEXAS DEFENDANTS, to wit, UTHSC, MILLER and PERALES

125.    In or about September 1999, Defendant Donovan, introduced and recommended to plaintiff a four (4) week-rotation through Environmental Medicine/Border Health program being conducted at the STEER-Center, Laredo, Texas by the Defendant UTHSC, Department of Family Practice under the directorship and supervision of Defendant Miller who continually sent catalog, brochures, flyers to UC.

126.    Defendant Miller represented to plaintiff among others that: the program provide free, safe, healthful and fully furnished housing with kitchen fully equipped with new and modern appliances to participants; free transportation from and to plaintiff's residence in Laredo, to and from any and all activities relating, pertinent to and connected with the rotation, customization and or individualization of the contents of the rotation to fit plaintiff's background and interests, and provision of materials for travel within the Laredo areas. She and other accredited faculty of department of family practice of UTHSC would afford plaintiff direct supervision and preceptorship pursuant to, inter alia, the UTHSC bylaws, rules, regulations, policies and procedures and standards of the accreditation bodies.

127.    In or about December 2000,upon approval of the rotation by Defendant Donovan, Donovan and plaintiff completed, signed and sent all the necessary application materials to Defendant Miller.

128.    In or about January 2000, Defendant UTHSC by Defendant Miller offered and plaintiff accepted the offered 4-week rotation, thus agreement ("UTHSC-Agreement") was created that bound both UTHSC and plaintiff.

129.    The UTHSC-agreement incorporated implicitly or impliedly, inter alia: the bylaws, rules, regulations, policies and procedures of the medical staff of UTHSC (UTHSC-bylaws); bylaws, rules, regulations, policies and procedures of the medical staff of the Department of Family Practice (DFP) of UTHSC (UTHSC-DFP bylaws); accreditation standards of Accreditation Council of Graduate Medical Education (ACGME-Standard); accreditation standards of American Board of Family Practice (ABFP-Standard); accreditation standards of Joint Commission on Accreditation of Healthcare Organizations (JACHO-Standard); Health Care Quality Improvement Act., 42 USC 11101 et seq. (HCQIA),

130.    All the said bylaws, standards and statutes independently, codependently and collectively secured due process to plaintiff.

131.    About the end of March 2000, plaintiff drove for days from Cincinnati, Ohio to Laredo, Texas to participate in the four-week rotation beginning from April 3 and ending on April 28, 2000. Plaintiff therby incurred heavy travel, board, etc, expenses.

132.    Upon arrival, plaintiff had much difficulty locating the STEER Center at Laredo, went to Laredo Community College campus where he was helped to contact the STEER officials, particularly Mr. Perales who refused and failed to come and get plaintiff to their office. However, plaintiff with difficulty

16

managed to get to the STEER Center where Perales and other STEER official coldly received him.

133.    Perales and plaintiff drove to the UTHSC-AHEC office for housing allocation and from there Perales and plaintiff drove to lonely Laredo Community College Campus at the outskirt of the city where plaintiff was assigned an archaic substandard and desolated home with leaking roof, leaking walls, leaking windows and doors, rusted piping, rusted pipes, rusted faucets, rusted cooking utensils, rusted cutleries, rusted spoon and forks, running dirty water with rusted grits, etc.

134.    On occasions when it rained, the rainwater leaked from the roof, the walls, the doors and windows, flooding the floor, the beddings; the wind was blowing with rainwater through the doors and windows, and setting the building into vibration. All these unhealthful and unsafe conditions constituted nuisances that affected health and safety, directly and proximately caused physical and emotional injuries, disrupted plaintiff's comfort, peace and quiet enjoyment of the premises.

135.    As a result of the nuisances, unsafe and the unhealthful conditions in the premises, plaintiff suffered severed abdominal cramps, nausea, vomiting, diarrhea, chills, fever and psychic trauma, which prompted plaintiff to seek medical consultation at Laredo and continued at Cincinnati.

136.    Similarly situated white participants in the program were given safer, healthful modern homes, with modern new utensils, new appliances, modern new cutleries, with no leaking roof, doors, walls and windows in side the city.

137.    Upon information and belief, plaintiff was the first and the only black, only of Nigeria origin, only of African ancestry to have participated in the program history, and was treated differently than similarly situated whites who were treated better, some of whom were mere students and non-physicians.

138.    Upon information and belief, the City of Laredo was 98% white Hispanics and 2% Caucasian with infinitesimal or virtually no discernable blacks.

139.    On or about April 1, 2000, plaintiff volunteered his free professional services to Health Fair organized by Laredo Department of Health, during which he intermingled, associated and assembled with people of both sexes thereby made new male and female friends. Defendant Miller was unavailable to supervise plaintiff.

140.    But Perales was always disruptive, interfering and interrupting, unnecessarily controlling and domineering plaintiff. Perales became jealous, unhappy and hostile because white Hispanic females were too friendly with plaintiff, who is black. Perales on many occasions expressed his disfavor for white Hispanic females being friendly and expressively associated with plaintiff, which were totally private matters.

141.    Perales also made many racial slurs, epithet, and innuendoes at plaintiff in furtherance of his racial discriminatory animus.

142.    On or about April 3, 2000, the first official beginning of the rotation, there was no schedule or

17

plan of the rotation activities for plaintiff, but after about a few days a schedule with blanks, and contents, which plaintiff already knew, was hastily made.

143.    Non-faculty, lay and low-level personnel without formal and due trans-cultural education and training and ethnic sensitivities were put in charge over activities and to supervise plaintiff.

144.    Defendant Miller, who was based in San Antonio about 200 miles away, was not available to instruct and supervise plaintiff pursuant to the agreement, bylaws and the accreditation standards.

145.    One other white female personnel at the STEER Center at Laredo was so preoccupied with her private domestic and family problems that she almost completely abandoned plaintiff.

146.    From April 3 through April 19, 2000 plaintiff used his car for most of the activities the UTHSC was to provide the free transportation for.

147.    The schedule of activities was not customized or individualized as promised by Miller and UTHSC.

148.    On or about April 13, 2000, defendant Miller arrived from her base at San Antonio, to Laredo that is about 200 miles away from San Antonio to lecture on the controversial "Multiple Chemical Sensitivity" She was several minutes late and when she arrived she was so cold and unfriendly to plaintiff. Miller was also very intimidated by plaintiff's extensive intellectual background and experience.

149.    Plaintiff complained to Miller among others, about the lack of preparation for his coming to participate in the program; lack of Miller's directly supervising his rotation; about the attitudes and behaviors of her low level personnel, particularly defendant Perales, she put to supervise plaintiff; about the disparate treatment of plaintiff than those similarly situated white participants; failure to fulfill the promises; the housing discrimination; Perales and other white lectures making racial slurs, epithets, innuendoes and creating hostile environment, etc.

150.    During defendant Miller's lecture on the controversial "Multiple Chemical Sensitivities" and other lectures given by other white presenters before her, plaintiff expressed his opinions and opposing views in some areas of the topics but Miller and others took it personal. Plaintiff was simply exercising his academic freedom, judgment and freedom of speech.

151.    Defendant Miller proposed to invite herself to plaintiff's residence but plaintiff declined.

152.    Perales without notice to and permission of plaintiff on separate occasions entered plaintiff's assigned residence and conducted searches. When plaintiff asked him why he did searches in his absence without notice and permission, Perales without apology simply stated that he had the right to do whatever he wanted. Plaintiff disagreed with him for Parales's conduct violated plaintiff's privacy right under the 4th Amendment. Perales did not similarly search the residences assigned to other participants.

153.    On about April 18, 2000 about three white males arrived from San Antonio to participate in the

STEER program. Upon their arrival, Perales completely abandoned plaintiff, treated the whites better than plaintiff.

154.    Perales demanded of plaintiff to up his assigned apartment to the whites, not only because they are white but also because the STEER program gave preferences to participant from within Texas, but plaintiff objected to the idea and,

155.    Consequently, in retaliation, Perales told plaintiff that he would recommend to Miller to terminate plaintiff's participation in the program.

156.    Further, on many occasions Perales had asked plaintiff to privately tutor him free some courses he was taking as part of his MPH degree program, but plaintiff declined and Perales developed antagonism, malice and hostility towards plaintiff.

157.    On or about April 19, 2000, Perales cumulatively and ultimately made good with his words when he without authority abruptly terminated plaintiff's rotation.

158.    When plaintiff told Perales that he had no authority and power to terminate the rotation, Perales communicated orally by phone and in writing to defendants,  Miller at San Antonio, TX and Donovan at Cincinnati, OH false and defamatory statements of fact that among others, plaintiff was engaging in sexual harassment of white women in Laredo.

159.    While plaintiff was conversing and familiarizing with some personnel at the Laredo Health Department exploring the possibility of appointment as director of Laredo Health Department, Perales came and told plaintiff that defendant Miller was on the phone to talk to him.

160.    Based on Perales' false statements of fact, on the phone without prior warnings and notice defendant Miller from San Antonio told plaintiff that his participation in the program was terminated immediately and that plaintiff should pack and go immediately, thus ratified Perales' action.

161.    Plaintiff asked defendant Miller why such a sudden termination without knowing what he had done wrong, Miller refused to tell plaintiff the reason for her action but said that she had had discussions on many occasions with defendant Donovan about plaintiff and that after conferring and agreeing with Donovan today both collusively agreed to terminate his participation.

162.    Defendant Miller said that she would be putting everything in writing to Donovan who would tell plaintiff why the sudden termination of his participation.

163.    Miller also told plaintiff that on the phone defendant Donovan had told her that plaintiff had record of sexual harassment at UC.

164.    Since 4/19/00 to the present defendant Donovan refused and failed to tell plaintiff why defendant Miller took that action.

165.    As a result of this incident, plaintiff suffered sudden and continuous extreme nervous shocks,

mental anguish, emotional distress, humiliation, embarrassment, chagrin, anxiety, depression, posttraumatic distress disorders, etc., which prompted his medical consultation at Laredo, TX and at Cincinnati, OH.

166.    Defendant Miller's action was arbitrary and capricious, in bad faith, malicious and constituted purposeful and conspiratorial "SETUP".

167.    Later in the evening of 4/19/00, defendant Donovan phoned plaintiff without probable cause or justification, threatened him with immediate termination of his entire residency training program saying that defendant Miller had told him that plaintiff was engaging in sexual harassment of white women at Laredo, which is absolutely false and defamatory per se.

168.    Plaintiff absolutely denied engaging any sexual harassment.

169.    Plaintiff told Donovan that Miller said she would be sending him written report about the incident and he (Donovan) would tell plaintiff in writing the reason for Miller's action.

170.    Defendant Donovan, furthermore, caused and or aggravated plaintiff's extreme nervous shocks, mental anguish, emotional distress, anxiety, depression, etc, by Donovan's threat to terminate the entire year residency without just cause and due process.

171.    Same day, plaintiff emailed his partial report/complaint to defendant Donovan and defendant Freeman but they failed to investigate and take action to protect plaintiff's rights.

172.    Plaintiff was unable to drive back to Ohio immediately because of his mental, psychological, emotional and physical trauma directly and proximately caused by the actions of Miller and Donovan.

173.    Perales threatened to forcibly evict plaintiff either by self-help or by police if plaintiff did not vacate the assigned apartment. However, luckily, plaintiff was assisted by a tourist driving back to Ohio on or about April 23. 2000.

174.    Upon information, soon after plaintiff vacated the assigned apartment, Perales assigned the apartment to the white participants from San Antonio.

175.    On or about April 24, 2000 without the guaranteed due process and without any culpable report from defendant Miller, Donovan arbitrarily and capriciously punished plaintiff by putting him on probation, restricting his clinical privileges and with threat of not giving plaintiff credits for the whole residency for the remaining entire portion of his residency training pending when he received written report from Miller at UTHSC, San Antonio, TX.

176.    Soon after Texas defendants terminated plaintiff's participation in the federally funded program, they continued the participation of the other white participants

177.    Plaintiff protested Donovan action and demanded written charges and hearing but Donovan heightened his threat of summarily terminating plaintiff's residency without credit.

178.    On or about April 4, 2001 Donovan told Dr Marshall Anderson of UC that he made a bad or

20

negative residency terminating evaluation of plaintiff because of plaintiff's sexual harassment of white omen in Laredo, Texas and at UH.

179.     The conspiratorial, bad faith, arbitrary and capricious actions of Donovan and Miller pushed plaintiff to the brink of suicide, caused and or aggravated his extreme major depression, mental anguish, emotional distress, nervousness, insomnia, lack of appetite, extreme pain and suffering, flashbacks, nightmares, post traumatic stress disorder, headaches, constitutional and physical maladies, which resulted in emergency and inpatient hospitalization.

180.     A trilogy of Perales, Miller and Donovan concertedly accusing plaintiff of sexual harassment is false and defamatory per se and it was a mastermind pretext for discrimination and terminating plaintiff's employment and training and putting plaintiff in false light.

181.     Beginning in July 1999, up to March 2001, and continuing to the moment, UC and UH, their employees, servants, and agents have engaged in regular, repeated and continuing series of discriminatory acts and systematic patterns of discriminations against plaintiff arising from their employment and training policy, or pattern and practice in continue violation of Title VI and Title VII of the Civil Rights law.

182.     The discrimination pervades a series of events culminating in discriminating act occurring in or about March 2001 and thereafter continuing to the present.

183.     Plaintiff timely filed a charge of discrimination within the limitation time period with U.S. Equal Employment Opportunity Commission on April 26, 200. On September 5, 2001 plaintiff received a Notice of Right to Sue within 90 days from the Civil Rights Division of the U.S. Department of Justice.

184.     From year 2000 to the present, UC and UH and their employees, servants and agents have prevented plaintiff's graduation from the program, withhold plaintiff's transcripts, validation or verification of attendance, prevented plaintiff from economic advantages, and restrained his trade.


### ALLEGATIONS OF ANTITRUST-SHERMAN'S ACT AGAINST OHIO DEFENDANTS

185.     Ohio defendants combined and conspired to unlawfully restrain plaintiff's trade and harm competition in Occupational Medicine market and defendants' activities in general and their misconduct in particular have a substantial anticompetitive effect on the market for occupational medicine services.

186.     Defendants UH, Donovan, Freeman, Lockey and Middaugh draw their patients from Cincinnati metropolitan area and beyond State of Ohio. Additionally, Medicare, Medicaid and other federally funded programs cover a significant number of patients that seek defendants' occupational medicine services; defendants receive significant funding and assistance from federal agencies in Washington, D.C. The defendants' various residency programs are federally funded and assisted.

187.    The disciplining of plaintiff was completely unrelated to the interests of patient care, was in derogation of plaintiff's established procedural rights as a member of UH medical staff, but was concert, conspiracy, subterfuge and sham designed solely to harass and exclude plaintiff as an effective competitor in the marketplace and harm competition in occupational medicine services market.

188.    The conspiracy has the effect of reducing competition in the market for occupational and environmental medicine services in the Cincinnati metro area, thus, raising services fees.

189.    The harm of preventing plaintiff from graduating from OEMRP of the hospital also reduces competition between Cincinnati area occupational medicine practitioners, reduces the availability of occupational medicine practitioners and freedom of consumers' choice in the relevant market.

190.    Each of the defendants, Donovan, Freeman, Lockey, Middaugh and UH had/have an independent personal stake in achieving the object of the conspiracy. The arbitrary probation, of plaintiff's staff privileges was imposed without notice to or an opportunity to be heard by plaintiff, and was effectuated by illicit and fraudulent conduct of defendants, particularly, Donovan, Freeman, Lockey and Middaugh, including but not limited to causing unfounded complaints against plaintiff to be filed with the Ohio State Medical Board and soliciting false and distorted evidence to be presented against plaintiff. Donovan had no authority to impose punishment upon plaintiff.

191.    Defendants' actions were endorsed and encouraged by each other, as all defendants personally stood to gain and did gain significant financial benefit by the exclusion of plaintiff as an effective competitor thus, harming the competition in the occupational and environmental medicine services market.

192.    The summary restriction of plaintiff's staff privileges, refusal to release to plaintiff his official transcripts and validation of attendance, and preventing his graduation resulted in his exclusion from the practice of occupational and environmental medicine in the Cincinnati metropolitan area and deprived and will deprive many individual patients, corporations, governments, industries and referring physicians of access to plaintiff's services for a substantial period of time, thus harming competition

193.    The continuously preventing graduation of and refusal to release official transcript and validation of attendance in OEMRP for more than four years to plaintiff directly and proximately caused plaintiff to lose significant income, which was thereby diverted, to defendants, as an intended and foreseeable result of restraining plaintiff's trade and restricting the supply of occupational medicine practitioner.

194.    The Defendants' combination and conspiracy were undertaken for the purpose of, with the intent to, and it had the effect of, unreasonably restraining trade in the marketplace for occupational medicine services; reflected the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation and was designed to prevent and or reduce competition in the Cincinnati area and the nation.

195.    Defendants' conduct described herein constitutes an unreasonable restraint of trade in violation

22

of the Sherman Act, 15 U.S.C. §1, and comparable Ohio State Law.

196.    Defendants have sufficient market power to monopolize relevant market and excluded plaintiff

197.    Defendants prevented Plaintiff's entrance into this market that could have the effect of helping consumers and would spur competition, resulting in low prices for occupational medicine services consumers.

## ALLEGATIONS OF RICO AGAINST OHIO DEFENDANTS

198.    Ohio defendants constitute themselves into ongoing organization, formal or informal functioning as a continuing unit.

199.    Defendants operated occupational medicine residency program through pattern of racketeering activitity including mail fraud and wire fraud in aid of racketeering, stealing and extortion in order to surreptitiously obtain substantial funds from federal government and from plaintiff who is a beneficiary of such federal funds.

200.    Defendants created fictitious, invalid and fraudulent debt purposefully to extort money from plaintiff, such fraudulent debt and the extortion thereof, effected plaintiff's trade, business, career and livelihood

201.    Defendants designed a fraudulent false debt and debt collection schemes to block plaintiff's graduation from residency program; to block release of legitimate transcripts and verification of attendance that are vital for plaintiff's employment, trade, career, business and economic advantage.

202.    Defendants used fraudulent scheme to steal half of the salary that plaintiff was entitled to under the federal funding or financial assistance plan constituting corporate fraud.

203.    Upon information, defendants made false and fraudulent financial or funding reports to federal government regarding the salary that they paid plaintiff from federal funding.

204.    Defendants used mail and wire communication to further their fraudulent schemes to extort money from plaintiff and to defraud the federal government and the plaintiff of monies.

205.    The predicate acts of the defendants are interrelated and they amount to or pose threat of continued illegal activities extending over at least five years that affected and are affecting and will continue to threaten plaintiff business, trade, career and livelihood.

206.    Plaintiff is entitled to judgment and damages.

## COUNT 1: Against Ohio and Texas Defendants

### (Civil Rights Violation, Discrimination, 42 USC 2000d et seq.)

207.    Plaintiff is black, of African ancestry, of Nigeria origin performed excellently and complied with all rules and regulations for his position at all relevant times and was exercising his protected rights.

208.    Defendants, recipients of federal fund and assistance, without probable cause and justification

23

and without due process prevented or excluded plaintiff from or denied him participation in, denied him benefits of, and subjected him to discrimination under their programs, inter alia STEER, employment and Family practice educational and training programs because of his race, color and national origin in violation of civil rights act of 1964 as amended, and 42 U.S.C. section 2000d et seq.

209.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 2: against Ohio and Texas Defendants

### 42 U.S.C. 1981 EQUAL RIGHTS UNDER THE LAW

210.    Defendants motivated by racial animus deprived plaintiff of equal rights "to make and enforce contracts" as defined by the statute.

211.    Plaintiff is qualified and applied for job but defendants failed to hire him because of racial animus.

212.    Defendants' actions have denied plaintiff enjoyment of all benefits, privileges, protection, terms and conditions of contractual relationships.

213.    Defendants' action denied plaintiff equal rights under the law and intentionally discriminated against him because of his race, sex, ancestry, and national origin.

214.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

215.    Plaintiff is entitled to recover compensatory and punitive damages from defendants for injuries suffered and continue to suffer.

## COUNT 3: Against Ohio and Texas Defendants

### 42 U.S.C. 1981 RETALIATION

216.    Plaintiff engaged in protected activities, inter alia, free speech, association, assembly, complaining of discrimination and disparate treatment in employment, housing and programs under the defendants.

217.    Defendants retaliated against plaintiff, inter alia, by termination, preventing graduation from residency, altering terms and conditions, preventing enforcement of contract because plaintiff opposed defendants' conduct that plaintiff reasonably believed constituted unlawful discrimination.

218.    There is causal connection between plaintiff's protected activities and adverse actions of the defendants.

219.    Plaintiff is entitled to judgment for compensatory and punitive damages.

24

**COUNT 4: Against Ohio and Texas Defendants**

42 U.S.C. 1983 EQUAL PROTECTION/DEPRIVATION OF CIVIL RIGHTS

220.      The individual Defendants' actions under the color of law have denied plaintiff's right to equal protection of the law as secured to him by the Fifth and Fourteenth Amendment to the U.S. Constitution enforced through 42 U.S.C. 1983.

221.      Defendants' actions, in retaliating under color of law against plaintiff because of his complaints, and harassing plaintiff throughout his employment, training and rotation, violated plaintiff's First Amendment rights to free expression and privacy.

222.      As a direct and proximate result, Plaintiff is entitled to judgment and to recover damages from defendants for injuries- loss of reputation, loss of self esteem, humiliation, extreme emotional distress, etc, - suffered and continues to suffer as a result of defendants' actions.

**COUNT 5: Against Ohio and Texas Defendants**

42 U.S.C. 1983 SUBSTANTIVE DUE PROCESS

223.      Defendants' actions have violated plaintiff's rights to substantive due process as secured to him by the Fourteenth Amendment to the U.S. Constitution enforced through 42 U.S.C. 1983.

224.      Plaintiff has property rights to his employment, training and education, as well liberty rights to his reputation and privacy. Defendants took away plaintiff's reputation, privacy and property right in training and education without due process.

225.      Texas defendants took away plaintiff's right under Texas Bill of Rights secured to him under the Texas Constitutional Bill of Rights, particularly sections 3, Equal rights; 3a, Equality under the law; 8, Freedom of Speech and from Libel; 9, Searches; 10, Rights of Accused; and 19, Deprivation of liberty, due course of law, privileges and Immunities

226.      Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions.

**COUNT 6: Against Ohio and Texas Defendants**

CIVIL RIGHTS VIOLATION, 42 U.S.C. 1983, PROCEDURAL DUE PROCESS

227.      Defendants' conducts violate 42 USC 1983 in that defendants under color of law and while clothed with the authority of their offices violated plaintiff's federally protected rights. Specifically, without limitation, defendants violated: a) plaintiff's First Amendment right to free speech by retaliating against him for complaining about matter of public concern and truthfully expressing his opposing opinions in academic and

25

intellectual matters to Miller and others; b) Plaintiff's Sixth Amendment Right to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him by summarily terminating his rotation and putting him on probation without probable or just cause; c) Plaintiff's Fifth and Fourteenth Amendments' Liberty Rights in his education and training, in his good name, honor, profession, integrity and reputation by falsely and publicly accusing him of sexual harassment of white women; d) Plaintiff's right to privacy by publicizing and criminalizing a purely private matter and by publicly portraying plaintiff in a false light and intruding into plaintiff premises

228.     Defendants are not entitled to immunity or privilege because their conducts were not a normal professorial function, a reasonable professor and or official under the same circumstances would have known (s)he was violating plaintiff's rights, and pursuant to 42 USC 2000d-7. Defendants acted maliciously, recklessly, wantonly, and with conscious disregard of plaintiff's rights.

229.     Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' conducts.

## COUNT 7 AGAINST OHIO AND TEXAS DEFENDANTS
### Violation of U.S. Constitutional Rights, 5TH Amendment
### Procedural and Substantive Due Processes,

230.     Defendants with apparent authority of their offices violated plaintiff's federal statutorily and U.S. Constitutionally protected rights. Specifically, without limitation, defendants violated: a) Plaintiff's First Amendment right to free speech by retaliating against him for voicing on matters of public concern and truthfully complaining of discrimination; b) Plaintiff's Fifth and Fourteenth Amendments Liberty and Property Rights and Interests in his job, education and training, in means of livelihood, enjoyment of good things of life, in his good name, honor, profession, integrity and reputation by denying him liberty and property interests in education and training, delaying his graduation, preventing his graduation, preventing him from gainful employment, falsely and publicly calling him sexual harasser; c) Plaintiff's Fourth Amendment right to be secure in his person, papers and effects violated by defendants without plaintiff's consent.

231.     Defendants acted maliciously, willfully, wantonly and with reckless and conscious disregard of plaintiff's protected rights.

232. Defendants violated plaintiff's right to procedural and substantive due process guaranteed to him by the Fifth Amendment to U.S, Constitution. Plaintiff is entitled to recover damages for each of the Articles or Amendments violated, from defendants for injuries directly, proximately and naturally caused by their unlawful conduct.

## COUNT 8: Against Ohio and Texas Defendants

### 42 U.S.C. 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

233.    Defendants motivated by a class-based invidiously discriminatory animus, conspired to deprive and did deprive plaintiff of equal protection rights of the laws and or equal privileges and immunities under the laws and plaintiff was thereby injured.

234.    Defendants, particularly Donovan, Lockey, Freeman, Middaugh, Filak acting in concert and motivated by a class-based invidiously discriminatory animus, conspired to deprive the plaintiff of equal protection rights of the laws, equal privileges and immunities under the laws.

235.    They concertedly and purposely masterminded the delay and prevention of plaintiff graduation from his residency training program by: inter alia, failing to evaluate, concocting sham evaluation of plaintiff, failing to post grades or evaluation, failing to provide verification of attendance at residency program and by recklessly, knowingly, maliciously, wantonly and willfully failing to follow the established rules, regulations, policies and procedures for awarding grades for courses, and evaluation of plaintiff thereby injuring plaintiff.

236.    Plaintiff is entitled to recover damages from defendants for the injuries directly, proximately and naturally caused by their unlawful conduct.

## COUNT 9: Against Ohio and Texas Defendants

### Neglect to Prevent Civil Rights Violation, 42 U.S.C. section 1986

237.    The defendants and particularly, Lockey, Buncher, Jarrell, Filak, Robbins, Harpster and Miller have the actual knowledge of the wrong to be done and have the power to prevent the wrong but neglected and or refused to prevent the violation of the plaintiff's civil rights.

238.    As a direct, proximate and natural cause by defendants' unlawful conduct plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 10: Against Texas Defendants

### 42 U.S.C. 3601 et seq. VIOLATION OF FEDERAL FAIR HOUSING.

239.    Texas Defendants unlawfully demanded that plaintiff gave up his assigned residence to Caucasian

240.    Defendants treated Amadasu differently than similarly situated whites in the assignment of housing by assigning desolated, unsafe and unhealthful accommodation to plaintiff while assigning safe, healthful and modern accommodation to Caucasians.

241.    Plaintiff is entitled to recover damages from the defendants for injuries suffered and continue to suffer as a result of defendants' conducts.

27

## COUNT 11: Against Texas Defendants

### NEGLIGENCE, NUISANCE, PREMISES LIABILITY PER SE

242.    Texas Defendants have duty to provide a safe and healthful housing for plaintiff. Defendants breached the duty of reasonable care owed to plaintiff by acting unreasonably and discriminatorily.

243.    It was foreseeable that by acting unreasonably, they would injure plaintiff, and their actions naturally, directly and proximately caused plaintiff's injuries.

244.    Plaintiff suffered and continues to suffer physical, mental, psychological and emotional injuries and is entitled to recover damages from defendants for injuries suffered and continues to suffer as a result of defendants' actions.

## COUNT 12: Against Ohio and Texas Defendant

### Negligent Hiring/Negligent Supervising/Negligent educating & training /Negligent enforcing/Preventing and Retention

245.    Defendants, particularly Miller and UTHSC have duty to provide a safe and hostility-free environment for plaintiff; Defendants have duty to educate its employees at the STEER Center, Laredo, TX about cross-cultural and ethnic differences and practices; Defendants have duty to supervise its employees; But defendants breached their duty by negligently hiring and retaining; negligently failing to supervise, negligently failing to educate their employees; Failed to conduct workshop, which familiarized their employees with cultural differences, anti discrimination laws, and limits of the scope of their duty.

246.    Defendants UC and UH have a duty of reasonable due care of providing workplace free from racism, discrimination, harassment, abuse and hostility; of educating the all Caucasian employees at the Division of Occupational & Environmental Medicine (DOEM) about non-discriminatory practices, cross-cultural and ethnic differences and practices; of preventing potential sources of conflicts, problems or controversies between employees; of conducting workshops for all the Caucasian employees at the DOEM, which familiarized them with need of, prepare them for and to accept ethnic diversity at the DOEM that had no track record of any minority, any black, any person of African ancestry and Nigeria origin ever been employed therein as faculty or in a decision making position; of supervising and monitoring Lockey, Donovan, Freeman, Middaugh, Pohl, Brockman, Gaynor, etc for compliance with and enforcing the bylaws, rules, regulations, policies and procedures; of providing support, education and training for all its employees.

247.    Defendants Donovan, Freeman, Lockey and Middaugh as per their assigned job-duties and obligations owe plaintiff mandatory and affirmative duty of reasonable due care of awarding grades for courses, teaching, educating and training, evaluating and counseling plaintiff and timely posting evaluations and grades

248.    Defendants UC, UH and UTHSC and servants have mandatory and affirmative duty of reasonable due care of investigating, conducting hearing on  information passed onto them before taking decision.

249.    Defendants Lockey and Filak have mandatory and affirmative of reasonable due care of supervising and overseeing Donovan, Freeman and Middaugh conducts

250.    Defendants breached those duties of due care by acting unreasonably; It is foreseeable that by acting unreasonably, they would injure the plaintiff; and their unreasonable actions directly, proximately and naturally caused plaintiff's injuries.

251.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continues to suffer as a result of defendants' actions.

### COUNT 13: Against Ohio and Texas Defendants
### INTENTIONAL MISREPRESENTATION

252.    Defendants, particularly Miller and UTHSC represented to make individualized or customized schedule, provide safe and healthful housing, provide free transportation for plaintiff during his rotation; At the time the representations were made defendants did not intend to perform;

253.    Plaintiff relied on the promises; Plaintiff acted upon the promises to his detriment, thereby causing plaintiff damages.

254.    Defendants made to plaintiff impressions (false impressions), statements (false statements), promises (false promises) or representations (misrepresentations), which included but not limited to: a) Timely and objective evaluation; b) Timely and objective award and posting of grades; c) fully executed documented objective job performance reviews/criticisms/corrective measures; d) fully executed documented due process disciplinary and grievance procedures; e) adherence to due process; f) equal opportunity in job and professional advancement; g) equal opportunity of seniority rights and benefits in appointment of Chief Resident; direct supervision, free transportation, excellent housing, etc.

255.    The defendants had knowledge that the promises/representations were false, and intended to induce plaintiff to rely thereon,

256.    Plaintiff actually and justifiably relied upon the false promises/misrepresentations, and acted upon the misrepresentations/false promises to his detriment, thereby causing plaintiff damages

257.    Plaintiff is entitled to recover damages from defendants for injuries suffered and continue to suffer as a result of defendants' actions. Further, Plaintiff is entitled to recover all his travel expenses.

**COUNT 14:** **Against Ohio and Texas Defendants**

**Negligent Misrepresentation**

258.    Defendants made promises to plaintiff with intent to induce plaintiff to rely thereon;

259.    Plaintiff actually and justifiably relied and acted on the misrepresentations to his detriment, thereby causing plaintiff's damages.

260.    Plaintiff is entitled to judgment.


**COUNT 15:**

**DEFAMATION- LIBEL AND SLANDER AGAINST OHIO & TEXAS DEFENDANTS**

261.    Defendants, Perales, Miller, Donovan and Gaynor repeated unprivileged oral and written publications concerning Plaintiff of sexual harassment of white women in Laredo, Texas and at UC were false, unprivileged and defamatory statement of facts. The false statements of facts by the defendants in concert that Amadasu; "continuously engaged sexual harassment of women here" at Laredo, TX and at UC were defamatory per se, slanderous per se, and libelous per se, and were made maliciously or with actual malice, and knowledge of falsity.

262.    Defendant Donovan's communication/publication over the telephone and in writing to Filak, Marshall Anderson, Pohl and many other unknown that plaintiff was **"a Sexual harasser" and "calling a female patient for dating....."** constituted defamation per se or slander per se. The publication about plaintiff was false statement of facts, defamatory and unprivileged, was made by defendants maliciously or with actual malice, with knowledge of the falsity of the statement, or with reckless disregard of the truth or falsity. The publication contained a false statement of fact, rather than a constitutionally and or statutorily protected opinion.

263.    That Filak, Jarell and Anderson and others perceived that the false statement related to plaintiff and the statement was concocted and fabricated by Donovan to induce or influence these third parties to discharge plaintiff from the program with ignominy and without credit.

264.    The statement was intended by defendants to prejudice plaintiff's reputation, office, trade, business, profession, integrity, good name, means of livelihood and prevent plaintiff from obtaining Ohio State Physician License. Donovan published to several third persons, inter alia, Ohio and Texas defendants, UC employees, University of Utah employees, Debra Moore of Utah, Ohio State Medical Board personnel, false statement of facts that plaintiff attempted at dating and harassing a female patient. The statement is defamatory per se because it imports moral turpitude.

265.    Donovan solicited and persuaded the patient to republish the defamatory state to Ohio State Medical Board. Such conduct is outside Donovan's job specifications.

266.    At the times defendants repeatedly published the defamatory statements without plaintiff's consent, they knew they were false, fabricated and concocted. They acted grossly in irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible and reasonable persons or organizations.

267.    Furthermore defendants grossly mischaracterized the facts of purely private and personal matter and portrayed it in a scandalous, defamatory and salacious false light. The statements are not constitutionally and statutorily protected

268.    These false statements of facts were willfully, intentionally and consciously concocted with malice or actual malice, with reckless disregard for the truth or falsity, to stigmatize, degrade and injury plaintiff in his reputation, good name, honor, and profession and have subjected plaintiff to ridicule, chagrin, humiliation, aggravation, embarrassment, insomnia, mental, emotional, physical and psychological pain and suffering prompting his medical attention.

269.    Plaintiff is entitled to recover damages from defendants.

## COUNT 16: Against Ohio and Texas Defendants
### INVASION OF PRIVACY AND TRESPASS

270.    Defendants intentionally, maliciously, illegally and without plaintiff's consent intruded and or invaded plaintiff's privacy by publicly disclosing matters concerning plaintiff's private life in a highly offensive and objectionable manner. Defendants further maliciously misrepresented the facts concerning the private affair and misrepresented plaintiff's motivations and intentions concerning the private affair, thus placing plaintiff in a false light. Perales intruded and trespassed into plaintiff premises without plaintiff's consent. Defendants violated plaintiff's right to be secured in his person, house and person under the 4th Amendment

271.    Ohio defendants have a duty to comply with Ohio law governing Personal Information System ORC 1347 et seq but breached that duty by placing irrelevant information about plaintiff in the system Defendants, particularly Gaynor in collusion and conspiracy with Donovan intentionally, maliciously, unlawfully and without plaintiff's consent intruded and or invaded into plaintiff's private and confidential personnel information and into plaintiff's file.

272.    Plaintiff has reasonable expectation of privacy and confidentiality in his private correspondences and in his file in the custody and management of UC.

273.    Defendants particularly Perales trespassed into Amadasu's premises without his consent and notice for no emergency on many occasions.

274.    Plaintiff is entitled to judgment.

## COUNT 17: Against Ohio and Texas Defendants

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

275.    Defendants intended and did cause intentional infliction of emotional distress.

276.    Defendants' actions were actually malicious, willful, severe, extreme, egregious, and outrageous that a normal reasonable person of ordinary sensibilities under the circumstances would feel extreme distress and could not be expected to endure it. They had intentional and reckless disregard of the probability of causing emotional distress.

277.    Defendants continuing conducts constitute ongoing intentional infliction of emotional distress, outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community

278.    As a direct, natural and proximate cause by defendants' wrongful conducts, plaintiff suffered and continue to suffer extreme and severe emotional distress, physical, mental and psychological pain and sufferings, including but not limited to fright, horror, grief, shame, humiliation, suicidal ideation, embarrassment, chagrin, disappointment, worries, nausea, flashbacks, nightmares, brink of suicide, insomnia, depression, post traumatic anxiety, aggravation, etc, prompting plaintiff's hospitalizations in medical facilities and ongoing medical treatment

## COUNT 18: Against Ohio and Texas Defendants

### Race, Sex, Color and National Origin Discrimination. 42 U.S.C. Section 2000e et seq.

279.    Plaintiff belongs to a minority group, black, of African Ancestry, Nigeria origin and well qualified

280.    Plaintiff performed excellently his duties and fully comply with all rules, regulations, policies, procedures and guidelines at all relevant times

281.    Defendants created a hostile environment and set different terms and conditions for plaintiff than similarly situated Caucasian employee-resident because of his race, ancestry and national origin.

282.    Plaintiff was treated differently than similarly situated Caucasian employee-residents. Plaintiff was denied seniority rights and benefits and job and professional advancement

283.    Defendants disciplined, retaliated against, harassed, and delayed plaintiff's graduation because of his race, ancestry and national origin and for complaining about discrimination in violation of Title VII of the Civil Rights Act 1964, as amended.

284.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 19: Against Ohio and Texas Defendants

### Hostile Environment, Sexual and Racial Harassment 42 U.S.C. Section 2000e et seq.

285.    Plaintiff is black, male, of African ancestry, of Nigeria origin, and performed his duties excellently and fully complied with all rules and regulations for his position at all relevant times

286.    Plaintiff was subjected to unwelcome conduct constituting sexual harassing conduct and harassing racial slurs, epithets, stereotypes, disrespect, verbal abuse and innuendoes.

287.    Plaintiff was treated differently or with iniquities than similarly situated Caucasian employees. Plaintiff was the only black resident of Nigeria origin who was denied tools of the trade.

288.    Plaintiff felt threatened, offended, harassed, horrified and humiliated when these severe and pervasive incidents occurred and by the totality of the circumstances. Plaintiff's race, sex, national origin and ancestry were the motivating impulses for Donovan, Miller and their cohorts' discriminatory animus and sexual harassment.

289.    Plaintiff gave Defendants actual notice but they failed to investigate or take remedial action and harassment constituted discrimination on the basis of plaintiff's race, color, sex, age, national origin and ancestry.

290.    Donovan the main perpetrator, had the power to alter or effect the terms and conditions of plaintiff's employment and training by evaluating performance.

291.    Plaintiff perceived the workplaces to be abusive and hostile that it was more difficult for him to do the job.

292.    Defendants disciplined and harassed plaintiff without rational justifications and factual basis but because of his race in violation of Title VII of the Civil Rights Act of 1964 as amended.

293.    They acted with malice and reckless indifference to plaintiff's civil rights and emotional and physical well-being.

294.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 20: Against Ohio Defendants

### Failure to promote. 42 U.S.C. Section 2000e et seq.

295.    Plaintiff is a member of a minority group, qualified for the promotion, applied for the position at issue but was not promoted because of his race, color and national origin

296.    The position was filled with less qualified and junior resident of none protected class

297.    Plaintiff is entitled to judgment and damages directly and proximately caused by their actions

33

## COUNT 21:

### Age Discrimination, ADEA 1967 as amended

298.　　Plaintiff is qualified and over 40 years old applied for position but was not hired because of his Age. Defendants' conduct denied plaintiff's right protected under ADEA of 1967, as amended.

299.　　Plaintiff is entitled to recover damages from defendants for the injuries suffered and continues to suffer as a result of defendants' unlawful conduct.

## COUNT 22: Against Ohio and Texas Defendants

### Retaliation, 42 U.S.C. section 2000e et seq.

230.　　Plaintiff opposed the defendants' unlawful discriminatory employment practices, as well as voiced concern about the inappropriate and disparate treatment of plaintiff who was the only black in the residency program, and for truthfully evaluating defendant faculty.

231.　　Defendants refused and failed to award grades, conduct evaluation of and graduate plaintiff from his residency training/employment in retaliation for the exercise of his protected rights.

232.　　There is causal connection between plaintiff involvement in protected activity and his non evaluation, non award of grades, punishment and his prevention from and delay in graduation by the defendants.

233.　　As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 23: Against Ohio and Texas Defendants

### Injurious Falsehood/Disparagement

234.　　Defendant Donovan's published to third parties false statement of facts that plaintiff **"called the female job applicant for dating"** The statement was derogatory to plaintiff's title to his business or his intellectual property or its quality, and intended to cause harm to plaintiff's pecuniary interest, trade and profession or either recognized or should have recognized that it was likely to do so.

235.　　It was published with malice or with actual malice, thereby causing plaintiff damages.

236.　　Plaintiff is entitled to judgment.

34

## COUNT 24:

### Race Discrimination - O.R.C. 4112.02

237.　　　Plaintiff belongs to a protected group, is black, of African ancestry, of Nigeria origin and

qualified for positions applied for at all relevant times

238.　　　Defendants created hostile environment for plaintiff because of his race, and opposition to
discrimination

239.　　　Plaintiff was treated differently than similarly situated Caucasian employee residents.

240.　　　Defendants disciplined, harassed and oppressed plaintiff because of his race, and protected
activity in violation of O.R.C. 4112.02 et seq.

241.　　　As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and
continues to suffer damages and is entitled to judgment.

## COUNT 25: Against Ohio Defendant

### Breach of Contract-Express/Implied.

242.　　　Plaintiff excellently fulfilled the employer and the training program legitimate performance
expectations; he was harassed, disciplined and delayed and prevented from graduation because of his race, color
and national origin.

243.　　　That defendants breached this contract by failing to fulfill their promises, representations and to
abide by the progressive process of dealing with performance standards, evaluation, grading and graduation
procedures

244.　　　That defendants breached this contract, inter alia, by disciplining without rational and factual
bases; by failing to award and post grades; by failing to release plaintiff official transcript; validation of
attendance; failing to give promised benefits; by failing to provide evaluations, by delaying and preventing
graduation of plaintiff by more than 48 months without justification. Violation of the Byelaws, Rules,
Regulations, Policies and Procedures.

245.These are other constitute material breach.

246.　　　Defendants have obligation to comply with the byelaws, rules, regulations, policies and
procedures of the UC, but the defendants intentionally, willfully, recklessly and wantonly violated their own
rules, byelaws, regulations, procedures and guidelines thereby directly, naturally and proximately causing
plaintiff damages.

247.　　　That as a result of defendants' breach the plaintiff has been damaged and is entitled to judgment
for actual, consequential and compensatory damages

## COUNT 26: Against Texas Defendant

### Breach of Contract-Express/Implied

248.     Defendants promised inter alia four complete weeks of rotation, free transportation, decent housing, free access to the computer at the center but failed to fulfill their side of the bargain thereby breached the contract.

249.     Plaintiff is entitled to judgment for damages

## COUNT 27: Against Ohio & Texas Defendants

### Breach of Fiduciary Duty and Covenant of Good Faith and Fair Dealing

250.     Under the UC-Agreement and UTHSC-Agreement, defendants have a fiduciary duty and implied duty of good faith and fair dealing to plaintiff.

251.     Plaintiff has reasonable and legitimate expectation of compliance with the terms and conditions of the contract by defendants and of plaintiff graduation or completing the rotation timely and good faith and fair dealings.

252.     Defendants' decision to not provide plaintiff with the full benefits of the contracts violated the defendants' fiduciary duties and duty of good faith and fair dealing

253.     Defendants deprived plaintiff of the benefits of the bargain and continued by acting in bad faith and unfair dealings.

254.     As a result of defendants' bad faith and unfair dealings plaintiff suffered and continues to suffer damages and plaintiff is entitled to judgment.

## COUNT 28: Against Ohio and Texas Defendants

### A Violation of Public Policy of Ohio, Texas & U.S., 29 U.S.C. sections 701

255.     Plaintiff incorporates all of the paragraphs above as if set forth fully herein

256.     That defendants have obligation not to violate the Ohio and the United States Constitution in their relationships with employees;

257.     Defendants have obligation not to violate any law of the United States or the State of Ohio in their relationships with employees.

258.     Defendants have obligation not to violate any principles of common law in their relationships with employees.

259.     That employees have a right to oppose conducts of public concern

260.     That plaintiff, while working for defendants, made his opposition to racism, discrimination, hostility and harassment, and voices his opinion about defendants' violation of their own rules, policies and

procedures.

261.        That plaintiff has disability recorded and or perceived by defendants

262.        That Defendants failed to hire and graduate plaintiff because he was disabled, and in an attempt to stop plaintiff from opposing defendants' unlawful conducts.

263.        That defendants' decision to not to hire and or graduate the plaintiff due to his disability and opposition violates the public policy of the State of Ohio and the United States.

264.        That plaintiff is entitled to judgement for damages.

## COUNT 29: Against Ohio and Texas Defendants

### Interference with Contractual Relations and prospective Economic Advantage

265.        Defendants, particularly Donovan, Miller and Perales intentionally, maliciously, without justification, but with improper objective or through improper means, purposefully interfered with plaintiff's contractual relationship with the defendant employers and prevented plaintiff from gainful employment, completing his rotation and graduation and from prospective employment and economic advantage

266.        Plaintiff is entitled to judgment.

## COUNT 30: Against Ohio Defendants

### Violation of The Sherman Act Section 1
### Unreasonable Restraint of Trade, Group Boycott/Concerted Refusal To Deal

267.        Defendant UH and its guiding or alter ego individual defendants had violated Sherman Act by conspiring to exclude plaintiff as a competitor, by engaging in exclusive dealing, refusal to deal and a group boycott and controlling a monopoly share of market for occupational medicine services in Cincinnati metro-area.

268.        Plaintiff suffered and is suffering antitrust injury and he is otherwise proper plaintiff to bring the action at issue.

269.        Defendants had concerted action, conspiracy, subterfuge and sham designed solely to harass and exclude plaintiff as an effective competitor in the marketplace and that produce anticompetitive effects within occupational medicine services in the Cincinnati metro area, the objects of which were illegal.

270.        The conspiracy and the concerted actions have the effect of reducing competition in the market for occupational medicine services in the Cincinnati metro-area. The harm of preventing plaintiff from graduating from OEMRP of the hospital also reduces competition between Cincinnati area occupational medicine practitioners, reduces the availability of occupational medicine practitioners and freedom of consumers' choice in the relevant market.

37

271.     Each of the defendants, Donovan, Freeman, Lockey, Middaugh and UH had/have an independent personal stake in achieving the object of the conspiracy and are the guiding or alter ego of defendant UH that violated antitrust laws.

272.     The arbitrary probation, of plaintiff's staff privileges was imposed without notice to or an opportunity to be heard by plaintiff, and was effectuated by illicit and fraudulent conduct of defendants, particularly, Donovan, Freeman, Lockey and Middaugh, including but not limited to causing unfounded complaints against plaintiff to be filed with the Ohio State Medical Board and soliciting false and distorted evidence to be presented against plaintiff. Donovan had no authority to impose punishment upon plaintiff.

273.     Defendants' actions were endorsed and encouraged by each other, as all defendants personally stood to gain and did gain significant financial benefit by the exclusion of plaintiff as an effective competitor.

274.     Defendants had the power to implement their anticompetitive scheme as evidenced by the summary restriction of plaintiff's staff privileges, refusal to release to plaintiff his official transcripts and validation of attendance and preventing his graduation resulted in his exclusion from the practice of occupational and environmental medicine in the Cincinnati metropolitan area and deprived and will deprive many individual patients, corporations, industries and referring physicians of access to plaintiff's services for a substantial period of time.

275.     The continuously preventing graduation of and refusal to release official transcript and validation of attendance in OEMRP to plaintiff directly and proximately caused plaintiff to lose significant income, which was thereby diverted, to defendants, as an intended and foreseeable result of restraining plaintiff's trade.

276.     The continuing exclusion of plaintiff as competitor and concerted refusal to deal by Defendants were undertaken for the purpose of, with the intent to, and it had the effect of, unreasonably restraining trade, causing group boycott, injuring plaintiff in the marketplace for occupational medicine in the Cincinnati area and the nation.

277.     Defendants' conduct described herein constitutes an unreasonable restraint of trade in violation of the Sherman Act, 15 U.S.C. §1, as amended and comparable Ohio State Law.

### COUNT 31:  Against Ohio Defendants
#### Violation of The Sherman Act Section 2
#### Attempted Monopolization And Conspiracy To Monopolize

278.     The above-described conduct by Defendants was jointly and knowingly undertaken with the specific intent to monopolize the market for occupational medicine services in the Cincinnati Metropolitan area and intentionally jeopardize competition in the market for occupational medicine  services

279.    Defendants possessed monopoly power in occupational medicine services market in Cincinnati metro area and willfully acquired or maintained that power through anticompetitive means as distinguished from growth or development as a consequence of a superior services, products, business acumen, or historic accident.

280.    Defendants had and have a dangerous probability of succeeding in their efforts to monopolize the market for occupational medicine services in the Cincinnati metropolitan area.

281.    Individual defendants were the guiding or the alter ego of defendant UH

282.    The above-described conduct by defendants constitutes overt action undertaken in furtherance of said defendants' conscious commitment to monopolize the market for occupational services in the Cincinnati metropolitan area.

283.    The above-described conduct of defendants constitutes the offenses of attempted monopolization and conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. §2, as amended and comparable Ohio State Law.

284.    Plaintiff directly and the citizens indirectly suffered and continue to suffer antitrust injury.

### COUNT 32: Against Ohio Defendants
### RICO, 18 USC 1962

285.    Defendants through commission of two or more related acts constituting pattern of racketeering activity directly or indirectly invest in, or maintain an interest in, or participate in an enterprise, the activities of which continuing to injure plaintiff's trade, business and career.

286.    The RICO violation directly and proximately caused plaintiff's injury and plaintiff is entitled to judgment.

### COUNT 33: Against UC and UH
### Fair Debt Collection Practices Act, 15 USC 1692 et seq.

287.    Plaintiff is consumer under the act who may or may not be obligated to pay money on a certain account, which may or may not be owed monies called "debt" under the act

288.    Defendants are a supplier, creditor and debt collector under the act

289.    Plaintiff did not owe any portion of and the whole debt

290.    On or about July 4, 2000 defendants, UC-UH, posted a letter to plaintiff demanding payment of debt in the amount of $2500.00. And on July 6, 2000 wrote defendant disputing the debt in question and requested verification.

291.    Not receiving response from defendants, on or about 7/12/00 plaintiff went to the defendants' account office where defendants erased the debt, which plaintiff did not owe. Defendants reduced the debt erasure in a letter to plaintiff.

292.    In or about January 2001, plaintiff applied for official course transcript and validation of attendance needed for prospective employments opportunities. Defendants denied the request for the reason they put a block on plaintiff transcript and validation of attendance because plaintiff owed them debt. Plaintiff demanded and defendant failed to produce verification of the debt.

293.    On or about 4/6/01, defendants sent plaintiff a letter that block hand been placed on his transcript for a debt he did not owe. All plaintiff's good faith efforts to resolve it were frustrated by defendants so the block remained permanently since April 2001 continuing and ongoing in 2004.

294.    Between 4/6/01 and 11/1/02 plaintiff received numerous annoying and harassing bills, debt collection letters and phone rings from defendants. Defendants ignored plaintiff's written and phone challenges to the debt, requests to cease all communication and to produce verification respecting the debt.

295.    On such bills dated 4/1/02 and 6/3/02 defendants demanded payment of $4,233.00 and $4,313.00 respectively. Many times, Plaintiff demanded verification but defendants failed to produce it.

296.    On or about July 16, 2002 defendants posted a confusing collection letter advising plaintiff about the block on his transcripts but failed to satisfy the standards of Notice of Debt under 15 USC 1692g(a). Defendants ignored plaintiff request to cease communication about the debt.

297.    On or about 9/2/02 defendants posted debt collection for $4,433.00 without complying without complying with Notice of debt requirements under 15 USC 1692g(a). Again, defendants ignored plaintiff challenges to the debt, request for verification and to cease debt communication.

298.    On or about 9/30/02, defendants posted a collection letter demanding $4,473.00, threatening to place the debt account with a collection agency without complying with statutory Notice of debt requirements. Defendants ignored plaintiff's request for verification and to cease communication.

299.    On or about 10/7/02 Plaintiff warned defendants against placing the debt account plaintiff did not owe with a collection agency and the consequences of doing so. Defendants ignored it.

300.    On or about 10/1/02 and 11/01/02 defendants posted collection letters demanding $4,473.00 and $4,513.00 respectively without complying with statutory notice of debt requirements and plaintiff's requests to provide verification and to stop communication

301.    In November 2002, ignoring plaintiff's warnings not to place the account with a collection agency, defendants eventually placed the debt account with a collection agency named General Revenue Corporation ("GRC"). Defendants continue to hold onto plaintiff's transcripts and validation of attendance need for employment and economic advantages.

302.    Defendants' conduct was offensive, abusive, harassing, oppressive, malicious and caused plaintiff great emotional distress, discomfort, embarrassment, humiliation, pain, suffering, depression, enormous economic or monetary losses.

303.    Without limiting the scope of defendants' liability, defendants' conduct as enumerated, at least, constituted the following violations of the act as set forth herein

(a). by constantly and continually ignoring statutory Notice of debt requirements in violation of 15 USC 1692g(a);

(b).    by constantly and continually ignoring plaintiff's request to cease all debt collection communication in violation of 15 USC 1692c(c); and communication with third parties in violation of 15 USC 1692c(b)

(c).  by threatening to take any action that cannot legally be taken or that is not intended to be taken in violation in violation of 15 USC 1692e(5);

(d)   by making false representation of the character and amount of any debt in violation of 15 USC 1692e(2);

(e)   by engaging in conduct which had the natural consequence of oppressing, harassing or abusing a consumer in connection with the collection of a debt in violation of 15 USC 1692d

(f)   by communicating to person credit information which is known or should be known to be false and failure to inform that the disputed debt is disputed in violation of 15 USC 1692e(8)

304.    As such, defendants are liable to plaintiff for both actual and statutory damages.


## COUNT 34:

### Against General Revenue Corporation (GRC)

### Fair Debt Collection Practices Act, 15 USC 1692 et seq.

305.    Plaintiff is consumer under the act who may or may not be obligated to pay money on a certain account, which may or may not be owed monies called "debt" under the act

306.    Defendants are debt collector under the act

307.    Plaintiff did not owe any portion of and the whole debt

308.    On or about 11/19/02, GRC posted a letter to plaintiff demanding payment of debt in the amount of $4,513.00. And on or about 11/22/02, 2000 plaintiff wrote defendant disputing the debt and requesting verification but GRC failed to send it

309.    Without sending the requested verification, on 12/3/02, within the 30 days, GRC sent a collection letter. On 12/9/02 Plaintiff requested verification and to cease communication but ignored it.

310.    On or about 12/2/03, GRC sent another collection letter and plaintiff demanded verification of the debt and to cease communication on 1/7/03 but GRC ignored it..

311.    Between 11/19/02 and 11/29/03 plaintiff received numerous annoying and harassing debt

41

collection phone rings from GRC. Defendant ignored plaintiff's written and phone challenges to the debt, requests to cease all communication and to produce verification respecting the debt.

312.　　　Defendants' conduct was offensive, abusive, harassing, oppressive, malicious and caused plaintiff great emotional distress, discomfort, embarrassment, humiliation, pain, suffering, depression, enormous economic or monetary losses.

313.　　　Without limiting the scope of defendants' liability, defendants' conduct as enumerated, at least, constituted the following violations of the act as set forth herein

　　　(a). by constantly and continually ignoring statutory Notice of debt requirements in violation of 15 USC 1692g(a);

　　　(b).　by constantly and continually ignoring plaintiff's request to cease all debt collection communication in violation of 15 USC 1692c(c); and communication with third parties in violation of 15 USC 1692c(b)

　　　(c).　by threatening to take any action that cannot legally be taken or that is not intended to be taken in violation in violation of 15 USC 1692e(5);

　　　(g)　by making false representation of the character and amount of any debt in violation of 15 USC 1692e(2);

　　　(h)　by engaging in conduct which had the natural consequence of oppressing, harassing or abusing a consumer in connection with the collection of a debt in violation of 15 USC 1692d

　　　(i)　by communicating to person credit information which is known or should be known to be false and failure to inform that the disputed debt is disputed in violation of 15 USC 1692e(8)

314.　　　As such, defendants are liable to plaintiff for both actual and statutory damages.

### COUNT 35:

**Against National Enterprise Systems (NES)**

**Fair Debt Collection Practices Act, 15 USC 1692 et seq.**

315.　　　Plaintiff is consumer under the act who may or may not be obligated to pay money on a certain account, which may or may not be owed monies called "debt" under the act

316.　　　Defendants are debt collector under the act

317.　　　Plaintiff did not owe any portion of and the whole debt

318.　　　On or about 1/20/04, NES posted a letter to plaintiff demanding payment of debt in the amount of $4,513.00. And on or about 1/23/04, plaintiff wrote defendant disputing the debt and requesting verification but NES failed to send it

319.     Without sending the requested verification, on 2/3/04, within the 30 days, NES sent a collection letter. On 2/9/04 Plaintiff requested verification and to cease communication but ignored it.

320.     On or about 3/16/04 and 4/14/04 NES sent another collection letters and plaintiff demanded verification of the debt and to cease communication on 3/19/04 and 4/19/04 but NES ignored it.

321.     Between 1/20/04 and 5/28/04 plaintiff received numerous annoying and harassing debt collection phone rings from NES. Defendant ignored plaintiff's written and phone challenges to the debt, requests to cease all communication and to produce verification respecting the debt.

322.     Defendants' conduct was offensive, abusive, harassing, oppressive, malicious and caused plaintiff great emotional distress, discomfort, embarrassment, humiliation, pain, suffering, depression, enormous economic or monetary losses.

323.     Without limiting the scope of defendants' liability, defendants' conduct as enumerated, at least, constituted the following violations of the act as set forth herein

(a). by constantly and continually ignoring statutory Notice of debt requirements in violation of 15 USC 1692g(a);

(b).  by constantly and continually ignoring plaintiff's request to cease all debt collection communication in violation of 15 USC 1692c(c); and communication with third parties in violation of 15 USC 1692c(b)

(c).  by threatening to take any action that cannot legally be taken or that is not intended to be taken in violation in violation of 15 USC 1692e(5);

(j)   by making false representation of the character and amount of any debt in violation of 15 USC 1692e(2);

(k)  by engaging in conduct which had the natural consequence of oppressing, harassing or abusing a consumer in connection with the collection of a debt in violation of 15 USC 1692d

(l)   by communicating to person credit information which is known or should be known to be false and failure to inform that the disputed debt is disputed in violation of 15 USC 1692e(8)

324. As such, defendants are liable to plaintiff for both actual and statutory damages.

### COUNT 36:  Against Collins, Mcintosh, UH & Davis
### (Federal Mental Health Rights and Advocacy, "Bill of Rights", 42 USC section 9501)

325.     Defendants grossly and intentionally violated the rights, protections and services guaranteed by federal law. Defendants abandoned plaintiff and refused to provide him with medical care and treatment

326.     Plaintiff suffered and continues to suffer humiliation, mortification, emotional distress, frustration, aggravation, nervousness, mental anguish and anxiety directly and proximately caused by

defendants' conducts.

327.      Plaintiff is entitled to recover damages from the defendants exceeding

### COUNT 37: Against Collins, Mcintosh, UH & Davis

### (Violation of Hospital-patient, Physician-patient Relationships, Confidentiality, ORC 5122.31)

328.      Defendants intentionally, recklessly, wantonly, deliberately with conscious disregard of plaintiff's rights breached the confidence plaintiff place on them.

**329.**      Plaintiff is entitled to recover damages exceeding $75,000 for injuries directly and proximately caused by defendants' conducts. Also for Failure and or unreasonable delay in releasing medical records **(ORC 3701.74 et seq.)**

### COUNT 38: Against UC and UH

### Violation of Equal Pay Act, Title VII and FLSA

330.      Defendants have discriminated plaintiff on the basis of his race and national origin and pay him unequally in violation of the Equal Pay Act., Title VII and Federal Labor Standard Act Defendants compensated plaintiff differently for equal work.

331.      Plaintiff is entitled to judgment and damages for back and front pay.

### PRAYER FOR RELIEF

Plaintiff demands judgment against defendants as follows:

A.      Finding in favor of plaintiff on all counts set forth in this complaint

B.      Awarding plaintiff compensatory, consequential, actual, damages on each of all the counts in an amount to be determined at trial

C.      Awarding plaintiff exemplary damages on each count in an amount to be determined at trial.

D.      Awarding plaintiff pre & post judgment interest, costs, travels, room and board, attorney/s fees and costs

E.      Injunction permanently restraining defendant from holding plaintiff transcripts, validation of attendance and further publication of false defamatory statements

F.      In counts 33, 34 and 35 judgment for statutory damages in an amount he is able to prove for each incident

G.      In counts 33, 34, and 35 judgment against defendant for all actual damages which he may be

44

able to prove for past, present and future loss of sleep, appetite, self esteem, self worth, pain, suffering, mental anguish, any additional past, present and future economic and pecuniary loss he may have suffered, is suffering and will suffer in future

H.    Order directing defendants to make plaintiff files whole.

I.    Award plaintiff back and front pay

J.    Awarding compensation for each defamatory act by the defendants.

K    Awarding plaintiff such other relief as this court deems just and proper.

Date: Cincinnati, 8/30/04

Darlington Amadasu, Lay Pro se Plaintiff
P.O. Box 6263
Cincinnati, OH 45206
513-207-9010