UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---

DARLINGTON AMADASU
    Plaintiff

V.

HEALTH ALLIANCE
OF GREATER CINCINNATI, et al
    Defendants

Individually, personally, officially, & jointly

CASE NO. C-1-01-0284

( Spiegel/Sherman)

PLAINTIFF'S MOTION FOR LEAVE TO FILE
AMENDED COMPLAINT AND FOR JOINDER
OF ADDITIONAL PARTIES AND CLAIMS

---

Comes now the Plaintiff, Darlington Amadasu, pursuant to FRCP 15 and this Court's Calendar Order of May 10, 2002 respectfully moves this Court for an Order granting Plaintiff leave to file an amended complaint, a true and correct copy of which is attached hereto as Exhibit A. In addition in connection with the amended complaint, Plaintiff requests leave, pursuant to FRCP 18, 19 & 20, to join as parties defendants, Sharon Evans, Janet Patterson, Sharyn Makrancy, Marci Donovan, Nikki Leimer and Med Tracker Personnel, Inc, and to join two counts as additional claims. The grounds in support of this motion are set forth in the Memorandum below.

MEMORANDUM

On May 10. 2002, this Court entered a Calendar Order establishing a deadline of June 14, 2002 for amending the complaint and /or adding parties.

Plaintiff seeks to amend his complaint to add parties defendants listed in the attached exhibit A. Plaintiff contends that the additional parties defendants were/are jointly, severally liable to Plaintiff. Additional two counts as claims are also being joined.

Since the Scheduling Order was made, Plaintiff was hospitalized for some days as a result of which he was unable to effectuate the amendment and joinder of parties and claims on or before the deadline.

On June 13, 2002, Plaintiff by phone conference with Michael Roberts, attorney for the defendants agreed that Plaintiff could file the amended complaint with joinder of parties and claims on of before June 21, 2002.

The proposed additional parties and claims all related to the underlying employment transaction and are logically based on the same facts and circumstances. The relevant facts relating to the proposed two additional claims and the proposed additional parties defendants are well known to the adverse parties consequently, they

1 22

will not be prejudiced.  It has been held: "Where the facts on which a previously unasserted claim is based are known or available to all parties, there is no prejudice in allowing an amended complaint." *Buder v. Merrill Lynch, Pierce, Fenner & Smith, 644 F.2d 690, 694 (8th Cir. 1981)*, Also see: *Foman v. Davis, 371, U.S. 178, 182 (1962) (citation omitted)* in which the Supreme Court identified the relevant criteria, in pertinent portion as follows:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded.

## CONCLUSION

Based on the following, Plaintiff respectfully requests leave to file the amended complaint be granted in order that all the issues raised by the facts relevant to this action can be tried and resolved as a single case.

Respectfully submitted,

Darlington Amadasu

Plaintiff, Lay Pro Se.

**CERTIFICATE OF SERVICE:**

I hereby certify that a true copy of the foregoing was served upon Michael Roberts, attorney for defendants by hand on 6/19/2002.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DARLINGTON AMADASU                              CASE No. C-1-01-284
P.O. Box 31484
Cincinnati, OH 45231

              Plaintiff                        Spiegel/Sherman

Vs.

                                   AMENDED COMPLAINT
                                  <u>AND JURY DEMAND</u>

HEALTH ALLIANCE OF GREATER CINCINNATI
3200 Burnet Avenue, Cincinnati, OH 45219,
CHRIST HOSPITAL
THOMAS KEMME
DAVID PARLATO
SHARON EVANS
JANET PATTERSON
SHARYN MAKRANCY
MARCI DONOVAN
2139 AUBURN AVENUE
CINCINNATI, OH 45219

        And

NIKKI LEIMER
8216 Princeton-Glendale Road
Suite #246
West Chester, OH 45069

        And

MED TRACKER PERSONNEL, INC.
8216 Princeton-Glendale Road
Suite #246
West Chester, OH 45069

                 Defendants

---

     Now comes the Plaintiff, Darlington Amadasu, lay pro se, and against the defendants individually, personally, officially and jointly, herein submits his following complaints:

<u>PARTIES:</u>

    1.     Plaintiff, Darlington Amadasu, (hereinafter Amadasu), is black, a citizen and resident of Hamilton County, Ohio during the course of his employment with defendants, Christ Hospital and Health

*Ex. A*

1

Alliance of Greater Cincinnati (hereinafter respectively Christ, and Alliance), and both are dominated by whites.

2.      Defendant, Christ Hospital is a corporation existing under the laws of the State of Ohio, and doing business in the State of Ohio, has its principal place of business at 2139 Auburn Avenue, Cincinnati, OH 45219, Hamilton county, Ohio, is a principal member of the Health Alliance of the Greater Cincinnati, and is a health care, research, educational, teaching and training institution, and is an employer within the meaning of federal and state laws.

3.      Defendant, Health Alliance of Greater Cincinnati (Alliance) with its principal place of business located at 3200 Burnet Avenue, Cincinnati, OH 45219, Hamilton County, Ohio is a corporation of some hospitals, including but not limited to Christ Hospital (Christ), University Hospital that is an Ohio State instrumentality/actor, and is dominated by Caucasians. With its vast resources and facilities, it is a health care, research, teaching, educational, and training institution, and employer within the meaning of federal and state laws. It regularly provides instructions, education and training in Vascular Technology to Alliance employees.

4.      Defendant, Thomas Kemme, (hereinafter Kemme), Caucasian male, was/is an employee of, and believed to be an Assistant Director of Radiology Department of Christ, and immediate supervisor of defendant David Parlato.

5.      Defendant, David Parlato, (hereinafter Parlato), Caucasian male, was/is employee, lead Vascular Technologist, and immediate Supervisor of Amadasu

6.      Sharon Evans, (hereinafter Evans), black female, was/is an employee, and the Director of Human Resources of Christ Hospital, has executive and supervisory responsibilities

7.      Janet Patterson, (hereinafter Patterson), Caucasian female employee of, and Human Resources Consultant for Christ/Alliance

8.      Sharyn Makrancy, (hereinafter Makrancy), Caucasian female employee of and Corporate Recruiter for Christ/Alliance

9.      Marci Donovan, (hereinafter Donovan), is a Caucasian female, employee and Administrative Director of Radiology of Christ Hospital, whom Amadasu had never heard about or met with during the relevant period.

10.     Nikki Leimer, (hereinafter Leimer), Caucasian female, was Recruiter and Placement Agent that recruited Amadasu for Christ/Alliance

11.     Med Tracker Personnel Inc., (hereinafter Agency), is a Recruiting and Placement Services business organized and operating under the law of Ohio, affecting interstate commerce. At all material times was a recruiting and Placement Agency for Christ/Alliance and it recruited Amadasu for Christ/Alliance.

<u>JURISDICTION AND VENUE</u>

12.     This action arises under the Titles VI and VII of Civil Rights Act of 1964, as amended, 42 U.S.C. sections 2000e, et seq.; 42 U.S.C 2000d et seq.; 42 U.S.C. sections 1981, 1983, 1985, and 1986 as

amended; Age Discrimination in Employment Act 1967, as amended; American with Disability Act of 1990, as amended; Violations of rights protected under the United States laws and Constitution, to wit, First Amendment-Free Speech; Fourth Amendment-Non violation of people to be secured in their persons, papers and effects; Fifth Amendment-deprivation of Liberty without due process; and the Fourteenth Amendment-deprivation of liberty, privileges and immunities without due process, equal protection of the law and Federal Public Policies; This court has jurisdiction to hear this case pursuant to Titles VI & VII and 28 U.S.C. Section 1331 because it arises under the laws of the United States. Plaintiff has fulfilled all jurisdictional prerequisites under Title VII.

13.    This court has jurisdiction over supplemental state claims pursuant to 28 U.S.C. Section 1367 because these claims arise from the same facts and circumstances as follows: Ohio Civil Rights and Anti-discrimination, ORC 4112 et seq.; defamation, breach of contract, invasion of privacy, conspiracy, misrepresentations, wrongful discharge, Ohio Public Policy, etc.

14.    The venue is properly laid in Southern District of Ohio, Western Division because the claims alleged herein arose in Hamilton County, Ohio, which is in this United States District Court.

## FACTUAL ALLEGATIONS:

15.    Plaintiff, Darlington Amadasu, (hereinafter Amadasu), is a black male, was 51 years of age at the material time, a citizen of the United States of America, Nigeria origin, African ancestry, with record of disability and or perceived by defendant Christ and Alliance to have disability. Prior to June 2000, Amadasu made many applications for job positions to Alliance without acknowledgment or response from Alliance.

16.    In or about Mid June 2000, One Ms Nikki Leimer, President of Med Tracker Personnel, Inc., a recruiting agency, (hereinafter the Agency), located in West Chester, Ohio on the phone sought permission of plaintiff to send his resume to the Alliance for the vacant positions of Sonographers at the Health Alliance of Greater Cincinnati, (The Alliance). After hearing from the agency about the employment and training opportunities at the Alliance, Amadasu authorized the agency to send his resume.

17.    On or about June 21, 2000, Ms Sharyn Makrancy, (hereinafter Makrancy), the Alliance Corporate Recruiter during the initial phone interview told Amadasu that the Alliance was very interested in arranging personal interview with him for the vacant Sonographer positions. After Amadasu was satisfied with the initial promises and representations made by Makrancy, Amadasu and Makrancy set a date for filling application forms and formal personal interviews with her (Makrancy) and David Parlato, (hereinafter Parlato), the lead Vascular Technologist and the Supervisor of the Vascular Laboratory.

18.    On or about June 23, 2000, Amadasu submitted completed applications for, among other positions, General Sonographer, and Vascular Sonographer. Amadasu was interviewed first by Makrancy and second by Parlato.

19.    On or about June 23, 2000 during the interview/hiring process, Amadasu affirmatively told Makrancy that he had considerable relevant experience in the area of General Sonography in which he had the national American Registry of Diagnostic Medical Sonographers (ARDMS) certification as Registered

3

Diagnostic Medical Sonographer (RDMS). But Amadasu also affirmatively told Makrancy that he had limited relevant experience in some areas of Vascular Sonography, and that he was not a formally trained and experienced in some other areas of Vascular Technology, in which he had no ARDMS certification as a Registered Vascular Technologist, (RVT). Then Makrancy told Amadasu, among others, that with its vast facilities, resources, policies and habits the Alliance do and would provide free on-the-job, in-service, career-cross, and formal educations and trainings for Amadasu as the Alliance habitually does for new and existing employees. Makrancy further represented to Amadasu the personnel development and promotion, job, educational and training opportunities that the Alliance had for its new and existing employees that would be available to plaintiff. Makrancy told Amadasu that given his educational background, experience, skills, versatility and ARDMS-RDMS certification, Amadasu was qualified for hiring and all available educations and trainings and other benefits in the Alliance. Makrancy affirmatively told Amadasu that the Alliance through and by Parlato and other instructors would provide the orientations, instructions, education and training needed and necessary for Amadasu to maintain desired performance standards as a Vascular Technologist, obtain ARDMS certification as Registered Vascular Technologist, (RVT), and to prepare for other job opportunities. Makrancy pledged Alliance unfettered wholly supports for Amadasu education and training while employed within the Alliance, which induced Amadasu to accept the offer of employment at the salary level lower than he had expected

20.     Amadasu upon inquiring about salary, Makrancy told him that Parlato would determine and fix his salary but Amadasu objected to the idea because this would have the potential for any time foreseeable conflicts/problems and Parlato as an employee could not be determining what Amadasu should earn. Makrancy however told Amadasu a negotiable salary range of between $13 to $23 or so per hour and Amadasu noticed that he would not start under $ 21.00 per hour. Makrancy sent plaintiff to Parlato for the second personal interview.

21.     At Amadasu's requests as some of the conditions for accepting the job if offered, Makrancy guaranteed among others to Amadasu bilaterally binding a committed minimum employment tenor of twenty four months, thirty day termination notice for just cause, due process, comprehensive orientations, on-job/in-service education and training, continuing medical education, tuition assistance, etc.

22.     On or about June 23, 2000, during the second personal interview, Parlato upon review of Amadasu's resume remarked that he (Parlato) was very intimidated by Amadasu's impressive educational background, expertise, experience, multi-competency, and diagnostic ultrasound versatility, which equal and greatly surpass those of any and all the Caucasian technologists in the vascular laboratory.

23.     Parlato was more concerned and worried about amount of bonus and salary Amadasu would be making. First Parlato repeatedly asked Amadasu how much bonus he was to get, Amadasu hesitantly told him $2000.00, then Parlato exclaimed that was too much compared with what he was paid only $1,500.00; second Parlato noted that Amadasu had no ARDMS-RVT certification but advised that Amadasu had six months to get his ARDMS-RVT certification. Amadasu affirmatively told Parlato that he had considerable relevant experience

4

in the area of General Sonography modality and that with limited level of his vascular experience he would need further instructions, education and training in some relevant areas of vascular technology modality in order to perform the job efficiently and obtain his ARDMS-RVT certification within the required period. Parlato affirmatively told Amadasu that Parlato among others do and would give Amadasu the mandatory comprehensive orientations, in-service/on-job education and training when Amadasu become employed with the alliance.

24.    About salary, Parlato told Amadasu that he wondered why the Alliance would want him to determine and fix Amadasu's salary. He told Amadasu that he had not worked out the details of the salary but noted that Amadasu's overall background called for reasonable and commensurate salary. He told Amadasu that he would confer with Makrancy about Amadasu's salary. After a tour of the vascular laboratory, Parlato sent Amadasu back to Makrancy.

25.    Between 23 and 29, June 2000 quad-partite of Amadasu, Makrancy and Parlato of the Alliance and Nikki Leimer of the recruiting agency were involved in intense salary negotiation. Parlato resisting any Amadasu's salary above $18.50, Amadasu asking salary above $20.00. Makrancy made many promises and guarantees that induced Amadasu to concede to $19.50 per hour. Nikki Leimer of the Agency guaranteed the payment of $500.00 to Amadasu as inducement to accept the offered position and salary within two business days.

26.    Alliance and Christ by their letter dated June 30, 2000 offered employment to Amadasu as Vascular Technician starting from July 10, 2000 for a guaranteed bilateral commitment of a minimum tenor of twenty-four months of employment relationship.

27.    On or about July 6, 2000 Amadasu formally accepted the offer of employment by signing and dating the Alliance/Christ's letter of 6/30/2000, and delivering it personally to Makrancy. [A copy is attached hereto and incorporated as exhibit A]. Contemporaneously, Amadasu's acceptance letter dated July 3, 2000 and signed by Amadasu was personally delivered to Makrancy who also signed it for and on behalf of the Alliance and Christ. [Attached hereto and incorporated is a copy as exhibit B]. The addendum to the employment contract dated 7/3/2000 [Attached hereto and incorporated is a copy as exhibit C]. These together constituted expressed written contract by, between and among Amadasu, the Alliance and Christ. Further, the parties had implied contractual agreement.

28.    On or about July 10, 2000, Amadasu attended the Alliance corporate mass-orientation during which promises, guarantees and representations, including but not limited to documentary mandatory departmental orientations, in-service/on-job education and training, benefits, etc were made reinforcing and confirming those already made to Amadasu by Makrancy and Parlato during the personal interviews.

29.    On or about July 11, 2000 Amadasu attended    Christ Hospital orientation during which promises, guarantees, representations, policies, procedures, some rules and regulations were repeated, reinforced and confirming those already said. Christ/Alliance gave Amadasu three different orientation blank forms, pamphlets or booklets that must be executed jointly by Amadasu and Parlato (departmental manager/supervisor)

5

when each and every component of the mandatory departmental orientations was done. The bilaterally executed orientation documentations must be delivered to the human resources office for processing. Then Amadasu went to the Vascular Laboratory (hereinafter "Vasculab") and assumed duty without the mandatory orientation.

30.      The all Caucasian employees of the Vasculab coldly received Amadasu. The Vasculab employees consisted of three Caucasian male Vascular Technologists, to wit: David Parlato, Bruce Smith, and David Moeller, a Caucasian female clerk/receptionist and Amadasu who was the only black, the only person of African ancestry and of Nigeria origin ever to have worked in the all Caucasian dominated Vasculab. Amadasu with bachelor and master degrees, multiple competencies, versatility in diagnostic Sonography, years of experience and expressed potential for higher administrative/management position greatly surpass any and all the Caucasian employees of the Vasculab.

31.      Essentially the Vasculab had three scanning rooms, each of which was claimed by each of the Caucasian technologists as his personal domain. Each Diagnostic Ultrasound Equipment was also claimed by each of the Caucasian as his personal possession in each of the three scanning rooms. The Caucasian never accepted Amadasu as a bona fide member of the purported team at the Vasculab.

32.      From 7/11/2000 through 8/1/2000 Amadasu was not given any and all components of the mandatory orientations of the Vasculab in spite of Amadasu's relentless reminders to Parlato to do so. Defendants did not fulfill the promised orientation, in-service/on-job education and training. While the all Caucasians in the Vasculab had the keys to Vasculab and the passwords to the computers therein Amadasu was denied because Parlato said that blacks were unreliable and that he did not trust black that often stole from the Christ Hospital. Amadasu had to wait a minimum of thirty minutes outside for any of the Caucasian employees to let him into the Vasculab and they did not like Amadasu be alone in the Vasculab. Amadasu was ostracized and subjected to harassment and hostile environment. Amadasu was referred to with racial slurs, epithets, and stereotyping comments.

33.      Parlato told Amadasu that he would have problems working with someone who had a disability like Amadasu's and that he would not be comfortable working with Amadasu who was as old as his father. On the day Parlato searched Amadasu's bag and desk without Amadasu's consent and asked Amadasu for what kind of illness Amadasu was taking the medicine in the container that Parlato took out from Amadasu's bag, Amadasu answered among others Major Depression. When Amadasu asked Parlato why he searched his bag and his desk, he could not give any reason initially but later said that he wanted to find out if Amadasu was stealing the hospital's property.

34.      Before 7/11/2000 and until about 7/24/2000 Parlato received orientations, education and training on brand new Hewlett Packard Agilent Ultrasound equipment that the Hewlett Packard sales representative promoted to and placed at the Vasculab. On many occasions Parlato had problems operating the said new equipment and had to call or wait until the representative came to teach him the know-how and gave him hands-on orientation and training.

35.      From about 7/25/2000 until about 7/31/2000, when the Caucasian female clerk/receptionist was

away, Parlato and plaintiff worked as backup clerks/receptionists because the Alliance and Christ would not provide substitute clerical personnel.

36.    On or about 7/20/2000, Makrancy telephoned and told Amadasu that according to the habits an policy of the Alliance she called to enquire how Amadasu was adjusting to the job and the Vasculab. Amadasu complained to her about the racial, national origin, age and disability discrimination, segregation, racial slurs, epithets, stereotyping, denial of orientation and training, hostile work environment, etc which were memorialized in writing to her. Plaintiff also attached completed Alliance internal transfer request form to jobs that were available at other Alliance's hospitals.

37.    On or about 7/24/2000 the plaintiff's first payday, Parlato demanded to see and review the pay slip and to know the exact age of Amadasu. When Amadasu refused but Parlato went and obtained from the computer Amadasu's private and confidential personal information that included but not limited to his date of birth, salary, etc. Then Parlato told Amadasu, among others that Amadasu was too old, has a heavy African accent, was making about the same salary like him; the Alliance and Christ would not pay him extra money if he was to give Amadasu the mandatory orientations, the promised education and training; that if he gave Amadasu the promised education and training and Amadasu subsequently obtained ARDMS-RVT certification plus the ARDMS-RDMS certification, master degree, years of experience and multiple competencies, Amadasu would eventually be taking Parlato's position or get promoted over and above him; that he would prefer hiring and training a younger new graduate who would earn $13.00 or less per hour, not compete with Parlato for position and who would stay longer than Amadasu. Parlato asked Amadasu why he did not go back to Africa. Parlato told Amadasu that Amadasu was his potential competitor at Christ hospital and was not happy with Plaintiff's letter of 7/20/2000 complaining about discrimination to Makrancy. Amadasu gave Parlato his complaint's letter dated 7/24/2000 and completed transfer form dated 7/24/2000. Upon receipt, Parlato told Amadasu that he was going to get rid of Amadasu from his employment. He made good on his words on 8/1/2000 when Amadasu was wrongfully discharged from his employment summarily without notice and just cause.

38.    On or about 7/31/2000, Parlato directed Amadasu to retrieve an old report of vascular physiological study of a patient from one noninvasive vascular physiological equipment to which Amadasu had not been oriented. After many unsuccessful attempts, Amadasu requested Parlato's assistance but Parlato also failed to obtain the report after many trials and errors. Parlato left Amadasu alone. Then David Moeller, one of the Caucasian technologists that Amadasu requested to help retrieve the report did the same operations that Amadasu and Parlato had done but was unable to retrieve it until Moeller and Amadasu referred to the equipment operator's manual before the report could be retrieved.

39.    When plaintiff expressed his concern about issues of public concerns, such as (a) the grossly inappropriate and disparate way and manner black patients were being handled and treated than similarly situated Caucasian patients at the vasculab by the Caucasian technologists, especially by Mr. Bruce Smith, (b) the "assembly line" type of services that were potentially costly, harmful and compromised health care quality, (c) racial discrimination, segregation, harassment and hostility in the workplace, preferential treatment for the

7

Caucasian than the plaintiff who was treated differently than similarly situated Caucasians, Parlato and the rest of his Caucasian cohorts branded Amadasu as a potential dangerous whistleblower.

40.    Plaintiff gave a specific example of the time Mr. Bruce Smith and Amadasu were alone in the Vasculab and the workload was not heavy. Mr. Smith made many disturbing disrespectful and disparaging remarks about black patients, especially one African-American female patient weighing about 300 to 400 lbs brought on a stroller for non-invasive vascular study. Mr. Smith inappropriately "completed" the study in less than five (5) minutes that would on the average take fifty (50) minutes. The patient was returned the following day for appropriate study.  Amadasu shared this concern with Parlato who failed to take action but covered up for his fellow Caucasian technologist.

41.    Amadasu was not aware and had not been made aware orally or in writing, by any person or group of persons, including but not limited to Parlato, of any concern about plaintiff's professional skills or performance at any point during the relevant period of his employment with the Alliance and Christ.  On the contrary, the medical director of the Vasculab on occasions had in the presence of the Amadasu and the rest technologists expressed dissatisfactions with the quality of studies and reports that the Caucasian technologists performed, especially the Mr. Smith's "assembly line", speedy, inappropriate, unreadable and un-interpretable studies. Mr. Bruce Smith had not been discharged.

42.    Any and all self-help efforts by Amadasu to orientate himself to the equipments, documentations, protocols, etc of the Vasculab were intentionally, purposefully and consciously frustrated by the ganged up Caucasian technologists in the Vasculab. Amadasu was unaware and was not advised by any person or group of persons at any point in time that he was being or had been evaluated for his professional skills. It is inappropriate to evaluate any employee who had not been given mandatory orientation.

43.    On or about 8/1/2000 Amadasu was summarily discharged without any prior warning or notice in a grossly humiliating and shocking manner as if Amadasu was a criminal. Parlato invited Amadasu to have a walk with him in the premises but suddenly and surprisingly was arraigned like a criminal before defendant Mr. Thomas Kemme (hereinafter Kemme) who summarily handed Amadasu pink discharged paper without prior oral or written warning or notice. Amadasu protested among others that he had not been given the mandatory orientation in the vasculab in particular and the radiology department in general and that he was never told that he was being or had been evaluated, was not confronted with the evaluation, that he was being discharged because of his race, age, disability, national origin, and in retaliation for exercising his protected rights. Upon inquiring Kemme told Amadasu that he had not received from Parlato any documentation of the purported evaluation and or of the mandatory departmental orientation, in-service education and training. In the next crude step, Kemme stripped the I.D. badge from Amadasu's shirt and ordered him to leave immediately, Then Amadasu asked, what about taking his bag in the vasculab? Kemme directed Parlato to escort Amadasu to take his bag. Coming back to Kemme's office, Amadasu requested copies of his file in the department but Kemme told him that he had no file on Amadasu. Next, Kemme demanded Amadasu's parking plastic card, Amadasu told him that it was in his car, then Kemme directed Parlato to follow Amadasu to his car in the parking garage

8

where Amadasu gave Parlato the parking plastic card. Then Parlato told Amadasu among others that there were many ultrasound positions out there for plaintiff and he Parlato strongly disfavored Amadasu's letters dated 7/20/2000 and 7/24/2000 complaining of discriminations, civil rights violations and requesting internal transfer from the Vasculab to other facilities.

44. From 8/1/2000 through 8/9/2000 Ms Janet Patterson, (hereinafter Patterson), Caucasian female, employee of and or Christ Hospital Human Resources Consultant refused to intervene and or meet with Amadasu in spite of his many requests to do so. On or about 8/1/2000 upon discharged, by phone Amadasu reported to human resources personnel including but not limited to Patterson that he had just been discharged from his job because of his race, age, disability, national and ancestry origin and in retaliation for exercising his protected rights. Patterson failed and or refused to act but told Amadasu that either Parlato or Kemme had not made her aware of Amadasu's situation.

45. On or about 8/10/2000 at Amadasu's request in order to exhaust all available internal administrative process for resolution of the matter, had a meeting in which Ms Sharon Evans, (hereinafter Evans), Director of Christ Human Resources and Patterson, the Human Resources Consultant were present. Amadasu protested to them that among others he was wrongfully discharged because of his race, age, disability, national and ancestry origin and in retaliation for his exercise of his protected rights, and that he wanted his job back or in the alternative, Amadasu requested internal transfer to same or similar job openings at other member hospitals of the Alliance. Amadasu gave Evans and Patterson Amadasu's fully executed Alliance application forms, internal transfer request form and a list of available similar positions to which Amadaasu could be transferred at other Alliance's hospitals. Amadasu requested copy of any and all documents relating and pertinent to Amadasu's employment relationship with the Alliance and Christ Hospital.

46. On or about 8/17/2000 plaintiff received from Evans a letter dated 8/15/2000 with a check for hiring bonus, which was one of the terms and conditions of the employment contract, copied twenty-page documents from Amadasu's personnel file. In the said letter Evans stated that she was still investigating Amadasu's complaint, and that upon completion on 8/22/2000 she would get back to Amadasu but she never did up till this moment. In the said letter, Evans directed Amadasu to contact Makrancy for other open positions but upon doing so Makrancy refused and failed to hire Amadasu in spite of many same and similar open positions for which Amadasu qualified and applied for and with copies sent to Evans. Defendants acted in bad faith in the administrative process to resolve the matter without the need for court process

47. Same and or similar positions remained open in the Alliance for which Amadasu was qualified, applied and not hired but were continuously advertised by the Alliance at its websites, billboards, and job listing boards, seeking applications from persons of similar or less qualifications, etc.

48. Subsequent to Amadasu's termination, defendants gave negative information about Amadasu over the telephone to Amadasu's potential employers. For example, defendants over the phone told Mercy Franciscan Hospitals that Amadasu was a fake and quack Sonographer and was fired because of Amadasu was quack and was not a registered Sonographer, which is false.

9

49.    On or about 9/26/2000 Amadasu filed charges of discrimination with the U.S. Equal Employment Opportunity Commission, [E.E.O.C.] Amadasu received the Notice of Right To Sue from the E.E.O.C. on 2/12/2001[attached hereto as exhibit "D"]

50.    Amadasu was a victim of tortious conduct perpetrated individually or collectively by David Parlato (Parlato) and Thomas Kemme (Kemme). The tortious conduct is as described above.

51.    At all times material to this action Parlato and Kemme were employed by Alliance and Christ in the capacities of manager/supervisor, and assistant director respectively.

52.    As a result of the tortious conduct perpetrated by defendant Christ/Alliance employees described above Amadasu suffered and continue to suffer damages and losses consisting of among others lost wages or income, benefits; shocks, pain and suffering, depression, mental anguish and emotional distress, etc.

53.    At the time the tortious conduct that injured Amadasu was committed by Christ/Alliance employees, such employees were acting within the scope of their employment duties and their tortious conducts were therefore imputable to Christ/Alliance under the doctrine of *respondeat superior;* and/or at the time the tortious conduct that injured plaintiff was committed by Christ/Alliance employees, such employees were acting within the scope of their apparent authority, such that plaintiff was justified in relying on the appearance of authority respecting the employees' actions. Such tortious conduct was therefore imputable to Christ/Alliance under the doctrine of *respondeat superior;* and /or the tortious conduct that was committed by Parlato and Kemme and which injured plaintiff described above, was authorized or approved in advance by Christ/Alliance, and thus, such tortious conduct is imputable to Christ/Alliance under the doctrine of *respondeat superior;* and/or the tortious conduct that was committed by Parlato and Kemme and which injured plaintiff described above was subsequently ratified by Christ/Alliance, and thus, such tortious conduct is imputable to Christ/Alliance under the doctrine of *respondeat superior;* Parlato and Kemme were motivated by a desire to serve  Christ and Alliance and or by personal reasons in engaging in their conduct, and thus, such conduct was imputable to Christ and Alliance because Christ and Alliance authorized and or ratified their conduct.

54.    The tortious conduct that was committed by Parlato and Kemme was egregious, outrageous and oppressive, suppressive and characterized by actual and or common law malice, willfulness, or wantonness justifying the imposition of punitive damages.

55.    The imposition of punitive damages on defendants and or Christ/Alliance for egregious and outrageous tortious conduct is justified on the grounds that Christ/Alliance authorized/ratified the conduct or the defendants were reckless or wanton in retaining the employee who committed the tort after knowledge of the employees' proclivities to engage in such conduct or that the employees who committed the tort occupied positions that are either equal to or above managerial position at Christ/Alliance.

## COUNT 1

### Race and National Origin Discrimination 42 U.S.C. Section 2000e et seq.

56.    Plaintiff incorporates all of the paragraphs above as if fully set forth herein

57. Plaintiff is black, of African ancestry, of Nigeria origin, belongs to the protected class and qualified for his position at all relevant times

58. Defendants created a hostile environment and set different terms and conditions for plaintiff than similarly situated Caucasian employees because of his race, ancestry and national origin.

59. Plaintiff was treated differently than similarly situated Caucasian employees.

60. Defendants disciplined, retaliated against, harassed, and discharged plaintiff because of his race, ancestry and national origin and for complaining about discrimination in violation of Title VII of the Civil Rights Act 1964, as amended.

61. As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 2

### Hostile Environment, Racial Harassment 42 U.S.C. Section 2000e et seq.

62. Plaintiff incorporates all of the paragraphs above as if fully set forth herein

63. Plaintiff is black, of African ancestry, of Nigeria origin, belongs to a protected class or racial minority, qualified for his position and job he was performing, was satisfying normal requirements in his work, work performance was evaluated by prohibited criteria and or method and was discharged. After his discharge defendant Christ-Alliance continued to advertise for applicants with lower qualifications and refused to hire plaintiff.

64. Plaintiff was subjected to unwelcome conduct constituting harassing racial slurs, epithets, stereotypes, segregation, ostracism, innuendoes, using the "N-word" as part of vocabulary commencing on or about 7/11/2000

65. Plaintiff was treated differently or with iniquities than similarly situated Caucasian employees. Plaintiff was the only person denied a key to the vascular laboratory, denied the password to the computers in the lab. Each of the three Caucasian coworkers claimed each of the three procedure rooms as his private domain, and all three Caucasian coworkers considered the vascular laboratory as their exclusive Caucasian domain.

66. Plaintiff felt threatened, offended, harassed, horrified and humiliated when these severe and pervasive incidents occurred and by the totality of the circumstances. Plaintiff's race, national origin and ancestry were the motivating impulse for his coworkers' discriminatory animus. Plaintiff gave Defendants actual notice but they failed to investigate or take remedial action and harassment constituted discrimination on the basis of plaintiff's race, age, national origin, ancestry and disability. Parlato the main perpetrator, had the power to alter or effect the terms and conditions of plaintiff's employment by evaluating performance

67. Plaintiff perceived the workplace to be abusive and hostile that it was more difficult for him to do the job.

68. Defendants disciplined, harassed and discharged plaintiff because of his race in violation of

11

Title VII of the Civil Rights Act of 1964 as amended. They acted with malice and reckless indifference to plaintiff's civil rights and emotional and physical well-being.

69.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 3

### Civil Rights Violation, 42 U.S.C. Section 2000d et seq.

70.    Plaintiff incorporates all the paragraphs above as if fully set forth herein

71.    Plaintiff is black, of African ancestry, of Nigeria origin, belongs to the protected class and qualified for his position at all relevant times

72.    Defendants, particularly Christ and Alliance, receiving federal funds and assistance without probable cause and justification prevented and or excluded plaintiff from participation in, denied him benefits of, and subjected him to disparate treatment than similarly situated Caucasians, to discrimination in their educational and training programs receiving federal assistance, funds, or contracts because of his race, color and national origin in violation of civil rights act of 1964 as amended, and 42 U.S.C. section 2000d et seq. Defendants discriminated against plaintiff on basis of race under program or activity receiving federal assistance, and that primary objective of federal funding was to provide employment

73.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 4

### Violation of Equal Rights under the Law, Intentional Discrimination 42 U.S.C. section 1981et seq.

74.    Plaintiff incorporates all the paragraphs above as if set forth fully herein

Defendants' action denied plaintiff equal rights under the law to make and enforce contracts, and intentionally discriminated against him because of his race, ethnicity, ancestry, and national origin or racial minority status.

75.    Plaintiff was qualified for his position and job he was performing; was satisfying normal requirements in his work; was purposefully and intentionally denied the mandatory orientation to job, and in-service training promised; his work performance was either not evaluated or evaluated deceitfully by prohibited criteria and or method and was wrongfully discharged by prohibited method. After his discharge defendant Christ-Alliance continued to advertise for applicants with lower qualifications and refused to hire plaintiff. Plaintiff was treated differently or with iniquities than similarly situated Caucasian employees. Plaintiff was the only black and the only person denied the key to the vascular laboratory, denied the password to the computers in the Vasculab on basis of his race. Each of the three Caucasian coworkers claimed each of the three procedure rooms as his private domain, and all three Caucasian coworkers considered the vascular laboratory as their exclusive Caucasian domain and thereby segregated and ostracized plaintiff

76.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment for damages, equitable and legal relief, compensatory and punitive damages.

## COUNT 5

### Equal protection/Deprivation of Civil rights, Privileges and Immunities; Article IV section 2 Clause 1, & 5th and 14th Amendment to U.S. Constitution.

77.    Plaintiff incorporates all the paragraphs above as if set forth fully herein

78.    Defendants' actions denied plaintiff's right to equal protection and non-deprivation of civil rights, privileges, property, liberty and immunities as secured to him by the Article IV Section 2 Clause 1 and the Fifth and the Fourteenth Amendment to the U.S. Constitution without due process. Some of the defendants may have acted the color of state law to do unlawful act against the plaintiff. Plaintiff has property, liberty and interest right in his employment, which was taken away by defendants without due process

79.    Plaintiff is entitled to recover damages from the defendants for injuries suffered and continue to be suffered as a result of defendants' unlawful conduct.

## COUNT 6

### Conspiracy to Interfere with/Violation of Civil rights 42 U.S.C. section 1985.

80.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

81.    Defendants, particularly Parlato, Kemme and Ms Marci Donovan acting in concert and motivated by racial dislike for protected class, racial or a class-based invidiously discriminatory animus, conspired to deprive the plaintiff of equal protection rights of the laws, equal privileges and immunities under the laws of the United States. They concertedly and purposefully masterminded the discharge of plaintiff from his employment by concocting sham performance evaluation of plaintiff and by recklessly, maliciously, wantonly and willfully failing to follow the established procedures for performance evaluation and discharge of plaintiff thereby injuring plaintiff.

82.    Defendants conspired purposefully to deprive plaintiff directly or indirectly equal protection of the law, or equal privileges and immunities under laws of the United States; and acted in furtherance of conspiracy whereby plaintiff was injured in his personal property, liberty or deprived of right, or privileges of citizen of the United States.

83.    Plaintiff is entitled to recover damages from defendants for the injuries directly, indirectly, proximately and naturally caused by their unlawful conduct.

## COUNT 7

### Neglect to Prevent Civil Rights Violation, 42 U.S.C. section 1986

84.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

13

85.    The defendants particularly, Christ, Alliance, Donovan, Evans, Patterson and Kemme have the actual knowledge of the wrong or conspiracy to be done to deprive plaintiff of equal protection, equal privileges or immunities, and were in position and have the power to prevent the implementation of the wrong or conspiracy but neglected and or refused to prevent the violation of the plaintiff's civil rights.

86.    As a direct, proximate and natural cause by defendants' unlawful conduct plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 8

### Violation of U.S. Constitutional Rights, 5TH Amendment Procedural and Substantive Due Processes,

87.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

88.    Defendants with apparent authority of their offices violated plaintiff's federal statutorily and U.S. Constitutionally protected rights. Specifically, without limitation, defendants violated: a) Plaintiff's First Amendment right to free speech by retaliating against him for voicing on matters of public concern and truthfully complaining of discrimination; b) Plaintiff's Fifth and Fourteenth Amendments Liberty and Property Rights and Interests in his job, education and training, in means of livelihood, in his good name, honor, profession, integrity and reputation by denying him liberty and property interests in his job, education and training, discharging him from gainful employment, falsely and publicly calling him quack and fake; c) Plaintiff's Fourth Amendment right to be secure in his person, papers and effects, against unreasonable searches that was conducted by Parlato without plaintiff's consent.

89.    Defendants acted maliciously, willfully, wantonly and with reckless and conscious disregard of plaintiff's protected rights.

90.    Defendants violated Plaintiff's right to procedural and substantive due process guaranteed to him by the Fifth Amendment to U.S. Constitution. Plaintiff is entitled to recover damages for each of the Articles or Amendments violated, from defendants for injuries directly, proximately and naturally caused by their unlawful conduct.

## COUNT 9

### Age Discrimination, ADEA 1967 as amended

91.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

92.    Defendants' conduct denied plaintiff's right protected under ADEA of 1967, as amended.

93.    Plaintiff is entitled to recover damages from defendants for the injuries suffered and continues to suffer as a result of defendants' unlawful conduct.

## COUNT 10

### American with Disability Act 1990, as amended, 42 U.S.C. section 12101 et seq.

14

94.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

95.    Plaintiff is a qualified individual with a disability because there is record of it and defendants regarded plaintiff as having such impairment. Plaintiff was capable of performing the essential functions of the job without the requirement of accommodation

96.    Defendants were motivated by plaintiff's disability when they discharged him from his job.

97.    As a result of direct, proximate, and natural cause by defendants' unlawful conduct plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 11

### Retaliation, 42 U.S.C. section 2000e et seq.

98.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

99.    Plaintiff opposed and complained about the defendants' unlawful discriminatory employment practices, hostile environment, racial harassment as well as voiced concern about the inappropriate treatment of minority patients.

100.    Defendants discharged plaintiff from his employment in retaliation for the exercise of his protected rights.

101.    There is causal connection between plaintiff involvement in protected activity and his discharge by the defendants.

102.    As a result of direct, proximate and natural cause by defendants' unlawful conduct, plaintiff suffered and continues to suffer damages, and is entitled to judgment.

## COUNT 12

### Negligent Hiring, Negligent Supervising, Negligent educating & training, and Negligent enforcing/Preventing

103.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

104.    Defendants Christ/Alliance have a duty of reasonable due care of providing workplace free from racism, discrimination, abuse, harassment and hostility; of educating the all Caucasian employees at the vasculab about non-discriminatory practices, cross-cultural and ethnic differences and practices; of preventing potential sources of conflicts, problems or controversies between employees; of conducting workshops for all the Caucasian employees at the Vasculab, which familiarized them with need of, prepare them for and to accept ethnic diversity at the vasculab that had no track record of any racial minority, any black, any person of African ancestry and Nigeria origin ever been employed therein; of supervising and monitoring Parlato and Kemme for compliance with the policies and procedures; of enforcing the policies and procedures; of providing support, education and training for all its employees.

105.    Defendant Parlato as per his assigned job-duties owed plaintiff mandatory and affirmative duty of reasonable due care of teaching, educating and training plaintiff

15

106. Defendant Christ, Alliance, Evans, Patterson, Donovan and Kemme have mandatory and affirmative duty of reasonable due care of thoroughly investigating information passed onto them before taking decision

107. Defendants breached those duties of due care by acting unreasonably; It was foreseeable that by acting unreasonably, they would injure the plaintiff; and their unreasonable actions or inactions directly, proximately and naturally caused plaintiff's injuries.

108. Plaintiff is entitled to judgment.

## COUNT 13

### Intentional Misrepresentation

109. Plaintiff incorporates all of the paragraphs above as if set forth fully herein

110. Defendants Christ/Alliance are, among others, teaching, educational and training institutions under federal, state and local laws, and on-going basis, traditionally, customarily and regularly provide, among others, on-the-job, in-service, cross, and remedial/corrective educations and trainings as part of the many employees' benefits.

111. Before and after hiring plaintiff, Defendants made to plaintiff impressions (false impressions), statements (false statements), promises (false promises) or representations (misrepresentations), which included but not limited to: a) fully executed documented on-the-job/in-service/cross/remedial/corrective educations and trainings; b) fully executed documented mandatory orientations, particularly, the Vascular laboratory orientation; c) fully executed documented objective job performance reviews/criticisms/corrective measures; d) fully executed documented disciplinary/termination procedures; e) adherence to due process; etc.

112 The defendants had knowledge that the promises/representations were false, and intended to induce plaintiff to rely thereon,

113. Plaintiff actually and justifiably relied upon the false promises/misrepresentations, and acted upon the misrepresentations/false promises to his detriment, thereby causing plaintiff damages

114. Plaintiff is entitled to judgment.

## COUNT 14

### Negligent Misrepresentation

115. Plaintiff incorporates all of the paragraphs above as if set forth fully herein

116. Defendants made promises to plaintiff with intent to induce plaintiff to rely thereon; Plaintiff actually and justifiably relied and acted on the misrepresentations to his detriment, thereby causing plaintiff's damages.

117. Plaintiff is entitled to judgment.

## COUNT 15

### Defamation

118.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

119.    Defendants communication/publication over the telephone to Mercy Franciscan Hospitals that plaintiff was " FAKE, AND DID NOT KNOW ANYTHING ABOUT HIS PROFESSION ....." constituted defamation per se or slander per se. The publication about plaintiff was false statement of facts, defamatory and unprivileged, was made by defendants maliciously or with actual malice, with knowledge of the falsity of the statement, or with reckless disregard of the truth or falsity. The publication contained a false statement of fact, rather than a constitutionally protected opinion.

120.    That Mercy Franciscan Hospitals perceived that the false statement related to plaintiff and the statement was one of the factors that influenced the hospital not to hire plaintiff.

121.    The statement was intended by defendants to prejudice plaintiff's reputation, office, trade, business, profession, integrity, good name, or means of livelihood.

122.    As a result of the defendants' willful and intentional defamatory per se statement, plaintiff suffered and continues to suffer ridicule, chagrin, humiliation, insomnia, depression, aggravation, post-traumatic anxiety, mental, emotional, psychological and physical pain and suffering, nightmares, etc.

123.    Plaintiff is entitled to judgment.


## COUNT 16

### Injurious Falsehood/Disparagement

124.    Plaintiff incorporates all of the paragraphs above as if set froth fully herein

125.    Defendants published to Mercy Franciscan Hospital false statement of facts that plaintiff was "fake, did not know any thing about his profession". The statement was derogatory to plaintiff's title to his business or his intellectual property or its quality, and intended to cause harm to plaintiff's pecuniary interest or either recognized or should have recognized that it was likely to do so. It was published with malice or with actual malice, thereby causing plaintiff damages.

126.    Plaintiff is entitled to judgment.


## COUNT 17

### Invasion of Rights to Privacy and Confidentiality

127.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

128.    Defendants, particularly Parlato intentionally, maliciously, unlawfully and without plaintiff's consent intruded and or invaded into plaintiff's private and confidential personnel information and into plaintiff's bag and desk. Unlawfully, without authority or probable cause conducted search of plaintiff's bag and desk. Further defendants Christ/Alliance authorized and or ratified Parlato's conduct.

17

129.    Plaintiff has reasonable expectation of privacy in his desk and in his bag. Plaintiff is entitled to judgment for damages against the defendants.

## COUNT 18

### Race Discrimination - O.R.C. 4112.02

130.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

131.    Plaintiff is black, of African ancestry, of Nigeria origin and qualified for his position at all relevant times

132.    Defendants created hostile environment for plaintiff because of his race, and opposition to discrimination

133.    Plaintiff was treated differently than similarly situated Caucasian employees.

134.    Defendants disciplined, harassed and discharged plaintiff because of his race, and protected activity in violation of O.R.C. 4112.02 et seq.

135.    As a direct, proximate and natural cause of defendants' unlawful conduct, plaintiff suffered and continues to suffer damages and is entitled to judgment.

## COUNT 19

### Disability Discrimination - O.R.C. 4112.05

136.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

137.    Defendants violated plaintiffs' rights under ORC 4112.05 because of his recorded/perceived disability. Plaintiff was capable of performing the essential functions of the job without accommodation. Plaintiff was meeting the legitimate performance of the job.

138.    Causal relationship between disability and the termination exists. Plaintiff suffered and continues to suffer damages and Plaintiff is entitled to judgment.

## COUNT 20

### Breach of Contract-Express/Implied.

139.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

140.    Plaintiff was/is a member of a protected class, he was qualified for his position or was meeting the employer's legitimate performance expectations; he was harassed, disciplined and discharged because of his race, etc.

141.    Defendants treated plaintiff differently than similarly situated Caucasian employees or treated similarly situated persons outside the protected class more favorably.

142.    That before or about the time plaintiff began his employment with defendants, defendants promised or expressed among others:

        a) A fixed term of a minimum of twenty-four months

        b) That plaintiff would be discharged only for just cause and with due process

18

c) That plaintiff would be discharged only in accordance with specified procedures

d) That plaintiff would be given full support, e.g. educational, financial & training supports, etc.

143.    That the defendants' promises were communicated to the plaintiff

144.    That the plaintiff accepted the offer and the defendants accepted plaintiff's acceptance

145.    That the defendants' promise was supported by consideration

146.    That the plaintiff was discharged from employment; and

147.    That the plaintiff's discharge was contrary to the terms of the contract; further

148.    That at the time the plaintiff began his employment with the defendants received a copy of some pertinent portions of the defendants' Policies and Procedures Manual (hereinafter "Manual") as a condition of his employment

149.    That the plaintiff's continue employment was conditioned upon accepting the terms as set forth in the aforesaid pertinent portions of the Policies and Procedures Manual.

150.    That the aforesaid Manual, as well as the defendants' letter of offer received by the plaintiff did not contain any disclaimer or language that the employee relationship was at-will or probationary.

151.    That the manual and the letter of offer did not contain any disclaimer or language indicating that the manual and the letter of offer were not to be deemed a contract of employment.

152.    That the letter of offer set forth the tenure of employee relationship; and the manual set forth a specific progressive process of dealing with standards of performance and conduct.

153.    That the manual set forth a specific procedure to be followed regarding discharge of an employee

154.    That there was a contract [express, implied] between defendants and plaintiff of a tenure employment permitting discharge with notice and only for just cause

155.    That defendants manifested their intent to enter into employment agreements with their employees by making representations and promises that the employees were entitled to support, fair and equitable treatment. These statements were made to induce plaintiff into employment with defendants.

156.    That defendants promised to abide by the progressive process of dealing with performance standards, as well as abide by the procedure for discharge in writing.

157.    That defendants breached this contract by failing to fulfill their promises, representations and to abide by the progressive process of dealing with performance standards and discharge procedures

158.    That defendants breached this contract by discharging plaintiff without justification

159.    That as a result of defendants' breach the plaintiff has been damaged. Plaintiff is entitled to judgment for all back pay, all benefits, plus punitive damages because defendants' action was egregious and outrageous.

## COUNT 21

### Breach of Covenant of Good Faith and Fair Dealing

160.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

161.    Plaintiff has reasonable and legitimate expectation of continued employment and the benefits

162.    Defendants deprived plaintiff of the wages and benefits of the bargain and continued employment by acting in bad faith and unfair dealings.

163.    As a result of defendants' bad faith and unfair dealings plaintiff suffered and continues to suffer damages and plaintiff is entitled to judgment.


## COUNT 22

### Termination as A Violation of Public Policy of Ohio & 29 U.S.C. section 701

164.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

165.    That defendants have obligation not to violate the Ohio and the United States Constitution in their relationships with employees;

166.    Defendants have obligation not to violate any law of the United States or the State of Ohio in their relationships with employees.

167.    Defendants have obligation not to violate any principles of common law in their relationships with employees.

168.    That employees have a right to oppose conducts of public concern .

169.    That plaintiff, while working for defendants, made his opposition to racism, discrimination, hostility and harassment, and voices his opinion about defendants' violation of their own rules, policies and procedures.

170.    That plaintiff has disability recorded and or perceived by defendants

171.    That Defendants terminated plaintiff because he was disabled and over 40 years of age and in an attempt to stop plaintiff from opposing defendants' unlawful conducts.

172.    That defendants' decision to terminate the plaintiff's employment due to his age, disability, protected activities and opposition violates the public policy of the State of Ohio and the United States.

173.    That plaintiff is entitled to judgment for damages.


## COUNT 23

### Interference with Contractual Relations and Economic Advantage

174.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

175.    Defendants, particularly Parlato and Kemme, intentionally, maliciously, without justification, but with improper objective or through improper means, purposefully interfered with plaintiff's contractual relationship with the defendant employers. Plaintiff is entitled to judgment for damages.

## COUNT 24

### Violation of the Byelaws, Rules, Regulations, Policies and Procedures

176.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

177.    Defendants have obligations and duty to comply with the byelaws, rules, regulations, policies and procedures of the Christ and Alliance, but the defendants intentionally, knowingly, willfully, recklessly and wantonly refused and failed to comply, thereby directly, naturally and proximately causing plaintiff damages. Plaintiff is entitled to judgment.

## COUNT 25

### Intentional Infliction of Emotional Distress

178.    Plaintiff incorporates all of the paragraphs above as if set forth fully herein

179.    Defendants conducts constitute intentional infliction of emotional distress

180.    Defendants' conducts were actually malicious, willful, severe, extreme, egregious, and outrageous that a normal reasonable person of ordinary sensibility under the circumstances would feel extreme distress.

181.    Defendants had intent to cause or reckless disregard of the probability of causing emotional distress

182.    As a direct, natural and proximate cause by defendants' wrongful conducts, plaintiff suffered and continues to suffer extreme and severe emotional distress, physical, mental and psychological pain and sufferings, including but not limited to fright, horror, grief, shame, humiliation, embarrassment, chagrin, disappointment, worries, nausea, flashbacks, nightmares, brink of suicide, insomnia, depression, post traumatic anxiety, aggravation, etc.

183.    Plaintiff is entitled to judgment for damages proximately caused by their conduct

## COUNT 26

### Wrongful Discharge

184.    Plaintiff incorporates all of the paragraphs above as if fully set forth herein

185.    Defendants Christ and Alliance have sets of policies and procedures for discharge of an employee

186.    Plaintiff employment was for a fixed term and plaintiff would be discharged only for just cause within due process.

187.    Defendants' promise supported by consideration was communicated to plaintiff who accepted the offer.

188.    Plaintiff was discharged from employment and plaintiff discharge was contrary to the terms of the contract

189.    Plaintiff has been damaged and is entitled to judgment.

## COUNT 27

### Breach of Oral Agreement, Promissory Estoppels

190.    Plaintiff incorporates all the paragraphs above as if fully set forth herein

191.    Defendants, Leimer and the Agency, offered/promised to pay $500 within 48-hours to Plaintiff to induce him to accept employment with Christ and Alliance at a low hourly rate. Plaintiff accepted the offer.

192.    Plaintiff relied on their promises and representations to his detriment when he accepted the employment but after plaintiff had accepted the employment Leimer and the Agency neglected, refused and or failed to pay plaintiff the sum of money promised or offered to pay him in spite of plaintiff's many demands and reminders.

193.    Plaintiff is entitled to collect the $500 for Leimer and the Agency.


**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A        Finding in favor of Plaintiff on all counts set forth in this complaint

B        Awarding Plaintiff all back pays, all benefits, compensatory damages on each of all the counts in an amount to be determined at trial

C        Awarding plaintiff exemplary damages on each count in an amount to be determined at trial.

D        Awarding plaintiff pre & post judgment interests, costs, travels, room and board, attorney/s fees and costs.

E.       Be awarded the promised $500 against Leimer and the Agency

E        Awarding plaintiff such other relief as this court deems just and proper.


Respectfully submitted,

Darlington Amadasu
Plaintiff, Lay Pro Se
P. O. Box 31484
Cincinnati, OH 45231