1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

DARLINGTON AMADASU          :
                            :
        Plaintiff,          :
   vs.                      :  Case No. C-1-01-210
                            : (Judge S. A. Spiegel)
JAMES R. DONOVAN, MD.,      :
et al.                      :
                            :
        Defendants.         :

- - - - - - - - - - - - - - - -


        Deposition of DARLINGTON AMADASU,

plaintiff herein, called by the defendants for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Taft, Stettinius & Hollister, 1800 US Bank

Center, 425 Walnut Street, Cincinnati, Ohio, on

December 13, 2004, at 9:03 a.m.

Page 2

```
1   APPEARANCES:

2

3       On behalf of the Ohio Defendants:

4       Justin D. Flamm, Esq.
        Taft, Stettinius & Hollister
5       1800 US Bank Center
        425 Walnut Street
6       Cincinnati, Ohio  45202-3957
        Phone:  (513) 381-2838

7       On behalf of Texas Defendants:

8       Ramiro Canales, Esq.
        Assistant Attorney General
9       Office of the Attorney General
        P.O. Box 12548
10      Austin, Texas 78711-2548
        Phone:  (512) 463-2120

11
   Also Present:  Esther Hajdar
12                  - - -

13

14       S T I P U L A T I O N S

15       It is stipulated by and between counsel for the

16  respective parties that the deposition of DARLINGTON

17  AMADASU, plaintiff herein, called by the defendants

18  for cross-examination, pursuant to the Federal Rules

19  of Civil Procedure, may be taken at this time by the

20  notary; that said deposition may be reduced to

21  writing in stenotype by the notary, whose notes may

22  then be transcribed out of the presence of the

23  witness; and that proof of the official character

24  and qualifications of the notary is expressly
```

Page 3

```
1   waived.

2           I N D E X

3       Examination by:           Page

4       Mr. Flamm . . . . . . . .    4

5

6           E X H I B I T S

7                                    Page

8

9   Deposition Exhibit 1 ................... 50
    Deposition Exhibit 2 ................... 68
10  Deposition Exhibit 3 ................... 153

11                  - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
1               DARLINGTON AMADASU

2   being by me first duly cautioned and sworn, deposes

3   and says as follows:

4       MR. FLAMM:  My name is Justin Flamm.  I

5   represent the group of defendants in this

6   action known as the Ohio defendants.  And those

7   defendants specifically are the University of

8   Cincinnati; James Donovan, D-O-N-O-V-A-N; James

9   Lockey, L-O-C-K-E-Y; Andrew Freeman; Debra,

10  D-E-B-R-A, Ann, A-N-N, Middaugh,

11  M-I-D-D-A-U-G-H; Muriel Pohl, M-U-R-I-E-L

12  P-O-H-L; Dora, D-O-R-A, Jefferson-Gaynor,

13  G-A-Y-N-O-R; Ralph Buncher, B-U-N-C-H-E-R; Judy

14  Jarrell, J-A-R-R-E-L-L; Tracy Herrmann,

15  T-R-A-C-Y H-E-R-R-M-A-N-N; and Andrew Filak,

16  F-I-L-A-K.

17      And I will give Texas counsel the

18  opportunity now to introduce himself on the

19  record.

20      MR. CANALES:  Yes.  My name is Ramiro

21  Canales.  That's R-A-M-I-R-O.  Last name is

22  C-A-N-A-L-E-S.  And I am an assistant attorney

23  general for the State of Texas.  I represent

24  the Texas defendants.  There are three of them.
```

Page 5

1  It is Claudia, C-L-A-U-D-I-A, S. Miller; Roger,
2  R-O-G-E-R, Perales, P-E-R-A-L-E-S; and the
3  University of Texas Health Science Center at
4  San Antonio.
5      MR. FLAMM:  All right.  Thank you, Ramiro.
6  Before we get started, I would like to note for
7  the record that we are under a Court order with
8  the following discovery limitation:  Quote,
9  Discovery shall be limited to and focussed on
10  Plaintiff's claims under Title VI and Title
11  VII, close quote.  That's set forth in the
12  September 17, 2003 order of District Court
13  Judge Susan Dlott as well as the June 21, 2004
14  scheduling order of Magistrate Judge Timothy
15  Black.
16          CROSS-EXAMINATION
17  BY MR. FLAMM:
18      Q. Mr. Amadasu, I note that you have brought
19  a tape-recorder with you to the deposition.  Are you
20  recording what's being said in the room today?
21      A. Of course.
22      Q. And why is it that you're doing that?
23      A. My record.
24      Q. I'm sorry?

Page 26

1    A. I can't recall the name.
2    Q. **And how is it specifically that that**
3 **person you claim than was less qualified than you were?**
4    A. Because based on my qualification would --
5 the person has also less qualified --
6        THE REPORTER: I'm sorry. Based on my
7    qualification --
8    A. Based on my qualification vis-a-vis the
9 person's qualification, I was more qualified. It
10 was not qualified -- were not given equal
11 opportunity. I was not given equal opportunity to
12 compete.
13    Q. **Sir, what specifically about your**
14 **qualifications do you believe are superior to the**
15 **qualifications of this supposed person who got the**
16 **job?**
17    A. I have an MD, medical degree, in human
18 medicine.
19        THE REPORTER: In what kind of medicine?
20    A. Human medicine. I have a master's in
21 public health. Public health, occupational health,
22 and environmental health. And also I have years
23 of -- of tutoring. Of tutoring.
24        THE REPORTER: I don't --

Page 27

1    A. I said years of tutoring, T-U-T-O-R,
2 tutoring.
3    Q. **And what is it about the qualifications of**
4 **the person that you claim did get the job?**
5    A. Well, to -- in my information, my
6 information and belief, the person was not a medical
7 doctor. Was not a medical doctor. Has no
8 experience working with communities.
9        THE REPORTER: I'm sorry. Say that again.
10    A. Has no experience working with
11 communities.
12    Q. **What is the basis of this information and**
13 **belief that you just cited for that information?**
14    A. I asked who -- who was hired, and they
15 told -- somebody told me person was hired and the
16 qualification of the person hires. So that, based
17 on information, I believe that person wasn't
18 qualified.
19        And, again, based on my information, I
20 swear the process and the procedure for faculty
21 hiring were not followed. The process of medical
22 procedure for hiring faculty members at UC were not
23 followed. By my information, the person was hand
24 picked by Ms. Herrimann.

Page 36

1 She was the same class with me.
2      THE REPORTER:  She was what class?
3   A.  The same class.  We had the same class,
4 the same year, the same third years.
5      So she -- I came in there then there were
6 other, three, Caucasians resident who were in the
7 second year of the residency.  So they were my
8 juniors.  Now, when I came in there, we were to be
9 provided with password or code to the computer that
10 would go -- form a part of our residency program.
11      THE REPORTER:  That would form a part?
12   A.  Yeah.  The password and the codes to the
13 computer would form part of the tools of our
14 training.  I was not given the password.  I was not
15 given the codes.  Other resident were given the
16 password and the code.
17      Also, every resident was to -- was to have
18 a microcassette dictation device.  Other resident
19 were given.  I was not given.
20      By the end of December, Dr. Tapp graduated
21 from the program.  I became the only senior resident
22 in the program.  Based on my sen-- on the seniority,
23 it was my turn to become the chief resident of
24 occupational medicine.  Instead, the university or

Page 35

1 entitled to a diploma when I graduate.  I'd be
2 entitled to official transcript.  I'd be entitled to
3 validation of attendance of the residency program at
4 UC.
5   Q.  Did they allow you to become a resident at
6 UC, sir?
7   A.  Yes.
8   Q.  And when did you begin that residency?
9   A.  July 1999.
10   Q.  Did anyone supervise you as a resident?
11   A.  Yes.
12   Q.  Who?
13   A.  Dr. Donovan, Dr. Lockey, Dr. Middaugh,
14 Dr. Freeman, and several others in other
15 departments.
16   Q.  Do you claim that you were discriminated
17 against in the residency position because of your
18 race?
19   A.  Yes.
20   Q.  And what specifically are the instances of
21 discrimination based on your race?
22   A.  In the program, in the third year of
23 occupational medicine residency we were only two
24 resident.  And Dr. Loren C. Tapp, she's a Caucasian.

Page 37

1 the faculty bypassed me and appointed a junior
2 resident to be my chief resident and ask me to take
3 orders from my junior.
4      THE REPORTER:  Say that again.
5   A.  And direct me to take orders from my
6 junior.  That was humiliating and very, very
7 mental -- caused me a lot of mental uneasiness.  And
8 that not all.
9      I took courses with those faculties.  I
10 took courses with Dr. Middaugh.  The course I took
11 was basic -- basic aspect of occupational medicine,
12 part one.  I took that -- took that was taking
13 under -- under audit.
14      THE REPORTER:  I took that --
15   A.  I took the basic of occupational medicine,
16 part one with Dr. Middaugh.  I took it under the
17 option of audit, not for credit -- credit.  And at
18 the end of that program she rendered a notation of
19 T, which is the grade for any audit courses.
20      Then in the following term I took basic
21 occupational medicine, part two, under, again,
22 Dr. Middaugh.  It was under the same conditions,
23 under the same requirement.  At the end of that
24 course she assigned F instead of T.

Page 38

1    I took that course, again, on that option
2 of audit.  Under the regulations, policy and
3 procedure of UC, courses taken for audition, the
4 notation assigned at the end of the course is T, not
5 F.  So by putting F she prevented me from graduating
6 from the program, because F in the transcript will
7 prevent any person from graduating from any program.
8    She had no business, no justification for
9 putting F.  In fact, she sidestepped or she violated
10 the university rules and procedures.
11    I took or so -- I -- I took a clinical
12 rotations under Dr. Middaugh.  She failed to make a
13 routine evaluation of my rotations.
14    I took rotations under Dr. Donovan, under
15 Dr. Lockey, under Dr. Freeman, beginning from
16 July 1999 up to June 2000.  None of this faculty,
17 member of the faculty, wrote a written evaluation
18 for me.
19    And also, when it was time for me to go
20 for vacations, I was denied vacation, and I was not
21 paid in lieu of that four weeks vacation.  Other
22 resident had vacations or they were paid in lieu of
23 vacations.
24    Other resident also attended clinical

Page 39

1 conference, and their -- their conference attendance
2 was fully paid for by the program, by UC.  I applied
3 for; I was denied.
4    I then, when I -- I tried to graduate from
5 the program at the end of June.  I have satisfied
6 all the requirement, completely satisfactorily
7 complied with all the requirements.  When I tried to
8 get graduation I was told that I have in my
9 transcript NG.  NG means no grade, no grade, no
10 grade.  That is Dr. Donovan, Dr. Lockey,
11 Dr. Middaugh.  All of them refused to assign grade
12 to the clinical rotations I did under audit.
13    THE REPORTER:  I'm sorry.  Assign grade to
14    the clinical --
15    A.  To the clinical rotations I did under
16 audit.  And then when I finally find out, so I
17 did -- I work diligently to have them correct what
18 they had done.  So I went to the office of
19 department of environmental health and I spoke to
20 the secretary there who is in charge, and I also
21 spoke to the administrative assistant, Ms. Trusha
22 (Phonetic).  She -- She's a -- she's a secretary
23 in -- in the division of occupational and
24 environmental medicine.  I also told her about not

Page 72

1  year.
2      THE REPORTER: He was what?
3      A. He was in the academic phase, which is the
4  second year of the program.  I was in the -- in the
5  third year, the final year of the program.  So it's
6  unheard of to appoint junior resident --
7      THE REPORTER: I'm sorry, so it --
8      A. It's unheard of --
9      THE REPORTER: It's --
10     A. It's unheard of.
11     THE REPORTER: Oh.
12     A. It's -- it's -- it's -- to have a -- a
13  junior resident to be chief resident over a senior
14  resident.
15     **Q. But specifically how is it that you think**
16  **you were better qualified for the position than he**
17  **was?**
18     A. By virtue of my seniority, by virtue of my
19  experience, by virtue of my qualifications.
20     THE REPORTER: I'm sorry.  What was the
21     second one?  By virtue of my seniority, by
22     virtue of --
23     A. Of my qualifications, by virtue of my
24  experience.

Page 71

1  BY MR. FLAMM:
2      **Q. Back on the record.  We were talking about**
3  **the chief resident position at UC, Mr. Amadasu.**
4  **What did you do to apply for that position?**
5      A. We had to type graduated.  I told Dr.
6  Donovan that I -- it had been my time to be the
7  chief resident.  That's what I told him.  So there's
8  no -- applied to that -- to that position.
9      **Q. So you didn't actually apply; you just**
10  **went to Dr. Donovan with the statement that you**
11  **believed you had some entitlement to the position,**
12  **correct?**
13     A. No.  I applied.  I said I would like to
14  be -- I mean, I applied already:  I want to be a
15  chief resident.
16     **Q. Who got the chief resident position?**
17     A. Who got it?  What is your question?
18     **Q. Who got the chief resident position?**
19     A. Dr. Gamble.  Dr. Gamble.  Robert M.
20  Gamble.
21     **Q. Do you believe that you are more qualified**
22  **than Dr. Gable (sic)?**
23     A. Dr. Gable (sic) was -- was my junior.  He
24  was in the academic phase of the program, the second

Page 73

1      **Q. And what qualifications, specifically, do**
2  **you have that he did not have?**
3      A. Well, he has -- when he came in there he
4  has only MD, be an MD.  But I came there with a --
5  with an MD.  I came there with a M -- I didn't have
6  my MPH by that time, but I had my master's, I had my
7  master's of art, I have a master of science, I
8  have -- also have all that experience.
9      THE REPORTER: I'm sorry.  You have also
10     what?
11     A. I have -- also have all that experience,
12  experience as a physician, yes.  I have also
13  supervised a resident.  I have supervised second
14  year -- I mean, first-year resident when I worked in
15  my family practice.  I supervised resident, I
16  supervised medical students.
17     **Q. And what were Dr. Gable's qualifications?**
18     A. From what I know he has, I think, a BS or
19  BA, MD, that's all.
20     **Q. How do you know that?**
21     A. Hmm?
22     **Q. How do you know that?**
23     A. That's what he told me.  Said he had a
24  bachelor degree and an MD degree.  That's what he

Page 74

1 told me.
2    **Q. Other than what he told you, do you know**
3 **anything about his qualifications?**
4    A. All I know -- they still --
5 qualifications, they told me --
6      THE REPORTER: I'm sorry. All I know --
7    A. All they told me during the interview that
8 chief resident appointed based on their seniority.
9 Their seniority in the program.
10    **Q. So the basis of this claim about the chief**
11 **resident position, sir, is really that you believe**
12 **you were told it was done on the basis of seniority,**
13 **correct?**
14    A. Yeah, seniority, yes.
15    **Q. And you felt that you were more senior**
16 **than the person who actually got it, correct?**
17    A. I was the most senior, yeah. I was in the
18 third year; he was in the second year.
19    **Q. And why is it that you think that your**
20 **race had something to do with Dr. Gable getting that**
21 **position?**
22    A. Yeah. Because if I were a Caucasian I
23 would have been appointed.
24    **Q. Well, how do you know that?**

Page 75

1    A. Definitely. I would have been appointed
2 if Caucasian.
3    **Q. How do you know that?**
4    A. How I knew that? Yeah, I knew that
5 because -- from past experience, from the histories,
6 from everyday --
7      THE REPORTER: What was that last thing?
8    A. I said based on the history of what
9 happened every day to blacks everywhere. So before
10 you appoint a black to a position it takes -- it
11 is -- it is a Herculean task. It is an -- it is an
12 uphill battle. It's a battle everywhere. Even
13 faculty position.
14      In division of occupational medicine there
15 is not a single colored resident. They are all
16 Caucasians. And they want to make it that way.
17      Because during the interview I told them I
18 was interested in the faculty position. I said they
19 did everything to -- to screen me out.
20    **Q. Why is it that you think your race**
21 **specifically had something to do with you not**
22 **getting this position, though? You've talked about**
23 **your perceptions of things, but I want to know why**
24 **you specifically believe that your race had**

Page 76

1 **something to do with someone else getting the chief**
2 **resident position?**
3    A. Yeah. It is my race, because if I were
4 Caucasian I would have been appointed. I said that
5 before. The person was in same class with me, she's
6 a Caucasian, and she was appointed as chief
7 residence. She was the only one in the third year
8 when I came here. When I came here we became two.
9      So she was there when those two other guys
10 were there. So why didn't they appoint Gamble
11 before appointing Dr. Tapp? Why didn't they appoint
12 Dr. Gamble to be chief resident? But Tapp was
13 Caucasian. They appointed her a chief resident.
14      THE REPORTER: Of the what chief resident?
15    A. They appointed Dr. Tapp as the chief
16 resident because she's a Caucasian. Dr. Gamble was
17 third year when they appointed her.
18      THE REPORTER: Dr. Gamble was third year?
19    A. Was second year. Dr. Tapp was in
20 third year. Dr. Gamble was in his second year.
21      So at the time Dr. Tapp was appointed
22 Gamble was there. So if Gamble was more, why they
23 appoint Gamble?
24      THE REPORTER: If Gamble -- if you slow

Page 77

1 down I could understand you better.
2    A. If -- if he was qualified they would have
3 appointed Gamble instead of Dr. Tapp. But Dr. Tapp
4 was the most senior and she's Caucasian. And she
5 was appointed the chief resident.
6      And, again, chief resident position is an
7 added qualification. They don't want me to get an
8 added qualification.
9      THE REPORTER: They what?
10    A. It is an added qualification. They
11 deprived me of that added qualifications by not
12 appointing me as chief resident.
13    **Q. What were the eligibility requirements for**
14 **the chief resident position?**
15    A. They told me seniority. That's what Dr.
16 Donovan told me.
17    **Q. Do you know what the eligibility**
18 **requirements were for the chief resident position?**
19    A. I say Dr. Donovan told me based on
20 seniority.
21    **Q. So the only qualification issue or**
22 **eligibility issue that you are aware of is this**
23 **claim about seniority, correct?**
24    A. That is what he told me, based on

Page 78

1  seniority.  Yeah.  Yeah.

2    Q. Okay.  How long had you been a resident

3  when you applied for the chief resident position?

4    A. Six months.

5    Q. And how much longer were you to be in the

6  resident program at that point?

7    A. Six months.

8    Q. Six more months?

9    A. Yeah.

10    Q. How much longer was Dr. Gamble to be in

11  the program?

12    A. What is your question?

13    Q. At the point in which Dr. Gamble or

14  Dr. Gable was appointed chief resident, how much

15  longer did he have in the program, if you know?

16    A. I don't know.  If he was in second year he

17  probably would have a year and a half.

18    Q. Okay.  You made reference with regard to

19  your race discrimination claims, that defendant

20  Middaugh failed to make evaluations of your

21  rotations?

22    A. Yeah.

23    Q. And also gave you an F in a course that

24  you claim you were auditing, correct?

79

Page 81

1    Q. Please let me finish.

2    A. Okay.

3    Q. As of today you have not graduated from
4 the program; is that your claim, sir?

5    A. Yes, I have not.

6    Q. What is it that you were supposed to
7 receive as a result of completing this program?

8    A. I supposed to get my diploma, supposed to
9 get validation of attendance, supposed to get
10 official transcript.

11    Q. And do you know why you've not gotten your
12 diploma?

13    A. I have my diploma.  They give me diploma,
14 yes.

15    Q. You got a diploma for completing the
16 program?

17    A. Yeah.  Yeah.  Yeah, got a diploma, yes

18    Q. When did you get the diploma?

19    A. I got the diploma, I think, around -- they
20 mailed it to me I think around May or June 2001.
21 That was almost a year after I graduated.

22    Q. Okay.  Have you gotten validation of your
23 attendance in the program?

24    A. No.  They -- they deny me.

Page 111

1 there's a connection between your letter and these
2 claimed failures?

3    A. I have already said the proximity.  Their
4 attitude before the letter, after the letter.

5    Q. And what was that attitude?

6    A. The attitude of failing to post grade, to
7 make written report of evaluation, to graduate me
8 from the program, and by putting a block, the block
9 on my transcript.

10    Q. What about Dr. Freeman, what basis do you
11 have to claim that Dr. Freeman retaliated against
12 you?

13    A. Well, Dr. Freeman is the assistant
14 director of the occupational environmental medicine.
15 He was originally on or with Dr. Donovan.  Okay?  So
16 he, in fact, he threatened to terminate my residency
17 because of what he perceived as a heavy African
18 accent.

19    Q. Did he ever actually terminate your
20 residency?

21    A. He threatened because of my -- what he
22 perceived a heavy African accent.

23    Q. That's not my question, sir.  Did he ever
24 actually terminate your residency?

1 **claim?**

2    A. On the same basis. On the same basis.

3 She was -- she was aware that the faculty who worked

4 under her, she has a duty, obligation, and

5 responsibility of monitoring, supervising,

6 overseeing and disciplining the faculty who failed

7 to do that duty.

8      She knew they didn't do this duty. I

9 complain to her. She aware of it. In fact, she had

10 said she recognized that Dr. Middaugh --

11    THE REPORTER: I'm sorry. In fact, she --

12    A. She acknowledged that Dr. Middaugh was

13 wrong in assigning F instead of T, but she failed to

14 do something about it.

15    **Q. And why do you think that was based on**

16 **your race?**

17    A. It based on my race because if I were

18 Caucasian she would have taken -- taken step to make

19 sure that the right thing was done, and to make sure

20 that the faculty who did it were subject to

21 discipline.

22    **Q. And how do you know that that's what she**

23 **would have done?**

24    A. Because that is her function. That's her

Amadasu vs. Donovan
December 13, 2004

1  duty, to monitor, to oversee, and to discipline.

2     Q. **Any basis to believe that Judy Jarrell**
3  **retaliated against you?**

4     A. Again, she has -- she has -- she's aware
5  of my complaint in the department.

6     Q. Is that all?

7     A. Yeah.

8     Q. **Okay.  Do you believe Tracy Herrmann**
9  **discriminated against you?**

10     A. Yes.

11     Q. **Why do you believe that?**

12     A. Yeah, because of my race, my national
13  origin.  I was qualified for the job.  I was not
14  interviewed.  I was not hired.  I was not -- was not
15  given equal opportunity to compete with those
16  others.  She didn't process my -- she didn't process
17  my application according to the policy and procedure
18  for recruiting, hiring, and solicitation of faculty.

19     Q. **And why do you believe that that was based**
20  **on your race, sir?**

21     A. Yeah, because I'm black, that's my
22  national origin, that's why she did it.

23     Q. **But why do you think that's why she did**
24  **it?**

then also I was not given my grade, my written evaluation. So they are simply cut away from me. Cut away from me. Okay? They are cut away from me. So they didn't even care whether I exist or not. That was the hostile environment.

**Q. Is there any other basis by which you claim --**

A. Yes, by falsely accusing me of sexual harassment that never happened. That -- that create -- that created a hostile environment. It was not once. It was continuous. Continuous. Continued beginning from 2000 to 2001 and it's been continuing before -- up to now, because I cannot get --

THE REPORTER: I'm sorry. Continued before --

A. Yeah. Up to now, because cannot get my credit, I cannot get my transcript, I cannot get my validation of attendance.

**Q. Is there any other fact out there that would support your hostile environment claim against any of the Ohio defendants?**

A. I put down there they -- it's minor -- this -- they -- they -- the person who was giving

Page 146

1 out these microcassette, Ms. Brinkman, (sic) okay,
2 so she usually let a racial slur.
3        THE REPORTER: She usually --
4    A. Racial slur. Okay?
5        THE REPORTER: I'm sorry? I don't get --
6    A. During the time we were talking about the
7 microcassette, when I asked her to give me
8 microcassette, she refused. Dr. Fredman --
9 Dr. Freeman asked her to give me the thing. She
10 refused. Okay? So -- using racial slur.
11        THE REPORTER: So --
12    A. She was using -- she was using the N word.
13 She was using the N word that the N person is
14 making -- I mean, is -- is -- is complaining about
15 discrimination. Okay?
16    Q. Did she say that to you?
17    A. She said to me in the clinic, safety and
18 occupational health. That's where she works. And
19 since that time she be very, very snobby -- okay? --
20 very cold. Okay?
21        If I ask her for something about to get me
22 a cassette, in order for me to make a report, she
23 will refuse. Okay? She will refuse to do it. If I
24 ask her about information about a patient, she would

Page 147

1 refuse to tell me. The same thing Ms. -- Defendant
2 Pohl, the same thing. The day in that clinic were
3 very cold.
4    Q. Back to the racial slur comment. Did you
5 hear a racial slur used?
6    A. Yeah, from -- from Brinkman when she use
7 the N word.
8    Q. And where exactly were you when you
9 allegedly heard her say that?
10    A. I was the Center for Occupational Health
11 where she works.
12    Q. And where was she?
13    A. She was on the desk where she works.
14    Q. And what exactly did she say?
15    A. She said: This nigger is making complaint
16 about microcassette.
17    Q. To whom did she say that?
18    A. To whom? There is some patients sitting
19 down there on the chair, a chair that would need to
20 be calling. I was standing in front of the -- of
21 the desk. She was behind the desk, the front
22 desk -- that was -- I was asking for the cassette
23 because I wanted to -- I wanted to dictate where --
24 where -- my findings for it to be transcribed.

Page 148

1 Okay? So most of the time I had to do my own
2 transcription. I had to do my own typing, because I
3 have no microcassette to dictate.
4    Q. So Brockman was not actually speaking to
5 you when you heard her make that comment, correct?
6    A. But she was speaking about me. She was
7 speaking about me. She spoke to me. I was there.
8 She speak about me. She spoke to me and about me.
9    Q. Did she ever use the N word speaking to
10 you?
11    A. I said she did. I said she use it.
12    Q. What?
13    A. Yeah, she use it.
14    Q. In a direct address to you or to someone
15 else that you could overhear?
16    A. To me and to people who are around.
17 People around heard it and I heard it.
18    Q. How many times did she use that term?
19    A. Well, many times. She use it -- she used
20 that -- I mean, she used occasionally around town.
21 When ask -- when asking, she was very cold, she was
22 very snobbish.
23    Q. Any other comments that would support your
24 hostile environment claim?

163

| 12:33:19 | 1 | time? |
| 12:33:19 | 2 | MR. CANALES:  Yes, 10:00 Eastern time. |
| 12:33:21 | 3 | THE WITNESS:  Is it the same time here in |
| 12:33:24 | 4 | Cincinnati? |
| 12:33:24 | 5 | MR. CANALES:  Yes. |
| 12:33:24 | 6 | THE WITNESS:  Okay.  Thank you. |
| 12:33:24 | 7 | MR. CANALES:  Eastern Time. |
| 12:33:24 | 8 | MR. FLAMM:  Local time. |
| 12:33:24 | 9 | THE WITNESS:  Okay.  I'll be here.  Thank |
| 12:33:25 | 10 | you very much. |
| 12:33:25 | 11 | MR. CANALES:  Which is 9:00 Central |
| 12:33:29 | 12 | Standard time. |
| 12:33:30 | 13 | THE WITNESS:  Okay.  Thank you. |
| 12:33:31 | 14 | MR. FLAMM:  Thank you, Ramiro. |
| 12:33:31 | 15 | MR. CANALES:  Thank you, Mr. Amadasu. |
| 12:33:32 | 16 | Thank you, Mr.Flamm.  I'll see you on Wednesday |
| 12:33:35 | 17 | morning. |
| 12:33:35 | 18 | THE WITNESS:  Thank you. |
| 12:33:35 | 19 | MR. CANALES:  Thank you, sir. |

12:33:35  20

_____
DARLINGTON AMADASU
March 18th, 2005

12:33:35  21

12:33:35  22          - - -

12:33:35  23
          (Deposition adjourned at 12:33 p.m.)
12:33:35  24          - - -

**ERRATA SHEET**

*Page 1 of 3*

TO THE REPORTER:  I, Darlington Amodasu, have read the entire transcript of my deposition taken on the 13th day of December, 2004, or the same has been read to me.  I request the following changes be entered upon the record for the reason(s) indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

| PAGE | LINE | CORRECTION (and reason) |
|------|------|--------------------------|
| 9 | 19 | ... because of the motion". Delete "Absurdity" |
|  | 21 | Change decomposition to de compensation DECOMPENSATION |
| 10 | 4 | Delete decomposition for decompensation. |
|  | 14 | Delete decomposition for decompensation. |
| 20 | 6 | A: Yes I am disabled. |
|  | 8 | A: Yes I am disabled |
|  | 11-12 | A: I sought employment but I was disabled. (delete "to do any Job") |
| 28 | 2-3 | A: Upon Information from Herrmann. |
| " | 5 | A: Herrman spoke to me in the dept and other somebody spoke to me |
| 29 | 17 | A: in addition Herrman Hand picked the person. |
| 33 | 14 | A: ... Delete "fds" for "Act" |
| 34 | 12 | A: delete "Salary" for "Stipend". |
| 37 | 19 | A: delete |
| 39 | 12 | A: delete "Assist" for "Them". |
|  | 16 | A: delete "Audit for "Them" |

**ERRATA SHEET**

*Page 2 of 3*

TO THE REPORTER:  I, Darlington Amadasu, have read the entire transcript of my deposition taken on the 13th day of December, 2004, or the same has been read to me.  I request the following changes be entered upon the record for the reason(s) indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

| PAGE | LINE | CORRECTION (and reason) |
|---|---|---|
| 40 | 2 | delete "Dr Geran" for Dr Jarrell |
|  | 7 | "     "        "    JARRELL |

Break at 1pm - 2pm.: Finished pages 1 - 41.

| PAGE | LINE | CORRECTION (and reason) |
|---|---|---|
| 42 | 12 | delete "business for "Basis" |
| 44 | 4 | delete "Cooly" for "Coddy" |
| " | 10 | delete "Cake" for "Archaic" |
| 45 | 5 | Delete "700" for "200"; delete "by" for "but" |
| " | 6 | delete "clock" for "Clerk" |
| 47 | 11 | delete "2nd" for "13th" |
| 60 | 9 | delete "don't" for "do"; and delete "Yeah" for "yes" |
| 61 | 12-13; 15-16 | delete: and replaced with: "And I said access to the computer is not graded" |
| 67 | 24 | add: " in the absence of any other senior resident than me" |
| 69 | 18 | Add " That's when I would have finished delete "yeah" |
| 73 | 5-6 | Add "I came there with a MPH degree; I did have my MPH by that time" |

**ERRATA SHEET**    *Page 3 of 3*

TO THE REPORTER:  I, _Darlington Amadasu_, have read the entire transcript of my deposition taken on the _13ᵗʰ_ day of _December_, 200_4_, or the same has been read to me.  I request the following changes be entered upon the record for the reason(s) indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

Pg | PAGE | LINE | CORRECTION (and reason)
---|------|------|------------------------
| 81 | 21 | Add "after when I would have graduated"
| 83 | 10 | No other resident had unpaid bill disputes
| 85 | 16 & 20 | "I wasn't wanted in the faculty position"
| 104 | 5 | Delete "A. Gerain" for "Dr Jarrell"
| 110 | 12 | delete "business" for "Basis"
| | 19 | delete "fail"
| 120 | 8 | delete "present" for "protected"
| 135 | 5 | delete "propriety" for improperly
| 136 | 16-17 | delete "University" for "Donovan"
| | & | never sent me a copy & what he sent to
| | | Dr Filak.
| 140 | 19 | delete "Business" for "Basis"
| 141 | 3 | delete "resident" for "student"
| | 6-7 | "to be dictated to by a medical student"
| 148 | 20 | delete "town"
| 154 | 20 | delete "I don't know"
| 159 | 23 | delete "forfeiture & a waiver" for "avoid"

3/18/05