FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

05 MAY 31  PM 4: 42

WEST DIST OHIO
WEST DIV CINCINNATI

| | |
|---|---|
| DARLINGTON AMADASU<br>Plaintiff | Case No: **C - 1- 01 - 210**<br>Black/Dlott |
| -V- | |
| JAMES R. DONOVAN, MD, et al<br>Defendants | **DECLARATION OF AMADASU IN SUPPORT OF PLAINTIFF'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT & OPPOSITIONS TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; & EXHIBITS** |

I, Darlington Amadasu, lay pro se plaintiff in this action, solemnly declare that I have personal knowledge of the facts and circumstances stated below and competence to testify to them, which are true, accurate to the best of my knowledge and belief and under the penalty of perjury pursuant to 28 U.S.C.A. 1746

1.    I certify that the attached exhibits are true and accurate copies of the original documents, written instruments or statements.

2.    The exhibits are true and accurate copies of the original business records, public records, court records, instructional records or fruits of the discoveries.

3.    This cross-motion for summary judgment is initial or preliminary because the defendants have not provided me with the responses and documents demanded in plaintiff's Rules 33, 34 and 36 discovery requests, all of which I need to adequately and fully respond to defendants' motions for summary judgment and to support my cross-motion, therefore, I reserve the right, pursuant to FRCP 56(e), to file supplemental or further affidavit in support of my cross-motion for summary judgment and in opposition to defendants' motion for summary judgment whenever defendants produce responses and documents responsive to plaintiff's discovery request.

4.    In or about 1998 plaintiff inquired about Occupational and Environmental Medicine Residency Program (OEMRP) at the University of Cincinnati Medical Center (UCMC) and requested full information package, *inter alia,* the program, application form, stipends and benefits. UCMC by defendant Donovan sent only a one-page letter, on UCMC letterhead, dated September 1, 1998 in which UCMC acknowledged that UCMC receives federal funds for the OEMRP [Ex.2, 28 p.1].

1

5.     Having completed the first one-year (PGY-1) of the Clinical Phase and the second-year (PGY-2) of the Academic Phase with a MPH degree, plaintiff submitted his application for the last, final or the third-year (PGY-3) of the Practicum Phase to UCMC or TUH. (Ex.1).

6.     In or about October 1998 plaintiff by phone requested in writing from Donovan stipends, all the benefits and written contract available to residents at UCMC. Donovan by 10/15/98 letter on UCMC letterhead informed plaintiff about the stipends, benefits and contract. (Ex.3). During the interview, Donovan affirmed to plaintiff that The University Hospital (TUH) and University of Cincinnati College of Medicine (UCCM) jointly offered a 12-month third-year (PGY-3) Practicum Occupational and Environmental Medicine Residency Program (POEMRP), which was/is funded by federal dollars and that they would strictly adhere to the requirements of ACGME, ABPM and JCAHO; that UCMC would offer Practicum Phase OEMRs stipend in the $40s, full benefits and written contract, and that upon completion of the requirements, plaintiff would be graduated with award of diploma, transcript and verification of attendance and other promises. (1st Amadasu Depo. p.33-35), also see (Ex.6; Ex.7; Ex.97)

7.     By employment letter dated January 25, 1999, on UCMC letterhead, UCMC employed plaintiff as Occupational and Environmental Medicine Resident ("OEMR") into the third year ("Practicum Phase") of their Occupational and Environmental Medicine Residency Program ("OEMRP") for one year beginning July 1999 but without specifying the ending date. The letter showed that the stipend for the position was $29,000 per year and the position had tuition remission and health benefits package. (Ex.4). Plaintiff was not a graduate student of UC under UC definition but was OEMR of TUH.

8.     Plaintiff began his Practicum Occupational and Environmental Medicine Residency Training (POEMR) in July 1999 and plaintiff became a bona fide member of the medical staff of TUH thereby entitled to all stipend, benefits, protections, rights, privileges, immunities, and due process, procedural and fair hearing provisions, etc, of the UCMC's Medical Staff Bylaws, etc, afforded to Medical Residents or House Staff Officer ("HSO") of the medical staff at TUH or UCMC. The Office of Graduate Medical Education ("OGME") of UCMC sent plaintiff a memo dated June 15, 1999

2

seeking Amadasu's consent to publish his certain private information in the 1999/2000 TUH's House Staff Directory (Ex.9).

9.      Amadasu never applied for, never consented to be placed on, and was never told he was being or have been placed on any of the purported "four different academic track." (Ex.1, 4). Neither Donovan nor UCMC ever told Amadasu that UCMC had placed Amadasu on one or any of the "four different academic track" or the "Accelerated Track." ACGME and ABPM did/do not accredit the purported "Accelerated Track." Amadasu applied for Practicum Phase and not Academic Phase, which he had completed as prerequisite for appointment into the Practicum Phase on the OEMRP (Ex.1). Donovan and or UCMC had no approval or accreditation to change the ACGME-accredited OEMRP's three-phases—clinical, academic, and practicum-- structure in (Ex.98-100) to ACGME-unaccredited "four different academic, slow, or accelerated tracks." Thus, Donovan and UCMC illegally imposed their track upon and violated the academic freedom of Amadasu.

10.     ACGME and UCMC's bylaws mandate that every, any and all medical doctor appointed into ACGME-accredited residency programs must be given written agreement of appointment or Graduate Medical Education Contract ("GME-Contract"), [Ex.97 p.14 at D(1); Ex.6; Ex.7]. Amadasu was appointed into ACGME-accredited OEMRP thus, was entitled to written GME-Contract. Upon appointment, Donovan and UCMC denied plaintiff the mandatory GME-contract (Ex.6 & Ex.7) despite plaintiff's demand for it. The Office of Graduate Medical Education ("OGME") of UCMC sent plaintiff a copy of a memo dated June 15, 1999 in which it demanded upon Donovan to return the GME-contract executed by Amadasu (Ex.5) and with the memo in hand Amadasu approached Donovan for GME-contract but he denied Amadasu the contract in violation of Amadasu's right guaranteed under Fifth, Fourteenth Amendments, 42 USC 1981, Bylaws, and requirements of ACGME, ABPM and JACHO as well as TUH/UCMC'S bylaws.

11.     Amadasu was entitled not only to the GME-Contract but also to the same amount of stipend and benefits package afforded to similarly situated third-year (PGY-3) residents regardless of the medical specialties therein at TUH or UCMC but Donovan and or UCMC underpaid Amadasu stipend short of an amount of not less than $13,000 and denied him substantial benefits package as guaranteed by UCMC's policy and mandated by ACGME and as represented in Compensation & Benefits for Residents/Clinical Fellows [Ex. 7(1-6)] and (1st Amadasu Depo. p.61-62; p.94-97). UCMC has

3

Residents' Reimbursement Funds (RRF) for any travel and conference expenses (Ex. 28 p.3). Amadasu applied for but was denied the funds to attend clinical conferences, e.g., SOTAC of ACOEM, AOHC (Ex.28 p.7). Amadasu had pre-authorization for RRF for expenses arising from Amadasu' participation in Laredo, Texas UTHSCSA- STEER program but when Amadasu submitted his expenses for reimbursement from the RRF UCMC refused to reimburse the expenses. (Ex.102-103).

12.     Every UCMC's Resident or House Staff Officer (HSO) was/is entitled to the tools and resources occasioned by his or her residency training. Donovan/UCMC afforded similarly situated non-protected group Occupational & Environmental Medicine Resident (OEMR) computers, password or code for access to the computer and to the educational websites, and the microcassett-dictation recorder but these were denied to Amadasu. (1st Amadasu Depo. p.55-60 and p. 63-66)

13.     Amadasu was/is a qualified, experienced, outstanding, loyal and dedicated employee, resident, public servant, and medical doctor with excellent reputation.  Amadasu performed his duties, obligations and responsibilities of his position with outstanding competencies, professionalism and ethics; complied with all bylaws, rules, regulations, policies and procedures of UCMC, the requirements of JACHO, ACGME, ABPM and his work performance was rated good to superior by preceptors who had supervised plaintiff's works. Those preceptors rated Amadasu's interpersonal relationships with patients, peers, faculty and other employees as good to superior (Ex. 55-60). Although belatedly and almost two years after supervising Amadasu, defendant Lockey rated Amadasu's performance good to superior (Ex.61).

14.     Before Amadasu served written complaint of discrimination and harassments upon Ohio defendants, Amadasu requested for letters of reference from Donovan, Freeman and Lockey all of who rated Amadasu good to superior in their letters of reference. (Ex.62, 64-67). Half way in the OEMRP, in December 1999 Donovan rated plaintiff's overall performance "fine" meaning superior quality (Ex.63). In December 1999, Donovan certified that Amadasu was a resident in good standing at UCMC (Ex.108). In May 2000, Donovan certified that Amadasu was OEMR in good standing. (Ex.68).

15.     Donovan, Lockey, Freeman and Middaugh are faculty member of the Department of Occupational and Environmental Medicine of UCMC and have duties, obligations and responsibilities to render and post grades and to make written evaluations for didactic courses and clinical rotations

4

that Amadasu did under their supervisions as mandated by ACGME (Ex.97 p.19 at D(2); by ABPM (Ex.99 at V(A)(1), and mandated by UCCM (Ex.28 p.3), but Donovan, Lockey, Freeman and Middaugh denied Amadasu grades for and written evaluations of the didactic courses and clinical rotations he did under them.

16.    From July 1999 to June 2000 and thereafter continuing to March 2001. Specifically, in Autumn quarter 1999; in winter quarter 2000; and in spring quarter 2000 they refused to render and post grades for Amadasu's work (Ex.30, 32, & 34). Also from July 1999 through June 2000 and continuing to this moment they refused to make written evaluations of Amadasu' clinical rotations that he did under them (Ex.51-54) despite by phone and in writing, Amadasu diligently reminded them to render and post grades and written evaluations (Ex.31, 33, and 35). However, almost two year after supervising Amadasu's clinical rotation, Lockey belatedly made one written evaluation on 4/4/01 (Ex.61) but Freeman, Donovan and Middaugh absolutely refused Amadasu written evaluations even to the present.

17.    On or about June 30, 2000 Amadasu completed all of the requirements of the 12-month Practicum Phase of the OEMRP and was entitled to graduate thereon from the program with diploma or certificate, verification of attendance and transcript as UCMC promised; as mandated by ACGME and ABPM (Ex.97 p.18-20 and Ex.98-100). Also see [1st Amadasu Depo. p38-41] Similarly situated OEMRs of non-protected group got their grades and written evaluations fully and timely and they were timely graduated upon completion of the residency with timely diploma, and, even, OEMRs who were junior to Amadasu graduated from the program before Amadasu who still has not been graduated from the OEMRP to the present.

18.    University of Cincinnati set forth the guidelines, rules, and regulations ("UC Grade Policy") applicable to those students applying and enrolling in either the MS or Ph.D. degree program in a booklet titled University of Cincinnati Department of Environmental Health (DEH) Graduate Student Guidelines Handbook (Ex.29). The policy provides that Letter "F" should be render for 'unsatisfactory work for graduate credit (Ex.29 p.8) and letter "T" should be rendered for course take for audit in which a grade is deemed unnecessary by the student. (Ex.29 p.9). Amadasu never applied and enrolled in any degree program and was not a graduate student working towards any graduate degree under the

5

UC definition of a graduate student and Amadasu had already completed his Academic Phase of the OEMRP elsewhere prior to being appointed into the Practicum Phase of OEMRP at UCMC thus, he had no need for graduate credit. Amadasu was not a postgraduate student of UC and UC admitted that Amadasu was not its employee (Donovan Decln. #3)

19.    Donovan, OEMRP program director and as the advisor to Amadasu, advised Amadasu to enroll for some courses for audit, which Amadasu did not need. For such courses taken for audit, the instructors rendered a letter "T" including the Basic of Occupational Medicine I course that Middaugh taught in autumn quarter of 1999 (Ex.30). In spring quarter of 2000 Donovan again advised Amadasu to enroll for courses for audit, including Basic of Occupational Medicine II (BOM-II) taught by Middaugh who rendered letter "F" instead of "T" (Ex.34) in violation of UC grading policy. At the time Donovan direct Amadasu to register for BOM-II he also directed Amadasu to go to Laredo, Texas for four week elective rotation. Before leaving for Texas, Donovan, Amadasu and Middaugh met and upon review of the BOM-II course contents or topics found out that Amadasu had already done all the topics to be covered for the April month when Amadasu would be in Texas for elective thus, Middaugh, Donovan and Amadasu agreed that Amadasu would not miss any topic and was free to go to Texas and rejoin course upon return which he did and regularly attended the class. The BOM-II class took place only once a week on Mondays. Amadasu was never tested to determine pass or fail, nevertheless, Amadasu needed not to take any test because he was merely auditing the course.

20.    ACGME and ABPM mandate that the faculty and supervisors—herein are Donovan, Lockey, Freeman, and Middaugh, must immediately render grade and written evaluation upon resident's completion of a course or clinical rotation and send them to the program director with copy given to the resident immediately (Ex. 97 p.19-20; Ex.99 at V(A)(1). See (1st Amadasu Depo.p.37-40, 98-101) Residents and specifically Amadasu have/has no duty, obligation and responsibilities to self-render grades and written evaluations and send them to program director because ACGME, ABPM and UCMC did not mandate Amadasu to do so and it is never the practice.

21.    Donovan, Lockey, Freeman and Middaugh failed and refused to render and post grades and written evaluations for Amadasu's courses and clinical rotation for more than 22-months in violation of the mandates of ACGME, ABPM, UC and TUH. Plaintiff diligently and relentless worked to have

6

the faculty to correct Amadasu's transcript. To this end, Amadasu worked with the departmental administrative assistant to change, correct, and post the grade. Donovan acknowledged that "no grade" (NG) should not have been rendered instead of pass "P" grade (Ex.37); Donovan acknowledged he failed to render and submit grades for Amadasu's courses that he had supervised (Ex.41). Middaugh rendered "F" credit grade instead of non-credit "T" audit grade (Ex.38); From June 2000 until November 2000, Middaugh refused to change the wrong "F" grade for the correct "T" audit grade despite Amadasu's all reasonable efforts and the UC-grading policy (Ex.39 & Ex.29) but would only change the wrong "F" grade to "W" withdraw on 11/5/00 (Ex.40) in spite of the corrective directives of defendant Jarrell, the departmental Director of Graduate Studies that the "T" for audit course should be rendered instead of the wrong "F" failure for credit course. (Ex.36); also see (1st Amadasu Depo. p.37-40, p.111-112) Donovan, as the program director of the OEMRG and pursuant to the requirements or mandates of ACGME, ABPM and UCMC, has the duty, obligation and responsibility to ensure that these anomalies never occurred and if they did occur, he must promptly rectify the situation but he failed to do so (Ex.97 p.18-19; Ex.98).

22.    Upon being informed that the rendition, correction, changes and posting of the grades had been completed, by 02/02/01 letter Amadasu informed and requested Donovan to graduate Amadasu from the program (Ex.42 and 42.0.1-42.0.3)

23.    On or about 2/26/0, that is about 9-months since Amadasu completed the requirements for graduation, Donovan unilaterally, singularly and improperly did final terminating evaluation without the mandatory participation of Amadasu and other faculty in violation of Amadasu's rights and the requirements of the ACGME and ABPM. See (Ex.99 at V(A). Without objective record evidence and justifications, Donovan maliciously failed and refused to complete a number questions on the evaluation form or his evaluations were inconsistent, contradictory and against the record evidence (Ex.43). Rather than consulting with or inviting the faculty to participate in the final evaluation pursuant to ACMGE & ABPM requirements—Id, Donovan improperly consulted with and sought unwarranted legal advice from the University legal counsel, Ms Linda Harpster (Ex.44).

24.    By 03/08/01 letter Amadasu disagreed with the evaluation and sought one-on-one meeting with Donovan in a good faith effort for internal amicable resolution of the matter (Ex.45). The departmental assistant set up the meeting for 03/19/01 (Ex.46) on which day Amadasu and Donovan met but Donovan failed and refused to amicable settle the matter and Amadasu by his 3/19/01

memorialized the meeting to Donovan (Ex.47). By his 03/26/01 Amadasu reminded and requested Donovan to send written basis, reasons and explanations for the evaluation (Ex.48); By his 03/27/01 letter, Donovan gave false and baseless reasons for the evaluation without corroborating bases in fact, policy and record evidence (Ex.49). Donovan's reasons and explanations are inconsistent with and/or are contradicted by his own serial letters of references about Amadasu in which he acknowledged Amadasu's good standing in the program, *see* (Ex. 63, 66, 67, 68, and 108). Further, Donovan's reasons and explanations are inconsistent with and/or are refuted by letters of reference by Lockey and Freeman (Ex.64, 65); and are refuted by evaluations by Lockey and other preceptors (Ex.55-61).

25.     During the entire relevant period, Amadasu was never involved in any disciplinary proceedings and not aware of any personal or professional circumstances that would indicate that Amadasu's privileges should be limited, postponed or denied. In a good faith effort, Amadasu complained to defendants Filak, Lockey and Buncher and without action on by them, Amadasu complained to the non-medical chairman of the Department of Environmental Health, who directed Donovan to redo the evaluation, which he did on or about 4/4/01 (Ex.50).

26.     As the program director and self-imposed Amadasu's advisor, Donovan advised and directed Amadasu to do a 4-week clinical elective in Environmental Medicine/Border Health at the Southern Texas Environmental Education and Research at Laredo, Texas (STEER) of the University of Texas Health Science Center at San Antonio (UTHSCSA). The Department of Family Practice (DFP) of UTHSCSA administered and managed the STEER. Donovan told Amadasu that UCMC would reimburse Amadasu's expenses. Upon inquiry and request, defendant Miller told Amadasu that STEER provides for free fully furnished housing, free round trip transportation from Amadasu's Laredo housing to all the STEER' offices and rotation sites, free use of the tools, clinical faculty supervision; and sent Amadasu some brochures. (Ex.122) Miller told Amadasu that STEER was an offspring of the federally funded Area Health Education Center (AHEC) program and was offered by DFP of UTHSCSA. (Ex.104-107).   Amadasu and Donovan executed the application for the elective at Cincinnati, Ohio in which Donovan acknowledged that Amadasu was in good standing at UCMC (Ex.108). By 01/06/00 letter, UTHSCSA through Miller offered Amadasu 4-week training elective from 04/03/00 through 04/28/00—Id, 2nd Depo. supra. On the eve of Amadasu's departure for Texas, by 3/27/00 letter, Miller advised Amadasu they were fully and completely prepared and ready for Amadasu's 4-week training (Ex.110). Also see (1st Amadasu Depo.p.43-44; 2nd Amadasu Depo.p.26-37).

27.    Amadasu drove almost 1800 miles to and arrived at Laredo on 3/31/00. Plaintiff lost
direction to STEER's office and requested Perales to come to escort Amadasu to STEER's office but
Perales failed and refused to assist in spite of one Laredo Community College Professor's phone call to
Perales to assist Amadasu. (Ex.117). Somebody else led Amadasu to STEER's office where Perales
coldly received Amadasu (Compl. #25). Instead of driving Amadasu's in STEER's vehicle Perales
made Amadasu to drive to AHEC office from there to an isolated, archaic desolate housing unit at
Laredo Community College where Amadasu was housed. Other AHEC's city based modern and fully
furnished housing at Delmar and Garfield were vacant (Ex.111). The house was unsafe, unhealthful,
and unfurnished and proximately caused Amadasu illness. (Compl. #26-28). Amadasu documented the
hazardous conditions of the housing and were acknowledged by an AHEC's official (Ex.112-113). In
Amadasu's absence and without his consent, Perales on two separate occasions intruded, entered and
trespassed Amadasu's premises (2nd Amadasu Depo.p.49). Amadasu complained about the hazardous
housing and he was transferred to the city based Delmar apartment building.

28.    UTHSCSA and Miller were not prepared and ready for Amadasu's participatory training
because: (a) The STEER Rotation Calendar (SRC) were not made before and about seven days after
arrival and when it was later made, it was incomplete, jigsaw-puzzle-like, and contained blank spaces
(Ex.116) as compared with the January and February 2000 SRCs made for other participants (Ex.114-
115 & 120). Also see (2nd Amadasu Depo. p.52-53).

29.    On 4/1/00 during Amadasu's participation in the Health Fair organized by Laredo Dept of
Health, Perales usurped and impersonated clinical faculty-supervisor in attempting to supervise and
interfere with Amadasu' clinical work, in breaching the privacy of patients that Amadasu were tending
to. When Amadasu requested Perales to stop he became angry and created animosity towards
Amadasu. (2nd Amadasu Depo.p.66). During the said health fair, Amadasu was the first, only black
person and easily identifiable in enormous pool of people. Friendly Hispanic males and females who
were curious approached and were having dialogue with Amadasu but Perales was unhappy and told
Amadasu that he disfavored white Hispanic females to friendly association with blacks.

30.    Perales refused to provide Amadasu with the promised free transportation as he refused to

transport Amadasu in STEER's vehicles to rotation sites. Perales refused to provide Amadasu with password and code to computer as he had provided other similarly participants of non-protected group. (2nd Amadasu Depo.p.51, 59-60, 69-72).

31.    Miller who promised to supervise Amadasu's rotation was unavailable to do so as she was in San Antonio, Texas. (2nd Amadasu Depo.p.65). When on 4/13/00 Miller came from San Antonio to STEER, Laredo Amadasu orally and in writing complained of discrimination and disparate treatment in STEER program to her. (Ex.117)

32.    On 4/18/00, three Caucasian UTHSCSA medical residents came from San Antonio, Texas to participate in the STEER elective. Perales demanded that Amadasu should give up the Delmar apartment for the Caucasian medical residents. Amadasu refused to give up his premises to the Caucasians and Perales instantly terminated Amadasu's participatory training in STEER program. Amadasu challenged the authority of Perales to terminate Amadasu's STEER training. (2nd Amadasu Depo. p. 52-55).

33.    On 4/19/00 Perales by phone to Amadasu's ears, told Miller that he had terminated Amadasu's participation because he claimed that Amadasu complained of discrimination and sexually harassed white Hispanic women, which was absolute false as to the harassment. Then Miller told Amadasu that Amadasu's participation was immediately terminated. When Amadasu requested to know why such termination without notice and reason, she said that she would send report to Donovan who in turn would tell Amadasu why he was terminated. (2nd Amadasu Depo.p.65)

34.    Perales sent 4/19/00 libelous letter to Miller and Donovan in which he stated the reasons for terminating Amadasu (Ex.118). On same day by 4/19/00 letter Perales instructed the AHEC's official to evict Amadasu from the housing. (Ex.119). On same day by 4/19/00 email, Amadasu informed Donovan and Freeman that his STEER participation had been terminated without knowing the reason and that Miller said that she would Donovan report and Donovan would inform Amadasu the reason for the termination. (Ex.120).

35.    The hazardous housing provided and the unjust sudden participation termination with defamation by UTHSCSA, Miller and Perales directly and proximately caused Amadasu's illness warranting medical treatment at Laredo and being placed on medical leave (Ex.124-125). Donovan

discussed the termination of STEER participation with Jarrell on 6/23/00 without discussing it with Amadasu (Ex.121).

36.     In or about August 1999, Gaynor offered to date Amadasu, which Amadasu initially accepted, consequently Amadasu and Gaynor started mutually consented dating relationship. During this brief relationship, Gaynor sent Amadasu loving email cards in which she expressed her love for Amadasu. (Ex.12-14). In or about early October 1999, Amadasu broke off the relationship but Gaynor refused to accept the discontinuance. She continued to phone and email Amadasu with threats of harming Amadasu, destroying his career and having him expelled from the residency training but Amadasu stopped reply to her communications.    (1st Amadasu Depo.p.117-118). In retaliation for Amadasu's refusal to date her and in furtherance of her threats to injure Amadasu, Gaynor solicited and obtained from a female employee of UC copies of emails that the employee received from someone else persons who were not Amadasu. Gaynor armed with those emails called and fabricated to Donovan that Amadasu was sexually harassing her and her female co-worker from whom she had solicited the emails. [1st Amadasu Depo.p.131 at 1-8]. Gaynor and Donovan conspired and colluded to be "papering" Amadasu's personnel with the emails, then, at request of Donovan, and without Amadasu's notice and consent, Gaynor maliciously put copies of the said emails dated December 14 to 15, 1999 into Amadasu's personnel file kept at the UCMC Department of Environmental Health where Gaynor was working [Ex.10 (1-6)], and she gave copies of the said emails to Donovan who put them in his secret files designed for Amadasu and to be published to third parties. Not only did Gaynor continue to sexually harass plaintiff by phone and emails with sexual contents, but she also continued to threaten plaintiff with termination of employment and expulsion from the OEMRP as evidenced by her 12/15/99 email that she put in Amadasu's file. [Ex. 10(6)]. Amadasu did not write and did not send those emails, and those emails were never sent to Gaynor in the first instance. When for the first time ever Amadasu discovered those emails in his personnel's file on or about 3/20/01, Amadasu by his 3/26/01 letter to Buncher, Jarrell and Anderson demanded investigation and explanations why those emails were put into his personnel file (Ex.11) but they did nothing.

37.     Relying on those said irrelevant private email documents, in October 1999, Donovan started to sexually harassed Amadasu by fabricating and falsely accusing him of sexually harassing two female employees when he stated that two fictitious females at human resources department complained of sexual harassment against Amadasu. Amadasu filed complaint of sexual harassment by Donovan and employees but defendants did nothing to remedy it.

38.     Amadasu demanded from Donovan the names and written complaints of the feigned complainants, nature, location, circumstances, date and time, and witnesses to the alleged sexual harassment to enable plaintiff the opportunity to respond, be heard and confront the complainants but Donovan absolutely failed to produce them. Amadasu complained to UCMC and their managers but they failed to take action to stop it. (Ex. 69). In 1999 and in 2000.

39.     Donovan expressly acknowledged to Amadasu that he had no written and signed sexual harassment complaints from any person against plaintiff; that he had no shred of evidence and factual foundations for the accusation of sexual harassments; and that he considered the alleged sexual harassments by Amadasu were **HOAX** and they were closed. Donovan affirmed these conclusions in his written memo, which was jointly signed by Donovan and plaintiff (Ex. 26-27) but Donovan continued to sexually harass Amadasu by continuously publishing it to third parties.

40.     UC and TUH sexual harassment policies and procedures mandate documented first-hand written and signed sexual harassment complaint by the complainant or victim, which must be vigorously, fully and completely investigated and heard comporting with due process but defendants failed to follow the policies. (Ex.20-24). Defendants failed to produce evidence of documented complaint, investigations, notice of charges, hearing, findings, conclusions and punishment comporting due process.

41.     But during Amadasu's meeting with Donovan on or about February 26, 2001 in order to graduate from the OEMRP, Donovan not only reinvented the false and fabricated sexual harassment complaints, which he had concluded to be hoax but he also fabricated another accusation that Amadasu attempted at dating a patient and used that as unfounded excuse to prevent plaintiff's graduation from the OEMRP. Plaintiff was very embarrassed, humiliated, distressed, anxious and shocked by these unfounded and concocted sexual harassments by Donovan.

42.     In furtherance of their devised fraudulent scheme, on or about February 16, 2000, Donovan and a nurse, Pohl connived, conspired, intentionally, deliberately, malicious, recklessly, wantonly and knowingly "set up" Amadasu to examine a female patient. Pohl with a duty to chaperon Amadasu, purposefully and knowingly failed to chaperon so as to concoct professional impropriety and sexual

12

harassment complaint against Amadasu and instigate the patient to file false complaint with the Ohio Medical Board purposefully to obstruct and prevent Amadasu from obtaining licensure to practice.

43.    On 2/16/00 a prospective employer sent the female patient to TUH's Center for Occupational Health (COH) for pre-employment placement medical examination. Donovan was supervising Amadasu during the relevant month and Pohl was the COH nurse whose duty included chaperoning Amadasu when examining a female patient. Pohl had always chaperoned Amadasu when examining a female patient but in this time she did not chaperon Amadasu.

44.    As usual, Donovan ordered and directed Amadasu to conduct medical examination on the patient and present the findings to him. Pohl put the patient in the exam room and left the room leaving Amadasu and the patient in the room. Amadasu professionally and ethically did the exam according to the COH guidelines and protocols and reported findings to Donovan who reviewed them without negative remark but noted that the patient did not bring her immunization/vaccination record that would enable to determine what and what not shots to administer to the patient and to complete the medical examination and send report to the prospective employer.

45.    Donovan instructed the patient to bring her immunization/vaccination record to COH the following day, i.e., 2/17/00 and Donovan also directed Amadasu to call to remind the patient to bring her immunization/vaccination if she forgot or failed to bring it. Patient did not make any complaint despite Donovan asking her if she had any question or complaint.

46.    During the examination the female patient told Amadasu that he had a heavy accent and asked whether Amadasu was from Africa and Amadasu replied, yes. Then the patient told Amadasu that she would want to travel to Africa and wanted Amadasu to tell her about Africa. Amadasu replied that he could not tell her about Africa at that moment and told her that she might call Amadasu at the COH during Amadasu free time to tell her about Africa. Nothing more than this was said and there was no intent or attempt on the part of Amadasu date the patient. Neither Donovan nor Pohl had any first hand or personal knowledge of what Amadasu and Patient said in the exam room.

47.    On 2/17/00 at 2.30pm, Donovan and Amadasu were in COH and Donovan was supervising Amadasu. When the patient failed to bring her immunization/vaccination record Donovan directed and ordered Amadasu to phone and remind the patient to bring the record. Amadasu phoned, nobody

answered and a message to bring the record was left in her answering device. Amadasu informed Donovan, noted it in the patient chart and Donovan endorsed it by his signature or initial (Ex.15)

48.    On 2/18/00 at 4.40pm, Donovan and Amadasu were in COH and Donovan was supervising Amadasu. When the patient failed to bring her immunization/vaccination record again Donovan directed and ordered Amadasu to phone and remind the patient to bring the record. Amadasu phoned, a female named Bridgett answered and said that the patient was not home so Amadasu left a message with Bridgett for the patient to bring the immunization/vaccination record to COH to enable Amadasu complete her exam and send report to her prospective employer that had sent her for the exam. Amadasu informed Donovan, noted the call in the patient chart and Donovan endorsed it by his signature or initial (Ex.15).

49.    Unusually, five days later on or about 2/21/00 Donovan directed Pohl to phone and asked the patient many suggestive sexist questions about the 2/16/00 pre-employment occupational physical exam with intent and purpose of concocting professional impropriety against Amadasu.  Pohl did phone and asked the patient sexually suggestive questions importing professional impropriety. Pohl improperly wrote in the patient's medical chart her solicited hearsay purported patient's complaint (Doc.97 Dft Summary Judgment Motion Ex.A).

50.    In 2/21/00 Pohl's hand-written-signed hearsay statement purportedly made by the patient, the patient did not specifically stated that Amadasu "harassed" or "attempted at dating" her but Donovan manipulated, spun, hyped the statement and fabricated that Amadasu sexually harassed and attempted at dating the patient, which are grossly false and defamatory per se.  Thus, Donovan and Pohl confederated, conspired and colluded to use sexism and sexual harassment to injure Amadasu's reputation by suborning and tampering with and soliciting the patient to make false defamatory complaint of "dating attempt" against Amadasu.

51.    On 3/22/00, unsatisfied with 2/21/00 Pohl's statement not fitting into his sinister scheme and intent to injure plaintiff, Donovan personally, knowingly, willfully, maliciously, intentionally, recklessly and wantonly by phoned, suborned, solicited, instigated and persuaded the patient to make false defamatory statement of facts concocted and fabricated by Donovan to the State Medical Board of Ohio with intent and purpose of injuring plaintiff's person, name, reputation, trade and career; making it impossible to obtain physician license any where in the nation; and to restrain and did

14

restrained his trade. These grossly defamatory false statements of facts were made for the wrong reason to injure and did injure Amadasu. Donovan acted outside the scope of his duty. Donovan improperly wrote in the patient's chart that he had advised the patient to make false charges against Amadasu to Ohio State Medical Board. (Ex.17).

52.     In his continuing malicious campaigns to injure Amadasu, his trade and reputation, Donovan fraudulently, maliciously, purposefully, knowing and willfully manufactured series of defamatory documents, which he published and intended to publish to several third persons without knowledge, consent of and without any copies given to plaintiff. Plaintiff did not know about these documents until about March 2001 when for the first Donovan disclosed them to plaintiff. The documents included but not limited to the following: (i) A medical record one-page document with the incident patient's name dated 3/22/00 in which he acknowledged that he had solicited, suborned and instigated the female patient to file a concocted false complaint against Amadasu with the Ohio State Medical Board. (Ex.17). Amadasu was unaware of this until late March 2001 when he demanded and reviewed his file kept at TUH's Office of Graduate Medical Education; (ii) The 2/21/00 medical record one-paged hearsay document made by Pohl, copy of which was not afforded Amadasu who for the first time knew of this document in March 2001 (Doc.97 Ex.A); (iii) A published document dated April 19, 2000, in which Donovan acknowledged that he had directed the patient to lie against Amadasu to Ohio State Medical Board, and that he fabricated Amadasu's harassing...and unwanted attempts at dating activity; Donovan acted unilaterally without authority, outside his job specifications, in violations of federal and state laws, bylaws, and accreditation boards' requirements, and the letter was libelous per se. Plaintiff knew of this document in March 2001(Ex.18); (iv) Malicious letter with April 28, 2000 date (Ex.19).

53.     Donovan had no authority and basis in fact, evidence and law for these illegal sanctions and were never noticed to Amadasu to enable him exercise his due process rights; (vi) The undated document from Donovan to Dr Jarrell. (Ex.121). Donovan had no authority to act unilaterally and without basis in facts, evidence and law. Amadasu was not afforded copy of this document.

54.     Some or all of the following documents of 2/1/00, 3/22/00, 4/28/00 (Ex.17-19) were published to several persons, inter alia, Filak on 5/4/00 (Ex.16), and Dr Jarrell, but none was afforded Amadasu thereby constituting a denial of due process secured to him. The said documents were designed to prevent and hinder plaintiff's trade and licensure. Filak, upon receipt of the Donovan's

manufactured documents ignored them and failed to investigate probably because they were baseless and or violated the requirements of ACGME, ABPM, HCQIA, Bylaws, etc.

55.     Amadasu was qualified and entitled to be promoted as the Chief Resident (CR) of OEMRP. Further, promotion to CR position was/is based on seniority regardless of the purported track the senior resident was on, and not on the unaccredited "academic or accelerated track. From 7/1/99 to 12/31/99 Plaintiff and one female Caucasian, Loren J. Tapp, ("Tapp") were the most senior residents in the third year practicum phase of the OEMRP and Tapp was then Chief Resident ("CR"). She was given preferential treatment by all white faculty than plaintiff at DOEM. In or about December 1999 Tapp graduated from the OEMRP leaving plaintiff as the only most senior resident in the OEMRP and who was qualified and entitled to be promoted as the the CR. In or around December 1999 bypassing plaintiff who was the only most qualified, most entitled and most senior resident to be appointed to the position of the CR defendants promoted a less qualified, less experienced, and more junior white resident, Robert M. Gabel, over and above Amadasu, thereby, denying Amadasu equal opportunity for promotion as CR because of his race, ancestry and national origin, thereby humiliating, degrading and demoting plaintiff

56.     Amadasu was qualified and entitled to be promoted as the Chief Resident (CR) of OEMRP. Further, promotion to CR position was/is based on seniority regardless of the purported track the senior resident was on, and not on the unaccredited "academic or accelerated track.

57.     From 7/1/99 to 12/31/99 Plaintiff and one female Caucasian, Loren J. Tapp, ("Tapp") were the most senior residents in the third year practicum phase of the OEMRP and Tapp was then Chief Resident ("CR"). She was given preferential treatment by all white faculty than plaintiff at DOEM. In or about December 1999 Tapp graduated from the OEMRP leaving plaintiff as the only most senior resident in the OEMRP and who was qualified and entitled to be promoted as the CR. In or around December 1999 bypassing plaintiff who was the only most qualified, most entitled and most senior resident to be appointed to the position of the CR defendants promoted a less qualified, less experienced, and more junior white resident, Robert M. Gabel, over and above Amadasu, thereby, denying Amadasu equal opportunity for promotion as CR because of his race, ancestry and national origin, thereby humiliating, degrading and demoting plaintiff

58.     Amadasu is black, applied and qualified for the second year (PGY-2) position in Family

Practice Residency Program ("FPRP"). UC did not hire him but kept the position unfilled while continuing to advertise it for several months until a less qualified and less experienced, younger Caucasian applied and was appointed Amadasu was not appointed to the FPRP because of his race, age, national origin and in retaliation for his opposition to their discrimination practices. (Ex.55-68)

59.    Amadasu is black, applied and qualified for the faculty position in health promotion. UC did not hire him. Amadasu was not appointed because of his race, age, sex, and national origin and in retaliation for his opposition to their discrimination practices. UC hired less qualified person because of her race (white), gender (female), younger and because she been a part of regular complement, which constitutes proscribed discriminatory employment practices.

60.    By its 7/3/00 letter (Ex.96) UC by Herrmann acknowledged receipt of Amadasu's application for the position and requested for more information, which Amadasu submitted. By its 8/7/00 letter (Ex.95) UC by Herrmann informed Amadasu that his application was reviewed and kept on file for one year but did not state that Amadasu was not qualified for the position.

61.    The UCMC Department of Occupational and Environmental Medicine (DOEM) is one of the 14 National Institute of Occupational Safety and Health (NIOSH) sponsored and funded Educational Research Centers (ERC) in the country (Ex.2, & Ex.28 p.1). OEMRP is one of the programs of the ERC and it is fully funded by federal dollars and assistance. OEMRP cannot operate and cannot be funded by federal government without accreditation by and full compliance with the JACHO, ACGME, ABMS, and ABPM.

62.    Nationally, Medical Doctors appointed as OEMR into ACGME-accredited OEMRP of the ERC receive written contract, stipend, full benefits package and pay naught to the sponsoring institution—here, TUH and pay naught to the participating institution—here, UC or UCCM for anything related to the program, including but not limited to tuition and fees because they are paid for by federal dollars. Amadasu was a beneficiary of the federal funds. Additionally, UCMC's OEMRs as part of their benefits package, which Amadasu was entitled to but denied, are entitled to Tuition Reimbursement up to $3,000.00 per year (Ex.7 p.5).

63.    The Academic and the Practicum Phases of the OEMRP are under the authority and

control of TUH because it is the recognized sponsoring institution pursuant to ACGME requirements (Ex.97 p.13, & Ex.98-100). UC or UCCM as the participating institution provides didactic academic courses to OEMRs on Academic Phase leading to M.S. degree in fulfillment of the requirements of the Academic Phase while TUH provides teaching and training for OEMRs on Practicum Phase.

64.    Amadasu had obtained MPH degree as prerequisite for appointment into the Practicum Phase thus, he had satisfied the Academic Phase Requirements, and thus, he did not require any didactic academic courses for a master degree, which he had already got. (Ex.1 & 62). For the intent and purpose of discriminating against and in furtherance of their scheme to defraud Amadasu, Donovan and UCMC knowingly and fraudulently placed Amadasu on their purported "academic track" without Amadasu's knowledge and consent and for which he did not apply and belong.

65.    Amadasu applied for and was appointed into Practicum Phase of OEMRP. (Ex.1). UCMC's 01/25/99 letter appointing Amadasu as OEMR into Practicum Phase clearly and unambiguously stated that the position had tuition remission (Ex.4). This statement, notwithstanding, Amadasu was not required to pay as an OEMR. At the advice and direction of Donovan and in the course of the residency, Amadasu registered for courses and clinical rotations, which were/are deemed absolutely remitted pursuant to the UCMC's 01/25/99 letter (Ex. 4) as well pursuant to NIOSH funding benefits.

66.    For example, for autumn quarter 1999 UC sent bill describing charges for academic courses, clinical rotations and fees and the tuition balance due was zero (Ex.70) as well as listed a mixed academic courses titles and clinical rotations titles that Amadasu registered for (Ex.71); For spring quarter 2000 UC sent bill describing charges for academic courses, clinical rotations and fees and the tuition balance due was $100, which was subsequently erased because Amadasu as a resident physician was not liable for any balance (Ex.72). The bill also described mixed academic courses titles and clinical rotations titles that Amadasu registered for (Ex.73).

67.    Amadasu's last and final registration for courses and clinical rotations took place in spring quarter 2000 on 03/15/00 (Ex.72, 73), that is, the spring quarter was the last quarter of Amadasu's One-year Practicum Phase of the OEMRP, which should have ended June 2000. After 03/15/00 Amadasu never registered for any academic courses and/or clinical rotations.

68.    UC continued to send to Amadasu distressing, harassing, vexatious and fraudulent bills for

zero, unidentified or unspecified courses titles. For example, (a) about 11-months after Amadasu's last registration in March 2000, UC sent winter quarter 2001 bill (Ex.74) with itemized charges amounting to tuition balance due of $3,993.00 covering inter alia, fees for 01/16/01 instructions that Amadasu never had. The bill shows zero current amount due meaning that Amadasu owed no money before this bill. Page 2 of the bill (Ex.75) shows zero courses for zero credit hours evidencing that Amadasu never registered for any course for which the bill in (Ex.74) covers; (b) 24-months after Amadasu's last registration in March 2000, UC sent spring quarter 2002 bill (Ex.76) that shows previous balance and late payment fees totaling $4,313.00 and the bill's page 2 (Ex.77) shows zero classes for zero credit hours; (c) summer and autumn quarters 2002 show the same pattern of billing as the preceding bill (Ex.78-83).

69.    Amadasu disputed those bills as follows: (a) by his 2/2/01 letter (Ex.86) to which by 2/5/01 letter (Ex.87) UC replied and acknowledged that Amadasu owed naught; (b) by his 10/7/02 letter (Ex.89) to which by its 10/10/02 (Ex.90) UC replied and acknowledged that Amadasu owed naught.

70.    In an effort to get employment with various employers which have requested official transcripts, Amadasu applied and paid for official transcripts on 04/05/01 (Ex.84) but UC sent to Amadasu 04/06/01 letter (Ex.85) that it had put service block on Amadasu's transcript and by another 7/16/02 letter (Ex.88) UC noticed continuing blockage against Amadasu's transcript, which is continuing to the present thereby causing Amadasu continuing injuries.

71.    By its 10/28/02 letter (Ex.91) UC informed Amadasu that it had referred the debt account to Debt Collection Company against which Amadasu raised futile protest. From November 2002 through about November 2003 debt collection company, General Revenue Corporation (GRC) collection regularly made harassing, vexatious, and emotionally distressing collection letters and telephone calls for nonexistent debt, e.g., (Ex.92-93). When GRC stopped collection activities, UC engaged another debt collection company, National Enterprise Systems (NES) that also harassed Amadasu for several months by its collection activities, e.g. (Ex.94).

72.    Beginning from Autumn 1999 continuously through years, 2000, 2001, 2003 and ongoing in 2004, UC regularly, repeatedly and continuously sent Amadasu bills for unidentified courses and clinical rotations, for which Amadasu never registered and had; which, however, were deem fully and

completely remitted and, of course, had been fully funded by federal govt. agency funding the OEMRP.

73.    From July 1999 to the present 2005 year and still to continue, Amadasu has diligently, relentlessly been applying for positions within and without United States. Every, any and all prospective employers and partners requested official transcripts and verification of attendance from UCMC but UCMC refused to release them. Examples of such job application efforts are shown by (Ex.126-130).

74.    Amadasu could have obtained license, board certification, registered as Occupational and Environmental Medicine Specialist, set up his own practice, form partnerships, be gainfully employed at various establishments and gain many economic opportunities but for the defendants' conduct, *inter alia,* defendants' false, discriminating and fraudulent withholding of grades, written evaluations, representation of debt to block the issuance of official transcripts and verification of attendance needed for Amadasu to be licensed as a specialist, obtain board certification, to be employed, to set up his specialty practice, form partnership and to obtain economic advantages.

**75.**    Donovan was the appointed OEMRP program director and self-appointed himself as Amadasu's clinical faculty advisor (CFA). Donovan was mandated and had the duty to help Amadasu with problems that arise during the residency (Ex.28 p.2) but, instead, he was Amadasu's worst nightmares, nefarious nemesis, obstructionist, jealous and malicious advisor who knowingly, recklessly, egregiously and deliberately created colossus of problems for Amadasu as evidenced by the sets of facts stated above herein.

**76.**    As a highlight, (i) Donovan is dubious, e.g., he signed the UCMC's 01/25/99 letter (Ex.4) appointing Amadasu as Occupational and Environmental Medicine Resident (OEMR) [Donovan Decln. #3] but Donovan fraudulently classified Amadasu as a graduate student (Donovan Decln. #11); and Donovan had always rated Amadasu "in good standing" from the start to the end of the program (Ex.63, 66, 67, 68) but fraudulently fabricated that Amadasu had problems throughout the program without pointing to any evidentiary support in the record; (ii) Donovan obstructed Amadasu graduation from the program, board certification, employment and economic advantages by neglecting, failing and refusing to render and post grades and written evaluations of Amadasu's clinical practicum courses; (iii) Donovan was jealous of Amadasu's qualifications, skills, expertise, versatility,

20

experience and prospective future economic advantages, all of which surpassed Donovan's qualifications; and (iv) Donovan was malicious by purposefully and knowingly fabricating nonexistent sexual harassment by Amadasu; by soliciting, suborning, persuading and pressuring a female to lie to and file false and concocted complaint with Ohio State Medical Board against Amadasu (Ex.17); by "papering" his secret file on Amadasu; etc.

77.    Donovan, Lockey, Freeman, Middaugh, and Miller Failed to comply with and perform their duties as faculty under the accreditation standards of ACGME and ABPM thereby proximately caused Amadasu's injuries. The duties, obligations and responsibilities of the faculty of ACGME are set forth in [Ex.97    p.19-20; Ex.98 at "B" & Ex.99 at V(A)] excerpted from Graduate Medical Education Directory. Faculty has supervisory and teaching duties and responsibilities, including but not limited to rendition of grades and written evaluations of the courses and clinical rotations done under them but they failed to supervise and/or render grades and written evaluations in timely manner or none at all. In Ex.97 p.19 and pursuant to requirement IV(D) the faculty must evaluate in a timely manner the residents whom they supervise; and in Ex.99 pursuant to ABPM requirements V(A)(1, 3 & 4)), the resident's supervisor in the clinical and practicum phases shall provide a written evaluation to the program director and the resident on completion of the rotation, and that the program director and faculty must certify that residents completing the program have fulfilled all requirement established requirements based on the whole evaluations but the faculty failed to do so thereby causes Amadasu's injuries.

78.    UC, UCCM, TUH, UCMC And UTHSCSA failed to comply with and perform their duties as the sponsoring or participating institutions under the Accreditation Standards Of ACGME and/or ABPM; and to comply with their own bylaws, policies and procedures thereby proximately caused Amadasu's injuries. The duties, obligations and responsibilities of the sponsoring and participating institutions are set forth in (Ex.97 p.13-16) excerpted from Graduate Medical Education Directory. They failed to comply with the ACGME's Institutional requirements in general and specifically, failed to afford financial support, benefits and conditions and agreement of appointment, grievance procedures and due process for Amadasu throughout Amadasu's relationship with them. See, e.g., (Ex.6, 7).

79.    For example. Exhibits 20 and 21 are excerpts from University of Cincinnati Hospital

Graduate Medical Education Policies and Procedures, which provide procedures for sexual harassment complaint and assurance of due process respectively. Exhibit 22 is an excerpt from UC Employee Manual, which also provides for sexual harassment procedures. Exhibits 23 and 24 are excerpts from UCMC or TUH's Medical Staff Bylaws, policies and procedures, which provide policy and procedures for complaint of sexual harassment involving a medical staff member; and Exhibit 25 is an excerpt from UCMC or TUH's Medical Staff Bylaws, policies and procedures, which provides policy and procedures for due process for disciplinary action against medical staff member. Amadasu was/is a bona fide medical staff member of UCMC and UTHSCSA. UC, UCCM, UCMC and/or TUH and UTHSCSA failed to follow their own bylaws thereby proximately caused Amadasu's injuries.

80.    Perales and Miller made stigmatizing statements in conjunction with plaintiff's termination from training at STEER. They did not alleged improper or inadequate performance of his duty by plaintiff. They voluntarily published the stigmatizing statements to the public and to Ohio defendants. Plaintiff complained that the statements were false and demanded name-clearing hearing but was denied.

Dated: May 27, 2005

DECLARANT

Darlington Amadasu

Plaintiff Lay pro se.

**CERTIFICATE OF SERVICE**
I hereby certify that true copy of the foregoing were served on Justin D. Flamm by delivery to receptionist and on John M. Grey, POB 12548, Austin Texas, 78711 by USPS mail on 05/31/05