FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

05 JUN -1 PM 3:23

---

DARLINGTON AMADASU
       Plaintiff

-V-

JAMES R. DONOVAN, MD, et al
       Defendants

Case No:  C - 1 - 01 - 210
Black/Dlott

**PLAINTIFF'S INITIALCOMBINED CROSS-MOTION
FOR SUMMARY JUDGMENT & OPPOSITIONS TO
ALL DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT;**

---

PLAINTIFF'S INITIAL COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT &
OPPOSITION TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT IS
SUPPORTED BY:

1. The Pleadings
2. 1st deposition of Amadasu by Ohio defendants
3. 2nd deposition of Amadasu by Texas defendants
4. Defendants' evasive/ambiguous/incomplete/none answers to plaintiff's interrogatories
5. Defendants' evasive/ambiguous/incomplete/none answers to plaintiff's Admissions
6. Declaration of Amadasu in support of plaintiff's combined cross-motion for summary judg.
7. Exhibits
8. Memorandum

Respectfully submitted,

Darlington Amadasu
Plaintiff Lay Pro Se
P.O. Box 6263
Cincinnati, OH 45206
(513) 207-9010

## TABLE OF CONTENTS

Page

INITIAL COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT...........................................1

INTRODUCTION.................................................................................................................2

RELEVANT BACKGROUND...............................................................................................4

   Overview Of Modern Teaching Hospital Governance, Duty, Obligations & Responsibility..........4

   Overview Of Graduate Medical Education ("GME") or Residency in Occupational
   and Environmental Medicine at The University of Cincinnati Medical Center ("UCMC")...........4

   ACGME/ABPM PROGRAM REQUIREMENTS FOR OEMRP ALL
      OVER THE UNITED STATES..................................................................................5

   THE NATURE OF PROCEDURAL PROTECTIONS AFFORDED TO
   THE PUBLIC AND PHYSICIANS.....................................................................................6

Procedural background.......................................................................................................8

RELEVANT FACTS..........................................................................................................8

ARGUMENT, LAW and AUTHORITIES...............................................................................36

   APPLICABLE SUMMARY JUDGMENT STANDARD..........................................................37

CONCLUSION................................................................................................................73

CERTIFICATE OF SERVICE............................................................................................73

## CASE LAWS & AUTHORITIES

Agarwal v. Johnson, 25 Cal.3d 932, 603 P.2d 58 (1979).............................................................69

Andolsun v. Berlitz Schools of Languages, 196 A.2d 926 (D.C.1964)...........................................58

Assoc. of Mexican-American Educators v. California, 183 F.3d 1055 (9th Cir.1999)...............38,73

Becker v. Alloy Hardfacing & Engineering Co., 401 N.W.2d 655 (Minn. Sup. Ct. 1987)..............63

Bickerstaff v. Vassar College, 196 F.3d 435 (2nd Cir.1999)........................................................71

Blankenship v. Parke Care Centers, Inc. (S.D. Ohio, W. Div. 1995) 913 F. Supp. 1045;

   citing Brandenburger v. Hilti, Inc. (Cuyahoga Cty. 1989), 52 Ohio App. 3d 21, 29............67

Boddie v. American Broadcasting Companies, Inc., 694 F.Supp. 1304 (N.D.Ohio 1988)...............51

Boone v. Federal Express Corp. (1995, CA8 Minn)...................................................................51

Bremiller v. Cleveland Psychiatric Inst. (1995, ND Ohio) 879 F. Supp. 782.................................51

Brooks v. ABC, Inc., 932 F.2d 495, 500 (6th Cir. 1991)...........................................................38

Browning v. Slenderella Sys., 54 Wash.2d 440, 341 P.2d 859 (1959).........................................68

Brown v. City of Niota, 214 F.3d 718, 722-23 (6th Cir.2000).....................................................49

Brown v. City of Oneonta, NY, 195 F.3d 111 (2nd Cir.1999)............................................42

Buchanan v. Sowa, 592 F.Supp. 1009 (D.C.Ohio 1984).............................................51

Buckner v. City of Highland Park, 901 F.2d 491, 494 (6th Cir.) (citing
    Loudermill v. Cleveland Bd. of Educ., 844 F.2d 304 (6th Cir. 1988)),
        cert. denied, 498 U.S. 848 (1990)..............................................47

Buwana v. Dept. of High Educ.Regents of Univ. of Colo, 55 F.Supp.2d 1139 (D.Colo.1998)...39,42

Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).................37

Canitia v. Yellow Freight System, Inc., 894 F.2d 196, 199 (6th Cir. 1990)..................38

Casale v. Dooner Lab. Inc., 503 F.2d 303 (4th Cir.1973)...................................59

Cellini v. Harcourt Brace & Co., 51 F.Supp.2d 1028......................................51

Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2557 (1986).....................................41

Chambers v. Omaha Girls Club (1986, DC Neb) 629 F.Supp 925 (citation omitted)...........41,42,51

Christiana Marine Service Corp. v. Texaco Fuel & Marine Marketing, Inc.,
    (2002 Del. Super. LEXIS 305)...........................................60

Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985))........................47

Cones v. Shalala, 199 F.3d 512 (C.A.D.C.2000)..........................................71,72

Davis v. County of Los Angeles, 566 F.2d 1334, 440 US 625 (1977, CA9 Cal)................41

Debra P. v. Turlington (1979, MD Fla) 474 F.Supp. 244...................................39,42

Doe v. Southeastern Penn. Transp. Authority, (ED Pa.1994, 886 F.Supp.1186.................66

Doody v. John Sexton & Co., 411 F.2d 1119 (1st Cir. 1969)..............................61

Drennen v. Westinghouse Electric Corp., 328 So.2d 52 (Fla. Dist. Ct. App. 1976)...........63

Dumont v. Administrative Officer, 915 F.Supp. 671, 674 (SDNY 1996)........................37

Elizaga v. Kaiser Found. Hosp., Inc., 259 Or.542, 487 P.2d 870 (1971)....................58

Elliott v. Shore Stop, Inc., 238 Va. 237, 384 S.E.2d 752 (1989).........................56

Evans v. Ohio State Univ. (1996), 112 Ohio App.3d 724, 680 NE2d 161.....................55

Farhat v. Jopke, et al, 370 F.3d 580 (6th Cir.2004) (citing Duchesne v. Williams,
    849 F.2d 1004, 1006-07 (6th Cir. 1988), cert. denied, 489 U.S. 1081 (1989))...............47

Feldstein v. Nash Community Health Services, Inc., 51 F.Spp.2d 673 (1999)...................37

Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572 (1st Cir.1999)......................27,72

Foucher v. First Vermont Bank and Trust Co., 821 F.Spp. 916, 922 (D.Vt.1993)...............37

Frankson v. Design Space Int'l, 394 NW2d 140 (Minn.1986)...............................63

Gallo v. Prudential Residential Services L.P., 22 F.3d 1219 (2d Cir. 1994)...............38

Garcia v. District of Columbia, 56 F.Supp.2d 1 (D.D.C.1998)............................43

Givan v. Greyhound Lines, Inc., 616 F.Supp. 1223 (S.D.Ohio 1985)........................................51

Gobson v. Rich, 44 F.3d 274, 277 (5th Cir.19995).......................................48

Godwin v. Dinkler St. Louis Mgmt. Corp., 419 S.W.2d 70 (Mo.1967)..................59

Griffen v. Breckenridge, 403 U.S. 88, 102-103 (1971)...................................49

Guillory v. Godfrey, 134 Cal. App. 2d 628, 286 P.2d 474 (1955)......................68

Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594 (1972)..........................38

Hall v. May Dep't Stores & Co., 292 Or.131, 637 P.2d 126, 130-31 (1981)..........65

Hamlen v. Fairchild Indus., Inc., 413 So.2d 800 (Fla.App.1982)........................59

Harless v. First Nat'l Bank, 169 W.Va. 673, 289 S.E.2d 692 (1982)...................69

Harris v. White 479 F. Supp. 996 (1979, DC Mass)......................................39

Hart v. McLucas, 535 F.2d 516, 519 (9th Cir. 1976)....................................55

Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998)...................48

Honnover Ins. Co. v. American Eng'g Co., 33 F.3d 727, 730 (6th Cir.1994)...........37

Housing Investors, Inc. v. City of Clanton, Ala., 68 F.Supp.2d 1287 (1999)...........52

In re Bailey, 182 F.3d 860 (C.A.Fed.1999)..............................................46

In re Rehab Project, Inc., 238 B.R. 363 (Bkrtcy. N.D. Ohio 1999)......................37

In re Selcraig, 705 F.2d 789, 796 (5th Cir.1983).......................................49

Jackson v. City of St. Louis, 220 F.3d 894 (8th Cir.2000)...............................71

Jett v. Dallas Indep. Sch. Dist., 798 F.2d 748 (5th Cir.Tex.1986).......................41

Johnson V. International Minerals & Chemicals Corp.,

    40 Fair Empl. Prac. Cas. (BNA) 1651 (D.S.D. 1986)...................................64

K.—Mart Corp. v. Trotti, 677 S.W.2d 632 (Tex Ct. App. 1984).......................65

Karim-Panahi v. Los Angeles Police Dept. 839 F.2d 621, 623 (9th Cir.1988)..........38

Klesch v. Reid, 95 OApp.3d 664, 643 NE2d 571 (1994)..............................40

Kovatovich v. K-Mart Corp., 88 F.Supp.2d 975 (D.Minn.1999)......................64

Larry P. v. Riles (1984, CA9 Cal) 793 F.2d 969........................................39

Lee v. Western Reserve Psychiatric Habilitation Ctr, 747 F.2d 1062 (6th Cir. 1984)....................46

Lenz v. Erdmann Corn., 773 F.2d 62, 64 (6th Cir. 1985)...............................38

Lewis v. Equitable Life Assurance Society, 389 N.W.2d 876 (Minn. 1986)............64

Luttrell v. United Telephone System, Inc., 236 Kan. 710, 695 P.2d 1279 (1985)........63

Matsushita Elec. Industries Co. v. Zenith Radio Corn., 475 U.S. 574, 587 (1986).......38

McAfee v. Rockford Coca-Cola Bottling Co., 40 Ill. App.4d 521, 352 N.E.2d 50 (1976)..............60

McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990)

(citing Patterson v. General Motors Corp., 631 F.2d 476, 482

    (7th Cir. 1980), cert. denied, 451 U.S. 914 (1981))...................40

McGrath v. Zenith Radio Corp., 651 F.2d 458 (7th Cir.1981)...................58

M.F. Patterson Dental Supply Co. v. Wadley, 401 F.2d 167, 169-70 (10th Cir. 1968)...................63

Miller v. California, 413 US 15, reh'g denied, 414 US 881 (1973)...................65

Miller v. Fairchild Industries, Inc., 797 F.2d 727 (9th Cir.1986)...................41

Milton v. Illinois Bell Tel. Co., 101 Ill. App.3d 75, 427 NE2d 829 (1981)...................69

Newman v. Federal Exp. Corp. 266 F.3d 401, *406 (6th Cir.2001) citing

    Patterson v. McLean Credit Union, 491 U.S. 164, 186,

        109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)...................41

Nowak v. EGW Home Care, Inc., 82 F.Supp.2d 101...................62

'O'Connor v. Ortega, 480 U.S. 709, 1 IER Cases 1617 (1987)...................65

Odom v. East Avenue Corp., 178 Misc. 363, 34 NYS2d 312 (1942)

    (refusal to serve hotel gusts in dinning room)...................68

Palmateer v. International Harvester Co., 85 Ill.App.3d 50, 406 NE2d 595 (1980)

    aff'd in part, rev'd in part, 85 Ill.2d 124, 421 NE2d 876 (1981)...................69

Park v. City of Atlanta, (1997 CA11 Ga) 120 F.3d 1157...................52

Payton v. Rush-Presbyterian-St. Luke's Med. Ctr, 184 F.3d 623...................51

Perry v. Woodward, 199 F.3d 1126 (10th Cir.1999)...................43

Quinones v. Nescie, 110 FRD 346 (EDNY 1986)...................52

Rackley v. Board of Trustees, 238 F.Supp.512. (1965, DC SC)...................39

Rankow v. First Chicago Corp., 870 F.2d 356 (7th Cir.1989)...................60

Regents of State Colleges v. Roth, 408 US 564, 569-70 (1972)...................43,48

Robinson v. Hewlett-Packard Corp., 183 Cal. App.3d 1108, 228 Cal. Rptr. 591 (1986)...................68

Schowengerdt v. General Dynamics Corp. 823 F.2d 1328, 2 IER Cases 545 (9th Cir. 1987)...................66

Selden Apartments v. United States Dept. of HUD, 785 F.2d 152 (6th Cir.1986)...................52

Shebar v. Sanyo Business Sys. C0rp., 218 N.J. Super.111, 526 A.2d 1144 (1987)...................55

Sherman v. Mutual Benefit Life Ins. Co., 633 F.2d 782, 785 (9th Cir.1980)...................61

Shields v. Burge, 874 F.2d 1201, 1203, 4 IER Cases 623 (7th Cir. 1989)...................66

Smith v. Reynolds Metals Co., 497 So.2d 93 (Ala.1986)...................60

Smith v. Montgomery Ward Co., 567 F.Spp. 1331, 1335 (D. Colo. 1983)...................65

St Hilaire v. The Pep Boys—Manny, Moe and Jack, 73 F.Spp.2d 1350 (SD Fla.1999)...................70

Stone v. F.D.I.C., 179 f.3D 1368 (C.A.Fed.1999)...................46

Talley v. Leo J. Shapiro & Assoc., 713 F.Supp. 254 (N.D. Ill.1989)........................................68

Tate v. Dravo Corp., 623 F. Supp.1090 (1985, WD NC)......................................................41

Taylor v. Slick, 178 F.3d 698 (C.A.3 Pa.1999)................................................................46

Tripp v. Long Island University, 48 F. Supp.2d 220 (1999).................................................39

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).....................................................38

United States v. Kiefer, 228 F.2d 448 (D.C. Cir. 1955).......................................................55

U.S. v. Nathan, 188 F.3d 190 (C.A.3 N.J.1999)...............................................................46

Varnum v. Nu-Car Carriers, Inc., 804 F.2d 638 (11th Cir.),

      reh'g denied, 808 F.2d 1524 (1986), cert. denied 481 US 1049 (1987)...........................57

Vaugh v. Lawrenceburg Power Sys., 269 F.3d 703, 715 (6th Cir.2001)..................................49

Wagner v. Allied Chemical Corp., 623 F. Supp. 1407 (D.Md.1985).......................................37

Whitt, et al., v. Country Club Apartments, et al., (6th Cir.1999) 1999 Ohio LEXIS 3573................53

Wildes v. Pens Unlimited Co., 389 A.2d 837 (Me.1978).....................................................57

Wilson v. Lyane, 526 US 603, 609 (1999)......................................................................48

Wong v. Aragona, (D.Md.1993) 815 F.Supp.889, affirmed 61 F.3d 902..................................62

Yeager v. Teamsters Local Union No.20, 6 Ohio St 3d 369, 374-75. 453 N.E.2d 666 (1983)...........67

Young v. Pierce (1982, ED Tex) 544 F.Supp.1010............................................................39

STATUTES/RULES

Title VI..................................................................................................2,39,40,41
Title VII................................................................................................2,41,71,72
42 USC 1981........................................................................2,41,42,43,45,52,71
42 USC 1982.......................................................................................2,52
42 USC 1983.......................................................................................2,43
42 USC 1985...............................................................................2,49,50,51
42 USC 1986.......................................................................................2,51
42 USCS 2000d....................................................................................39
42 USCS 2000d....................................................................................41
42 USC 3601........................................................................................52
42 USC 3604(a) and (b)...........................................................................52
42 U.S.C. 11111 et seq.............................................................................2,3
42 U.S.C. 11133, 11135...........................................................................2,6
Fair Housing Act (FHA)...........................................................................52
Fifth Amendment................................................................................43,44
First Amendment...................................................................................43
Fourth Amendment................................................................................43
Fourteenth Amendment.........................................................................43,44
Sixth Amendment..................................................................................44

States of Ohio Constitution................................................................44
States of Texas Constitution.............................................................44
FRCP 36...................................................................................40
FRCP 56(c)............................................................................37,40
FRCP 56(e)................................................................................74
FRCP 56(f)................................................................................74
HCQIA......................................................................................3

## ACCREDITATION BOARDS & MISC.

ABPM..........................................................2,4,5,9,42,44,53,54,56,71
ABFP..................................................................................4,6,54
American Board of Medical Specialties (ABMS)...........................................4
ACGME.......................................................2,4,5,6,9,42,44,53,54,56,71
*Bouvier's Law Dictionary, Baldwins Student Edition (1946) p.533*........................53
Clady Test.................................................................................72
 JCAHO.........................................................2,4,5,6,9,42,44,56,71
Hornbook law-W. Keeton, D. Dobbs, R. Keeton & D. Owens, Prosser and Keeton on
    The Law of Torts, Section 113 (5th ed. 1984).....................................63
Restatement 2d of torts, note 2 section 46 comment.....................................67
Restatement 2d of Torts Section 525 note 2 comment e...................................57
Restatement 2d of Torts, Section 552 (1977) comment...................................60
Restatement 2d of Torts Sect.577 comment h (1977).....................................63
Restatement (Second) of Torts S 581A..................................................64
Webster's New American Dictionary, 1995...............................................54
Webster's Dictionary Website..........................................................53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DARLINGTON AMADASU
    Plaintiff

-V-

JAMES R. DONOVAN, MD, et al
    Defendants

Case No: **C - 1- 01 - 210**
Black/Dlott

PLAINTIFF'S COMBINED CROSS-MOTION
FOR SUMMARY JUDGMENT & COMBINED
OPPOSITIONS TO ALL DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT

**I.**        **INITIAL COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT**

Lay pro se plaintiff Darlington Amadasu moves this Court, and submits this initial combined cross-motion for summary judgment in his favor pursuant to Federal Rules of Civil Procedure (FRCP) 56(c). This motion supported by the pleadings, depositions, answers to interrogatories, admissions, and declaration with annexed exhibits, all of which either demonstrate there is no genuine issues of material fact and plaintiff is entitled to judgment in his favor as a matter of law, or that the facts and evidence are so one-sided against the defendants that plaintiff is entitled to judgment in his favor.

This cross-motion for summary judgment is initial or preliminary because the defendants have not provided plaintiff with the responses and documents demanded in plaintiff's Rules 33, 34 and 36 discovery requests, all of which plaintiff needs to adequately and fully respond to defendants' motions for summary judgment and to support his cross-motion, therefore, plaintiff reserves the right, pursuant to FRCP 56(e), to file supplemental or further affidavit in support of his cross-motion for summary judgment and in opposition to defendants' motion for summary judgment whenever defendants produce responses and documents responsive to plaintiff's discovery request.

Plaintiff put the Court and defendants on notice that defendants have failed to respond to plaintiff's discovery requests and requested pre-motion to compel conference with the Magistrate to

1

resolve the discovery disputes (Doc.92) but the court is yet to schedule the conference to resolve the discovery issues.

## MEMORANDUM

### II.    INTRODUCTION

This action arises from violation of plaintiff's rights protected under: (1) the United States Constitution and laws: First Amendment-Free Speech; Fourth Amendment-Non Violation of people to be secured in their persons, houses, papers, and effects; Fifth and Fourteenth Amendments- deprivation of liberty, property, privileges, equal protection and immunities rights without due process; Sixth Amendment- right to be informed of the nature and cause of accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor; civil rights, Title VI, Title VII, Sections 1981, 82, 83, 85, and 86, Health Care Quality Improvement Act, 42 U.S.C. 11111 et seq.; (2) Ohio and Texas States Constitutions and laws, etc. This action arises out of attempts of defendants to side-step, corrupt and pervert the goals and purposes of accreditation standards, peer review, and due process mandated by federal and state laws, accreditation standards and their own bylaws. First, University of Cincinnati Medical Center ("UCMC") absolutely refused to offer plaintiff contract that is mandatory, universally, customarily and usually offered to all similarly situated medical residents therein. Second, Lockey, Donovan, Freeman and Middaugh without authority discriminatorily decided not to render and report grades and written evaluations for plaintiff's courses and clinical rotations done under them; Third, defendants denied plaintiff most of the benefits and tools of the training he was entitled to; Fourth, defendants fabricated never-happened sexual harassment and non-existent debt as pretext for discriminations; Fifth, defendants excluded and or prevented plaintiff from participating in and or graduating from federally funded programs without due process.

Because federal laws, e.g., 42 U.S.C. 11133, 11135 (Supp. 1993), state laws, accreditations standards of ACGME, ABPM and JCAHO and bylaws only permit disciplinary action against doctors for valid quality of care and conduct reasons only after vigorous verification procedures comporting

2

with due process, and because the report of disciplinary action carries with it false accusation of sexual harassment, Donovan, Gaynor, Pohl, Miller and Perales were forced by their own misconduct to fabricate sexual harassment "reasons" for excluding and or not graduating plaintiff from their training programs. UCMC and UTHSCSA accepted, tolerated, approved, ratified, condoned, acquiesce in misconduct of Donovan, Gaynor, Pohl, Miller, and Perales. The defendants, in continuing violation and or rejection of the statutes, accreditation standards and side-stepping their own byelaws, rules, regulations, policies and procedures, deliberately avoided all obligations imposed upon them by federal and state laws and by their own byelaws to investigate and verify their own accusations as part of their review and due process requirements.

This action arises out of hospital defendants' combination and conspiracy to unlawfully take away plaintiff's liberty and property interests and rights; This action also arises out of hospital defendants' open-ended and continuous pattern and scheme to defraud, impede, and defame plaintiff in connection with plaintiff's professional career in general, and plaintiff's professional affiliation with defendants and other healthcare institutions in particular.

As more fully set forth below, defendant Donovan with the knowledge, participation, and acquiescence of hospital defendants as well as with other named and unnamed co-conspirators, who include physicians within the hospitals and with malice and intent to injure plaintiff: (a) engaged in a pattern of conduct pursuant to which they decided not to render and report grade and written evaluation for plaintiff's courses and clinical rotations for opposing their impermissible discrimination; (b) fabricated false accusation against plaintiff; used discriminatory criteria in quality of care determinations, and acted in secrecy to further their personal grudges, jealousies, vendetta and interests rather than those of the hospitals; (c) bypassed the mandated Risk Management, Credential Assessment, Quality Assurance, due process and Peer review mechanisms, corrupted the hospital medical and administrative processes and controls, violated the Hospital Medical Staff byelaws; (d) concealed the real retaliatory, discriminatory animus for not graduating plaintiff; (e) communicated

3

false and defamatory information on repeated occasions within and outside their premises to multiple third parties regarding plaintiff's performance; (e) fabricated nonexistent debt; (f) tampering with, and 'papering' plaintiff's personnel file.

## III.    RELEVANTBACKGROUND

### A.  Overview Of Modern Teaching Hospital Governance, Duty, Obligations & Responsibility

The modern teaching hospital is governed by (1) internal constitutions, rules, regulations, policies and procedures (collectively known as "Byelaws"); (2) public regulations and laws, such as federal Health Care Quality Improvement Act (HCQIA), 42 USC 11111 et seq. (3) accreditation standards or requirements of Joint Commission on the Accreditation of Health Care Organizations (JCAHO), Accreditation Council for Graduate Medical Education (ACGME), and other medical specialty boards, specifically American Board of Preventive Medicine (ABPM) and American Board of Family Practice (ABFP). A hospital and or a teaching hospital's continuing existence depends on compulsorily meeting various licensure, accreditation and certification qualifications, and survey and audit standards. Compliance with such standards is mandatory and guarantees a minimum level of quality of care, employment, training and job security. The Fifth and Fourteenth Amendments to United States Constitution, HCQIA, JCAHO, ACGME, ABPM, ABFP and bylaws mandate due process.   UCMC violated these laws and standards thereby constitutes strict liability.

### B.  Overview Of Graduate Medical Education ("GME") or Residency in Occupational and Environmental Medicine at The University of Cincinnati Medical Center ("UCMC").

ACGME  and other medical specialty boards must accredit a hospital as a teaching hospital for the purpose of educating, teaching and training medical doctors. Additionally, medical specialties boards under the American Board of Medical Specialties (ABMS) must accredit a teaching hospital for the purpose of offering a medical specialty training in medical specialties and must accredit each medical specialty training program by sets of standards and requirements for each of the medical specialties. These standards and requirements are collectively called "The Essentials of Accredited Residencies in Graduate Medical Education: Institutional and Program Requirements" that are published annually in a book (popularly called "The Green Book") bearing the same title. (See Ex. 97 an excerpt from the Green Book) and may be viewed at www.acgme.org. The GME in the specialty of Occupational Medicine or Occupational and Environmental Medicine Residency Program (OEMRP) is governed by

4

the nationally recognized standards and requirements set by ACGME and ABPM, which establish the institutional and the program requirements. See (Ex.97 and Ex.6 p.2-3)

University of Cincinnati Medical Center ("UCMC") is composed of the University of Cincinnati College of Medicine ("UCCM") and The University Hospital, Inc. ("TUH"). TUH is the ACGME/ABPM recognized legitimate sponsor of the OEMRP but operated the program with UCCM as a participating or supervising institution, thus, UCMC operates the OEMRP under the authority, control and responsibility of TUH. See (Ex.6 p.2-3; Ex.97 p.13; & Ex.101). The ACGME accredited GME programs—here, the OEMRP, must operate under the authority and control of a Sponsoring Institution—here, the TUH and not under UC or UCCM per se. See [Ex.97 p.13 at I(B)]. Further "Institutional Requirements, *inter alia*, Sponsoring, Compliance, Responsibilities, Agreements, Accreditation, Quality Assurance, Financial Support for Residents, etc" that TUH/UCMC must comply with are set forth in (Ex.97). JCAHO' accreditation of TUH is a prerequisite for ACGME accreditation

Under the ACGME Institutional Requirements, UCMC must inform all residents in writing of the terms, conditions, and benefits of appointment, including financial support; vacations; parental, sick, and other leaves of absence; professional liability, hospitalization, health; must assure that residents are provided with a written agreement of appointment or contract outlining the terms and conditions of their appointment to ACGME-accredited program; and must provide residents with grievance procedures and due process. See (Ex.6, 7 & 97). UCMC violated these thereby liable.

## C. ACGME/ABPM PROGRAM REQUIREMENTS FOR OEMRP ALL OVER THE UNITED STATES

Nationally, ACGME/ABPM mandated Program Requirements for OEMRP, include, *inter alia*, Basic components or curriculum; program phases; faculty and program director qualifications, duties, and responsibilities; facilities and resources; participating institution, resident evaluation, etc. See (Ex.98-100). The ABPM accredits OEMRP for a total of three years of training in three phases, to wit, 1-year Clinical Phase, 1-year Academic Phase, and 1-year Practicum Phase. (Ex.99-100). Thus, there are no ACGME/ABPM-accredited Fast and or Slow Track in OEMRP. While the Academic Phase leading to an award of an academic postgraduate degree is the only phase that is based in the

Participating Institution—here, UCCM, the Practicum Phase is based in the Sponsoring Institution—here, TUH.

**D.**        **THE NATURE OF PROCEDURAL PROTECTIONS**
        **AFFORDED TO THE PUBLIC AND PHYSICIANS**

Because of the need to provide high quality health care and well-trained quality medical doctors to the public, and the importance of adverse determinations of professional conduct in the delivery of health care, significant protections, consisting of federal, state, defendants' own and other review mechanisms, are built into the system to protect both the public and medical professionals. Such protections include, but are not limited to the followings: Quality Assurance, Peer Review, due process and grievance procedures mandated under the medical staff Byelaws requirements of JCAHO, ACGME, ABFP, ABPM, the Regulations of the States, HCQIA, 42 U.S.C. 1101 et. Seq. and other procedural protections. These protections include among their objectives (a) ensuring that information on conduct of medical professionals and medical practices is reliable and valid. In addition, through the built in controls and appellate review procedures, these mechanisms prevent unfair and unjust determinations against innocent physicians and prohibit their unjustified exclusion as trainee-medical residents, and as providers of medical care. These protections are all designed to assure that medical professionals whose conduct is called into question have <u>full due process</u> and are protected and treated equally under the law. Such procedures require, at a minimum, the right to notice of charges, notice of clinical or conduct deficiencies, opportunity to examine the evidence against him, opportunity to present his side of the story either in person or in writing, a hearing before an impartial tribunal, representation by counsel if desired, and review of adverse determinations. None of these protections were afforded plaintiff, but all of these defendants promised and assured plaintiff, the federal funding agencies, and accreditation organizations as conditions or requirements precedent for receiving federal funds and accreditations.

Due to the unique fragility of a physician's reputation, the importance of a physician's official record, and the permanent impact of hospital actions on a physician's ability to practice medicine, very rigorous review and control mechanisms must be adhered to before making and reporting health care determinations or taking any action based therein. Violation(s) of these laws, rules and regulations affording these protective mechanisms constitute strict or absolute liability. This is so because actions taken against physicians are subject to reporting requirements, which include, *inter alia*; (a) new reporting procedures for hospital actions; (b) formal credentialing processes; (c) restrictions and legal liabilities for hospitals in hiring physicians; (d) required reliance of subsequent hospitals on information supplied by previous hospitals; (e) interstate reciprocity of hospital actions; (f) legal liabilities of individual physicians in future malpractice litigation as a function of previous hospital statements and actions; (g) licensing criteria relying on hospital actions; (h) state disciplinary proceedings and penalties based on hospital actions; (i) a national physician practitioner data bank disseminating information on physicians and hospital actions; (j) obligations imposed upon physicians to disclose all pending or threatened adverse actions; (k) application to residency, fellowship training programs, and (l) application to specialty board for specialty board certification examination and certification

It is precisely these protective control mechanisms and processes referred to above that Defendants willfully, knowingly and intentionally circumvented and completely omitted, because their fabrications, distortions, and false allegations could not stand the scrutiny of the mandated formal reviews. Violation(s) of these laws, rules and regulations affording these protective control mechanisms and processes constitute strict or absolute liability.

The outcome of those acts, omissions and blatant violations of peer review and due process was to and did harm plaintiff's competitiveness, profession, occupation, training, employment, career, economic opportunities, enjoyment of life, reputations; physical, mental and psychological health based on the defendants' making, reporting and acting upon determinations based upon discriminating

7

animus, personal grudges, vendetta, professional jealousies, economic interest rather than on criteria of patient care.

The requirements of due process, peer review, quality assurance, credentialing and the prescriptions against retaliations and discrimination are all designed to prevent persons in a position of power from fraudulently and unfairly harming, impeding, obstructing and excluding their potential competitors

## VI. **Procedural background**

April 11, 2001, Lay pro se Plaintiff filed a complaint alleging federal and state laws violations claims. (Doc.2). From 4/11/01 to 9/06/02 plaintiff was battling collusive defendants' attempts to change venue. On or about 9/6/02 this court resolved the venue and personal jurisdiction issues. (Doc.36). The court granted and denied in part plaintiff's motion for joinder of additional claims and parties. (Docs.26, 40, & 50). Amended complaint was filed 9/17/03 (Doc.51) to which Ohio and Texas defendants filed answers 10/1/03 and 10/2/03 respectively. (Docs.52 & 53). The court made Scheduling Order on 6/21/04 (Doc.61). The court denied plaintiff's amended complaint (Docs. 63, 78).

Parties engaged in discovery. Defendants provided evasive, incomplete, ambiguous answers or failed to provide responses warranting plaintiff's notices to inspect and obtain documents and for pre-motion to compel conference before the Magistrate Judge (Docs. 80-82, 92). Defendants misused the court's order limiting discovery to Title VI and VII as baseless excuse to evade discovery of relevant materials.

## V.    **RELEVANT FACTS**

## A.    **Appointment of Plaintiff as Occupational & Environmental MedicineResident(OEMR)**

In or about 1998 plaintiff inquired about Occupational and Environmental Medicine Residency Program at the University of Cincinnati Medical Center (UCMC) and requested full information package, *inter alia*, the program, application form, stipends and benefits. UCMC by defendant Donovan sent only a one-page letter, on UCMC letterhead, dated September 1, 1998 in which UCMC acknowledged that UCMC receives federal funds for the OEMRP [Ex.2, 28 p.1]. (Amadasu Decln. #4) Having completed the first one-year (PGY-1) of the Clinical Phase and the second-year (PGY-2) of the

8

Academic Phase with a MPH degree, plaintiff submitted his application for the last, final or the third-year (PGY-3) of the <u>Practicum Phase</u> to UCMC. (Ex.1). In or about October 1998 plaintiff by phone requested in writing from Donovan stipends, all the benefits and written contract available to residents at UCMC. Donovan by 10/15/98 letter on UCMC letterhead informed plaintiff about the stipends, benefits and contract. (Ex.3). During the interview, Donovan affirmed to plaintiff that TUH and UCCM jointly offered a 12-month third-year (PGY-3) Practicum Occupational and Environmental Medicine Residency Program (POEMRP), which was/is funded by federal dollars and that they would strictly adhere to the requirements of ACGME, ABPM and JCAHO; UCMC would offer Practicum Phase OEMRs stipend in the $40s, full benefits and written contract, and upon completion plaintiff would be graduated with award of diploma, transcript and verification of attendance and other promises. (1st Amadasu Depo. p.33-35), also see (Ex.6-7; Ex.97) [Amadasu Decln. #6]

By employment letter dated January 25, 1999, on UCMC letterhead, UCMC employed plaintiff as Occupational and Environmental Medicine Resident ("OEMR") into the third year ("Practicum Phase") of their Occupational and Environmental Medicine Residency Program ("OEMRP") for one year beginning July 1999 but without specifying the ending date. The letter showed that the stipend for the position was $29,000 per year and the position had tuition remission and health benefits package. (Ex.4). Plaintiff was not a graduate student of and under UC definition. (Amadasu Decln. #7)

**B.    <u>Amadasu Occupied Practicum, & Not Academic Phase Resident Position in UCMC's OEMRP</u>**

Without the promised and ACGME-mandated written GME appointment agreement or contract, Plaintiff began his POEMRP in July 1999 and plaintiff became a bona fide member of the medical staff of TUH thereby entitled to all stipend, benefits, protections, rights, privileges, immunities, and due process, procedural and fair hearing provisions, etc, of the UCMC's Medical Staff Bylaws, etc, afforded to Medical Residents or House Staff Officer ("HSO") of the medical staff at UCMC. The Office of Graduate Medical Education ("OGME") of UCMC sent plaintiff a memo dated June 15,

9

1999 seeking Amadasu's consent to publish his certain private information in the 1999/2000 TUH's House Staff Directory (Ex.9). [Amadasu Decln. #8]

**C.**    **Amadasu Never Applied for & UCMC Never Placed Him On Non-accredited Accelerated Track**
Amadasu never applied for, never consented to be placed on, and was never told he was placed on any of the purported "four different academic track." (Ex.1, 4). Neither Donovan nor UCMC ever told Amadasu that  UCMC had placed Amadasu on one or any of the "four different academic track" or the "Accelerated Track." ACGME and ABPM did/do not accredit the purported "Accelerated Track." Amadasu applied for Practicum Phase and not Academic Phase, which he had completed as prerequisite for appointment into the Practicum Phase on the OEMRP(Ex.1). Donovan and or UCMC had no approval or accreditation to change the ACGME-accredited OEMRP's three-phases----clinical, academic, and practicum-- structure in (Ex.98-100) to ACGME-unaccredited "four different academic, slow, or accelerated tracks." Thus, Donovan and UCMC illegally imposed their track upon and violated the academic freedom of Amadasu. (Amadasu Dcln. #9)

**D.**    **Donovan & UCMC Denied Amadasu GME Contract Mandated by ACGME & Its Own Bylaws**
ACGME and UCMC's bylaws mandate that every, any and all medical doctor appointed into ACGME-accredited residency programs must be given written agreement of appointment or Graduate Medical Education Contract ("GME-Contract"), [Ex.97 p.14 at D(1)]. Amadasu was appointed into ACGME-accredited OEMRP thus, was entitled to written GME-Contract. Upon appointment, Donovan and UCMC denied plaintiff the mandatory GME-contract (Ex.6 &7) despite plaintiff's demand for it. The Office of Graduate Medical Education ("OGME") of UCMC sent plaintiff a copy of a memo dated June 15, 1999 in which it demanded upon Donovan to return the GME-contract executed by Amadasu (Ex.5) and with the memo in hand Amadasu approached Donovan for GME-contract but he denied Amadasu the contract in violation of Amadasu's right guaranteed under Fifth, Fourteenth Amendments, 42 USC 1981, Bylaws, and requirements of ACGME, ABPM, and JACHO as well as TUH/UCMC'S bylaws. (Amadasu Decln. #10)

**E.**    **Donovan/UCMC Denied Amadasu Benefits and Underpaid Him Stipend For PGY-3 Residents**

Amadasu was entitled to the same amount of stipend and benefits afforded to similarly situated third-year (PGY-3) residents regardless of the medical specialties therein at UCMC but Donovan and or UCMC underpaid Amadasu stipend in an amount of not less than $13,000 and denied him substantial benefits package as mandated by ACGME and as represented in UCMC's Compensation & Benefits for Residents/Clinical Fellows [Ex. 7(1-6)] and (1st Amadasu Depo. p.61-62; p.94-97)

UCMC has Residents' Reimbursement Funds (RRF) for any travel and conference expenses (Ex. 28 p.3). Amadasu applied for but was denied the funds to attend clinical conferences, e.g., SOTAC of ACOEM, AOHC (Ex.28 p.7). Amadasu had pre-authorization for RRF to expenses arising from Amadasu' participation in Laredo, Texas UTHSCSA- STEER program but when Amadasu submitted his expenses for reimbursement from the RRF, UCMC refused to reimburse the expenses. (Ex.102-103). (Amadasu Decln. #11)

**F.    Donovan/UCMC Denied Amadasu The Tools and Resources of The Training in OEMRP**
Every UCMC's Resident or House Staff Officer (HSO) was/is entitled to the tools and resources occasioned by his training. Donovan/UCMC afforded similarly situated non-protected group Occupational & Environmental Medicine Resident (OEMR) computers, password or code for access to the computer and to the educational websites, and the microcassett dictation recorder but these were denied to Amadasu. (1st Amadasu Depo. p.55-60 and p. 63-66). [Amadasu Decln. #12]

**G.    Amadasu Had Always Good To Superior Standing As OEMR At UCMC**
Amadasu was a qualified, experienced, outstanding, loyal and dedicated employee, resident, public servant, and medical doctor with excellent reputation. Amadasu performed his duties, obligations and responsibilities of his position with outstanding competencies, professionalism and ethics; complied with all bylaws, rules, regulations, policies and procedures of UCMC and his work performance was rated good to superior by preceptors other than Donovan, Freeman, and Middaugh who had supervised plaintiff's works. Those preceptors rated Amadasu's interpersonal relationships with patients, peers, faculty and other employees as good to superior (Ex. 55-60). Although belatedly and almost two years

after supervising Amadasu, defendant Lockey rated Amadasu's performance good to superior (Ex.61).

Before Amadasu served written complaint of discrimination and harassments upon Ohio defendants,

Amadasu requested for letters of reference from Donovan, Freeman and Lockey all of who rated

Amadasu good to superior in their letters of reference. (Ex.62, 64-67). Half way in the OEMRP, in

December 1999 Donovan rated plaintiff's overall performance "fine" meaning superior quality (Ex.63). In

December 1999, Donovan certified that Amadasu was a resident in good standing at UCMC (Ex.108). In May

2000, Donovan certified that Amadasu was OEMR in good standing. (Ex.68). [Amadasu Decln. #13-14]

**H.    Donovan, Lockey, Freeman and Middaugh Withheld Grades and Written Evaluations**

Donovan, Lockey, Freeman and Middaugh are Caucasians and faculty of the Department of

Occupational and Environmental Medicine of UCMC and they had/have duty, obligation and

responsibility to render and post grades and to make written evaluations for didactic courses and

clinical rotations that Amadasu did under their supervisions as mandated by ACGME (Ex.97 p.19 at

D(2); by ABPM (Ex.99 at V(A)(1), and mandated by UCCM (Ex.28 p.3), but Donovan, Lockey,

Freeman and Middaugh denied Amadasu grades for and written evaluations of the didactic courses and

clinical rotations he did under them

From July 1999 to June 2000 and thereafter continuing to March 2001. Specifically, in Autumn

quarter of 1999; in winter quarter of 2000; and in spring quarter of 2000 they refused to render and

post grades for Amadasu's work (Ex.30, 32, & 34). Also from July 1999 through June 2000 and

continuing to this moment they refused to make written evaluations of Amadasu' clinical rotations he

did under them (Ex.51-54) despite by phone and in writing, Amadasu diligently reminded them to

render and post grades and written evaluations (Ex.31, 33, and 35). However, almost two year after

supervising Amadasu's clinical rotation, Lockey belatedly made one written evaluation on 4/4/01

(Ex.61) but Freeman, Donovan and Middaugh absolutely refused Amadasu written evaluations even to

the present. (Amadasu Decln. #15-16)

12

On or about June 30, 2000 Amadasu completed all of the requirements of the 12-month Practicum Phase of the OEMRP and was entitled to graduate thereon from the program with diploma or certificate, verification of attendance and transcript as UCMC promised; as mandated by ACGME and ABPM (Ex.97 p.18-20 and Ex.98-100). Also see [1st Amadasu Depo. p38-41]

Similarly situated OEMRs of non-protected group got their grades and written evaluations fully and timely and they were timely graduated upon completion of the residency with timely diploma, and, even, OEMRs who were junior to Amadasu graduated from the program before Amadasu who still has not been graduated from the OEMRP to the present. (Amadasu Decln. #17).

### I. UC'S Violated Its Own Grades and Grading Policies and Practices for Graduate Students, Graduate Credit and Non- graduate credit Didactic Course That Did Not Mandate Rendering "F" Grade For Audit Courses

University of Cincinnati set forth the guidelines, rules, and regulations ("UC Grade Policy") applicable to those students applying and enrolling in either the MS or Ph.D. degree program in a booklet titled University of Cincinnati Department of Environmental Health (DEH) Graduate Student Guidelines Handbook (Ex.29). The policy provides that Letter "F" should be render for 'unsatisfactory work for graduate credit (Ex.29 p.8) and letter "T" should be rendered for course take for audit in which a grade is deemed unnecessary by the student. (Ex.29 p.9). Amadasu never applied and enrolled in any degree program and was not a graduate student working towards any graduate degree under the UC definition of a graduate student and Amadasu had already completed his Academic Phase of the OEMRP elsewhere prior to being appointed into the Practicum Phase of OEMRP at UCMC thus, he had no need for graduate credit. Amadasu was not a postgraduate student of UC and UC admitted that Amadasu was not its employee (Donovan Decln. #3; and Amadasu Decln. #18)

### J. Donovan and Middaugh Set-Up Amadasu To Fail:

Donovan, the program director of OEMRP and as the advisor to Amadasu, advised Amadasu to enroll for some courses for audit, which Amadasu did not need. For such courses taken for audit, the instructors rendered a letter "T" including the Basic of Occupational Medicine I course that

13

Middaugh taught in autumn quarter of 1999 (Ex.30). In spring quarter of 2000 Donovan again advised Amadasu to enroll for courses for audit, including Basic of Occupational Medicine II (BOM-II) taught by Middaugh who rendered letter "F" instead of "T" (Ex.34) in violation of UC grading policy. At the time Donovan direct Amadasu to register for BOM-II he also directed Amadasu to go to Laredo, Texas for four week elective rotation. Before leaving for Texas, Donovan, Amadasu and Middaugh met and upon review of the BOM-II course contents or topics found out that Amadasu had already done all the topics to be covered for the first two months of the quarter, the first month of which Amadasu would be in Texas for elective thus, Donovan, Middaugh and Amadasu agreed that Amadasu would not miss any topic and was free to go to Texas and rejoin course upon return which Amadasu did and regularly attended the classs. The BOM-II class took place only once a week on Mondays. Amadasu was never tested for pass or fail. Amadasu needed not to take any test because he was merely auditing the course.

**K. Failure & Refusal of Lockey, Donovan, Freeman & Middaugh To Render, Correct and Post Grades and Written Evaluations Proximately Delayed and Prevented Amadasu From Graduating From the OEMRP In June 2000**

ACGME and ABPM mandate that the faculty and supervisors—herein are Donovan, Lockey, Freeman, and Middaugh, must immediately render grade and written evaluation upon resident's completion of a course or clinical rotation and send them to the program director with copy given to the resident immediately (Ex. 97 p.19-20; Ex.99 at V(A)(1). See (1st Amadasu Depo.p.37-40, 98-101) Residents and specifically Amadasu have/has no duty, obligation and responsibilities to self-render grades and written evaluations for courses and rotations done and send them to program director because ACGME, ABPM and UCMC did not mandate Amadasu to do so and it is never the practice.

**L.    Took More Than Twenty Two Months To Render, Correct and Post Grades**

As already stated above, Donovan, Lockey, Freeman and Middaugh failed and refused to render and post grades and written evaluations for Amadasu's courses and clinical rotation for more

than 22-months in violation of the mandates of ACGME, ABPM, UC and TUH. Plaintiff diligently and relentlessly worked to have the faculty to correct Amadasu's transcript. To this end, Amadasu worked with the departmental administrative assistant to change, correct, and post grade. Donovan acknowledged that "no grade" (NG) should not have been rendered instead of pass "P" grade (Ex.37); Donovan acknowledged that grades for Amadasu's courses that he had supervised were not reported or recorded (Ex.41). Middaugh rendered "F" credit grade instead of non-credit "T" audit grade (Ex.38); From June 2000 until November 2000, Middaugh refused to change the wrong "F" grade for the correct "T" audit grade despite Amadasu's all reasonable efforts and the UC-grading policy (Ex.39 & Ex.29) but would only change the wrong "F" grade to "W" withdraw on 11/5/00 (Ex.40) in spite of the corrective directives of defendant Jarrell, the departmental Director of Graduate Studies that the "T" for audit course should be rendered instead of the wrong "F" failure for credit course. (Ex.36); also see (1st Amadasu Depo. p.37-40, p.111-112) Donovan, as the program director of the OEMRG and pursuant to the requirements or mandates of ACGME, ABPM and UCMC, has the duty, obligation and responsibility to ensure that these anomalies never occurred and if they did occur, he must promptly rectify the situation but he failed to do so (Ex.97 p.18-19; Ex.98). [Amadasu Decln. #21]

Upon being informed that the rendition, correction, changes and posting of the grades had been completed, by o2/02/01 letter Amadasu informed and requested Donovan to graduate Amadasu from the program (Ex.42 and 42.0.1-42.0.3) [Amadasu Decln. #22]

**M.      Donovan Did Fraudulent Terminating Evaluation In Absence of Amadasu and Faculty**

On or about 2/26/0, that is about 9-months since Amadasu completed the requirements for graduation, Donovan unilaterally, singularly and improperly did final terminating evaluation without the mandatory participation of Amadasu and other faculty in violation of Amadasu's rights and the requirements of the ACGME and ABPM. See (Ex.99 at V(A). Without objective record evidence and justifications, Donovan maliciously failed and refused to complete a number questions on the evaluation form or his evaluations were inconsistent, contradictory and against the record evidence

(Ex.43). Rather than consulting with or inviting the faculty to participate in the final evaluation pursuant to ACGME & ABPM requirements—ld, Donovan improperly consulted with and sought unwarranted legal advice from the University legal counsel, Ms Linda Harpster (Ex.44).

By 03/08/01 letter Amadasu disagreed with the evaluation and sought one-on-one meeting with Donovan in a good faith effort for internal amicable resolution of the matter (Ex.45). The departmental assistant set up the meeting for 03/19/01 (Ex.46) on which day Amadasu and Donovan met but Donovan failed and refused to amicable settle the matter and Amadasu by his 3/19/01 memorialized the meeting  to Donovan (Ex.47). By his 03/26/01 Amadasu reminded and quested Donovan to send written basis, reasons and explanations for the evaluation (Ex.48); By his 03/27/01 letter, Donovan stated false and baseless reasons for the evaluation without corroborating bases in fact, policy and record evidence (Ex.49). Donovan's reasons and explanations are inconsistent with and/or are contradicted by his own serial letters of references about Amadasu in which he acknowledged Amadasu's good standing in the program, *see* (Ex. 63, 66, 67, 68, and 108). Further, Donovan's reasons and explanations are inconsistent with and/or are refuted by letters of reference by Lockey and Freeman (Ex.64, 65); and are refuted by evaluations by Lockey and other preceptors (Ex.55-61).

During the entire relevant period, Amadasu was never involved in any disciplinary proceedings and not aware of any personal or professional circumstances that would indicate that Amadasu's privileges should be limited, postponed or denied. In a good faith effort, Amadasu complained to defendants Filak, Lockey and Buncher and without action on by them, Amadasu complained to the non-medical chairman of the Department of Environmental Health, who directed Donovan to redo the evaluation, which he did on or about 4/4/01 (Ex.50). [Amadasu Decln. 323-25]

**N.    Amadasu's Training At UTHSCSA-STEER, Laredo, Texas Constituted Set-up To Fail**

As the program director and self-imposed Amadasu's advisor, Donovan advised and directed Amadasu to do a 4-week clinical elective in Environmental Medicine/Border Health at the Southern

Texas Environmental Education and Research at Laredo, Texas (STEER) of the University of Texas Health Science Center at San Antonio (UTHSCSA). The Department of Family Practice (DFP) of UTHSCSA administered and managed the STEER. Donovan told Amadasu that UCMC would reimburse Amadasu's expenses. Upon inquiry and request, defendant Miller told Amadasu that STEER provides for free fully furnished housing, free round trip transportation from Amadasu's Laredo housing to all the STEER' offices and rotation sites, free use of the tools , clinical faculty supervision; and sent Amadasu some brochures. (Ex.122) Miller told Amadasu that STEER was an offspring of the federally funded Area Health Education Center (AHEC) program and was offered by DFP of UTHSCSA. (Ex.104-107).   Amadasu and Donovan executed the application for the elective at Cincinnati, Ohio in which Donovan acknowledged that Amadasu was in good standing at UCMC (Ex.108). By 01/06/00 letter, UTHSCSA through Miller offered Amadasu 4-week training elective from 04/03/00 through 04/28/00---Id, (2nd Depo. supra). On the eve of Amadasu's departure for Texas, by 3/27/00 letter, Miller advised Amadasu they were fully and completely prepared and ready for Amadasu's 4-week training (Ex.110). Also  see (1st Amadasu Depo.p.43-44; 2nd Amadasu Depo.p.26-37).

Amadasu drove almost 1800 miles to and arrived at Laredo on 3/31/00. Plaintiff lost direction to STEER's office and requested Perales to come to escort Amadasu to STEER's office but Perales failed and refused to assist in spite of one Laredo Community College Professor's  phone call to Perales to assist Amadasu. (Ex.117). Somebody else led Amadasu to STEER's office where Perales coldly received Amadasu (Compl. #25). Instead of driving Amadasu's in STEER's vehicle Perales made Amadasu to drive to AHEC office from there to an isolated, archaic desolate housing unit at Laredo Community College where Amadasu was  housed. Other AHEC's city based modern and fully furnished housing at Delmar and Garfield were vacant (Ex.111). The house was unsafe, unhealthful, and unfurnished and proximately caused Amadasu illness. (Compl. #26-28). Amadasu documented the hazardous conditions of the housing and were acknowledged by an AHEC's official (Ex.112-113). In

Amadasu's absence and without his consent, Perales on two separate occasion intruded, entered and trespassed Amadasu's premises (2nd Amadasu Depo.p.49). Amadasu complained about the hazardous housing and he was transfered to the city based Delmar apartment building. (Amadasu Decln. #26-27)

UTHSCSA and Miller were not prepared and ready for Amadasu's participatory training because: (a) The STEER Rotation Calendar (SRC) were not made before and about seven days after arrival and when it was later made, it was incomplete, jigsaw-puzzle-like, and contained blank spaces (Ex.116) as compared with the January and February 2000 SRCs made for other participants (Ex.114-115 & 120). Also see (2nd Amadasu Depo. p.52-53). [Amadasu Decln. #28]

On 4/1/00 during Amadasu's participation in the Health Fair organized by Laredo Dept of Health, Perales usurped and impersonated clinical faculty-supervisor in attempting to supervise and interfere with Amadasu' clinical work, in breaching the privacy of patients that Amadasu were tending to. When Amadasu requested Perales to stop he became angry and created animosity towards Amadasu. (2nd Amadasu Depo.p.66). During the said health fair, Amadasu was the first, only black person and easily identifiable in enormous pool of people. Friendly Hispanic males and females who were curious approached and were having dialogue with Amadasu but Perales was unhappy and told Amadasu that he disfavored white Hispanic females to friendly association with blacks.

Perales refused to provide Amadasu with the promised free transportation as he refused to transport Amadasu in STEER's vehicles to rotation sites. Perales refused to provide Amadasu with password and code to computer as he had provided other similarly participants of non-protected group. (2nd Amadasu Depo.p.51, 59-60, 69-72).

Miller who promised to supervise Amadasu's rotation was unavailable to do so as she was in San Antonio, Texas. (2nd Amadasu Depo.p.65). When on 4/13/00 Miller came from San Antonio to STEER, Laredo Amadasu orally and in writing complained of discrimination and disparate treatment in STEER program to her. (Ex.117) [Amadasu Decln. #29-31]

18

On 4/18/00, three Caucasian UTHSCSA medical residents came from San Antonio, Texas to participate in the STEER elective. Perales demanded that Amadasu should give up the Delmar apartment for the Caucasian medical residents. Amadasu refused to give up his premises to the Caucasians and Perales instantly terminated Amadasu's participatory training in STEER program. Amadasu challenged the authority of Perales to terminate Amadasu's STEER training. (2nd Amadasu Depo. p. 52-55). On 4/19/00 Perales by phone to Amadasu's ears, told Miller that he had terminated Amadasu's participation because he claimed that Amadasu complained of discrimination and sexually harassed white Hispanic women, which was absolute false as to the harassment. Then Miller told Amadasu that Amadasu's participation was immediately terminated. When Amadasu requested to know why such termination without notice and reason, she said that she would send report to Donovan who in turn would tell Amadasu why he was terminated. (2nd Amadasu Depo.p.65) [Amadasu Decln. #32-33]

Perales sent 4/19/00 libelous letter to Miller and Donovan in which he stated the reasons for terminating Amadasu (Ex.118). On same day by 4/19/00 letter Perales instructed the AHEC's official to evict Amadasu from the housing. (Ex.119). On same day by 4/19/00 email, Amadasu informed Donovan and Freeman that his STEER participation had been terminated without knowing the reason and that Miller said that she would Donovan report and Donovan would inform Amadasu the reason for the termination. (Ex.120). [Amadasu Decln. #34]

The hazardous housing provided and the unjust sudden participation termination by UTHSCSA, Miller and Perales directly and proximately caused Amadasu's illness warranting medical treatment at Laredo and being placed on medical leave (Ex.124-125).

Upon arrival at Cincinnati, Ohio, without affording Amadasu due process, Donovan unilaterally imposed punishment of probation and threat of terminating Amadasu's residency. This Donovan's action pushed Amadasu to the brink of suicide warranting psychiatric hospitalization for

about ten days treatment. Donovan discussed the termination of STEER participation with Jarrell on 6/23/00 without discussing it with Amadasu (Ex.121). [Amadasu Decln. #35]

N. **Amadasu Was/is The Real And Actual Victim of Racial and Sexual Harassment By Donovan, Gaynor, Pohl, Miller and Perales for The following Sets of Facts:**

1. **Amadasu Rejected Gaynor's Offer of Dating Relationship, Thus, Gaynor's Retaliation:** In or about August 1999, Gaynor offered to romantically date Amadasu, which Amadasu initially accepted, consequently Amadasu and Gaynor started mutually consented dating relationship. During this brief relationship, Gaynor sent Amadasu loving email cards in which she expressed her love for Amadasu. (Ex.12-14). In or about early October 1999, Amadasu broke off the relationship but Gaynor refused to accept the discontinuance. She continued to phone and email Amadasu with threats of harming Amadasu, destroying his career and having him expelled from the residency training but Amadasu stopped reply to her communications. (1st Amadasu Depo.p.117-118). In retaliation for Amadasu's refusal to date her and in furtherance of her threats to injure Amadasu, Gaynor solicited and obtained from a female employee of UC copies of emails that the employee received from someone else persons who were not Amadasu. Gaynor armed with those emails called and fabricated to Donovan that Amadasu was sexually harassing her and her female co-worker from whom she had solicited the emails. [1st Amadasu Depo.p.131 at 1-8; and Amadasu Decln. #36].

2. **Donovan and Gaynor Conspired and Fabricated False Sexual Harassment Complaint As Pretext For Discrimination and Retaliation, and To Harass Amadasu:**
Gaynor and Donovan conspired and colluded to be "papering" Amadasu's personnel with the emails, then, at request of Donovan, and without Amadasu's notice and consent, Gaynor maliciously put copies of the said emails dated December 14 to 15, 1999 into Amadasu's personnel file kept at the UCMC Department of Environmental Health where Gaynor was working [Ex.10(1-6)], and she gave copies of the said emails to Donovan who put them in his secret files designed for Amadasu and to be published to third parties. Not only did Gaynor continue to sexually harass plaintiff by phone and

20

emails with sexual contents, but she also continued to threaten plaintiff with termination of employment and expulsion from the OEMRP as evidenced by her 12/15/99 email that she put in Amadasu's file. [Ex. 10(6)]. Amadasu did not write and did not send those emails, and those emails were never sent to Gaynor in the first instance. When for the first time ever Amadasu discovered those emails in his personnel's file on or about 3/20/01, Amadasu by his 3/26/01 letter to Buncher, Jarrell and Anderson demanded investigation and explanations why those emails were put into his personnel file (Ex. 11) but they did nothing. (Amadasu Decln. #36)

Relying on those said irrelevant private email documents, in October 1999, Donovan started to sexually harassed Amadasu by fabricating and falsely accusing him of sexually harassing two female employees when he stated that two fictitious females at human resources department complained of sexual harassment against Amadasu. Amadasu filed complaint of sexual harassment by Donovan and employees but defendants did nothing to remedy it. (Amadasu Decln. #37)

Amadasu demanded from Donovan the names and written complaints of the feigned complainants, nature, location, circumstances, date and time, and witnesses to the alleged sexual harassment to enable plaintiff the opportunity to respond, be heard and confront the complainants but Donovan absolutely failed to produce them. Amadasu complained to UCMC and their managers but they failed to take action to stop it. (Ex. 69). In 1999 and in 2000, Donovan expressly acknowledged to Amadasu that he had no written and signed sexual harassment complaints from any person against plaintiff, that he had no shred of evidence and factual foundations for the accusation of sexual harassments; and that he considered the alleged sexual harassments by Amadasu were **HOAX** and they were closed. Donovan affirmed these conclusions in his written memo, which was jointly signed by Donovan and plaintiff (Ex. 26-27) but Donovan continued to sexually harass Amadasu by continuously publishing it to third parties. (Amadasu Decln. #38-39)

**3. UC, TUH, UCMC and Donovan Failed To Comply With Their Own Sexual Harassment Policy**

UC and TUH sexual harassment policies and procedures mandate documented first-hand written and signed sexual harassment complaint by the complainant or victim, which must be vigorously, fully and completely investigated, heard, determined, and concluded comporting with due process but defendants failed to follow the policies. (Ex.20-24). Defendants failed to produce evidence of documented complaint, investigations, notice of charges, hearing, findings, conclusions and punishment comporting due process. (Amadasu Decln. #40)

**4.    Donovan and Pohl Set-up Amadasu, Fabricated Patient's Complaint & Persuaded Patient To Lie Against Amadasu To Ohio State Medical Board As Pretext For Discrimination and Retaliation**

But during Amadasu's meeting with Donovan on or about February 26, 2001 in order to graduate from the OEMRP, Donovan not only reinvented the false and fabricated sexual harassment complaints, which he had concluded to be hoax but he also fabricated another accusation that Amadasu attempted at dating a patient and used that as unfounded excuse to prevent plaintiff's graduation from the OEMRP. Plaintiff was very embarrassed, humiliated, distressed, anxious and shocked by these unfounded and concocted sexual harassments by Donovan. (Amadasu Decln. #41)

In furtherance of their devised fraudulent scheme, on or about February 16, 2000, Donovan and a nurse, Pohl connived, conspired, intentionally, deliberately, malicious, recklessly, wantonly and knowingly "set up" Amadasu to examine a female patient. Pohl with a duty to chaperon Amadasu, purposefully and knowingly failed to chaperon so as to concoct professional impropriety and sexual harassment complaint against Amadasu and instigate the patient to file false complaint with the Ohio Medical Board purposefully to obstruct and prevent Amadasu from obtaining licensure to practice.

On 2/16/00 a prospective employer sent the female patient to TUH's Center for Occupational Health (COH) for pre-employment placement medical examination. Donovan was supervising Amadasu during the relevant month and Pohl was the COH nurse whose duty included chaperoning Amadasu when examining a female patient. Pohl had always chaperon Amadasu when examining a

22

female patient but in this time she did not chaperon Amadasu. Donovan ordered and directed Amadasu to conduct medical examination on the patient and present the findings to him. Pohl put the patient in the exam room and left the room leaving Amadasu and the patient in the room. Amadasu professionally and ethically did the exam according to the COH guidelines and protocols and reported findings to Donovan who reviewed them without negative remark but noted that the patient did not bring her immunization/vaccination record that would enable to determine what and what not shots to administer to the patient and to complete the medical examination and send report to the prospective employer. Donovan instructed the patient to bring her immunization/vaccination record to COH the following day, i.e., 2/17/00 and Donovan also directed Amadasu to call to remind the patient to bring her immunization/vaccination if she forgot or failed to bring it. Patient did not make any complaint despite Donovan asking her if she had any question or complaint. (Amadasu Decln. #42-45)

During the examination the female patient told Amadasu that he had a heavy accent and asked whether Amadasu was from Africa and Amadasu replied, yes. Then the patient told Amadasu that she would want to travel to Africa and wanted Amadasu to tell her about Africa. Amadasu replied that he could not tell her about Africa at that moment and told her that she might call Amadasu at the COH during Amadasu free time to tell her about Africa. Nothing more than this was said and there was no intent or attempt on the part of Amadasu date the patient. Neither Donovan nor Pohl had any first hand or personal knowledge of what Amadasu and Patient said in the exam room. (Amadasu Decln. #46)

On 2/17/00 at 2.30pm, Donovan and Amadasu were in COH and Donovan was supervising Amadasu. When the patient failed to bring her immunization/vaccination record Donovan directed and ordered Amadasu to phone and remind the patient to bring the record. Amadasu phoned, nobody answered and a message to bring the record was left in her answering device. Amadasu informed Donovan, noted it in the patient chart and Donovan endorsed it by his signature or initial (Ex.15)

On 2/18/00 at 4.40pm, Donovan and Amadasu were in COH and Donovan was supervising Amadasu. When the patient failed to bring her immunization/vaccination record again Donovan

23

directed and ordered Amadasu to phone and remind the patient to bring the record. Amadasu phoned, a female named Brigett answered and said that the patient was not home so Amadasu left a message with Brigett for the patient to bring the immunization/vaccination record to COH to enable Amadasu complete her exam and send report to her prospective employer that had sent her for the exam. Amadasu informed Donovan, noted the call in the patient chart and Donovan endorsed it by his signature or initial (Ex.15). [Amadasu Decln. #47-48]

Unusually, five days later on or about 2/21/00 Donovan directed Pohl to phone and asked the patient many suggestive sexist questions about the 2/16/00 pre-employment occupational physical exam with intent and purpose of concocting professional impropriety against Amadasu. Pohl did phone and asked the patient sexually suggestive questions importing professional impropriety. Pohl improperly wrote in the patient's medical chart her solicited hearsay purported patient's complaint (Doc.97 Dft Summary Judgment Motion Ex. A). In 2/21/00 Pohl's hand-written-signed hearsay statement purportedly made by the patient, the patient did not specifically stated that Amadasu "harassed" or "attempted at dating" her but Donovan manipulated, spun, hyped the statement and fabricated that Amadasu sexually harassed and attempted at dating the patient, which are grossly false and defamatory per se. Thus, Donovan and Pohl confederated, conspired and colluded to use sexism and sexual harassment to injure Amadasu's reputation by suborning and tampering with and soliciting the patient to make false defamatory complaint of "dating attempt" against Amadasu. (Amadasu Decln. #49-50)

On 3/22/00, unsatisfied with 2/21/00 Pohl's statement not fitting into his sinister scheme and intent to injure plaintiff, Donovan personally, knowingly, willfully, maliciously, intentionally, recklessly and wantonly by phoned, suborned, solicited, instigated and persuaded the patient to make false defamatory statement of facts concocted and fabricated by Donovan to the State Medical Board of Ohio with intent and purpose of injuring plaintiff's person, name, reputation, trade and career; making it impossible to obtain physician license any where in the nation; and to restrain and did

24

restrained his trade. These grossly defamatory false statements of facts were made for the wrong reason to injure and did injure Amadasu. Donovan acted outside the scope of his duty. Donovan improperly wrote in the patient's chart that he had advised the patient to make false charges against Amadasu to Ohio State Medical Board. (Ex.17). [Amadasu Decln. #51]

**5.    Donovan' "Papering" Amadasu's File Without Notice or Copies Afforded Amadasu**

In his continuing malicious campaigns to injure Amadasu, his trade and reputation, Donovan fraudulently, maliciously, purposefully, knowing and willfully manufactured series of defamatory documents, which he published and intended to publish to several third persons without knowledge, consent of and without any copies given to plaintiff. Plaintiff did not know about these documents until about March 2001 when for the first time Donovan disclosed them to plaintiff. The documents included but not limited to the following: (i) A medical record one-page document with the incident patient's name dated 3/22/00 in which he acknowledged that he had solicited, suborned and instigated the female patient to file a concocted false complaint against Amadasu with the Ohio State Medical Board. (Ex.17). Amadasu was unaware of this until late March 2001 when he demanded and reviewed his file kept at TUH's Office of Graduate Medical Education; (ii) The 2/21/00 medical record one-paged hearsay document made by Pohl, copy of which was not afforded Amadasu who for the first time knew of this document in March 2001 (Doc.97 Ex.A); (iii) A published document dated April 19, 2000, in which Donovan acknowledged that he had directed the patient to lie against Amadasu to Ohio State Medical Board, and that he fabricated Amadasu's harassing...and unwanted attempts at dating activity; Donovan acted unilaterally without authority, outside his job specifications, in violations of federal and state laws, bylaws, and accreditation boards' requirements, and the letter was libelous per se. Plaintiff knew of this document in March 2001(Ex.18); (iv) Malicious letter with April 28, 2000 date (Ex.19). Donovan had no authority and basis in fact, evidence and law for these illegal sanctions and were never noticed to Amadasu to enable him exercise his due process rights; (vi) The undated

25

document from Donovan to Dr Jarrell. (Ex.121). Donovan had no authority to act unilaterally and without basis in facts, evidence and law. Amadasu was not afforded copy of this document.

Some or all of the following documents of 2/1/00, 3/22/00, 4/28/00 (Ex.17-19) were published to several persons, inter alia, Dr Filak on 5/4/00 (Ex.16), and Dr Jarrell, but none was afforded Amadasu thereby constituting a denial of due process secured to him. The said documents were designed to prevent and hinder plaintiff's trade and licensure. Filak, upon receipt of the Donovan's manufactured documents ignored them and failed to investigate probably because they were baseless and or violated the requirements of ACGME, ABPM, HCQIA, Bylaws, etc. (Amadasu Decln. #52-54)

**O.     Amadasu Was Qualified For Promotion To OMRP Chief Resident Position Because He Never Applied For Or Consented To Be Placed On Unaccredited "Accelerated Track"**

Amadasu incorporates the facts set forth above at **V(c).** Based on those sets of facts set forth above at V(c) Amadasu was qualified and entitled to be promoted as the Chief Resident (CR) of OEMRP. Further, promotion to CR position was/is based on seniority regardless of the purported track the senior resident was on, and not on the unaccredited "academic or accelerated track. From 7/1/99 to 12/31/99 Plaintiff and one female Caucasian, Loren J. Tapp, ("Tapp") were the most senior residents in the third year practicum phase of the OEMRP and Tapp was then Chief Resident ("CR"). She was given preferential treatment by all white faculty than plaintiff at DOEM. In or about December 1999 Tapp graduated from the OEMRP leaving plaintiff as the only most senior resident in the OEMRP and who was qualified and entitled to be promoted as the the CR. In or around December 1999 bypassing plaintiff who was the only most qualified, most entitled and most senior resident to be appointed to the position of the CR defendants promoted a less qualified, less experienced, and more junior white resident, Robert M. Gabel, over and above Amadasu, thereby, denying Amadasu equal opportunity for promotion as CR because of his race, ancestry and national origin, thereby humiliating, degrading and demoting plaintiff     (Amadasu Decln. #55-57)

**P.     Amadasu Was Qualified For 2nd Year Position in Family Practice Residency Program**

Amadasu is black, applied and qualified for the second year (PGY-2) position in Family Practice Residency Program ("FPRP"). UC did not hire him but kept the position unfilled while continuing to advertise it for several months until a less qualified and less experienced, younger Caucasian applied and was appointed Amadasu was not appointed to the FPRP because of his race, age, national origin and in retaliation for his opposition to their discrimination practices. (Ex.55-68) [Amadasu Decln. #58]

## Q.  Amadasu Was Qualified For Faculty Position In Health Promotion At UC's Raymond Walters College, A Position For Which He Had The Qualifications

Amadasu is black, applied and qualified for the faculty position in health promotion. UC did not hire him. Amadasu was not appointed because of his race, age, sex, national origin and in retaliation for his opposition to their discrimination practices. UC hired less qualified person because of her race (white), gender (female), younger and because she been a part of regular complement, which constitutes proscribed discriminatory employment practices.  See, e.g., Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572 (1st Cir.1999) (The very existence of a policy under which an employer hires only persons who have been part of its regular complement sometimes constitutes evidence of discrimination in violation of Title VII.). (Ex.55-68).

By its 7/3/00 letter (Ex.96) UC by Herrmann acknowledged receicpt of Amadasu application for the position and requested for more information, which Amadasu submitted. By its 8/7/00 letter (Ex.95) UC by Herrmann informed Amadasu that his application was reviewed and kept on file for one year but did not state that Amadasu was not qualified for the position. (Amadasu Decln. #59-60)

## R.    Amadasu Owed No Money To UC; UC Fraudulently Fabricated Debt As Pretext For Discrimination, Retaliation & To Block Amadasu's Employment & Economic Opportunities

The UCMC Department of Occupational and Environmental Medicine (DOEM) is one of the 14 National Institute of Occupational Safety and Health (NIOSH) sponsored and funded Educational Research Centers (ERC) in the country (Ex.2, & Ex.28 p.1). OEMRP is one of the programs of the ERC and it is fully funded by federal dollars and assistance. OEMRP cannot operate and cannot be

27

funded by federal government without accreditation of and full compliance with the JACHO, ACGME, ABMS, and ABPM. Nationally, Medical Doctors appointed as OEMR into ACGME-accredited OEMRP of the ERC receive written contract, stipend, full benefits package and pay naught to the sponsoring institution—here, TUH and pay naught to the participating institution—here, UC or UCCM for anything related to the program, including but not limited to tuition and fees because they are paid for by federal dollar. Amadasu was a beneficiary of the federal funds. Additionally, UCMC's OEMRs as part of their benefits package, which Amadasu was entitled to but denied, are entitled to Tuition Reimbursement up to $3,000.00 per year (Ex.7 p.5). [Amadasu Decln. #61-62]

The Academic and the Practicum Phases of the OEMRP are under the authority and control of TUH because it is the recognized sponsoring institution pursuant to ACGME requirements (Ex.97 p.13, & Ex.98-100). UC or UCCM as the participating institution provides didactic academic courses to OEMRs on Academic Phase leading to M.S. degree in fulfillment of the requirements of the Academic Phase while TUH provides teaching and training for OEMRs on Practicum Phase.

Amadasu had obtained MPH degree as prerequisite for appointment into the Practicum Phase thus, he had satisfied the Academic Phase Requirements, and thus, he did not require any didactic academic courses for a master degree which he had already got. (Ex.1 & 62).

For the intent and purpose of discriminating against and in furtherance of their scheme to defraud Amadasu, Donovan and UCMC knowingly and fraudulently placed Amadasu on their purported "academic track" without Amadasu's knowledge and consent and to which he did not apply and belong. (Amadasu Decln. #63-64)

Amadasu applied for and was appointed into Practicum Phase of OEMRP. (Ex.1). UCMC's 01/25/99 letter appointing Amadasu as OEMR into Practicum Phase clearly and unambiguously stated that the position had tuition remission (Ex.4). This statement, notwithstanding, Amadasu was not required to pay as a resident. At the advice and direction of Donovan and in the course of the

residency, Amadasu registered for courses and clinical rotations, which were/are deemed absolutely remitted pursuant to the UCMC's 01/25/99 letter (Ex. 4) as well pursuant to NIOSH funding benefits. For example, for autumn quarter 1999 UC sent bill describing charges for academic courses, clinical rotations and fees and the tuition balance due was zero (Ex.70) as well as listed a mixed academic courses titles and clinical rotations titles that Amadasu registered for (Ex.71); For spring quarter 2000 UC sent bill  describing charges for academic courses, clinical rotations and fees and the tuition balance due was $100, which was subsequently erased because Amadasu as a resident physician was not liable for  any balance (Ex.72). The bill also described mixed academic courses titles and clinical rotations titles that Amadasu registered for (Ex.73). [Amadasu Decln.65-66]

Amadasu's last and final registration for courses and clinical rotations took place in spring quarter 2000 on 03/15/00 (Ex.72, 73), that is, the spring quarter was the last quarter of Amadasu's One-year Practicum Phase of the OEMRP, which should have ended June 2000. After 03/15/00 Amadasu never registered for any academic courses and/or clinical rotations. (Amadasu Decln. #67)

UC continued to send to Amadasu distressing, harassing, vexatious and fraudulent bills for zero, unidentified or unspecified courses titles. For example,  (a) about 11-months after Amadasu's last registration in March 2000, UC sent winter quarter 2001 bill (Ex.74) with itemized charges amounting to tuition balance due of $3,993.00 covering inter alia, fees for 01/16/01 instructions that Amadasu never had. The bill shows zero current amount due meaning that Amadasu owed no money before this bill. Page 2 of the bill (Ex.75) shows zero courses for zero credit hours evidencing that Amadasu never registered for any course for which the bill in (Ex.74) covers; (b)  24-months after Amadasu's last registration in March 2000, UC sent spring quarter 2002 bill (Ex.76) that shows previous balance and late payment fees totaling $4,313.00 and the bill's page 2 (Ex.77) shows zero classes for zero credit hours; (c) summer and autumn quarters 2002 show the same pattern of billing as the preceding bill (Ex.78-83). UC is fraudulently billing Amadasu for unspecified courses and rotations that Amadasu

never had and for the period when Amadasu had completed his practicum phase of the OEMRP (See, Donovan Decln. #3). [Amadasu Decln. #68]

Amadasu disputed those bills as follows: (a) by his 2/2/01 letter (Ex.86) to which by 2/5/01 letter (Ex.87) UC replied and acknowledged that Amadasu owed naught; (b) by his 10/7/02 letter (Ex.89) to which by its 10/10/02 (Ex.90) UC replied and acknowledged that Amadasu owed naught. (Amadasu Decln. #69)

In an effort to get employment with various employers which have requested official transcripts, Amadasu applied and paid for official transcripts on 04/05/01 (Ex.84) but sent to Amadasu 04/06/01 letter (Ex.85) that it had put service block on Amadasu's transcript and by another 7/16/02 letter (Ex.88) UC noticed continuing blockage against Amadasu's transcript, which is continuing to the present thereby causing Amadasu continuing injuries. (Amadasu Decln. #70)

By its 10/28/02 letter (Ex.91) UC informed Amadasu that it had referred the debt account to debt collection company against which Amadasu raised futile protest.

From November 2002 through about November 2003 debt collection company, General Revenue Corporation (GRC) collection regularly made harassing, vexatious, and emotionally distressing collection letters and telephone calls for nonexistent debt, e.g., (Ex.92-93). When GRC stopped collection activities, UC engaged another debt collection company, National Enterprise Systems (NES) which also harassed Amadasu for several months by its collection activities, e.g. (Ex.94). [Amadasu Decln. #71].

Beginning from Autumn 1999 continuously through years, 2000, 2001, 2003 and ongoing in 2004, UC regularly, repeatedly and continuously sent Amadasu bills for unidentified courses and clinical rotations, for which Amadasu never registered and had; which, however, were deem fully and completely remitted and, of course, had been fully funded by federal govt. agency funding the OEMRP. (Amadasu Decln. #72)

**S.    Defendants' Conduct Continue to Block All Amadasu's Continuing Efforts To Get Board
Certification, Specialist Licensures, Employment and Other Economic Opportunities**

From July 1999 to the present 2005 year and still to continue, Amadasu has diligently, relentlessly
been applying for positions within and without United States. Every, any and all prospective employers
and partners requested official transcripts and verification of attendance from UCMC but UCMC
refused to release them. Examples of such job application efforts are shown by (Ex.126-130).
Amadasu could have been obtained license, board certification, registered as Occupational and
Environmental Medicine Specialist, set up his own practice, form partnerships, be gainfully employed
at various establishments and gain many economic opportunities but for the defendants' conduct, inter
alia, defendants' false, discriminating and fraudulent withholding of grades, written evaluations,
representation of debt to block the issuance of official transcripts and verification of attendance needed
for Amadasu to be licensed as a specialist, board certified, to be employed, to set up his specialty
practice, form partnership and to obtain economic advantages. (Amadasu Decln. #73-74)

**T.    Donovan Was/Is Amadasu's Nefarious Nemesis,
Obstructionist, Jealous, dubious & Malicious Advisor**

Donovan was the appointed OEMRP program director and self-appointed himself as
Amadasu's clinical faculty advisor (CFA). Donovan was mandated and had the duty to help Amadasu
with problems that arise during the residency (Ex.28 p.2) but, instead, he was Amadasu's worst
nightmares, nefarious nemesis, obstructionist, jealous and malicious advisor who knowingly,
recklessly, egregiously and deliberately created colossus of problems for Amadasu as evidenced by the
sets of facts stated above herein.

As a highlight, (i) Donovan is dubious, e.g., he signed the UCMC's 01/25/99 letter (Ex.4)
appointing Amadasu as Occupational and Environmental Medicine Resident (OEMR) [Donovan
Decln.#3] but Donovan fraudulently classified Amadasu as a graduate student (Donovan Decln.#11);

31