and Donovan had always rated Amadasu "in good standing" from the start to the end of the program (Ex.63, 66, 67, 68, 108) but fraudulently fabricated that Amadasu had problems throughout the program without pointing to any evidentiary support in the record; (ii) Donovan obstructed Amadasu graduation from the program, board certification, employment and economic advantages by neglecting, failing and refusal to render and post grades and written evaluations of Amadasu's clinical practicum courses; (iii) Donovan was jealous of Amadasu's qualifications, skills, expertise, versatility, experience and prospective future economic advantages, all of which surpassed Donovan's qualifications; and (iv) Donovan was malicious by purposefully and knowingly fabricating nonexistent sexual harassment by Amadasu; by soliciting, suborning, persuading and pressuring a female to lie to and file false and concocted complaint with Ohio State Medica Board against Amadasu (Ex.17); by "papering" his secret file on Amadasu; etc. (Amadasu Decln. #75-76)

**U.** **Donovan and Miller Failed To Comply With and Perform Their Duties As Program Directors Under The Accreditation Standards Of ACGME and ABPM; Thereby Proximately Caused Amadasu's Injuries**

The duties and responsibilities of Donovan and Miller as the program directors are described in [Ex.97 p.18 at IV(B)—Common Program Requirements] and (Ex.98 at "A"). excerpted from Graduate Medical Education Directory. Pursuant to IV(B)(1, 4 & 5) requirements, Donovan had duty to supervise Lockey, Freeman, and Middaugh who were faculty of OEMRP; and Miller had duty to supervise the faculty of the STEER program under the Department of Family Practice (DFP) of the UTHSCSA but both failed to satisfy those duties thereby proximately caused Amadasu's injuries. Donovan and Miller had duty to afford Amadasu Grievance procedures and due process and must ensure the implementation of fair policies and procedures as established by TUH and UTHSCSA, both sponsoring institutions, to address resident grievances and due process in compliance with the Institutional Requirements but they failed to do thereby caused Amadasu's injuries; They had duties as program directors and as medical doctors to not cause Amadasu stress, emotional distress, psychic and mental anguish but they did those.

32

**V.    Donovan, Lockey, Freeman, Middaugh, and Miller Failed To Comply With and Perform Their Duties As Faculty Under The Accreditation Standards Of ACGME and <u>ABPM; Thereby Proximately Caused Amadasu's Injuries</u>**

The duties, obligations and responsibilities of the faculty of ACGME are set forth in [Ex.97 p.19-20; Ex.98 at "B" & Ex.99 at V(A)] excerpted from Graduate Medical Education Directory. Faculty has supervisory and teaching duties and responsibilities, including but not limited to rendition of grades and written evaluations of the courses and clinical rotations done under them but they failed to supervise and/or render grades and written evaluations in timely manner or none at all. In Ex.97 p.19 and pursuant to requirement IV(D) the faculty must evaluate in a timely manner the residents whom they supervise, and in Ex.99 pursuant to ABPM requirements V(A)(1, 3 & 4)), the resident's supervisor in the clinical and practicum phases shall provide a written evaluation to the program director and the resident on completion of the rotation, and that the program director and faculty must certify that residents completing the program have fulfilled all requirement established requirements based on the whole evaluations but the faculty failed to do so thereby causes Amadasu's injuries.

Donovan has been dismissed as the program director not unconnected with his misconduct that is the subject matter of this action. (Ex.8) [Amadasu Decln. #77]

**W.    UC, UCCM, TUH, UCMC And UTHSCSA Failed To Comply With and Perform Their Duties As Sponsoring or Participating Institutions Under The Accreditation Standards Of ACGME and/or ABPM; & To Comply With Own Bylaws, Policies and Procedures <u>Thereby Proximately Caused Amadasu's Injuries</u>**

The duties, obligations and responsibilities of the sponsoring and participating institutions are set forth in (Ex.97 p.13-16) excerpted from Graduate Medical Education Directory. They failed to comply with the ACGME's Institutional requirements in general and specifically, failed to afford financial support, benefits and conditions and agreement of appointment, grievance procedures and due process for Amadasu throughout Amadasu's relationship with them. See, e.g., (Ex.6, 7).

For example, Exhibits 20 and 21 are excerpts from University of Cincinnati Hospital Graduate

Medical Education Policies and Procedures, which provide procedures for sexual harassment complaint and assurance of due process respectively. Exhibit 22 is an excerpt from UC Employee Manual, which also provides for sexual harassment procedures. Exhibits 23 and 24 are excerpts from UCMC or TUH's Medical Staff Bylaws, policies and procedures, which provide policy and procedures for complaint of sexual harassment involving a medical staff member; and Exhibit 25 is an excerpt from UCMC or TUH's Medical Staff Bylaws, policies and procedures, which provides policy and procedures for due process for disciplinary action against medical staff member. UC, UCCM, UCMC and or TUH failed to follow these bylaws thereby proximately caused Amadasu's injuries. (Amadasu Decln. #78-79)

## VI.    DISPOSITIVE FACTS NOT IN GENUINE DISPUTE.

1. Amadasu belongs to the protected class and was the only black in the OEMRP at UCMC and the only black in the UTHSCSA-STEER program during the relevant time period

2. Defendants UC, UCCM, UCMC AND UTHSCSA (and the OEMRP and STEER) were/are recipients of federal funds and assistance (Ex.2, 104; Donovan Admission #2; UC Admission #2 and UTHSCSA Admission #2 & 3)

3. Amadasu was beneficiary and or intended beneficiary of the federal fund or assistance to activities and programs of UTHSCSA and UCMC [UTHSCSA Admission # 4]

4. Amadasu applied for practicum phase medical resident position in UCMC's OEMRP and not as postgraduate student position in UC graduate school (Ex.2)

5. UCMC or TUH  and not UC per se offered Amadasu  Practicum Phase position as OEMR in OEMRP and not academic phase position in OEMRP; and not postgraduate student position in UC graduate school (Ex.4; Donovan Admission #2)

6. UCMC appointed Amadasu into ACGME-Accredited OEMRP and denied Amadasu written appointment agreement or GME-Contract to which he was entitled (Donovan Decln.#3)

7. UCMC denied Amadasu GME-Contract, benefits package and other terms and conditions all of which Amadasu was entitled to and denied, but were afforded similarly situated third-year (PGY-3) residents in UCMC's ACGME-Accredited residency programs—Id, (Donovan Decln. #3)

8. Amadasu completed his one-year (PGY-3) Practicum Phase of the OEMRP in June 2000 (Donovan Decln. #3) but was unduly belatedly provided with diploma or certificate of completion in or about June 2001, i.e., June12-months after completion of his practicum phase of OEMRP

9. Donovan, Lockey, Freeman, Middaugh, and UCMC neglected, failed and refused to render grades and written evaluations of Amadasu's courses and rotations for more than twenty two (22) months until in or about April 2001when they partially rendered grades for courses

10. UCMC put block against Amadasu's Official transcript and verification of attendance since 4/6/01 and continuing to the present (Donovan Decln.#11)

11. No evidence that faculty and UCMC neglected, failed and refused to render and/or withheld grades and written evaluations of courses and rotations of similarly situated medical residents and medical residents from non-protected group at UCMC.

12. No evidence that UCMC neglected, failed and refused to timely provide diploma or certificate of completion of residency training to similarly situated medical residents and medical residents from non-protected group at UCMC.

13. No evidence that UC and/or UCMC put block against official transcripts of similarly situated medical residents and medical residents from non-protected group at UCMC.

14. UC and or UCMC offered Amadasu full tuition remission in a letter signed by Donovan (Ex.4) and Amadasu, as OEMR is required to pay naught for courses and rotations

15. Donovan, Gaynor, Pohl, Miller, Perales, UC, UCMC, UTHSCSA could not and cannot produce any evidence of documented, written, signed, investigated, heard, determined and concluded sexual harassment complaint against Amadasu throughout his residency at UCMC and throughout his rotation in STEER program

16. No evidence that defendants afforded Amadasu grievance procedures and due process in their conclusory accusatory sexual harassment, numerous complaints, and deprivation of Amadasu's liberty and property rights and interests.

17. Defendants failed to establish and produce evidentiary proof of the elements of their conclusory accusatory sexual harassment.

18. Ohio defendants failed to produce any evidence that Amadasu was the author and sender of the incident emails and they failed to produce written, signed, investigated, heard, determined and concluded sexual harassment complaint by victim(s) based on the emails.

19. Gaynor was terminated from her job for soliciting, obtaining from another third party and putting the emails into Amadasu's personnel file without authorization and thereafter

fabricating sexual harassment based on the emails. Gaynor's termination from UC resulted from Amadasu's 3/26/01 written complaint (Ex.11).

20. Donovan was terminated from the position of program director of OEMRP as a result of his misconduct

21. Donovan orally and in serial writings affirmatively admitted and acknowledged that the undocumented sexual harassment complaints of the two female UC employees were HOAX (Ex.26 & 27).

22. Donovan ordered, directed, endorsed and ratified officially documented Amadasu's professionally related phone calls to the female patient. [Exhibit 15 *is a true copy of the female medical chart executed by Donovan and Amadasu*]

23. UC or UCMC had no written policy and procedures and criteria for selection and appointment of Chief Resident of the OEMRP and have no evidence that (a) Amadasu applied for and was placed on the purported "Accelerated Track" (b) that "Accelerated Track Residents" are barred from appointment as Chief Resident.

24. Pohl whose duty was to chaperon, admitted that she failed to chaperon Amadasu' examination of the female patient [Pohl Admission at #6 & 9] thereby evidenced that Donovan and Pohl deliberately masterminded the "set up" or framed up of Amadasu for fabricated nonexistent sexual harassment and attempted dating activity. [See Pohl's evasive and ambiguous responses to Admission Requests]

25. The female patient never filed any written and signed complaint pursuant to UC, UCMC and TUH

26. Defendants failed to present evidence of any disciplinary proceedings and reports against plaintiff.

27. UTHSCSA offered and Amadasu accepted 4-weeks residency training at its STEER program

28. UTHSCSA by Miller and Perales excluded Amadasu from participation in its activities and program

29. UTHSCSA denies that Amadasu was entitled to all equal protections, privileges, immunities, rights and due process while participating in its programs and activities [UTHSCSA Admission #1]

30. UTHSCSA admitted that it excluded plaintiff from participating in its programs and activities

**D.**                                   **ARGUMENT, LAW and AUTHORITIES**

## APPLICABLE SUMMARY JUDGMENT STANDARD

Judgment sought shall be render forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to the material fact and that the moving party is entitled to a judgment as a matter of law. FRCP 56(c). In order not to usurp the right of a party to a trial by jury, the court is precluded from weigh the evidence, and must construe all evidence in a manner most favorable to the nonmoving party. Honnover Ins. Co. v. American Eng'g Co., 33 F.3d 727, 730 (6th Cir.1994).

When parties file cross-motions for summary judgment, court must consider each motion separately, since each party, as movant, bears burden of establishing the nonexistence of genuine issues of material fact, as well as his/her entitlement to judgment as matter of law. In re Rehab Project, Inc., 238 B.R. 363 (Bkrtcy. N.D. Ohio 1999). When adverse parties each moves for summary judgment, the court will draw all permissible inferences in the light most favorable to each party when considering the motion of the parties. Feldstein v. Nash Community Health Services, Inc., 51 F.Spp.2d 673 (1999). A defendant may move for summary judgment, the court can evaluate the materials presented in support of and in opposition to the motion, and can then determine whether there is a need for trial. See Wagner v. Allied Chemical Corp., 623 F. Supp. 1407 (D.Md.1985)

The purpose of the summary judgment motion is to have a court decide whether it can render a judgment on merits in regard to a claim or claims without the need for trial. Foucher v. First Vermont Bank and Trust Co., 821 F.Spp. 916, 922 (D.Vt.1993). A court can only do so if it can determine that there would be no factual issues for a jury or judge to decide at trial. In making this determination, the trial court's responsibility is not to decide disputed factual issues, but to determine whether there are issues of fact to be tried. Dumont v. Administrative Officer, 915 F.Supp. 671, 674 (SDNY 1996)

Summary judgment may only be granted if there are no genuine issues of material fact, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. Fed. R. Civ. P. 56; Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988). In determining whether summary judgment is warranted, a court must construe evidence in the light most favorable to the non-moving party, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the

party opposing the motion." See, e.g., United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Matsushita Elec. Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Brooks v. ABC, Inc., 932 F.2d 495, 500 (6th Cir. 1991).

It is well recognized that when the motivation, intent, or state of mind of the Defendant is at issue, summary judgment is rarely appropriate, so that the trial of fact may resolve the dispute over motive. See Lenz v. Erdmann Corp., 773 F.2d 62, 64 (6th Cir. 1985); see also Canitia v. Yellow Freight System, Inc., 894 F.2d 196, 199 (6th Cir. 1990) (every reasonable and favorable inference should be given to Plaintiffs version or allegations of discriminatory intent); Gallo v. Prudential Residential Services L.P., 22 F.3d 1219 (2d Cir. 1994) (summary judgment is drastic remedy in discrimination cases and should be granted only sparingly).

When considering the pleadings filed by a pro se civil rights litigant, "the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." Karim-Panahi v. Los Angeles Police Dept. 839 F.2d 621, 623 (9th Cir.1988); see also Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594 (1972). Plaintiff will now present his side of the case and rebuttal to defendants.

## COUNT 1

### No Disputed Issues of Material Facts Exist For Jury, Making Judgment Proper For Plaintiff; Alternatively, Genuine Issues of Material Fact Exist As To Plaintiff's Title VI Claim Making Summary Judgment Improper For Defendants,

The purpose of Title VI is to avoid the use of federal resources to support discriminatory practices and to provide effective protection against those practices. Assoc. of Mexican-American Educators v. California, 183 F.3d 1055 (9th Cir.1999). . The UCMC's activities and programs incorporate healthcare, education, employment and training programs or activities for which it receives federal funds. The UTHSCSA excluded Plaintiff from its educational and training programs and benefits thereof thus, creating a nexus between the hospital misconduct and federal funds.

To succeed on claim under civil rights statute prohibiting discrimination in programs receiving federal financial assistance, plaintiff must established that: (1) entity involved is engaging in racial or

38

national origin discrimination; and (2) entity involved is receiving federal financial aid. Tripp v. Long Island University, 48 F. Supp.2d 220 (1999).

A state or private hospital, which receives funds from the United States cannot practice racial discrimination. Rackley v. Board of Trustees, 238 F.Supp.512. (1965, DC SC) Deprivation of substantive right to equal treatment, in violation of 42 USCS 2000d, can be redressed by private civil action against federal funding agency or recipient of federal aid. Young v. Pierce (1982, ED Tex) 544 F.Supp.1010. In Title VI action, once prima facie case has been established, burden is on defendant to demonstrate that criteria used was required by educational (and training) necessity. Larry P. v. Riles (1984, CA9 Cal) 793 F.2d 969.

Plaintiff must prove intent to discriminate as essential element of claim under 42 USCS 2000d...he need only alleged that discriminatory purpose has been one of motivating factors for alleged unlawful conduct, not that it has been necessary factor. Harris v. White 479 F. Supp. 996 (1979, DC Mass) In proving intent to discriminate, it may be assumed that actor intended natural consequences of its deeds. Debra P. v. Turlington (1979, MD Fla) 474 F.Supp. 244

1.    **Plaintiff Establishes a prima facie Case of Violation of Title VI Claim**

   **(a). Undisputed That UTHSCSA, UC, UCCM, TUH and or UCMC Are Recipients of Federal financial Assistance.**
   In plaintiff's Requests for Admission, UC and UTHSCSA admit that they are recipients of federal funds and assistance. See (Ex.2, 104; Donovan Response Admission #2; UC Response Admission #2 and UTHSCSA Response Admission #2 & 3)

   **(b). Undisputed UC and UTHSCSA Intentionally Discriminated Against Plaintiff On Basis Of His Race and National Origin By Subjecting Him to Disparate Treatment.**
   Plaintiff has demonstrated discriminatory intent, a necessary element of Title VI prima facie case by showing disparate treatments above. "Employee can establish discriminatory intent...by showing disparate treatment, with required discriminatory motive being inferred from differences in treatment." Buwana v. Dept. of High Educ.Regents of Univ. of Colo, 55 F.Supp.2d 1139

(D.Colo.1998). Thus, it is undisputed that UCMC and UTHSCSA have subjected plaintiff to disparate treatment in standard, terms and condition of employment and/or training. Plaintiff has set forth facts with corroborating evidence above and in the supporting declaration that proof disparate treatment.

**There is direct evidence of disparate treatment:** Every, any and all medical residents in ACGME-accredited residencies must be given written GME-Contract and benefits package by the sponsoring institution. All medical residents in UCMC had GME-contract except Amadasu (Ex. 6-7). UCMC admitted that it denied Amadasu GME-Contract and benefits package all of which were afforded similarly situated residents (Donovan Decln. #3). UCMC and UTHSCSA denied Amadasu the tools of the trade or residency training that were afforded similarly situated residents. UTHSCSA provided free transport and decent modern housing to similarly situated participants in its STEER program but provided Amadasu with desolated, harmful and unsafe housing. There is direct evidence that UTHSCSA excluded plaintiff from its STEER program and its housing before the end of the 4-weeks residency training thereby breached the 4-weeks residency training contract between it and plaintiff.

It has been held "Where a party files a written request for admission, a failure of the opposing party to timely answer the request constitutes a conclusive admission pursuant to Civ.R.36 (FRCP 36) and also satisfies the written answer requirement of Civ. R. 56(c) [FRCP 56(c)] in case of a summary judgment, since an oral hearing is not required in every case." Klesch v. Reid, 95 OApp.3d 664, 643 NE2d 571 (1994).

Defendants argued that plaintiff cannot produce any evidence that they engaged in intentional discrimination in violation of Title VI lack merits because plaintiff has produced in the record direct evidence of disparate treatment. Conclusory allegations are not sufficient to defeat a properly supported summary judgment motion. McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990) (citing Patterson v. General Motors Corp., 631 F.2d 476, 482 (7th Cir. 1980), cert. denied, 451 U.S. 914 (1981)). Defendants' motions for summary judgment are based merely on conclusory assertion that plaintiff has no evidence to prove his claim and they failed to articulate legitimate non-

40

discriminatory reasons for treating plaintiff disparately. The United States Supreme Court has held that a motion based simply on a conclusory assertion that the opponent has no evidence to prove his claim would be plainly insufficient to warrant summary judgment, See Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2557 (1986). Thus, because there are no disputed issues of material facts as to Title VI claims for the jury, plaintiff is entitled to summary judgment as a matter of law.

## COUNT 2

### No Disputed Genuine Issues of Material Fact Exist As To Plaintiff's 45 USC 1981 Claim For Jury, Making Judgment Proper For Plaintiff Making and Enforcing Contract], Alternatively, Genuine Issues of Material Fact Exist As To Plaintiff's 42 USC 1981 Claim Making Summary Judgment Improper For Defendants,

42 USCS 1981 and Title VII, 42 USCS 2000e et seq., embrace parallel or overlapping remedies against discrimination. Davis v. County of Los Angeles, 566 F.2d 1334, 440 US 625 (1977, CA9 Cal) Elements of prima facie case of race discrimination are same under Title VII and Section 1981. Tate v. Dravo Corp., 623 F. Supp.1090 (1985, WD NC). Principles of order and allocation of proof are same under Section 1981 as they are for Title VII claims of disparate treatment. Chambers v. Omaha Girls Club (1986, DC Neb) 629 F.Supp 925 (citation omitted). Plaintiff raised genuine factual issues regarding disparate treament under Title VII presents triable claim under Section 1981, Miller v. Fairchild Industries, Inc., 797 F.2d 727 (9th Cir.1986).

Section 1981 prohibits racial discrimination in the making and enforcing of private contracts and provides cause of action for public or private discrimination based on race or alienage, Jett v. Dallas Indep. Sch. Dist., 798 F.2d 748 (5th Cir.Tex.1986). See 42 U.S.C. § 1981. Section 1981 claims are analyzed under the Title VII McDonnell Douglas/Burdine framework. Newman v. Federal Exp. Corp. 266 F.3d 401, *406 (6th Cir.2001) citing Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

To establish a claim under civil rights statute protecting rights to make and enforce contracts, plaintiff must alleged facts supporting the following elements: (1) plaintiff is a member of a racial

minority; (2) defendant's intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities. Brown v. City of Oneonta, NY, 195 F.3d 111 (2nd Cir.1999).

Plaintiff makes the following prima facie case of defendants' violations of the 42 USC 1981.

**First prong:** (1) Undisputed that plaintiff is black and belongs to the racial minority.

**Second prong**: (2) Plaintiff was an Occupational Medicine Resident or House Staff Officer ("HSO") and therefore was bona fide member of the medical staff of the Medical Center of University Hospital/University of Cincinnati College of Medicine. Every HSO  upon being hired has the equal right and is entitled to make and enforce contract. Defendant University of Cincinnati Medical Center ("UCMC") afforded GME-contract and benefits package to similarly situated residents from non-protected group but denied plaintiff the same because of his race and national origin. The UCMC has its own policy mandating the signing of a contract upon hiring an HSO.  ACGME and JCAHO mandate UCMC  to execute GME-contract with HSO but UCMC denied plaintiff GME-Contract thereby subjected plaintiff to disparate treatment and deprived him of right to make and enforce contract. Defendants intentionally retaliated against plaintiff for opposing their impermissible discrimination by excluding and preventing graduation from their programs and activities.

In proving intent to discriminate, it may be assumed that actor intended natural consequences of its deeds. Debra P. v. Turlington, 474 F.Supp.244 (1979, MD Fla). "Employee can establish discriminatory intent...by showing disparate treatment, with required discriminatory motive being inferred from differences in treatment." Buwana v. Dept. of High.Educ.Regents of Univ. of Colo, 55 F.Supp.2d 1139 (D.Colo.1998). When evidence of disparate [treatment] is combined with other circumstantial evidence such as departure from procedural norms, case of intentional discrimination may be shown, Chambers v. Omaha Girls Club, 629 F.Supp.925 (1986). Defendants have departed from procedural norms of their institutions and accreditation requirements of ACGME, ABPM, and JACHO, etc.

42

**Third prong:** 42 USC 1981(a) provides for equal right to make and enforce contract and to obtain benefits thereof, thus, UCMC denying plaintiff the statutory right to make and enforce contract and to enjoy the benefits thereof constituted violation of plaintiff's right to make and enforce GME-Contract. HSO contract. The offer and acceptance of the 4-weeks residency training by and between UTHSCSA and the plaintiff constituted a contract, which was breached by UTHSCSA by prematurely terminating the 4-weeks residency training thereby deprived plaintiff of the benefits, privileges, enjoyment, and immunities of the contract.

It has been held that Section 1981; guaranteeing equal rights to make and enforce contracts prohibits discriminatory conduct that occurs both before and after the establishment of the contractual relation. Perry v. Woodward, 199 F.3d 1126 (10th Cir.1999). Because UCMC and UTHSCSA have failed to proffer legitimate non-discriminatory reasons for their actions and they have not and cannot dispute the material fact as to denying plaintiff the right to make and enforce contract, plaintiff is entitled to summary judgment as matter of law.

## COUNT 3, 4 & 5 (42 USC 1983 Violations)

**No Genuine Issues of Material Fact Exist As To Plaintiff's Equal Protection, Procedural and Substantive Due Process Rights Violation Claim Making Summary Judgment Proper For Plaintiff, Alternatively, Disputed Issues of Material Facts Exist Making Judgment Improper For Defendants**

To state a claim for violation of his due process rights under the Fifth Amendment plaintiff must identify protected liberty and property interests that have been denied. See Garcia v. District of Columbia, 56 F.Supp.2d 1 (D.D.C.1998). The Fourteenth Amendment forbids state actors from depriving individuals of life, liberty or property without due process of law. Regents of State Colleges v. Roth, 408 US 564, 569-70 (1972).

The First Amendment guarantees to plaintiff right of freedom of speech, to oppose impermissible conduct of public concern, to assemble, to choose the people with whom he associates The Fourth Amendment guarantees to the plaintiff the rights to be secure in his person, papers, houses, and effects against unreasonable trespass, searches and seizures, which shall not be violated. Plaintiff's

43

person includes his body, reputation, confidentiality and privacy in his premises; his effects includes his personal property; and his papers includes his personnel file, personal information given in confidence and privately to defendant UCMC; his houses include the premises rightfully possessed.

The Fifth Amendment guarantees to plaintiff that he shall not "be deprived of life, liberty, or property, without due process of law. Plaintiff's liberty interests include without limitation, his good name, profession, pursue of chosen occupation, means of livelihood, pursuit of happiness, honor, integrity, reputation, mobility, freedom of choice, academic freedom, etc. Plaintiff has property rights and interest in education, training, his job, stipend, salary, money, his grades, written evaluations, transcripts, verification of attendance, premises, and continuing employment.

The Sixth Amendment guarantees to plaintiff the right to be informed of the nature and cause of the accusation of sexual harassment, and "attempted dating activities", to be confronted with the witnesses against him; to be able to compel the appearance in an impartial hearing of witnesses in his favor.

The Fourteenth Amendment prohibits state government, its arms, agencies, employees, agents and servants from encroaching on plaintiff's rights without due process of the law and prohibits any state and its agencies from denying to any person within its jurisdiction the legal rights it grants to others, equal right and equal treatment.

Additionally, equivalent States of Ohio and Texas Constititutions and laws provide for rights to due process, equal rights, equal treatment, and defendants have adopted the due process guaranteed by their own bylaws, and the mandatory due process requirement mandated by the accreditation bodies, to wit, JCAHO, ACGME, and ABPM (Ex.6, 21, 25, 97 and 98-100]

On more than two occasions in April 2000 at Laredo, Texas, Texas defendants, particularly Perales under the color of state law, without consent, probable cause or justification and without warrant intruded into and trespassed plaintiff's premises and searched plaintiff's effects and premises thereby violated plaintiff's protected rights of privacy, confidentiality and to be secured in his effects and house. At the time of terminating plaintiff, Perales and Miller under the color of state law

44

voluntarily published to third parties, e.g., Donovan and UC within and outside STEER office, Laredo and State of Texas orally and in writing false defamatory statement of facts regarding plaintiff that plaintiff sexually harassed white Hispanic female at Laredo. The statement destroyed plaintiff's reputation, good name, honor and profession. The Texas defendants under color of state law denied plaintiff's his property and liberty rights and interests in his residency training, the benefits, privileges, immunities, equal rights and equal treatment thereof without due process when they terminated plaintiff with defamatory false statement without due process. They denied plaintiff pre-termination and post-termination due process to clear his name.

In or about 1999, Gaynor under the color of state law intruded into and deposited into plaintiff's personnel file emails which she unlawfully solicited and procured from another female employee and fabricated sexual harassment accusation against plaintiff with the sole purpose to and did deprive plaintiff of his liberty right in his privacy, to be secure in his papers, reputation, good name, and occupation without due process. Donovan fabricated sexual harassment and "attempt at dating a female patient" accusations thereby destroyed plaintiff's reputation, integrity, good name, liberty rights to be secure in person without due process.

Ohio defendants deprived plaintiff grades, written evaluations, transcripts, verification of attendance, stipend, benefits, written contract, enjoyment of life, and graduation from the OEMRP for more than 6-years and still continuing to the present thereby destroyed and destroying plaintiff's property rights and interests therein without due process. These conducts deprived plaintiff of his liberty to pursue his occupation, to have enjoyment of life, to earn livelihood, etc. 42 USC 1981 guaranteed to plaintiff equal rights and right to make and enforce contract, which defendants had denied plaintiff.

All the defendants, particularly the individual defendants denied plaintiff of notice of charges or taking away his property; notice of proceedings; an opportunity to prepare for the proceedings; the chance to be heard both in presenting his own claim and in combating the defendants' accusations or

taking away his property and liberty interests, fair hearing before an impartial tribunal; and appellate review. Thus, defendants denied plaintiff his rights to procedural and substantive due process before and after they deprived him of his liberty and property rights and interests.

The fabricated serial false sexual harassment accusations and "attempt at dating" perpetrated in concert by defendants directed toward plaintiff carried with them no written, signed, investigated, noticed, charged, heard, determined and concluded complaints by any victim and imposed upon plaintiff a stigma that prevented and would prevent his being board certified, licensed, admitted into professional societies, pursue his career, profession and occupation.

In exercise of his First Amendment rights, defendants retaliated against him for opposing orally and in writings (Ex.69, 117) defendants' impermissible discriminations and false accusations against him, and for assembling and associating with white Hispanic females who voluntarily chose to assemble and associated with plaintiff.

Adequate notice detailing the reasons for a proposed termination of a constitutionally protected liberty or property interest must be afforded to individuals prior to the deprivation. Taylor v. Slick, 178 F.3d 698 (C.A.3 Pa.1999). Due process, guaranteed by the Fifth Amendment, requires specific notice and adequate opportunity to be heard prior to...decisions depriving individuals of liberty or property interests. In re Bailey, 182 F.3d 860 (C.A.Fed.1999). Under due process clause, a deprivation of life, liberty or property must be preceded by notice and opportunity for hearing appropriate to nature of the case; this principle requires some kind of hearing prior to discharge of ...employee who has constitutionally protected property interest in his or her employment. Stone v. F.D.I.C., 179 f.3D 1368 (C.A.Fed.1999). An impartial judge is a basic due process requirement. U.S. v. Nathan, 188 F.3d 190 (C.A.3 N.J.1999). "...Due process requires some sort of predischarge hearing. Lee v. Western Reserve Psychiatric Habilitation Ctr, 747 F.2d 1062 (6th Cir. 1984)

Plaintiff was denied procedural and substantive due process because the individual defendants did not meet the constitutional due process requirements for pretermination and post-

termination, pre-deprivation and post-deprivation hearings. Plaintiff never received any notice of charges and hearing before a neutral decisionmaker. Plaintiff was not permitted to present his grievance directly to the Executive Committee of Medical Staff of UCMC and UTHSCSA

Due process requires some sort of pretermination hearing, the formality of which depends upon the importance of the interest and the nature of the subsequent proceedings. Farhat v. Jopke, et al, 370 F.3d 580 (6th Cir.2004) (citing Duchesne v. Williams, 849 F.2d 1004, 1006-07 (6th Cir. 1988), cert. denied, 489 U.S. 1081 (1989)). For public employees who can only be fired for cause, the Supreme Court has held, specifically, that a pretermination proceeding is required. Id. (discussing Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985))

In Loudermill, the Supreme Court held that a full evidentiary hearing is not required prior to termination. Rather, the pretermination hearing is to provide an initial check against mistaken conclusions, "essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Loudermill, 470 U.S. at 545-46. The essential elements required for due process are notice and an opportunity to respond, either in writing or in person. Id. at 546. Sixth Circuit, has held that prior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer." Buckner v. City of Highland Park, 901 F.2d 491, 494 (6th Cir.) (citing Loudermill v. Cleveland Bd. of Educ., 844 F.2d 304 (6th Cir. 1988)), cert. denied, 498 U.S. 848 (1990). The "right of reply" before the official responsible for the discharge is sufficient. Duchesne, 849 F.2d at 1006. It is at the post-deprivation stage where a neutral decisionmaker is needed to adjudicate the evidence. Where there is a system of post-termination procedures available to the employee that includes a neutral decisionmaker and/or arbitration, coupled with a pretermination "right of reply" hearing, then the employee has received all the process due under the Constitution. See Duchesne, 819 F.2d at 1006; Buckner, 901 F.2d at 494;

47

Loudermill, 470 U.S. at 545.

The law is well-established that it is the *opportunity* for a post-deprivation hearing before a neutral decisionmaker that is required for due process. As long as the procedural requirements are reasonable and give the employee notice and an opportunity to participate meaningfully, they are constitutionally adequate. See Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998). In Duchesne, the employee claimed that he was denied procedural due process because his pretermination proceeding was biased. Duchesne, 849 F.2d at 1005. The proceeding was presided over by the person who ultimately fired the employee, who was also the person about whom the employee had complained to the city council. *Id.* We held  that even if the decisionmaker at the pretermination hearing was biased, due process is fulfilled by a post-termination, trial-type proceeding where an opportunity to "ferret out bias, pretext, deception and corruption by the employer in discharging the employee" is provided. *Id.* at 1008.

Under the authority cited above, due process has been denied in this Case. Plaintiff was not given pretermination notice and an opportunity to be heard, which all that is required prior to termination or deprivation, even if the person against whom he made the allegations was the same person who will preside

Defendants contention that qualified immunity protects them lacks merit To prevail against qualified immunity a plaintiff must first establish the constitutional right that he claims was violated by the defendants. Wilson v. Lyane, 526 US 603, 609 (1999). Plaintiff has alleged the deprivation of actual constitutional rights and has demonstrated that his rights were clearly established t the time of the infringement . Qualified immunity defense does not protect the plainly incompetent or those who knowingly violated the law. Gobson v. Rich, 44 F.3d 274, 277 (5th Cir 19995). In this case at bar, defendants were plainly incompetent and knowingly violated the law based on the facts set forth above

The Fourteenth Amendment forbids state actors from depriving individuals of life, liberty or property without due process of law. Regents of State Colleges v. Roth, 408 US 564, 569-70 (1972).

48

Plaintiff has established the five elements that he must show in order to establish that he was deprived of his liberty interest and entitled to name-clearing hearing. See Brown v. City of Niota, 214 F.3d 718, 722-23 (6th Cir.2000). Defamatory statements were made in conjunction with termination of plaintiff's training by Texas defendants. In re Selcraig, 705 F.2d 789, 796 (5th Cir.1983) ("A constitutional deprivation of liberty occurs when there is some injury to employment (or training)... in addition to damage to reputation and a subsequent denial of procedural due process to redress that injury).

Plaintiff can establish a prima facie case that the defendants' action in terminating his training and or withholding his grades, transcript and graduation violated his First Amendment right by showing that he engaged in a constitutionally protected activity—opposing discrimination that the defendants' adverse action caused him to suffer injuries that would likely chill a person of ordinary firmness from continuing to engage in that activity and the adverse action was motivated at least to the xercise of his constitutional right. Vaugh v. Lawrenceburg Power Sys., 269 F.3d 703, 715 (6th Cir.2001). Texas defendants admitted that plaintiff was not entitled to equal protection, immunities, privileges, and right while he was in Texas, (UTHSCSA Response to Admission Request #1) Defendants did not dispute this material fact, thus, warranting summary judgment in favor of plaintiff as a matter of law.

## COUNT 6

### No Genuine Issues of Material Fact Exist As To Plaintiff's 42 USC 1985 Claim Making Summary Judgment Proper For Plaintiff, Alternatively, Disputed Issues of Material Facts Exist For Jury, Making Judgment Improper For Defendants

To make out a claim under 42 U.S.C. § 1985, plaintiff must show that two or more persons conspired to deprive him of his civil rights because of race. Griffen v. Breckenridge, 403 U.S. 88, 102-103 (1971). This statute requires that plaintiff show that defendants acted to deprive him of his rights with "discriminatory racial animus." Id. at 102.

**1. Plaintiff can show two or more persons conspired to deprive him of his civil rights**

49

UC, UCMC, and UTHSCSA are each a separate, independent, distinct and self-governing corporate legal entity. The individual defendants were employed differently by their different employers They and other known and unknown employees formed membership in conspiracy to deprive plaintiff of his civil rights as set forth in plaintiff's declaration. The Department of Occupational and Environmental Medicine (DOEM) are predominantly Caucasians and no black, African-American and Nigerian-American ever worked there.

Plaintiff being the first and only black to do residency training in STEER program and the only black in UCMC's OEMRP and with education, training, experience and multi-skills far more superior to any of the Caucasians there, they all "coldly received him. The conspirators conspired and acted in concert for themselves and for their employers to deprive and did deprive plaintiff the privileges, immunities and rights guaranteed by federal and state laws and by their employers' byelaws. At the time they were conspiring to oust plaintiff or withhold written contract, benefits, etc, they purposefully, egregiously and willfully sidestepped their employers' byelaws and bypassed the Executive Committee of the Medical Staff and without notice and opportunity to be heard they discharged plaintiff and or prevent him from graduation with defamatory false statement of facts about him. Similarly situated Caucasian employees had all the protections, privileges and immunities except plaintiff who is black.

Plaintiff has already demonstrated discriminatory animus above, plaintiff has satisfied the elements of the prima facie case of Section 1985 claims.

### 3. Defendants argument based on "Intracorporate conspiracy" doctrine lacks merits

The intracorporate conspiracy doctrine is not applicable in this action because: Individual defendants are not employed by the same legal entity and acted outside the scope of their duty and authority when they withheld plaintiff's contract, benefits, grades, written evaluations, graduation from OEMRP and or when they violated clearly established constitutional rights.

The intracorporate conspiracy doctrine defense is not absolute but there are exceptions

depending on the scope of acts of the conspirators. Where corporate employees conspired and acted beyond the scope of their duty or authority the intracorporate doctrine defense is lost and each conspirator is liable individually for conspiratorial damages. "Although corporation cannot conspire with itself, 42 USCS 1985(3) claim may arise where individually named defendants act outside scope of their employment or for personal reasons." Boone v. Federal Express Corp. (1995, CA8 Minn) 59 F.3d 84, Also see Chambers v. Omaha Girls Club (1986, DC Neb) 629 F.Supp.925, 1988 US. App.LEXIS 18913. and Bremiller v. Cleveland Psychiatric Inst. (1995. ND Ohio) 879 F. Supp. 782.

The conspirators acted egregiously and for personal reasons, because they flagrantly and knowingly disobeyed the federal laws, employers' byelaws and recklessly disregarded plaintiff's rights, thus individually liable. "Exceptions exist to the intracorporate corporate conspiracy limitation, for purposes of claim of conspiracy to interfere with civil rights, in egregious circumstances." Payton v. Rush-Presbyterian-St. Luke's Med. Ctr. 184 F.3d 623. Additionally, because the UC, UCMC, TUH and UTHSCSA certainly fail the "Integrated Enterprise Test" factors enumerated in Cellini v. Harcourt Brace & Co., 51 F.Supp.2d 1028, they do not constitute a single employer, thus intracorporate conspiracy doctrine defense must fail. Consequently, there is disputed issue of material fact as to whether Section 1985(3) and Section 1986 claims are barred by intracorporate conspiracy doctrine making summary judgment for defendants improper, alternatively, defendants' defense arguments failed making summary judgment for plaintiff proper as a matter of law.

## COUNT 7

### No Genuine Issues of Material Fact Exist As To Plaintiff's 42 USC 1986 Claim Making Summary Judgment Proper For Plaintiff, Alternatively, Disputed Issues of Material Facts Exist For Jury, Making Judgment Improper For Defendants

The district courts in Ohio uniformly agree that a Section 1986 claim is premised on a violation of Section 1985. *See* Boddie v. American Broadcasting Companies, Inc., 694 F.Supp. 1304 (N.D.Ohio 1988); Givan v. Greyhound Lines, Inc., 616 F.Supp. 1223 (S.D.Ohio 1985); Buchanan v. Sowa, 592 F.Supp. 1009 (D.C.Ohio 1984).

Defendants knew of the conspiracy, were in the position to prevent its implementation and neglected or refused to prevent it, they are liable under Section 1986. Park v. City of Atlanta, (1997 CA11 Ga) 120 F.3d 1157. Plaintiff rests on Section 1985 claims prima facie case and argument above.

## COUNT 8

### Violation of Federal Fair Housing

Texas defendants violated 42 USC 3604(a) and (b) of Federal Fair Housing Act (FHA). Same elements must be established in fair housing action brought under Title VIII as actions brought under Section 1981 or 1982, Selden Apartments v. United States Dept. of HUD, 785 F.2d 152 (6th Cir.1986). To claim Fair Housing Act (FHA) violation...plaintiff can show either that the decision  has segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group...proof need not be that racial discrimination was the sole or dominant reason...just that race played some role in the adverse decision; test is essentially the same under the equal protection clause, and under Sections 1981 and 1982 Housing Investors, Inc. v. City of Clanton, Ala., 68 F.Supp.2d 1287 (1999). Action by dark-skinned woman under 42 USC 1981-82 and 3601 stated claim for housing discrimination. See Quinones v. Nescie, 110 FRD 346 (EDNY 1986). The Texas defendants' decision to put plaintiff in desolated, isolated and archaic housing at Ainsworth was segregative, made housing options significantly more restrictive for plaintiff or "otherwise made unavailable or deny, a dwelling to any person(plaintiff) because of his race, color or national origin. To establish prima facie case of violation of FHA, Plaintiff relies on his established elements for Section 1981 above.

## COUNT 10

**No Disputed Genuine Issues of Material Facts Exist As To Plaintiff's Negligent Hiring/Supervising/Educating/Training/Enforcing/Preventing Claim For Jury  Making Judgment Proper For Plaintiff; Alternatively, Genuine Issues of Material Fact Exist Making Summary Judgment Improper For Defendants**

52

In order to maintain an action for negligent hiring/supervising/educating/training/enforcing and preventing, plaintiff must establish: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring supervising or retaining (not educating, training) the employee as the proximate cause of plaintiff's injuries. Whitt, et al., v. Country Club Apartments, et al., (6th Cir.1999) 1999 Ohio LEXIS 3573.

### (1). Existence of an employment relationship:

As for the prong (1) it is undisputed that employment relationship between individual defendants and the corporate defendants existed.

### (2). Plaintiff can establish the incompetence of the actors in their actions

Incompetence means: "Lack of ability or fitness to discharge the required duty" *Bouvier's Law Dictionary, Baldwins Student Edition (1946) p.533. Webster's Dictionary Website* defines Incompetence as: "Inadequate, unsuitable for particular purpose; lacking quality." Donovan and Miller and their faculty displayed lack of ability or fitness to discharge their duties, obligations and responsibilities of their positions as program directors and faculty. They showed lack of understanding of the requirements of the ACGME and the bylaws, rules, regulations, policies and procedures of their employers. Foe instance, Donovan acknowledged his gross incompetence when he declared, "OMRP faculty are not required to submit course evaluations or clinical practicum evaluations to the department—that is the resident's responsibility (sic)" See (Donovan Decln. #8), which is contrary to requirements of the ACGME, ABPM (Ex.29, 97, & 98-100). Perales who was a clerk and sanitarian was performing the duty and function of clinical faculty and employer when UTHSCSA and Miller allowed him to supervise clinical work of plaintiff-medical resident physician. Perales admitted he was not a faculty, (Perales Response Admission #12, 13; & UTHSCSA Response Admission #25). Plaintiff has set forth facts above which show that the applicable defendants were incompetent.

### (3).    The actors' employer had actual or constructive knowledge of such incompetence

UCMC and UTHSCSA had actual, constructive knowledge or should reasonably have known that their employees were not competent. The UCMC and UTHSCSA actually knew or should have known Perales was not qualified or competent to supervise Amadasu because they had the actual knowledge of the requirements of accreditation bodies and their own bylaws. The employer had actual knowledge that their employees were ignorant of the requirements of the accreditation bodies and their own bylaws; The employer had actual knowledge that Perales was a mere clerk and sanitarian with no actual supervising, managerial, directorial, and clinical decision-making duty or authority. The employer had actual knowledge that it is only the licensed and board certified physician had duty and authority to supervise plaintiff's clinical work; Other facts and evidence of employers' actual and or constructive knowledge of their defendants employees' incompetence are set forth above.

**(4).    The employees' act or omission causing the plaintiff's injuries**

The acts and omissions of the employees causing plaintiff's injuries are set forth above.

**(5).    The employer's negligence in hiring, supervising, enforcing or retaining (not educating, training) the employees was the proximate cause of plaintiff's injuries**

The employers were negligent in hiring or appointing Donovan and Miller who lacked racial sensitivities, administrative and directorial expertise and experience to be program directors. The employers were negligent in failing to properly educate, train and supervise their employees. The employers were negligent in failing to enforce adherence to their bylaws, rules, regulations, policies and procedures; failing to enforce adherence to the requirements or provisions of ACGME, ABPM, ABFP, JCAHO, federal and state laws.

**(6).    Foreseeability and or Anticipation Of Misconduct**

Webster's New American Dictionary, 1995 defines "foresee" as to see or realize beforehand, to expect; apprehend, anticipate;" and defines "anticipate" as to foresee and provide for beforehand; to look forward to; Thus, the words: "foresee" (foreseeability) and "anticipate" (anticipation) are synonymous.

When employers sidestepped their own bylaws, policies and procedures, the requirements or

54

standards of the accreditation bodies and federal and state laws which they had adopted, for proper organization and operation of their institutions and then set up a hierarchical chain of incompetent program directors, faculty and supervisors beginning from Filak, Donovan, Miller and Lockey through Perales, misconduct of these incompetent supervisors was to be foreseeable and or anticipated and the employer took the risk of it, thus liability must be imposed upon the employer for the injury or damages that Plaintiff suffered, is suffering and will continue to suffer. Although, this instant action is a civil case, the Sixth Circuit in Whitt, *Id.* supra, citing a criminal action, Evans v. Ohio State Univ. (1996), 112 Ohio App.3d 724, 680 NE2d 161, ruled that, "the mere fact that misconduct on the part of another might be foreseen is not itself sufficient to place the responsibility upon the defendant, rather, it is only where the misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed."

### COUNT 11

**No Genuine Issues of Material Fact Exist As To Plaintiff's Intentional and Negligent Misrepresentations Claim Making Summary Judgment Proper For Plaintiff, Alternatively, Disputed Issues of Material Facts Exist Making Judgment Improper For Defendants**

Plaintiff establishes prima facie case: (1) a misrepresentation of material, existing fact; (2) made with knowledge of falsity; (3) with intent to induce the plaintiff to rely; (4) reasonable reliance of the plaintiff; and (5) damages. See Hart v. McLucas, 535 F.2d 516, 519 (9th Cir. 1976) and United States v. Kiefer, 228 F.2d 448 (D.C. Cir. 1955).

Defendants had seriously misled plaintiff concerning employment, residency training and rotation. In misrepresentation case, the focus is generally on statements made to plaintiff at the time of hiring or when plaintiff was induced to accept the offer and stay on the job rather than accept other an inside and or outside offer. See Shebar v. Sanyo Business Sys. COrp., 218 N.J. Super.111, 526 A.2d 1144 (1987).

**(1).    Ohio Defendants:** During the interview and at the time of hiring, defendants represented to plaintiff that: *inter alia*, (i) they would appoint plaintiff for Practicum Phase position in ACGME-accredited OEMRP for one year; (ii) full tuition remission; (iii) afford plaintiff GME-Contract, full benefits package; (iv) would adhere to requirements of the accreditation bodies—JCAHO, ACGME, ABPM, their own bylaws, federal and state relevant laws and would afford plaintiff all the protections, privileges, immunities and rights thereof, etc; **Texas Defendants**: Represented to plaintiff that: *inter alia*, (i) plaintiff would complete 4-weeks of residency training participation in their STEER program; (ii) free transportation; (iii) free healthful, safe and fully furnish housing for 4-weeks; (iv) full and complete STEER Rotation Calendar; (v) they would adhere to their bylaws, the requirements of accreditation bodies, federal and state laws; etc.

**(2).** But at the time the statements were made, they were known to be false for immediately upon starting to the practicum phase of the OEMRP Ohio defendants denied plaintiff GME-Contract, full benefits package, and they sidestepped the requirements of the accreditation bodies, federal and state laws; Texas denied plaintiff free transportation, furnished healthful housing and prematurely terminated plaintiff's participation, etc; **(3).** Defendants never intended follow through with other aforesaid representations and or promises; **(4).** Defendants made their representations and promises to induce reliance and indeed, induced plaintiff to rely on them to his detriment by forgoing other employment and residency training opportunities; and **(5).** Shortly after hiring plaintiff, defendants reneged on their representations and promises; prevented plaintiff from graduating and/or excluded plaintiff from participation in their programs for fabricated debt or for opposing their discrimination.

In Elliott v. Shore Stop, Inc., 238 Va. 237, 384 S.E.2d 752 (1989), the court held, "an action in tort for fraud and deceit may be predicated on promises made with the present intention not to perform them; the gist of fraud is the fraudulent intent." Defendants made promises that did not intend to perform at the time they were made. However, the Elliot court, Id, held that the fraud was complete two days before the plaintiff learned that she had been set up; the plaintiff did not know of the

employer's scheme until just hours before the test and the court also held that a tort action exists against those who conspired to induce a breach of contract. Here in this action at bar, the misrepresentations were complete before plaintiff knew that defendant did not intend to keep promises and they conspired to deny plaintiff GME-Contract, benefits, etc, and prevented him from graduation from the program.

**Evidence of defendants' promises and representations:** Evidence of promises and breach thereof are articulated above and needless to re-write them herein. When the facts suggest that an employee has been misled in a serious way, and that the employer is responsible, the problem will be analyzed for implied misrepresentation or concealment, and for false promises. If employer explains circumstances of employment, the full story must be told. See Varnum v. Nu-Car Carriers, Inc., 804 F.2d 638 (11th Cir.), reh'g denied, 808 F.2d 1524 (1986), cert. denied 481 US 1049 (1987).

**Representations are implied in hiring**: Employment is always contracted for within a specific factual context. The surrounding circumstances may suggest that a promise was implied; the hiring negotiations, however short, will always be conducted in the context of certain mutually understood facts. Some of those are facts spelled out in writing or discussed openly; others are so basic that no discussion is necessary, see *Restatement 2d of Torts Section 525 note 2 comment e*, or they are necessarily implied by the offer of a job itself. Defendants made express representation of offering GME-contract, benefits, full tuition remission, 4-weeks elective rotation, etc, Thus, there was an expressed and implied representation that there were no presently existing facts that would prevent affording plaintiff GME-contract, benefits, tuition remission, etc, shortly after the employee-plaintiff came to work

In Wildes v. Pens Unlimited Co., 389 A.2d 837 (Me.1978) court found fraud where shortly after the employee was hired for a specific sales representative position, his position was eliminated in reorganization. The restructuring was known to have been contemplated at the time of hiring, and the termination took place three days after the employee, at the company's urging, relinquished another

57

position elsewhere. This Wildes *Id,* case somewhat bears analogy to this instant case because shortly after plaintiff was hired for specific OEMRP practicum resident position, was denied written GME-contract, benefits, etc, without affording him the mandated equal protections, due process, etc. The intent not to afford plaintiff the GME-contract, benefits, stipend, etc, had been contemplated at the time of hiring, and denial of contract and benefits, etc took place after plaintiff started residency training. See also Andolsun v. Berlitz Schools of Languages, 196 A.2d 926 (D.C.1964). Also see Elizaga v. Kaiser Found. Hosp., Inc., 259 Or.542, 487 P.2d 870 (1971). In both Andolsun, *Id,* and Elizaga, *Id,* the courts reasoned that the employer's knowledge of the employee's situation certainly was important in showing that an implied representation did exist.

Another necessary implication of the offer of a job is that plaintiff was, at the time of hire, acceptable to the defendants. In McGrath v. Zenith Radio Corp., 651 F.2d 458 (7th Cir.1981) the employee surrendered his stock and a stock option to the acquiring company based on an assurance that he would become president of the acquired company. The undisclosed collateral fact was that his superiors had met and decided that instead of promoting him, they would fire him. Discharge was plainly inconsistent with a promotion, and the promise of promotion carried with it an untrue representation that the employee was acceptable to the acquiring company. In analogy to this instant case, plaintiff, at the urging of defendants, declined other offered positions for OEMR position based on defendants' assurance that plaintiff would be afforded GME-contract, benefits, tuition remission, etc. The undisclosed collateral fact was that defendants had met and decided that instead of affording plaintiff the promised and mandated GME-contract as OEMR, they would classify him graduate student on accelerated track. Denial of written contract, benefits package, tuition, etc was plainly inconsistent with OEMRP fully funded by federal dollars, and the promise of GME-cntract, benefits, tuition remission, etc carried with it an untrue representation that the plaintiff was acceptable to the defendants.

**Defendants made Promise with intent not to perform:** In Shebar v. Sanyo, Id, supra, plaintiff through an executive search agency found a position with Sony, which promised and assured him a vice-president position. Plaintiff subsequently tendered resignation from his employer, Sanyo, which assured him of job for life to stay with it. In reliance on the promises his employer, Sanyo, made to him, plaintiff agreed to stay with Sanyo and rescinded his acceptance of Sony's job offer and communicated it to the recruiting agency. Four months after refusing the plaintiff's resignation, Sanyo summarily fired him with ignominy and asked him to leave the premises forthwith. The court held that the plaintiff had a claim for fraud or misrepresentation. When his two superiors made their promises of job security to him and induced him to forgo employment with a competitor, if they then had the intention of firing him in the near future, that was fraud.

In analogy to this case at bar, plaintiff OEMRP positions with defendants and other employers. Defendants' promises and assurances to afford written GME-Contract, benefits, etc, for the position induced plaintiff to detrimentally relied to forgo other positions which defendants encouraged plaintiff to forgo. The defendants buttressed their promises of good fortune on the job with specific falsehoods of GME-contract, benefits, tution remission, etc, for plaintiff and they withheld existing facts inconsistent with the offer of a job and allowed the false and misleading implication of available work to stand. The deceit is present; to remedy the deceit the courts recognize misrepresentation or fraud action when a promise is made with a present intent not to perform. See Casale v. Dooner Lab. Inc., 503 F.2d 303 (4th Cir.1973); and Hamlen v. Fairchild Indus., Inc., 413 So.2d 800 (Fla.App.1982). The violation of a promise is one of the requirements for this kind of action. Defendant employers made the promise with fraudulent intent, i.e., the intent to deceive the employee-plaintiff. See Godwin v. Dinkler St. Louis Mgmt. Corp., 419 S.W.2d 70 (Mo.1967).

**Defendants breached their duty to disclose change of intent:** In McGrath v. Zenith Radio Corp., Id, supra, the decision not to fulfill the promise of employment was subject to serious doubt almost immediately after it was made and well prior to the acts of reliance by the employee. The court

59

found that the failure to correct the mistaken impression was a continuing course of conduct amounting to fraud. *Id.* at 468.

### Prima Facie Case of Negligent Misrepresentation Claims :

The elements of negligent misrepresentation are (1) one who, in course of his or her business, profession, or employment; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; and (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *Restatement 2d of Torts, Section 552 (1977) comment.* Plaintiff is required to show (a) defendant supplied the information constituting misrepresentation to plaintiff for use in business transactions with third parties; (b) defendants are in the business of supplying information and (c) plaintiff reliance on the misstatement was justified or reasonable. See Rankow v. First Chicago Corp., 870 F.2d 356 (7th Cir.1989); and Christiana Marine Service Corp. v. Texaco Fuel & Marine Marketing, Inc., (2002 Del. Super. LEXIS 305).

Defendants misrepresented to plaintiff that plaintiff would be afforded GME-Contract, benefits, tuition remission, etc, which Plaintiff accepted and conveyed to other third party employer which upon being guided by the information foreclosed other opened positions for plaintiff but defendants failed to fulfill the representations; (b) Defendants, particularly the Hospital, are in the business of supplying information for the guidance of third parties; (c) Plaintiff reasonably or justifiably relied detrimentally on the misrepresentation to decline other job positions inside and outside the UCMC.

Ohio, like many states, recognizes negligent misrepresentation as a tort. See Smith v. Reynolds Metals Co., 497 So.2d 93 (Ala.1986); and McAfee v. Rockford Coca-Cola Bottling Co., 40 Ill. App.4d 521, 352 N.E.2d 50 (1976) in which court allowed an action based on the direct statement to the plaintiff because authority to make the promise was impliedly represented, and the speaker had been negligent in ascertaining the extent of his authority and whether it was safe for the plaintiff to decline

other employment, even absent an intent to defraud. No element of scienter was required. However, in most jurisdictions the scienter requirement for a fraud suit may be satisfied by showing of reckless disregard for the truth or 'conscious indifference' to the truth, a state of mind more serious than negligence. In this instant case, Defendants recklessly disregarded the mandated GME-Contract, benefits, tuition remission.

Proof that a promise was made without intent to perform may not generally be based solely on the fact that promise was broken. See Sherman v. Mutual Benefit Life Ins. Co., 633 F.2d 782, 785 (9th Cir.1980). In Doody v. John Sexton & Co., 411 F.2d 1119 (1st Cir. 1969), the employer's admission that he had been 'kidding' when specific promises about the job were made was enough to establish that there was no intent to perform at the time of the promise. Generally, however, circumstantial evidence must be relied upon to prove that the promise was not genuine when made. Thus, in this instant action, defendants' admission that they subjected plaintiff to disparate treatment would be enough to establish that there was no intent to perform at the time of the promise. Among the circumstances that have been held to establish the fraudulent intent is a scheme to eliminate the plaintiff as a competitor by false employment promises. See Shebar v. Sanyo, *Id, supra*. Here also Defendants decided to eliminate plaintiff as pontetial potential competitor by fraudulently putting block on his transcript.

**Reasonableness of employee's reliance:** Actions for employment fraud or misrepresentation have been founded on a variety of types of employee reliance, *inter alia*, an employee's giving up other work or employment opportunity. See Casale v. Dooner, *Id, supra*. Thus, plaintiff has reasonably relied upon defendants' misrepresentation to decline other opened positions. Since "reasonableness" is a question of fact for the trier to determine based on all of the circumstances, summary judgment for defendants would be improper. "...fact issues existed as to whether defendants knew that their alleged misrepresentations were false when they were made and whether lender relied on alleged

misrepresentations, precluding summary judgment," <u>Wong v. Aragona</u>, (D.Md.1993) 815 F.Supp.889, affirmed 61 F.3d 902.

## COUNT 12
**No Genuine Issues of Material Fact Exist As To Plaintiff's Defamation—Libel & Slander Claim Making Summary Judgment Proper For Plaintiff As Matter of Law, Alternatively, Disputed Issues of Material Facts Exist For Jury, Making Judgment Improper For Defendants.**

To maintain a cause of action for defamation the plaintiff must establish that: (1) a communication impugns the reputation of plaintiff, (2) the communication is received by a third party; (3) the defendant is unable to prove that the utterance was true or substantially true or show that he/she was "privileged" to the statement; and (4) the communication proximately causes damages that can be proved, unless the nature of communication allows the court to presume that it must have caused damages. See Restatement of Torts Section 559.  To state a claim for defamation a plaintiff must establish : (1) false defamatory statement of fact; (2) regarding plaintiff; (3) that was published without privilege or authorization to third party; and (4) causing injury to plaintiff, <u>Nowak v. EGW Home Care, Inc.</u>, 82 F.Supp.2d 101

(1) Donovan, Gaynor, Pohl, Miller and Perales made false defamatory statement facts of sexual harassment, and attempt at dating regarding plaintiff, which they published without any privilege or authorization to several known and unknown third persons within and outside their working and employing premises and which caused plaintiff injury. The statement were false statements of fact, libelous per se, slanderous per se and  defamatory per se because they imputed moral turpitude, criminality and that plaintiff was unfit to perform duties of his office, employment, trade and profession and defamation of character.

(2) The communications were received by third persons that reasonably understood that the defamatory statement referred to the plaintiff.

Some statements that had neither imputed the commission of a crime nor disparaged the employee's

performance have nonetheless been held defamatory. In <u>Drennen v. Westinghouse Electric Corp.</u>, 328 So.2d 52 (Fla. Dist. Ct. App. 1976), the employer's representative read a communication to 300 employees which stated that an employee had taken company property and placed it in his truck without a pass. The court found the statement accused the employee of conduct incompatible with the proper exercise of his employment and was therefore defamatory.

If an explanation of the circumstances attending a statement is required to show that it was defamatory, it must also be shown that the statement was understood in a defamatory sense. In <u>Becker v. Alloy Hardfacing & Engineering Co.</u>, 401 N.W.2d 655 (Minn. Sup. Ct. 1987), a former salesman brought an action against his former employer seeking damages for defamation, unpaid wages and wage penalties following his discharge. The employer had filed a false stolen car report and wrote letter to the new employer stating that the employee had retained property belonging to the former employer. The court held that a cause of action for defamation had been pleaded where the employee was upset and embarrassed and was pressured to work harder and longer hours at his new employment. See also <u>M.F. Patterson Dental Supply Co. v. Wadley</u>, 401 F.2d 167, 169-70 (10th Cir. 1968) (where employer sent a telegram to discharged salesman's former customers implying that the salesman was unfit to further represent the company and by further innuendo that he was guilty of some public or personal misconduct or activity, the court held that a cause of action for defamation had been pleaded because the letter was "susceptible of . . . defamatory imputations. In <u>Luttrell v. United Telephone System, Inc.</u>, 236 Kan. 710, 695 P.2d 1279 (1985), the Kansas Supreme Court held that remarks made in the course and scope of employment by one corporate employee and communicated to a second corporate employee concerning the job performance of a third corporate employee "constitute publications to a third person sufficient for a defamation action. This is accorded with <u>Frankson v. Design Space Int'l</u>, 394 NW2d 140 (Minn.1986). This position comports with the Restatement 2d of Torts Sect.577 comment h (1977) and *Hornbook law-W. Keeton, D. Dobbs, R. Keeton & D. Owens, Prosser and Keeton on* The Law of Torts, Section 113 (5th ed. 1984)

(3) The defendant is unable to prove that the utterance was true or substantially true or show that he/she was "privileged" to the statement. The burden of establishing the truth as defense rests on the defendants. The defendant had raised no affirmative defense to this claim in its Answer to the Complaint thus, they had waived the defense, or if they had made such defense, they failed to prove the truth. Truth is no defense to a claim of defamation. Restatement (Second) of Torts S 581A; Johnson V. International Minerals & Chemicals Corp., 40 Fair Empl. Prac. Cas. (BNA) 1651 (D.S.D. 1986). Truth is only a defense when the basis of the statement is true, not merely when the statement is verbally accurate. Lewis v. Equitable Life Assurance Society, 389 N.W.2d 876 (Minn. 1986). At common law, a defamatory publication was presumed false unless the defendant affirmatively pleaded and proved its truth.

(4) The communication proximately causes plaintiff damages that can be proved, and the nature of communication allows this court to presume that it must have caused damages.

Defendant Gaynor fabricated sexual harassment for herself and her purported co-worker based on the emails she had solicited from the co-worker and put them into plaintiff's personnel file. Then she published it to Donovan who in breach of his duty and without investigation republished it to other third persons. It has been held, "a communication is qualifiedly privileged when, among other things, it is based upon reasonable or probable cause, when a party making a defamatory statement takes no steps to investigate truth of statement, but instead, relies entirely upon hearsay, without verification, he has not acted as reasonably prudent person, and lacks probable or reasonable grounds for making a defamatory statement." Kovatovich v. K-Mart Corp., 88 F.Supp.2d 975 (D.Minn.1999). Donovan admitted that the statements were false or hoax.

There is no disputed issue of material facts for the jury thus, warranting judgement for plaintiff as matter of law.

## COUNT 13

**No Genuine Issues of Material Fact Exist As To Plaintiff's Invasion of Privacy and and Trespass Claim Making Summary Judgment Proper For Plaintiff, Alternatively, Disputed Issues of Material Facts Exist For Jury, Making Judgment Improper For Defendants**

The privacy interests of an employee in the private sector are much the same as those of a public employee. In Texas, an employee has prevailed on a claim for invasion of privacy for a supervisor's search of his locker. In K—-Mart Corp. v. Trotti, 677 S.W.2d 632 (Tex Ct. App. 1984), a Texas court held that an employee had a legitimate expectation of privacy with respect to his locker where, with his employer's consent, he supplied his own lock for a workplace locker, the employer did not require a duplicate key, and the employer gave no notice of possible searches.

Fact issue exist as to whether Perales exceeded the bounds of tolerance by intruding into and searching plaintiff's premises without plaintiff's consent. Hall v. May Dep't Stores & Co., 292 Or.131, 637 P.2d 126, 130-31 (1981) ("this is a judgment of social standards"). The trial in a common law cases ultimately seeks to determine how much individual control, respect, dignity the community standards give to an individual. This is similar to the trial function in obscenity cases where the U.S. Supreme Court has decided to allow local communities to define obscenity. Miller v. California, 413 US 15, *reh'g denied*, 414 US 881 (1973). Tenth Circuit Judge John Moore has written that in an outrageous conduct case the "issues are mainly factual, and the conscience of the community-the jury-must be brought to bear,...[they] should not be resolved by the court." Smith v. Montgomery Ward Co., 567 F.Spp. 1331, 1335 (D. Colo. 1983)

'O'Connor v. Ortega, 480 U.S. 709, 1 IER Cases 1617 (1987). is the leading case in the area of searches into an employee's work place in the US Supreme Court ruled on the question of whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis. In this case, Dr. Ortega had a reasonable expectation of privacy in his desk and file cabinets. Employer intrusions in these cases are to be judged by the standard of "reasonableness under all the

65

circumstances." There is a two-part test to determine the reasonableness of a search. First, a search of an employee's office by a supervisor must be "justified at its inception," and second, the search must be permissible in scope. A search will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose. The search is permissible in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of . . . the nature of the [misconduct].

Shortly after *O'Connor* was handed down, the Ninth Circuit decided <u>Schowengerdt v. General Dynamics Corp</u>. 823 F.2d 1328, 2 IER Cases 545 (9th Cir. 1987). The court concluded that Schowengerdt enjoyed a reasonable expectation of privacy in areas given over to his exclusive use, unless he was on notice from his employer that searches of the type to which he was subjected might occur from time to time for work-related purposes. Schowengerdt alleged that there were no regulations providing for searches of employees' office furnishings. According to the court, it was error for the district court to dismiss the complaint based on a finding that he could have no reasonable expectation of privacy in his desk. *See* <u>Shields v. Burge</u>, 874 F.2d 1201, 1203, 4 IER Cases 623 (7th Cir. 1989), ([W]e conclude that the *Ortega* plurality's reasonableness analysis governs work-related workplace searches.... [T]he essential principle that *Ortega* teaches is that an employer's workplace search must be reasonable. Reasonableness depends upon the circumstances presented in a given situation and upon balancing the public, governmental, and private interests at stake in that situation.

The reasoning in these cases is applicable to this instant case Perales had no authority and justification to intrude, trespass and search plaintiff's premises without plaintiff's consent. Material issues of fact existed as to whether employee (plaintiff) had expectation of privacy precluding summary judgment. <u>Doe v. Southeastern Penn. Transp. Authority</u>, (ED Pa.1994, 886 F.Supp.1186

## COUNT 14

**No Genuine Issues of Material Fact Exist As To Plaintiff's Claim For Intentional Infliction of Emotional Distress Making Summary Judgment Proper For Plaintiff Alternatively, Disputed Issues of Material Facts Exist For Jury, Making Judgment Improper For Defendant As A Matter of Law.**

To prevail on a claim for intentional infliction of emotional distress under Ohio law, a plaintiff must prove that (a) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (b) conduct was outrageous and extreme that caused the plaintiff to suffer severe emotional distress. Yeager v. Teamsters Local Union No.20, 6 Ohio St 3d 369, 374-75. 453 N.E.2d 666 (1983), "Outrageous conduct is defined as being so extreme as to exceed 'all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" Id. at 375. (c) The defendant additionally must have intended to cause, or have acted with reckless disregard to the likelihood of causing, the emotional distress suffered by the plaintiff. Blankenship v. Parke Care Centers, Inc. (S.D. Ohio, W. Div. 1995), 913 F. Supp. 1045; citing Brandenburger v. Hilti, Inc. (Cuyahoga Cty. 1989), 52 Ohio App. 3d 21, 29. (d) The defendant must cause severe emotional distress; the mental distress must be so severe that no reasonable person could be expected to endure it, giving due consideration to both the intensity of distress and its duration. The severity of the defendant's conduct in itself can be important evidence of distress. *Restatement 2d of torts, note 2 section 46 comment.*

The defendants' conduct does rise to the level of "outrageous" or "extreme," either in frequency or in severity. Accordingly, the claim for intentional infliction of emotional distress succeeds as a matter of law.

**Standard for intentional infliction of emotional distress: "Totality of the circumstances"**

Three identifiable forms of behavior toward employees are recognized as a basis for mental distress recovery because they violated generally accepted social standards of behavior. The three

67

repeated patterns of behavior are (a) ridicule, harassment, or discharge based on race or sex; (b) abuse of disability/handicap; (c) discharge for conduct protected by public policy.

**(a). Racial harassment:**

Courts have recognized racist behavior as outrageous. See: <u>Odom v. East Avenue Corp.</u>, 178 Misc. 363, 34 NYS2d 312 (1942) (refusal to serve hotel gusts in dinning room); <u>Guillory v. Godfrey</u>, 134 Cal. App. 2d 628, 286 P.2d 474 (1955) (intimidation of business and customers for employment of black cook); <u>Browning v. Slenderella Sys.</u>, 54 Wash.2d 440, 341 P.2d 859 (1959) (refusal to serve customer because of race). The pattern in these cases generally consists primarily of racial slurs, comments, epithets, stereotypes and jokes. In <u>talley v. Leo J. Shapiro & Assoc.</u>, 713 F.Supp. 254 (N.D. Ill.1989) the district court disagreed with the defendant's argument that none of the plaintiff's allegations rose to the level of "extreme and outrageous" conduct, holding that allegations that defendants harassed and denigrated black employees because of their race and implemented cruel and retaliatory policies and actions against black employees are broad enough to leave open the possibility that defendants' conduct was sufficiently extreme and outrageous to support the claims. Also in <u>Robinson v. Hewlett-Packard Corp.</u>, 183 Cal. App.3d 1108, 228 Cal. Rptr. 591 (1986) the court held an employer's use of racial slurs against an employee who is susceptible to such slurs may constitute "outrageous" conduct. Here there was evidence that the plaintiff's supervisor intentionally insulted him and his race and that he suffered emotional distress. This raised a triable issue as to whether the employer and its supervisor and employees engaged in outrageous conduct.

The evidence of defendants' outrageous conduct detailed above needlessly be re-written here the colossus of intense and frequent fabrications of false accusations of sexual harassment, sexually harassing plaintiff, withholding grades and written evaluations for more than 60-months and still continuing to the present, fabricating debts, withholding transcripts needed to be gainfully employed, denying benefits; engaging debt-collection companies to harass, intimidate, vex, and threaten plaintiff for more than 4-years, racial slurs, epithets, comments, ridicule, jokes, stereotype, segregations,

68

disparate treatment, set-up-to-fail or frame-up tactics to examine patient without providing chaperon so as to discredit plaintiff's performance; denying plaintiff tools of the residency training, denial of contract, immunities, privileges of employment, etc because of plaintiff's race, age, and national origin, to which plaintiff was subjected for more than 6-years, all in their totality constitute "outrageous and severe" conduct that causes and or aggravated depression, anxieties, loss of sleep, social withdrawal, loss of enjoyment of life, suicidal ideations warranting multiple hospitalizations, increased frequent visits to medical doctors. Applying the Talley Id. and Robinson, Id. cases to this instant case, triable issue as to whether defendants engaged in outrageous conduct has been raised.

**(b).    Retaliatory Discharge:**

Retaliatory discharge for reasons offensive to civilized society and to public policy would seem at first to be a perfect candidate for the operative test of the second *Restatement*. The tort of retaliatory discharge has been recognized in no small part because it produces the outraged reaction in the courts, which is an element of the action for mental distress. Restatement 2d of Torts note 2, Sect.46 comment d: "Recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!" Where retaliatory discharge has been recognized as tortious, however, the public policy violation has been held to satisfy the first element of mental distress. E.g., Milton v. Illinois Bell Tel. Co., 101 Ill. App.3d 75, 427 NE2d 829 (1981), distinguishing Palmateer v. International Harvester Co., 85 Ill.App.3d 50, 406 NE2d 595 (1980) *aff'd in part, rev'd in part*, 85 Ill.2d 124, 421 NE2d 876 (1981) (premise that retaliatory discharge was not actionable overruled by state supreme court); Harless v. First Nat'l Bank, 169 W.Va. 673, 289 S.E.2d 692 (1982) (recovery for mental distress allowed).

**(c). Discharge & post-termination conduct as outrage:**

In Agarwal v. Johnson, 25 Cal.3d 932, 603 P.2d 58 (1979), false accusations concerning the employee's job performance causing discharge were one of the many factors that added up to outrageous conduct accompanied by racial discrimination, racial slurs, manipulation of working

69

conditions, and frustration of employee's effort to obtain board certification, license to practice and to have gainful employment and other economic advantages.

### (d). Intrusion , trespass and searching Plaintiff's premises as outrage:

Without consent of the plaintiff, Perales intruded into, trespassed, and searched plaintiff's premises. Here in this instant case, the Agarwal's *Id.* case is applicable to plaintiff's case because defendants intentionally had falsely accused plaintiff of nonexistent sexual harassments as pretext for discrimination and discharge but later admitted that their false sexual harassments were a hoax. They subjected plaintiff to disparate treatment and that reason for putting block on his transcript and terminating his STEER's residency training were false. Fabricated sexual harassment in order to prevent plaintiff from getting license and practicing his trade thus, constituting intentional outrageous conduct proximately causing plaintiff extreme psychic injuries, mental anguish, suicidal ideations and emotional distress precluding summary judgment for defendants.

Donovan purposefully calling and suborning the female patient to lie and make false report against plaintiff to the state medical board constitute intent to cause or knowing that such actions would result to serious emotional distress and constitutes outrageous and extreme actions that went all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community because purposefully fabricating debt and fabricating sexual harassments so as to destroy plaintiff's reputation, profession, and career based on race and national origin offends the conscience of a civilized society.

### COUNT 16
### Violation of Title VII Failure To Promote To Chief Resident Position

To establish a prima facie case of discrimination under Title VII based on failure to promote, the plaintiff must prove by a preponderance of the evidence that: 1) he is a member of protected group; 2) he applied for an available position; 3) for which he was qualified; 4) he was rejected despite his qualifications; 5) the position was filled by someone outside the protected group. St Hilaire v. The Pep Boys---Manny, Moe and Jack, 73 F.Spp.2d 1350 (SD Fla.1999).

The prongs: 1, 2, 3, 4 and 5 are undisputed because plaintiff is a member of minority group, applied for promotion to position of OEMRP's Chief Resident (CR), was qualified but was rejected despite his qualifications and the position was filled by someone—Caucasian who was junior to him, of less seniority and outside the protected group.

Defendants contended that Amadasu was not eligible for the position because the person whom they appointed was not on accelerated track but they failed to present: (1) evidence of executed UCMC's policy and procedure and criteria which barred someone on accelerated track from the position; (2) failed to present evidence that Amadasu applied for and was actually on the purported accelerated track. Defendants proffered reason is false, pretextual and pretext for discrimination because: (1) Amadasu never applied for and was never placed on accelerated track which was not accredited by ACGME and ABPM; (2) defendants told plaintiff that seniority was a criterion for promotion to CR position; (3) Clinical Phase, Academic Phase, and Practicum Phase are the only three tracks structure accredited by ACGME and ABPM. See [Ex.99 at IV(1, 2, 3, & 4]. The Exhibit 99, an excerpt from Graduate Medical Education, is a direct evidence that accelerated track is not accredited track in the ACGME-accredited OEMRP.

To establish prima facie case of race discrimination in federal agency's denial of promotion, African-American federal employee was not required to establish that a similarly situated person had been promoted into the position, and, thus, it was irrelevant whether the person ultimately selected was promoted to the position, hired from a pool of outside candidates, or laterally transferred; rather, the only relevant question was whether plaintiff employee was rejected for the position and a white person selected.. Cones v. Shalala, 199 F.3d 512 (C.A.D.C.2000). The all-Caucasian faculty, particularly Donovan had bias against black becoming CR as well as faculty member. It has been held: "The impermissible bias of a single individual at any state of the promoting process may taint the ultimate employment decision in violation of Title VII; this is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaning role in the promotion process. Bickerstaff v. Vassar College, 196 F.3d 435 (2nd Cir.1999) Departure from procedural regularity can raise a question in a Title VII action as to the good faith of a promotion process where the departure may reasonably affect the decision—Id. Evidence supported finding of delayed promotion for the purposes of 42 USC 1981 claim by African-American employee, where evidence showed that personnel actions by supervisor, including promoting white employees instead of plaintiff, and refusing to reclassify plaintiff to increase his chances for promotion, were racially motivated, Jackson v. City of St. Louis, 220 F.3d 894 (8th Cir.2000).

The CR position carried with it higher salary, supervision, added qualification for future positions. Because defendants- proffered reason is false, pretexual and pretex for discrimination, there are no genuine disputed issues of material fact, thus, plaintiff is entitled to judgment as matter of law

### COUNT 16
**Violation of Title VII Failure To Hire For Second-Yr
(PGY-2) Position In Family Practice Residency Program**
Plaintiff can establish prima facie case of discrimination under McDonnell-Douglas burden

shifting frame work, plaintiff must show that (1) he is a member of a protected class; (2) he applied for

and was qualified for the available position; (3) despite his qualifications, he was rejected; and (4)

either someone not of his protected class filled the position or the position remained vacant and the

employer continued to seek applicants. Cones v. Shalala, 199 F.3d 512 (C.A.D.C.2000)

The four prongs of the prima facie case are not in dispute, thus plaintiff is entitled to judgment

as matter of law.

### COUNT 16
**Violation of Title VII Failure To Hire For Faculty In Health Promotion**

Plaintiff can establish prima facie case of violation of Title VII failure to hire by showing that

plaintiff (1) belongs to the protected minority, (2) applied for and was/is qualified for the position; (3)

he was not hired for the position; and (4) either someone not of his protected class filled the position or

the position remained vacant and the employer continued to seek applicants. Cones v. Shalala, 199

F.3d 512, (C.A.D.C.2000). Defendants admitted that they hired a person who has been a member of

UC. (Herrmann Decln. #4). It has been held, "The very existence of a policy under which an employer

hires only persons who have been part of its regular complement sometimes constitutes evidence of

discrimination in violation of Title VII." Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572 (1st

Cir.1999). The validation of an employment criterion under Title VII involves a three-step process (or

the slightly different test under *Clady*): (1) the employer must first specify the particular trait or

characteristic which the selection device is being used to identify or measure: (2) the employer must then

determine that particular trait or characteristic is an important element of work behavior: and (3) finally, the

72

employer must demonstrate by professionally acceptable methods that the selection device is predictive of or significantly correlated with the element of work behavior identified in the second step. Association of Mexican-American Educators v. State of Cal., 195 F.3d 465 (9th Cir.1999). Ohio defendants failed to produce evidence that they followed the policy and procedure and criteria for selection and hiring faculty and they failed to produce evidence of the qualification of the person hire. Thus, material facts issues exist whether defendants comply with their selection and hiring policy and procedure and whether the person hired was more qualified than plaintiff precluding summary judgment.

## CONCLUSION

For the foregoing initial reasons, plaintiff prays this Court to stay decision on the defendants' motions and plaintiff's cross-motion for summary judgment pending when plaintiff file Rule 56(f) to obtain outstanding responses to his discovery requests from defendants to enable plaintiff file and serve supplemental memorandum and further affidavit or declaration pursuant to Rule 56(e).

Respectfully submitted,

Darlington Amadasu
Plaintiff Pro se

**CERTIFICATE OF SERVICE**
I hereby certify that true copy of the foregoing were served on Justin D. Flamm by delivery to receptionist and on John M. Grey, POB 12548, Austin Texas, 78711 by USPS mail on 05/31/05  06/31/05

73